GARCIA RAINEY BLANK & BOWERBANK LLP
    A LIMITED LIABILITY PARTNERSHIP
NORMA V. GARCIA, Cal. Bar No. 223512
ngarciaguillen@garciarainey.com
JEFFREY M. BLANK, Cal. Bar No. 217522
jblank@garciarainey.com
HUGO A. LOPEZ, Cal. Bar No. 315846
hlopez@garciarainey.com
695 Town Center Drive, Suite 700
Costa Mesa, CA 92626
Telephone:    (714) 382-7000
Facsimile:    (714) 784-0031

Attorneys for Plaintiffs
Clifford A. Rosen, MD and Ronald A. Christensen, MD.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLIFFORD A. ROSEN, an individual; RONALD A. CHRISTENSEN, an individual<br><br>Plaintiffs,<br><br>vs.<br><br>URBAN COMMONS, LLC, a Delaware Limited Liability Company; URBAN COMMONS 6TH AVE SEATTLE, LLC, a Delaware Limited Liability Company; URBAN COMMONS BATTERY PARK, LLC, a Delaware Limited Liability Company; CHICAGO ANALYTIC TRADING COMPANY, LLC, d/b/a LITTLERIVER CAPITAL, LLC, a Delaware Limited Liability Company; DIGITAL CAPITAL MARKETS, LLC, a Maryland Limited Liability Company; TAYLOR WOODS, an individual; HOWARD WU, an individual; C. BRIAN EGNATZ, an individual; and DOES 1 through 10, inclusive | **Case No.:** 8:20-cv-01973-JLS-DFM<br><br>**APPENDIX OF EXHIBITS IN SUPPORT OF PLAINTIFFS CLIFFORD A. ROSEN AND RONALD A. CHRISTENSEN'S APPLICATION FOR RIGHT TO ATTACH ORDER, ORDER FOR ISSUANCE OF WRIT OF ATTACHMENT, AND REQUEST FOR AN ORDER PERMITTING EXPEDITED DISCOVERY**<br><br>Date:          May 14, 2021<br>Courtroom:    6B, 6th Floor<br>Judge:        Hon. Douglas F. McCormick |

-1-

## APPENDIX OF EVIDENCE

In support of Plaintiffs Clifford A. Rosen ("Dr. Rosen") and Ronald A. Christensen's ("Dr. Christensen, collectively "Plaintiffs") Application For Right To Attach Order, Order For Issuance Of Writ of Attachment, And Request For An Order Permitting Expedited Discovery, Plaintiffs submit the following exhibits:

**EXHIBIT A**: January 6, 2020 Woods' correspondence from Taylor Woods on behalf of Urban Commons, LLC regarding investment opportunity in the Hilton Seattle Hotel.

**EXHIBIT B**: Document titled "Hilton Seattle Hotel Investment Opportunity" provided by Urban Commons, LLC to prospective investors.

**EXHIBIT C**: Dr. Clifford Rosen's signed Urban Commons 6th Ave. Seattle, LLC Subscription Agreement.

**EXHIBIT D**: Dr. Clifford Rosen's signed Urban Commons 6th Ave. Seattle, LLC Operating Agreement.

**EXHIBIT E**: May 17, 2020 Notice of Rescission Of Membership Interest Subscription Agreements in Urban Commons 6th Ave Seattle, LLC and Urban Commons Battery Park, LLC.

**EXHIBIT F**: June 6, 2020 Demand for Inspection of Books and Records of Urban Commons 6th Ave Seattle, LLC and Urban Commons Battery Park, LLC.

**EXHIBIT G**: June 21, 2020 Reply to Urban Commons LLC's Response to Demand for Inspection of Books and Records of Urban Commons 6th Ave Seattle, LLC and Urban

Commons Battery Park, LLC.

**EXHIBIT H**:  June 30, 2020 Demand for Rescission of Membership Interest Subscription Agreements in Urban Commons 6th Ave Seattle, LLC and Urban Commons Battery Park, LLC.

**EXHIBIT I**:  Dr. Ronald Christensen's signed Urban Commons 6th Ave. Seattle, LLC Subscription Agreement.

**EXHIBIT J**:  Dr. Ronald Christensen's signed Urban Commons 6th Ave. Seattle, LLC Operating Agreement.

**EXHIBIT K**:  Email correspondence from Dr. Ronald Christensen to defendant Taylor Woods regarding Dr. Christensen's signed Urban Commons 6th Ave. Seattle, LLC Subscription Agreement, signed Urban Commons 6th Ave. Seattle, LLC Operating Agreement and $250,000 wire transfer to purchase membership interest in Urban Commons 6th Ave. Seattle, LLC.

**EXHIBIT L**:  February 25, 2020 Investment Offering Memorandum from Urban Commons, LLC regarding investment opportunity to purchase the Wagner Hotel.

**EXHIBIT M**:  February 25, 2020 email correspondence from defendant Brian Egnatz regarding his involvement with Urban Commons, LLC, Urban Commons, LLC's inner workings, and Urban Commons, LLC's relationship with Eagle Hospitality Trust.

**EXHIBIT N**: Dr. Ronald Christensen's signed Urban Commons Battery Park, LLC Subscription Agreement.

**EXHIBIT O**:  Urban Commons Battery Park, LLC Operating Agreement.

**EXHIBIT P**:  Email correspondence from Tina Ellis to defendant Taylor Woods regarding questions Dr. Christensen had regarding his investments in Urban Commons 6th Ave Seattle, LLC and Urban Commons Battery Park, LLC

**EXHIBIT Q:** Notice of Deposition of Person Most Qualified for Urban Commons, LLC.

**EXHIBIT R:** Notice of Deposition of Person Most Qualified for Urban Commons 6th Ave Seattle, LLC.

**EXHIBIT S:**  Notice of Deposition of Person Most Qualified for Urban Commons Battery Park, LLC.

**EXHIBIT T:**  Notice of Deposition for defendant Taylor Woods.

**EXHIBIT U:**  Notice of Deposition for defendant Howard Wu.

**EXHIBIT V:**  Plaintiffs' Special Interrogatories to Defendant Urban Commons, LLC, Set One.

**EXHIBIT W:**  Plaintiffs' Special Interrogatories to Defendant Urban Commons 6th Ave Seattle, LLC, Set One.

**EXHIBIT X:**  Plaintiffs' Special Interrogatories to Defendant Urban Commons Battery Park, LLC, Set One.

APPENDIX OF EXHIBITS IN SUPPORT OF WRIT OF ATTACHMENT

1    **<u>EXHIBIT Y</u>:** Plaintiffs' Special Interrogatories to Defendant Taylor Woods, Set One.

2

3    **<u>EXHIBIT Z</u>:** Plaintiffs' Special Interrogatories to Defendant Howard Wu, Set One.

4

5

6 DATED:  April 16, 2021

7                 GARCIA RAINEY BLANK & BOWERBANK LLP

8

9

10

11        By   _____

12                   NORMA V. GARCIA

                  JEFFREY M. BLANK

13                   HUGO A. LOPEZ

                  Attorneys for Plaintiffs

14         Clifford A. Rosen, MD and Ronald Christensen, MD

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT A



Urban Commons, LLC
10250 Constellation Blvd., Suite 1750
Los Angeles, California, 90067
213-260-9111

January 6, 2020

Dear Prospective Investor:

Since its founding in 2008, Urban Commons has generated a phenomenal track record of significant returns in our value-add hospitality acquisitions and dispositions. Recently, Urban Commons become the sponsor of Eagle Hospitality Trust, a U.S. hospitality-focused public REIT in Singapore. As sponsor, Urban Commons will actively seek to act as a pipeline for growth, vending suitable assets to the REIT. Properties will generally be 3-4 Star full-service hotels located in the top 30 metropolitan statistical areas in the United States, specifically in markets that demonstrate substantial demand generators. Targeted assets will have a healthy NOI and an attractive cap rate (mid 7%) and would require a minimal property improvement plan.

We are pleased to present an exciting investment opportunity in vibrant Seattle, Washington. This offering is for the acquisition of the 256-room very high cash-flow Hilton Seattle Hotel. The 29-story hotel recently completed an extensive $16 million renovation in September 2019 that has drastically improved its overall product quality and guest experience. Other highlights include repositioned F&B facilities, refreshed meeting and event space, 17 brand new premium guest rooms on the top floor, and a prime location in the heart of downtown Seattle. Further to the attractiveness of the asset, we have the opportunity to purchase it for just $97.5MM, or $380k per door. This property is one of the highest quality products in the market and has very strong in-place performance following the renovation with 2020E NOI of $8.4MM which yields an outstanding 8.6% acquisition capitalization rate.

Key Investment Highlights:

- Up to $25MM of equity available for investment
- Ownership will be based on $40MM of total equity in the deal
  - E.g., a $4.0MM contribution would reflect 10% ownership
- Expected duration of the investment is 3-4 months
- Cash on cash return to investors targeted at 37%+ with targeted IRR at 100%+

Thank you for your consideration.

Sincerely,


Taylor Woods
Principal

EXHIBIT B



# Hilton Seattle Hotel
## Investment Opportunity



# EXECUTIVE SUMMARY

- Urban Commons is pleased to offer a compelling investment opportunity to participate in an equity investment in the Hilton Seattle Hotel

- The property offers 256 rooms with 17 brand new premium guestrooms on the top floor that replace previously underutilized meeting space. Guests will benefit from a full suite of amenities including:

  - Hilton Serenity Collection with exclusive Suite Dreams mattress
  - 49-inch flat-screen HDTV
  - Armchair
  - Beverage center with coffeemaker, ice bucket and mini-refrigerator
  - Spacious desk
  - WiFi access
  - In-room safe
  - Hair dryer
  - Room service from 6:00 am until midnight
  - Serenity Bath features the Mega-Rich line by Peter Thomas Roth

- The property has recently undergone an extensive $16 million renovation that has completely overhauled existing guestroom and guest bathroom spaces in addition to a full refresh of the lobby, restaurant, and public spaces

- The property also benefits from its ideal location in the heart of downtown Seattle while being directly connection to the Washington State Convention Center via underground concourse.

- We expect this investment to generate substantial returns for investors, with a base case expectation of 40%+

## Property Overview

### HILTON SEATTLE - PROPERTY OVERVIEW

| | |
|---|---|
| **ADDRESS**<br>1301 6th Avenue<br>Seattle, WA 98101 | **FRANCHISE**<br>Hilton (September 2026) |
| **YEAR OPENED / RENOVATED**<br>1970 / 2019<br>(Expected Renovation Completion:<br>Q3 2019) | **MANAGEMENT**<br>Unencumbered<br>(Currently Managed by<br>Stonebridge Companies) |
| **SIZE OF SITE**<br>21,600 SF | **MEETING SPACE**<br>3,875 SF |
| **GUEST ROOMS**<br>256 (Includes the recent addition<br>of 17 guest rooms) | **OWNERSHIP**<br>Fee Simple Condominium Interest |
| **FOOD & BEVERAGE**<br>Redtrees Restaurant + Bar | **EMPLOYMENT**<br>Union* |

*CBA was renegotiated and signed in 2018 and remains effective through 2021. Note that this is one of only six union hotels in downtown Seattle.

## HILTON SEATTLE - RENOVATION SUMMARY

| | |
|---|---|
| Interior | $13.5M |
| Exterior | $2.5M |
| **Total Renovation Spend** | **$16M** |

2

# OPPORTUNITY OVERVIEW

- Urban Commons has a phenomenal track record creating significant returns in our value-add hospitality acquisitions and dispositions

- Urban Commons is the sponsor of Eagle Hospitality Trust, a U.S. hospitality-focused public REIT in Singapore

- Urban Commons appetite for additional value-add acquisitions has grown significantly for suitable assets

  - Properties types are 3-4 star full-service hotels and be located within the top 30 metropolitan statistical areas, in markets that demonstrate significant demand generators

  - Mid-7% capitalization rate on a blended basis

  - Targeted assets either already demonstrate a healthy NOI at an attractive cap rate and would require a minimal PIP, or are value-add properties with a period of time to complete strategic improvements or initiatives

- The Hilton Seattle Hotel is an excellent fit for the REIT

  - The property is in great condition, and benefits both from the high-growth Seattle market generally as well as the optimal downtown location, providing a year-round demand driver

  - The property has excellent in-place cash flow at a very attractive cap rate

- Urban Commons has reached agreement to purchase the property for ~$97.5MM (8.6% capitalization rate on 2020E NOI)

- Upon sale, we expect to achieve a 7.0% exit capitalization rate

# HILTON SEATTLE HOTEL

- 256-room, full-service hotel with ample amenities including 3,875 square feet of meeting space, a full-service restaurant, a fitness center, business center, Executive Lounge, and sundry shop

- Strong in-place performance with 2020E NOI of $8.4MM

- The 29-story Hilton enjoys a highly visible location in the heart of downtown Seattle and benefits from an extensive $16 million renovation project that was completed in September 2019

- Seattle is a leading lodging market with compelling long-term fundamentals

  - Since 2010, the Seattle metro area has generated a 7.7% RevPar CAGR, outperforming the broader Top 25 US Markets (RevPAR CAGR of 5.6% over the same period

  - High barriers to entry due to the lack of available developable land in downtown Seattle along with a limited competitive new supply in the area means that demand is expected to meaningfully out-pace new supply over the next several years

- Additionally, the property is directly connected to the Washington State Convention Center which is currently undergoing a $1.7B, 1.4 million square-foot expansion that will draw significant hotel demand for the Seattle lodging market




4









# LOCATION OVERVIEW

- The broader Seattle area is one of the most dynamic gateway markets in the country, benefiting from an unprecedented level of economic expansion and exceptional long-term market fundamentals that have strengthened the region's status as a leading office investment market in the U.S. The region offers a well-educated workforce, excellent access to ports, superior transportation infrastructure and a low cost of doing business with no corporate income tax and low energy costs. The region has experienced remarkable growth over the past decade, driven by a diversified economic base including the aerospace, manufacturing, software development, healthcare, technology, life sciences and global trade industries.

- Seattle boasts a rich history of producing pioneering companies across a variety of industries. Fortune 500 companies born and raised in Seattle include Amazon, Boeing, Starbucks, and Costco. With over 167,000 tech jobs and more net millennial migration than any other U.S. city, Seattle has emerged as a recognized global technology hub.

- Seattle is in the midst of unparalleled expansion, with a record $4.8 billion in current construction activity downtown as of year-end 2018.

- Sea-Tac is the primary air transportation hub of the Pacific Northwest and is a major international gateway, serving 49.8 million passengers as the eight busiest U.S. airport.



# GUESTROOMS SUMMARY

- Hilton Seattle offers 256 contemporary guest rooms located on floors 14 to 29. All guest rooms feature large bay windows and offer views of the city, mountains or Elliott Bay. Parking is located on floors 1-9, the lobby is on floor 10, and there are no floors 11-13.

- The Hotel renovation included a complete overhaul of guest accommodations, including new window treatments and the creation of a window seat to optimize natural light from large bay windows and accentuate the Hotel's sweeping views, replacement of all case goods and soft goods, new carpet, wall vinyl and lighting, and new fixtures, finishes and lighting in bathrooms.

- Diamond and Gold HHonors members staying on the Executive Floors (24 to 29) have access to the Executive Lounge daily from 6:00 am until 8:00 pm. The Hotel will benefit from a completely new Executive Lounge on the 10th floor, including a variety of seating types and areas, televisions mounted throughout and a food and beverage serving area.

- The addition of 17 keys are replacing underutilized meeting space on the top floor of the Hotel, converting space previously yielding negligible net operating income into premium guest rooms with the best views that will be easily absorbed given the Hotel's historically high occupancy.

## GUEST ACCOMMODATIONS

| Room Type | Number of Rooms |
|---|---|
| King | 180 |
| Double/Double | 76 |
| **Total** | **256** |

## AMENITIES AND SERVICES

- Fitness Center
- Business Center
- Sundry Shop
- Concierge
- Leased Metropolitan Deli Café
- WiFi Access
- Digital Key (in Hilton Honors App)
- Luggage Storage
- Laundry/Valet Service
- Safety Deposit Box
- Self Parking



## FOOD & BEVERAGE OUTLETS

- Hilton Seattle offers signature dining at Redtrees Restaurant + Bar. The contemporary lobby restaurant showcases a casual setting with modern finishes and unique architectural elements.

- Redtrees serves American cuisine with a Pacific Northwest influence and is open daily for breakfast, lunch, dinner and cocktails from 6:30 am until midnight. The bar area is highlighted by a fireplace, large screen television and a variety of microbrews on tap.

- The renovation scope includes a new fireplace surround and lounge seating area, new restaurant seating and lighting, as well as a revitalized bar area, including updated bar design, lighting, seating and artwork.

- The intimacy of the event space at the Hilton Seattle is a competitive advantage for the Hotel as it allows for one group to take over the entire space.

redtrees | restaurant | bar




8

# MEETING & EVENT SPACE

- Hilton Seattle offers 3,875 square feet of dedicated meeting space on the lobby level, making it a leading venue for a wide range of events including small board meetings, conferences and weddings.

- Meeting space is equipped with WiFi and services including a full selection of audio/visual equipment, catering and event planning.

- The Hotel is also directly connected to the adjacent convention center.



## HILTON SEATTLE
### MEETING SPACE CAPACITY

| Name | Size (SF) |
|------|-----------|
| **Taku-Chinook** | **770** |
| Chinook | 374 |
| Taku | 396 |
| **Pacific Ballroom** | **3,105** |
| Windward | 1,575 |
| Leeward | 1,530 |
| **Total** | **3,875** |

9

URBAN commons

# HILTON SEATTLE – EXIT ANALYSIS

**Acquisition Information**

| | |
|---|---|
| Acquisition Cost | $97,500,000 |
| PIP and Capex | $2,500,000 |
| Entitlement Cost | $0 |
| Reserve | $0 |
| **Total** | **$100,000,000** |

**Finance Information**
**At Closing**

| | | |
|---|---|---|
| Cash Downpayment + Reserve | 40% | $40,000,000 |
| Purchase Loan | 60% | $60,000,000 |
| **Total** | | **$100,000,000** |

**Cash Flow Analysis**

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| EBITDA | $9,458,812 | $10,132,270 | $10,836,927 | $11,568,226 | $12,222,227 |
| Less: | | | | | |
| FFE Reserves (4% of Total Revenue) | $1,083,485 | $1,135,901 | $1,190,886 | $1,248,566 | $1,312,642 |
| Interest Expense - Interest Only (3.6%) | $2,160,000 | $2,160,000 | $2,160,000 | $2,160,000 | $2,160,000 |
| **Total Available Cash (Distributable Income)** | **$6,215,328** | **$6,836,369** | **$7,486,040** | **$8,159,660** | **$8,749,585** |
| **IRR (Annual Return on Capital based Only from Total Available Cash** | **15.5%** | **17.1%** | **18.7%** | **20.4%** | **21.9%** |
| **Value Projection at 7.0 CAP** | **$119,647,537** | **$128,519,553** | **$137,800,575** | **$147,423,711** | **$155,851,212** |
| **Profit (Calculated Only from Sales Value)** [1] | **$17,254,587** | **$25,949,162** | **$35,044,564** | **$44,475,237** | **$52,734,188** |
| ROI (Calculated Only from Sales Value) | 43.14% | 64.87% | 87.61% | 111.19% | 131.84% |

1. Includes 2% sale costs

# URBAN COMMONS' COMPANY OVERVIEW

Urban Commons is one of the nation's fastest growing private real estate development and investment management firms and provides a wide range of real estate offerings to a substantial and diversified client base that includes corporations, financial institutions and high-net-worth individuals. Founded in 2008, the firm is headquartered in Los Angeles, CA and has over 30 employees. The company holds assets in major real estate markets across the country.

## REAL ESTATE DEVELOPMENT

Specializing in hospitality, yet very diversified in all asset classes, we target acquisitions for under-managed-utilized assets in need of re-positioning/re- branding as well as ground-up urban smart growth[1] development. Development opportunities range from acquisition of raw land, to entitlements, renovations, and ground-up construction projects in prime locations.

## RE-POSITIONING / RE-BRANDING / EXPANSION

We focus on re-positioning and re-branding assets in need of improved management or better brand alignment in the hospitality sector to create greater market penetration and value. We thoroughly analyze economic data alongside local area statistics to assess viability for property re-alignment or expansion.

## INVESTMENT MANAGEMENT

We offer investment products across several major real estate asset classes through separately managed accounts for each of our privately held investment funds to a diverse set of institutional and high-net-worth individuals and families.



*The Wagner at Battery Park Hotel and Residences*

---

1. Smart growth is an urban planning and transportation theory that concentrates growth in compact walkable urban centers to avoid sprawl. Its sustainable development goals are to achieve a unique sense of community and place; expand the range of transportation, employment, and housing choices; equitably distribute the costs and benefits of development; preserve and enhance natural and cultural resources; and promote public health.

11

# URBAN COMMONS' BUSINESS STRATEGY

Urban Commons focuses on impacting under-managed and under-utilized assets by developing innovative and emerging properties to promote optimal economic, social and environmental returns.

Urban Commons deploys the firm's capital to help transform assets into sustainable and vibrant properties of choice and opportunity, while maintaining attractive investment opportunities. We work closely with municipalities, communities, and neighborhoods to ensure our developments optimize space and contain a variety of value added revitalization to the area.

Our ultimate objective is to build or enhance an aesthetically progressive project, with an eye on delivering tremendous long-term and short-term value for the community, our investors and other stakeholders. This approach ensures a constant market appeal, long-term investment value preservation and expansion, and exponential investor returns.

Urban Commons is committed to ensuring that our practices and standards are of the highest quality and that we meet or exceed the expectations of our partners and stakeholders. We are committed to producing quality, stability, transparency and economic opportunity.



# URBAN COMMONS' EXECUTIVE TEAM

- **Taylor Woods, Principal**. Woods brings experience and expertise in investor relations, generating lending capital for a variety of project types and borrowers, and operational management required to ensure accuracy, delivery, and transparency. Prior to Urban Commons, Woods founded, and ultimately sold, the nation's leading provider of end-to-end outsourced mortgage services, offering a comprehensive mortgage origination and secondary marketing solution on a private-label basis to more than 50 banks across the United States, ultimately  resulting in the origination and sale of billions of dollars in real estate assets and hundreds of thousands of transactions for the financial  institutions and their customers.

- **Howard Wu, Principal**. Wu has developed numerous multi-family, retail, hospitality, and office properties as well as thousands of entitlements for individual lots, custom homes and condominiums, particularly specializing in the densely populated California market. Wu's expertise and training is manifest in his skill for predicting market movements and opportunities, together with managing relationships with bankers, lenders, civic leaders, and in the identification and negotiation of properties with the highest returns. Additionally, Wu has a strict eye toward cost management and budgeting which ensures completion of projects well under plan with regard  to cost, and well above plan with regard to returns on investment.

- **John Jenkins Jr., Chief Operations Officer**. Jenkins Jr. has over 30 years of hospitality experience leading food and beverage operations, sales and marketing, revenue management, and rooms operations. Prior to Urban Commons, he was the General Manager of the Queen Mary Hotel. Prior to Queen Mary, he spent 25 years with Marriott Hotels where he ultimately was Resident Manager of the 2,000-room Marriott Marquis Hotel in Times Square, New York.

- **Douglas Kiel, Chief Financial Officer**. Kiel is an experienced Chief Financial Officer with a demonstrated history of working in the real estate industry and is skilled in land development, investor relations, business planning, retail, and financial operations. Prior to Urban Commons, Kiel was the CFO and COO for Laurus Corporation, a private real estate investment and development firm with a focus on hospitality, office, retail, and multifamily residential properties where he managed over $1B in real estate assets across 30+ projects that included extensive construction and renovation.

## PROFIT SHARE PROGRAM

**Management Fees – Aligned Incentives**

Urban Commons believes that our compensation as Manager should be based on Total Investor Annualized Return performance.  Therefore, our compensation is based entirely on a proportion of the total capital return ratio with consideration for total duration and total cash distributions (including distributions of operating income and from profit distributions as a result of capital events such as a sale or refinance).  Urban Commons will receive a share of total net distributable cash flow based on the total annualized return (calculated as total XIRR performance using the Excel formula for XIRR) and calculated at the time of final liquidation according to the total XIRR performance level reached on the scale below:

| Investor Annualized Return (XIRR) | Management Fee (% of total net distributable cash flow) |
|---|---|
| 0 – 15 % | 15% |
| 15.01 – 30 % | 20% |
| 30.01 – 45 % | 25% |
| 45.01 % + | 30% |

14



# URBAN COMMONS, LLC

**Managing Partners:**

Urban Commons, LLC

**Mailing Address:**

Urban Commons, LLC
10250 Constellation Blvd., Suite 1750
Los Angeles, CA 90067
www.urban-commons.com
contact@urban-commons.com

CONFIDENTIALITY AGREEMENT

This is a confidential document intended solely for your limited use and benefit in determining whether you desire to express further interest in an investment with the company. This document contains selected information pertaining to the company and does not purport to be a representation of the state of affairs of Urban Commons, LLC ("Urban Commons"), to be all-inclusive or to contain all or part of the information which prospective investors may require to evaluate a purchase of real property. All financial projections and information are provided for general reference purposes only and are based on assumptions relating to the general economy, market conditions, competition and other factors beyond the control of Urban Commons. Therefore, all projections, assumptions and other information provided and made herein are subject to material variation. All references to acreages, square footages and other measurements are approximations. Additional information will be made available to interested and qualified prospective investors. Neither Urban Commons nor any of their respective partners, directors, members, officers, affiliates or representatives make any representation or warranty, expressed or implied, as to the accuracy or completeness of this document or any of its contents and no legal commitment or obligation shall arise by reason of your receipt of this document or use of its contents.

Urban Commons expressly reserves the right, at its sole discretion, to reject any or all expressions of interest or offers to invest with the company, and/or to terminate discussions with any entity or person(s) at any time with or without notice which may arise as a result of review of this document. Urban Commons shall have no legal commitment or obligation to any entity or person(s) reviewing this document or making an offer to invest with the company unless and until written agreement(s) have been fully executed, delivered and approved by Urban Commons and obligations therein have been satisfied or waived.

By receipt of this document, you agree that this document and its contents are of a confidential nature, that you will hold and treat it in the strictest confidence and that you will not disclose this document or any of its contents to any other entity without the prior written authorization of Urban Commons. You also agree that you will not use this document or any of its contents in any manner detrimental to the interest of Urban Commons.

In this document, certain documents and other materials are described in summary form. These summaries do not purport to be complete nor necessarily accurate descriptions of the full agreements referenced. Interested parties are expected to review all such summaries and other documents of whatever nature independently and not rely on the contents of this document in any manner.

EXHIBIT C

## URBAN COMMONS 6TH AVE SEATTLE, LLC
## MEMBERSHIP INTEREST SUBSCRIPTION AGREEMENT

TO:     Urban Commons 6th Ave Seattle, LLC

I hereby irrevocably offer to purchase a membership interest (the "Interest") in Urban Commons 6th Ave Seattle, LLC, a Delaware limited liability company (the "Company"), for a purchase price of $ _250 000_____, upon the terms and conditions described below. The membership interest shall be calculated using my capital contribution divided by the total capital contribution of $40,000,000, which shall result in an ownership percentage of _0.625_ %. I agree to make an initial deposit of 25% of the purchase price for the Interest to the Company not later than January 10, 2019. I agree to pay the balance of the purchase price for the Interest to the Company not later than January 30, 2019. I will deliver to the Company the purchase price for the Interest in the manner set forth in Section 14 below.

I understand that up to 100% of the membership qualified purchasers may purchase interests in the Company in this offering. I further understand that the Company may terminate this offering at any time, that the Company, in its discretion, may accept or reject my subscription, provided that notification of such rejection must be given to me within 15 days after this Agreement, properly completed and signed by me, and full payment of the purchase price for the Interest is delivered to the Company, and that, if there is such rejection notification, the purchase price will be promptly returned to me without interest. The Company anticipates completing this offering by February 5, 2019.

I understand the Company will not use or apply the purchase price until the Company has raised the necessary funds from this offering. The funds raised from the offerings will be used to invest in an entity which shall acquire, own, operate, and eventually sell that certain property known as the Hilton Seattle, located at 1301 6th Avenue, Seattle, Washington (the "Property"). I further understand that (i) the purchase price will be deposited into an interest-bearing secure bank account and (ii) all interest earned on such account will be used by the Company to pay all cost and expenses (including, but not limited to, all legal, accounting and management costs and expenses) incurred in connection with this offering and the formation of the Company. The initial membership interests of the members will be reflected in the Operating Agreement for the Company. If this subscription is terminated, all funds raised by the Company will be returned to the applicable investors, together with any interest remaining on such funds following the payment of all costs and expenses.

I understand the Company is obtaining acquisition loans in an approximate aggregate amount of approximately $60,000,000 in order to acquire and refurbish the Property but that the terms for such financing have not yet been finalized.

I understand that the terms of the Interest and related agreements are set forth in the Operating Agreement for the Company, a copy of which has been or will be provided separately to me. The Company's acceptance of my subscription will be conditioned on my entering into the Operating Agreement and agreeing to be bound by all of its terms. I understand that the Operating Agreement for the Company will name Urban Commons, LLC as the sole manager of the Company (the "Manager") with exclusive authority and control over all Company decisions in entering into and managing real estate investments. The Operating Agreement will provide that each investor's capital will be returned at the time of a capital event(s) and prior to any profits from such capital event(s) being distributed to the members.

I understand that the purchase of the Interest involves certain risks, including, but not limited to, the risks identified on the **Schedule of Investment Risks** attached to this Agreement. I have carefully read and considered these risks before making this offer to purchase the Interest.

In connection with my subscription for and purchase of the Interest, I hereby represent and warrant to the Company and agree as follows:

1.      I am acquiring the Interest for my own account for investment and not with a view to or for sale in connection with any distribution of the Interest.

2.      In making this investment, I am relying upon my own investigation and analysis and have determined that the Interest is a suitable investment for me. The Company has made available to me information, and the opportunity to question its representatives, concerning the terms of this offering and the proposed investment of the Company in various real investments. I have been furnished with such information as I have requested. It has never been guaranteed or warranted by the Company, or any person connected with or acting on the Company's behalf, that I will be able to sell or liquidate the Interest in any specified period of time or that there will be any particular profit to be realized as a result of this investment. I have adequate means to provide for my current and expected financial needs and reasonable contingencies, can bear the economic risks (including a complete loss of the purchase price) associated with my purchase of the Interest and have no need for liquidity in this investment.

1

UC6th&Batt008772

3.       The Company has advised me that the Interest is not being registered under the Securities Act of 1933, as amended (the "1933 Act"), in reliance upon the exemption from the registration requirements provided by Section 4(2), Rule 506 of Regulation D and/or Regulation S under the 1933 Act, and are not being qualified or registered under any state securities laws in reliance upon applicable exemptions from the qualification and registration requirements.  I understand that no federal or state agency has made any finding or determination as to the fairness of this investment, nor any recommendation or endorsement of the Interest.  I understand that the Company is relying in part on my representations set forth in this Agreement for purposes of claiming such exemptions.  I understand the Company is under no obligation to register the Interest on my behalf.

4.       I agree that I, and any transferees of the Interest, shall be bound by the restrictions on transfers of the Interest which are described in this paragraph or are otherwise applicable under federal or state securities laws.  I also understand that any certificate representing the Interest will bear a legend substantially in the following form, and any legend appropriate to comply with applicable state securities laws, which I agree to abide by:

"THE MEMBERSHIP INTEREST REPRESENTED BY THIS CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 NOR REGISTERED OR QUALIFIED UNDER ANY STATE SECURITIES LAWS, AND MAY NOT BE SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS DULY QUALIFIED AND REGISTERED UNDER APPLICABLE STATE AND FEDERAL SECURITIES LAWS OR UNLESS, BASED ON AN OPINION OF COUNSEL OR OTHER EVIDENCE SATISFACTORY TO THE COMPANY, SUCH QUALIFICATION AND REGISTRATION ARE NOT REQUIRED."

I agree that stop transfer instructions prohibiting transfers of the Interest may be filed in the Company's records or issued to the Company's transfer agent as a means of preventing the sale or disposition of the Interest in violation of the restrictions and legends set forth in this paragraph above and that any transfer of the Interest or any portion thereof causing such a violation shall be void.

5.       The offer to sell the Interest was directly communicated to me by direct communication with the Company's director(s), officer(s) or manager(s), and I was not presented with or solicited by any leaflet, public promotional meeting, television advertisement or other form of general advertising.   (FILL IN THE FOLLOWING)   I am a citizen of _____ CANADA _____ or, if I am an entity, I was formed and exist under the laws of _____.

6.       I have a substantial preexisting personal or business relationship with the Company's management personnel and/or, by reason of my business or financial experience, or the business or financial experience of my management if I am an entity, am capable of evaluating the merits and risks of my purchase of the Interest and have the capacity to protect my interests in connection with this investment.

7.       I am an "Accredited Investor," as defined in Rule 501(a) of Regulation D under the 1933 Act, as follows (CHECK EACH APPLICABLE BOX--AT LEAST ONE MUST BE APPLICABLE AND CHECKED):

[✓]   (a)   I am a natural person whose individual net worth, or joint net worth with my spouse, including the estimated net fair market value of my principal residence, presently exceeds $1,000,000; and/or

[✓]   (b)   I am a natural person who had individual income, without that of my spouse, in excess of $200,000 in each of the two most recent years and reasonably expects to have income in excess of $200,000 in the current year; and/or

[✓]   (c)   I am a natural person who had joint income with my spouse in excess of $300,000 in each of the two most recent years and reasonably expects to have such joint income in excess of $300,000 in the current year; and/or

[ ]   (d)   I am (circle which one) a corporation, partnership, limited liability company, or organization described in Section 501(c)(3) of the Internal Revenue Code, not formed for the specific purpose of acquiring the Interest, with total assets in excess of $5,000,000; and/or

[ ]   (e)   I am a trust, not formed for the specific purpose of acquiring the Interest, with total assets in excess of $5,000,000 whose purchase is directed by a sophisticated person (i.e., a person who has such knowledge and experience in financial and business matters that he or she is capable of evaluating the merits and risks of this prospective investment); and/or

[ ]   (f)   I am any of the following (CIRCLE WHICH ONE):  a bank (as defined in Section 3(a)(2) of the 1933 Act), or a savings and loan association or other institution (as defined in Section 3(a)(5) of the 1933 Act), whether acting in an individual or fiduciary capacity; or a broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934; or an insurance company (as defined in Section 2(13) of the 1933 Act; or an investment company registered under the Investment Company Act of 1940; or a business development company (as defined in Section 2(a)(48) of the Investment Company Act of 1940; or a Small Business Investment Company licensed by the U.S. Small Business

2

UC6th&Batt008773

Administration under Section 301(c) or (d) of the Small Business Administration Act of 1958; or a plan established and maintained by a state, its political subdivisions or any agency or instrumentality of a state or its political subdivisions for the benefit of its employees, if such plan has total assets in excess of $5,000,000; or an employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary (as defined in Section 3(21) of such Act), which is either a bank, savings and loan association, insurance company or registered investment adviser or, if a self-directed plan, with investment decisions made solely by persons who are accredited investors; and/or

[ ]     (g)     I am an entity in which all of the equity owners are Accredited Investors.

8.     (CHECK THIS BOX IF APPLICABLE:     [✓]) The offer to sell the Interest was not made to me by the Company or its agents while I was in, and I have made this offer to buy the Interest and signed this Agreement when I have been outside of, the United States of America (which for purposes of this Agreement includes all of its states, territories and possessions and the District of Columbia).

9.     The information set forth in this Agreement is correct with respect to me as of the date of my execution of this Agreement. I will promptly notify the Company of any change in such information occurring before I am notified of the acceptance of my subscription by the Company and will provide any further supplementary information, which is requested by the Company.

10.     I hereby agree to indemnify the Company and its officers, directors, managers and agents against, and hold such parties harmless from, any and all liabilities, damages, costs or expenses, including, without limitation, those arising under federal or state securities laws, incurred on account of or arising out of: (a) any inaccuracy in my representations and covenants set forth herein; or (b) the disposition of any of portion of the Interest which I will receive, contrary to my foregoing representations and covenants.

11.     If a corporation, partnership, trust, limited liability company or other form of business entity, I am authorized and otherwise duly qualified to purchase and hold the Interest and have not been formed for the specific purpose of making an investment in the Company. If an undersigned individual is executing this Agreement, as well as all other related documents, on behalf of any entity, such individual represents that he or she is duly authorized to execute all such documents on behalf of that entity. If an individual, I am under no legal disability with respect to entering into this Agreement or purchasing the Interest.

12.     At the Company's request, I will promptly execute such other instruments or documents as may be reasonably required in connection with my purchase of the Interest. Whenever the context hereof so requires, use of either the masculine, feminine or neuter shall include the masculine, feminine and neuter, and use of the singular or the plural form shall include the singular and plural. This Agreement shall be governed by and construed in accordance with the laws of the State of California, excluding conflict of laws provisions. In any dispute or legal proceeding relating to the enforcement of rights under this Agreement, the prevailing party shall be entitled to recover its reasonable legal fees and costs. This Agreement constitutes the entire agreement between me and the Company, and supersedes any prior or contemporaneous representations, warranties, understandings or agreements, with respect to the subject matter of this Agreement. Neither this Agreement nor any provision hereof may be amended, waived or canceled except by an instrument in writing signed by the party against whom any such amendment, waiver or cancellation is sought. Any provision of this Agreement which is invalid or unenforceable under applicable laws shall be deemed inoperative to the extent it conflicts with such laws, but shall not affect the enforceability of other provisions of this Agreement. No waiver of any of the provisions of this Agreement shall be deemed a waiver of any other provision, whether or not similar, nor will any waiver constitute a continuing waiver.

13.     This Agreement shall be binding upon my heirs, executors, administrators, successors and assigns. However, my rights and obligations to purchase the Interest under this Agreement may not be assigned or transferred to any other person without the Company's prior written consent and any assignment or transfer in violation of this paragraph shall be void.

14.     The purchase price for the Interest will be paid in the form of a (wire, check, transfer, etc): _WIRE_.

3

UC6th&Batt008774

DATED: _29 | 01 | 2020_

Printed Name of Purchaser

_CLIFFORD foren_

Signature of Purchaser

Printed Name(s) and Title(s) or
Capacity(ies) of any Officer(s)
Partner(s) or Agent(s) Acting on
Behalf of Purchaser (if an entity):

Signature(s) of Any Officer(s),
Partner(s) or Agent(s) Acting
on Behalf of Purchaser if an entity:

Name: _____

Signature: _____

Title: _____

4

UC6th&Batt008775

**ADDITIONAL INFORMATION**

[COMPLETE EACH ITEM. MODIFY AS APPROPRIATE IF THERE ARE TWO OR MORE PURCHASERS.  ADD ADDITIONAL SHEETS IF NECESSARY TO COMPLETE ANY OF THE ITEMS.]

1.   Give the exact name(s) in which title to the Interest is to be taken:

_____CLIFFORD ROSEN_____

Indicate the type of ownership [check one]:

[✓] Individual ownership  (One signature required)

[ ] Joint Tenancy  (Both parties must sign)

[ ] Trust (Include name of trustee(s) and date trust was established)

[ ] Community Property  (Spouse or spouses named as record holder(s) must sign)

[ ] Partnership (Include copy of the statement of partnership or the partnership agreement or certificate authorizing signature)

[ ] Tenants in Common  (Both parties must sign)

[ ] Corporation (Include certified corporate resolution authorizing purchase and signature)

[ ] Other:_____

2.   If the purchaser is other than an individual purchasing for his or her own account (a corporation, trustee, partnership, custodian, estate, etc.), indicate the nature of the purchaser and the capacity of any person(s) signing above on behalf of the purchaser:

_____

_____

3.   Residence address of purchaser or principal business address (if an entity):

_____345 MAJESTIC DRIVE, LAKESHORE, ONTARIO, N8N 4L5, CANADA__

4.   Mailing address (if different than residence address) to be used for notices from the Company:

_____

5.   Telephone numbers:

Business:   (519) 567 6868

Residence:   (519) 735 8410

Facsimile:   (___) _____

6.   Tax ID Number (Social Security Number if an individual):____N/A____

7.   E-Mail Address:___Cliffordrosen@gmail.com___

5

UC6th&Batt008776

**ACCEPTANCE BY THE COMPANY**

URBAN COMMONS 6TH AVE SEATTLE, LLC hereby accepts the foregoing agreement and agrees to be bound by its provisions.

DATED: 29/01/2020

URBAN COMMONS 6TH AVE SEATTLE, LLC,
a California limited liability company

By:    Urban Commons, LLC,
      a Delaware limited liability company,
      Its Manager

By: _____
    Signature

_Alec Robinson_
Printed Name

_Authorized Signer_
Title

6

UC6th&Batt008777

# EXHIBIT D

**OPERATING AGREEMENT**
**FOR**
**URBAN COMMONS 6TH AVE SEATTLE, LLC**

THE MEMBERSHIP INTERESTS IN URBAN COMMONS 6TH AVE SEATTLE, LLC HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE FEDERAL SECURITIES ACT OF 1933, AS AMENDED, OR QUALIFIED WITH THE CORPORATIONS OR SECURITIES COMMISSIONER OF ANY STATE, AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION AND QUALIFICATION REQUIREMENTS OF SUCH LAWS.   ANY ATTEMPTED TRANSFER OF THE SECURITIES IS RESTRICTED BY SUCH LAWS AS WELL AS RESTRICTIONS DESCRIBED IN THE WITHIN AGREEMENT.

Dated:  December 16, 2019

66644.1

UC6th&Batt008728

Pltfs (UC) 000233

# TABLE OF CONTENTS

ARTICLE I:  DEFINITIONS ........................................................................... 1

ARTICLE II:  ORGANIZATION...................................................................... 7

ARTICLE III:  CAPITAL AND CAPITAL CONTRIBUTIONS............................... 8

ARTICLE IV:  ALLOCATIONS AND DISTRIBUTIONS ...................................... 10

ARTICLE V:  MANAGEMENT ....................................................................... 17

ARTICLE VI:  ACCOUNTS AND ACCOUNTING.............................................. 24

ARTICLE VII:  MEMBERSHIP-MEETINGS, VOTING, INDEMNITY ................... 27

ARTICLE VIII:  TRANSFERS OF MEMBERSHIP INTERESTS ......................... 28

ARTICLE IX:  DISSOLUTION AND WINDING UP............................................. 33

ARTICLE X:  INDEMNIFICATION AND ARBITRATION..................................... 34

ARTICLE XI:  INVESTMENT REPRESENTATIONS .......................................... 35

ARTICLE XII:  ATTORNEY-IN-FACT AND AGENT........................................... 36

ARTICLE XIII:  GENERAL PROVISIONS ......................................................... 37

UC6th&Batt008729

Pltfs (UC) 000234

# OPERATING AGREEMENT
## for
## URBAN COMMONS 6TH AVE SEATTLE, LLC

A.      THIS OPERATING AGREEMENT is effective as of December 16, 2019 by and among the individuals and entities identified on the signature pages attached to this Agreement and listed on Exhibit "A" attached hereto (referred to individually as a "Member" and collectively as the "Members").

B.      The Members have formed a limited liability company (the "Company") under the Delaware Limited Liability Company Act (currently Chapter 18 of Title 6 of the Delaware Code) (the "Act") by filing Articles of Organization with the Delaware Secretary of State.

C.      The Members enter into this Agreement to form and provide for the governance of the Company and the conduct of its business, and to specify their relative rights and obligations.

NOW THEREFORE, the Members agree as follows:

## ARTICLE I:

## DEFINITIONS

Capitalized terms used in this Agreement have the meanings specified in this Article or elsewhere in this Agreement.

1.1      "Act" is defined in Recital A.

1.2      "Adjusted Capital Account Deficit" is defined in Section 4.3(a).

1.3      "Affiliate" of a Member or a Manager means (a) any Person directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the Member or (b) the parent, spouse, sibling (including the sibling's spouse) or child (including the child's spouse) of any Member, Manager or Person with direct or indirect, through one or more intermediaries, control over any Member or Manager. The term "control" (including the terms "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through membership, ownership of voting securities, by contract, or otherwise.

1.4      "Agreement" means this Operating Agreement, as originally executed and as amended from time to time.

1.5      "Articles" is defined in Section 2.7.

66644.1

UC6th&Batt008730

Pltfs (UC) 000235

1.6   "Assignee" means a Person who has acquired a Member's Economic Interest in the Company, by way of a Transfer in accordance with the terms of this Agreement, but who has not become a Member.

1.7   "Assigning Member" means a Member who by means of a Transfer has transferred an Economic Interest in the Company to an Assignee.

1.8   "Available Capital Proceeds" means, with respect to any fiscal year, the net cash proceeds remaining in the Company and available for distribution derived from any Capital Event, after deduction of amounts required for all expenses incurred by the Company in connection with obtaining such proceeds and any amounts required for the payment of Company indebtedness, as determined by the Manager(s).

1.9   "Available Cash Flow" means all cash received from Company operations not including amounts received as Capital Contributions, reduced by all cash paid as determined by the Manager(s), including payment of Company indebtedness or amounts used to establish Reserves.

1.10   "Award" is defined in Section 8.5(a).

1.11   "Book Depreciation" is defined in Section 4.3(b).

1.12   "Bona Fide Offer" is defined in Section 8.3.

1.13   "Capital Account" means, with respect to any Member, the account reflecting the capital interest of the Member in the Company, consisting of the Member's initial Capital Contribution maintained and adjusted in accordance with Section 3.4.

1.14   "Capital Contribution" means, with respect to any Member, the amount of money and the fair market value of any property (other than money) at the time such property is contributed to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take "subject to" under IRC Section 752) (a) in consideration of a Capital Percentage Interest held by such Member or (b) as additional Capital Contributions made in accordance with Sections 3.2 and 3.3.  A Capital Contribution shall not be deemed a loan.

1.15   "Capital Event" means a sale or disposition of any of the Company's capital assets, the receipt of insurance and other proceeds derived from the involuntary conversion of Property, the receipt of proceeds from a refinancing of Property, or a similar event with respect to Property or assets.

1.16   "Capital Percentage Interest" means the ratio of a Member's total Capital Contributions to the total Capital Contributions by all Members expressed as a percentage and represents a Member's entire Economic Interest in the Company, including a Member's share of the Company's Profits, Losses and distributions of the Company's Available Cash Flow and Available Capital Proceeds pursuant to this Agreement.  The Membership List shall be amended upon the admission of any new Members to the Company and upon any adjustments to a Member's Capital Percentage

UC6th&Batt008731

Pltfs (UC) 000236

Interest pursuant to the terms and conditions of this Agreement.  The initial Capital Percentage Interests of the Members are listed on Exhibit "A" attached hereto.

1.17   "Code" or "IRC" means the Internal Revenue Code of 1986, as amended, and any successor provision.

1.18   "Company" means the company named in Section 2.2 of this Agreement.

1.19   "Company Minimum Gain" is defined in Section 4.3(c).

1.20   "Economic Interest" means a Person's share of (a) the Company's items of income, gain, deduction, loss and expense, and (b) the distributions of the Company's assets pursuant to this Agreement and the Act, but shall not include any other rights of a Member, including, without limitation, the right to vote or participate in the management of the Company, or any right to information concerning the business and affairs of the Company.

1.21   "Encumber" means the act of creating or purporting to create an Encumbrance, whether or not perfected under applicable law.

1.22   "Encumbrance" means, with respect to any Membership Interest, or any element thereof, a mortgage, pledge, security interest, lien, proxy coupled with an interest (other than as contemplated in this Agreement), option, or preferential right to purchase.

1.23   "Expiration Date" is defined in Section 8.5.

1.24   "Fair Option Price" is defined in Section 8.8.

1.25   "Gross Asset Value" means, with respect to any item of Property, the item's adjusted basis for federal income tax purposes, except as follows:

(a)   The initial Gross Asset Value of any item of property contributed by a Member to the Company shall be the fair market value of such property, as mutually agreed by the contributing Member and the Company;

(b)   The Gross Asset Value of any item of Property distributed to any Member shall be the fair market value of such item of Property on the date of distribution; and

(c)   The Gross Asset Value of any item of Property shall be subject to the adjustments specified in Section 4.9.

1.26   "Indemnified Party" is defined in Section 10.1.

1.27   "Initial Members" means those Persons whose names are set forth on the original Membership List maintained by the Company and are listed on Exhibit

UC6th&Batt008732

Pltfs (UC) 000237

"A" attached hereto.   A reference to an "Initial Member" means any of the Initial Members.

1.29   "Involuntary Transfer" means, with respect to any Membership Interest, or any element thereof, any Transfer or Encumbrance, whether by operation of law, pursuant to court order, foreclosure of a security interest, execution of a judgment or other legal process, or otherwise, including a purported transfer to or from a trustee in bankruptcy, receiver, or assignee for the benefit of creditors.

1.30   "IRR" means the annualized discount rate, determined by iterative process on a cumulative basis, which results in a net present value of zero, calculated and compounded on a monthly basis (as calculated using the XIRR function using Excel or equivalent accounting program), when such discount rate is applied to specified Capital Contributions from the date when such contributions were made and to specified distributions to the date such distributions were initially made.   A further explanation and sample Internal Rate of Return calculation is attached hereto as Exhibit "B."

1.31   "Liabilities" is defined in Section 10.1.

1.32   "Losses" is defined in Section 4.2.

1.33   "Major Decision" means the decision by the Manager(s) and a Majority of Members on behalf of the Company to do any of the following:   (a) the merger of the Company with another limited liability company or corporation, general partnership, limited partnership or other entity (except that any act which would cause a Member to incur personal liability for the obligations of the Company or its successor shall also require the consent of such Member); (b) any act which would make it impossible to carry on the ordinary business of the Company; (c) the confession of a judgment against the Company if the amount of the judgment is in excess of Three Hundred Thousand Dollars ($300,000) and is not covered by insurance carried by the Company; (d) the incurring of any capital expense that costs in excess of Five Hundred Thousand Dollars ($500,000) unless such capital expense had been accounted for in the operating budgets for the Company; (e) lending money to, or guaranteeing the debts or other obligations of, a Member or any other Person; (f) the filing of a petition in bankruptcy or the entering into of an arrangement among creditors; (g) the entering into, on behalf of the Company, of any transaction constituting a "reorganization"; (h) the amendment of this Agreement, provided that this Agreement cannot be amended without the consent of each Member adversely affected if such amendment would (i) appoint such Member as a Manager of the Company, (ii) modify the limited liability of a Member, or (iii) alter the interest of a Member in Profits, Losses, other items of income, gain, loss and deduction, or any Company distributions; and (i) the compromise of any obligation of a Member to make a Capital Contribution or return an improper distribution.

1.34   "Majority of Members" means a Member or Members whose Percentage Interests when taken together represent more than 50% of the Percentage Interests of all the Members.

1.35   "Manager" or "Managers" means the Person(s) named as such in Section 2.9 or the Persons who from time to time succeed any Person as a Manager and who, in either case, are serving at the relevant time as a Manager.

1.36   "Member" means an Initial Member or a Person who otherwise acquires a Membership Interest, as permitted under this Agreement, for as long as it continues to own such Membership Interest.

1.37   "Member Nonrecourse Debt" is defined in Section 4.3(d).

1.38   "Member Nonrecourse Debt Minimum Gain" is defined in Section 4.3(e).

1.39   "Member Nonrecourse Deductions" is defined in Section 4.3(f).

1.40   "Membership Interest" means a Member's rights in the Company, including the Member's Capital Percentage Interest and Percentage Interest, any right to Vote or participate in management, and any right to information concerning the business and affairs of the Company.

1.41   "Membership Interest Certificates" is defined in Section 7.3.

1.42   "Non-Contributing Member" is defined in Section 3.3.

1.43   "Nonrecourse Deductions" is defined in Section 4.3(g).

1.44   "Nonrecourse Liability" is defined in Section 4.3(h).

1.45   "Notice" means a written notice required or permitted under this Agreement. A notice shall be deemed given or sent when deposited, as certified mail or for overnight delivery, postage and fees prepaid, in the United States mails; when delivered to Federal Express, United Parcel Service or other similar overnight delivery service, for overnight delivery, charges prepaid or charged to the sender's account; when personally delivered to the recipient; when transmitted by electronic means, and such transmission is electronically confirmed as having been successfully transmitted; or when delivered to the home or office of a recipient in the care of a person whom the sender has reason to believe will promptly communicate the notice to the recipient.

1.46   "Option Date" is defined in Section 8.6.

1.47   "Partner" is defined in Section 6.6.

1.48   "Percent of the Members" means the specified total of Percentage Interests of all the Members.

1.49   "Percentage Interest" means the ownership interest of a Member in the Company from time-to-time, including a Member's right to Vote on Company matters.   The Membership List shall be amended upon the admission of any new

UC6th&Batt008734

Pltfs (UC) 000239

Members to the Company and upon any adjustments to a Member's Percentage Interest pursuant to the terms and conditions of this Agreement.  The initial Percentage Interests of the Members are listed on Exhibit "A" attached hereto.

1.50  "Person" means an individual, partnership, limited partnership, trust, estate, association, corporation, limited liability company, or other entity, whether domestic or foreign.

1.51  "Profits" and "Losses" are defined in Section 4.2.

1.52  "Property" means those certain properties knows as the Hilton Seattle at 1301 6th Ave., Seattle, Washington, 98101 and any other tangible or intangible, real or personal property contributed to or acquired or owned directly or indirectly by the Company.

1.53  "Proxy" means a written authorization signed or an electronic transmission authorized by a Member or the Member's attorney-in-fact giving another Person the power to exercise the voting rights of that Member.

1.54  "Regulations" ("Reg") means the income tax regulations promulgated by the United States Department of the Treasury and published in the Federal Register for the purpose of interpreting and applying the provisions of the Code, as such Regulations may be amended from time to time, including corresponding provisions of applicable successor regulations.

1.55  "Reserves" means the aggregate of reserve accounts that the Manager(s), in the Manager's(s') sole discretion, deems reasonably necessary to meet accrued or contingent liabilities of the Company, reasonably anticipated operating expenses, and working capital requirements.

1.56  "Secretary" is defined in Section 6.7(b).

1.57  "Selling Member" is defined in Section 8.4.

1.58  "Substituted Member" is defined in Section 8.9.

1.59  "Successor in Interest" means an Assignee, a successor of a Person by merger or otherwise by operation of law, or a transferee of all or substantially all of the business or assets of a Person.

1.60  "Tax Item" means each item of income, gain, loss, deduction, or credit of the Company.

1.61  "Tax Matters Member" means such Person as may be designated under Section 6.6.

1.62  "Transfer" means, with respect to a Membership Interest or any element of a Membership Interest, any sale, assignment, gift, Involuntary Transfer,

UC6th&Batt008735

Pltfs (UC) 000240

Encumbrance, or other disposition of such a Membership Interest or any element of such Membership Interest, directly or indirectly, other than an Encumbrance that is expressly permitted under this Agreement.

1.63   "Triggering Event" is defined in Section 8.4.

1.64   "Unreturned Capital Contributions" means, with respect to a Member, such Member's Capital Contributions that have not been returned to such Member pursuant to Section 4.12(a).

1.65   "Urban Commons" means Urban Commons, LLC, a Delaware limited liability company.

1.66   "Voluntary Contributing Member" is defined in Section 3.3.

1.67   "Vote" means a written consent or approval, a ballot cast at a meeting, or a voice vote.

1.68   "Voting Interest" means, with respect to a Member, the right to Vote or participate in management and any right to information concerning the business and affairs of the Company as provided under this Agreement. A Member's Voting Interest shall be directly proportional to that Member's Percentage Interest.

## ARTICLE II:

## ORGANIZATION

2.1   The Manager(s) has caused the Articles of Organization for the Company to be executed and filed with the Secretary of State of the State of California.

2.2   The name of the Company is **URBAN COMMONS 6TH AVE SEATTLE, LLC**.

2.3   The mailing address of the Company shall be at 10250 Constellation Blvd., Suite 1750, Los Angeles, California 90067, or such other place or places as may be determined by the Manager(s) from time to time.

2.4   The initial agent for service of process on the Company shall be Taylor Woods, whose mailing address is 10250 Constellation Blvd., Suite 1750, Los Angeles, California 90067.   The Manager(s) may from time to time change the Company's agent for service of process.

2.5   The purpose of the Company is to acquire, own, develop, redevelop, operate, manage, lease, finance and/or sell the Property, and to do all things necessary, convenient or incidental to that purpose, including, but not limited to, engaging a qualified, licensed third party manager to manage the operations of all or any portion of the Property.

UC6th&Batt008736

Pltfs (UC) 000241

2.6     The Members intend the Company to be a limited liability company under the Act.  Neither the Manager(s) nor any Member shall take any action inconsistent with the express intent of the parties to this Agreement.

2.7     The term of existence of the Company shall commence upon the acceptance of the Articles of Organization of the Company (the "Articles") by the Office of the California Secretary of State, and shall continue until the Company is dissolved and wound up pursuant to Article IX.

2.8     The names and addresses of the Initial Members are set forth on Exhibit "A" attached hereto.

2.9     The initial Manager of the Company will be Urban Commons:

> Urban Commons, LLC
> 10250 Constellation Blvd., Suite 1750
> Los Angeles, California  90067
> Phone No.:  (949) 400-8808
> Attention:  Taylor Woods

## ARTICLE III:

## CAPITAL AND CAPITAL CONTRIBUTIONS

3.1     Each Member shall contribute to the capital of the Company as the Member's initial Capital Contribution the money and property specified on the Subscription Agreement signed by the Member.  The initial fair market value of each item of contributed property (net of liabilities secured by such property) that the Company is considered to assume or to take "subject to" under IRC Section 752, is also set forth on the Subscription Agreement, together with the description and amount of these liabilities.  If a Member fails to make the initial Capital Contributions specified in this Section by January 25, 2016, that Member's entire Membership Interest shall terminate, and that Member shall indemnify and hold the Company and the other Members harmless from any loss, cost, or expense, including reasonable attorney fees caused by the failure to make the initial Capital Contribution.

3.2     The Manager(s) does not anticipate that any additional Capital Contributions will be required from the Members in addition to the initial Capital Contributions made by the Members in accordance with Section 3.1 above.  However, if the Manager(s) reasonably determines from time to time that additional cash capital contributions are needed to carry out the purposes of the Company (in connection with making such determination the Manager(s) will take into account any projected Available Cash Flow which may be available and the availability of additional financing to pay for any such items), the Manager(s) shall deliver written notice to the Members as to the amount of additional capital that is needed.  Within thirty (30) days after receipt of such written notice, each Member may, but without any obligation to do so, make

UC6th&Batt008737

Pltfs (UC) 000242

additional cash Capital Contributions to the Company in an amount equal to the product obtained by multiplying its Capital Percentage Interest by the additional capital amount that the Manager(s) reasonably determined is necessary to carry out the purposes of the Company.

3.3     If any Member (a "Non-Contributing Member") shall decide not to make any additional Capital Contribution within such thirty (30) day period then, within the following ten (10) day period, all or any portion of the contributing Members (such contributing Members who elect to make such additional Capital Contribution in place of the Non-Contributing Member shall be hereinafter referred to as a "Voluntary Contributing Member") may, pro rata in accordance with the Voluntary Contributing Members' aggregate Capital Percentage Interests, make such additional Capital Contribution(s) in place of the Non-Contributing Member; in which case the Capital Percentage Interests of the Non-Contributing Member and the Voluntary Contributing Members shall be adjusted so that each such Member's Capital Percentage Interest shall equal a fraction, which shall be expressed as a percentage, the numerator of which is the Capital Contributions, including the additional Capital Contributions, made by such Member and the denominator of which is the total Capital Contributions, including the additional Capital Contributions, made by all Members.   All such adjustments to the Capital Percentage Interests of the Non-Contributing Member and the Voluntary Contributing Members shall be effective immediately after the making by the Voluntary Contributing Members of the additional Capital Contributions in place of the Non-Contributing Member.

3.4     An individual Capital Account for each Member shall be maintained in accordance with the requirements of Reg Section 1.704-1(b)(2)(iv) and adjusted in accordance with the following provisions:

(a)     A Member's Capital Account shall be increased by that Member's Capital Contributions, that Member's share of Profits, and any items in the nature of income or gain that are specially allocated to that Member pursuant to Article IV.

(b)     A Member's Capital Account shall be increased by the amount of any Company liabilities assumed by that Member subject to and in accordance with the provisions of Reg Section 1.704-1(b)(2)(iv)(c).

(c)     A Member's Capital Account shall be decreased by (a) the amount of cash distributed to that Member; (b) the fair market value of any Property so distributed, net of liabilities secured by such distributed Property that the distributee Member is considered to assume or to be subject to under IRC Section 752; and (c) the amount of any items in the nature of expenses or losses that are specially allocated to that Member pursuant to Article IV.

(d)     A Member's Capital Account shall be reduced by the Member's share of any expenditures of the Company described in IRC Section 705(a)(2)(B) or which are treated as IRC Section 705(a)(2)(B) expenditures pursuant to

UC6th&Batt008738

Pltfs (UC) 000243

Reg Section 1.704-1(b)(2)(iv)(i) (including syndication expenses and losses nondeductible under IRC Sections 267(a)(1) or 707(b)).

(e)    If any Economic Interest (or portion thereof) is transferred, the transferee of such Economic Interest or portion shall succeed to the transferor's Capital Account attributable to such interest or portion.

(f)    The principal amount of a promissory note that is not readily traded on an established securities market and that is contributed to the Company by the maker of the note shall not be included in the Capital Account of any Person until the Company makes a taxable disposition of the note or until (and to the extent) principal payments are made on the note, all in accordance with Reg Section 1.704-1(b)(2)(iv)(d)(2).

(g)    Each Member's Capital Account shall be increased or decreased as necessary to reflect a revaluation of the Company's property assets in accordance with the requirements of Reg Sections 1.704-1(b)(2)(iv)(f) and 1.704-1(b)(2)(iv)(g), including the special rules under Reg Section 1.701-1(b)(4), as applicable. The provisions of this Agreement respecting the maintenance of Capital Accounts are intended to comply with Reg Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with those Regulations.

3.5    A Member shall not be entitled to withdraw any part of the Member's Capital Contribution or to receive any distributions, whether of money or property, from the Company except as provided in this Agreement.

3.6    No interest shall be paid on Capital Contributions or on the balance of a Member's Capital Account except as provided in this Agreement.

3.7    A Member shall not be bound by, or be personally liable for, the expenses, liabilities, or obligations of the Company except as otherwise provided in this Agreement.

3.8    Except as otherwise expressly provided in the Act or in this Agreement, no Member shall have priority over any other Member with respect to the return of a Capital Contribution or distributions or allocations of income, gain, losses, deductions, credits, or items thereof.

## ARTICLE IV:

## ALLOCATIONS AND DISTRIBUTIONS

4.1    (a)    Profits shall be allocated among the Members as follows:

1.    First, to the Members to the extent of, and in proportion to, the cumulative Losses, if any,

UC6th&Batt008739

Pltfs (UC) 000244

previously allocated to such Members pursuant to Sections 4.1(b)(2), reduced by any prior allocations of Profits pursuant to this Section 4.1(a)(1).

2.   Second, to the Members to the extent of, and in proportion to, the excess, if any, of the cumulative Losses previously allocated to each such Member pursuant to Section 4.1(b) (including any such Losses described in Section 4.1(b)(2)) over the cumulative Profits previously allocated to such Member pursuant to Section 4.1(a), until such excess is entirely eliminated with respect to each such Member.

3.   Third, to the Members in accordance with and to the extent of distributions made in accordance with Sections 4.11(a), 4.11(b), 4.11(c) and 4.11(d), in that order.

4.   Fourth, to the Members in accordance with and to the extent of distributions made in accordance with Sections 4.12(b), 4.12(c), 4.12(d) and 4.12(e), in that order.

(b)   Losses shall be allocated among the Members as follows:

1.   To the Members to the extent of and in proportion to the cumulative Profits, if any, previously allocated to such Members pursuant to Sections 4.1(a)(4) and (3), in that order, reduced in each case by any prior allocations of offsetting Losses pursuant to this Section 4.1(b)(1).

2.   Thereafter, one hundred percent (100%) to the Members based on the Members' Capital Percentage Interests.

(c)   Notwithstanding Sections 4.1(a) and (b) above, to the extent the Code requires that Losses be allocated other than as set forth in Section 4.1(b) ("Tax Loss Allocations"), gross income and Profits shall be allocated so as to minimize as quickly as possible the difference between the balances in a Member's Capital Account reflecting such Tax Loss Allocations and what the Capital Account balances would be absent such Tax Loss Allocations.

4.2   As used in this Agreement, "Profits and Losses" means, for each fiscal year or other period specified in this Agreement, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance

with IRC Section 703(a), including all Tax Items required to be stated separately pursuant to IRC Section 703(a)(1), with the following adjustments:

(a)     Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses shall be added to such taxable income or loss;

(b)     Any expenditures of the Company described in IRC Section 705(a)(2)(B) or treated as IRC Section 705(a)(2)(B) expenditures pursuant to Reg Section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Profits or Losses shall be subtracted from such taxable income or shall increase such loss;

(c)     Gain or loss resulting from any disposition of Property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the fair market value of the Property disposed of, notwithstanding that the adjusted tax basis of such Property differs from its fair market value;

(d)     In lieu of depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Book Depreciation for such fiscal year or other period, computed in accordance with the definition of "Book Depreciation" in Section 4.3(b); and

(e)     Notwithstanding the foregoing provisions of this Section 4.2, any items of income, gain, loss, or deduction that are specially allocated shall not be taken into account in computing Profits or Losses under Section 4.1.

4.3     The following definitions shall apply with respect to this Article IV.

(a)     "Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year of the Company, after such Member's Capital Account has been adjusted as follows: (1) the Member's Capital Account shall be increased by the amount of such Member's share of Company Minimum Gain and Member Nonrecourse Debt Minimum Gain; and (2) the Member's Capital Account shall be decreased by the amount of the items described in Reg Sections 1.704-1(b)(2)(ii)(d)(4), (5), and (6).

This definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Reg Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently with that Regulation.

(b)     "Book Depreciation" means, with respect to any item of Property for a given fiscal year, a percentage of depreciation or other cost recovery deduction allowable for federal income tax purposes for such item during that fiscal year equal to the result (expressed as a percentage) obtained by dividing (1) the fair market value of that item at the beginning of the fiscal year (or the acquisition date during the

UC6th&Batt008741

Pltfs (UC) 000246

fiscal year), by (2) the federal adjusted tax basis of the item at the beginning of the fiscal year (or the acquisition date during the fiscal year). If the adjusted tax basis of an item is zero, the Manager(s) may determine Book Depreciation, provided that the Manager(s) does so in a reasonable and consistent manner.

(c)   "Company Minimum Gain" has the meaning set forth in Reg Section 1.704-2(d)(1).

(d)   "Member Nonrecourse Debt" is defined in Reg Section 1.704-2(b)(4).

(e)   "Member Nonrecourse Debt Minimum Gain" for a fiscal year of the Company means the net increase in Minimum Gain attributable to Member Nonrecourse Debt, determined as set forth in Reg Section 1.704-2(i)(2).

(f)   "Member Nonrecourse Deductions" has the meaning set forth in Reg Section 1.704-2(i)(2). For any fiscal year of the Company, the amount of Member Nonrecourse Deductions with respect to a Member Nonrecourse Debt equals the net increase during that fiscal year in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt during that fiscal year, reduced (but not below zero) by the amount of any distributions during such year to the Member bearing the economic risk of loss for such Member Nonrecourse Debt if such distributions are both from the proceeds of such Member Nonrecourse Debt and are allocable to an increase in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, all as determined according to the provisions of Reg Section 1.704-2(i)(2). In determining Member Nonrecourse Deductions, the ordering rules of Reg Section 1.704-2(j) shall be followed.

(g)   "Nonrecourse Deductions" has the meaning set forth in Reg Section 1.704-2(c).  The amount of Nonrecourse Deductions for a Company fiscal year equals the net increase in the amount of Company Minimum Gain during that fiscal year, reduced (but not below zero) by the aggregate amount of any distributions during that fiscal year of proceeds of a Nonrecourse Liability that are allocable to an increase in Company Minimum Gain.

(h)   "Nonrecourse Liability" is defined in Reg Section 1.752-1(a)(2).

4.4.   The following special allocations shall be made in the following order:

(a)   Company Minimum Gain Chargeback.   If there is a net decrease in Company Minimum Gain during a fiscal year, each Member shall be allocated, before any other allocation under this Section, items of Company income and gain for such fiscal year equal to such Member's share of the net decrease in Company Minimum Gain as determined in accordance with Reg Section 1.704-2(g)(2).

UC6th&Batt008742

Pltfs (UC) 000247

(b)      Member Nonrecourse Debt Minimum Gain Chargeback. If there is a net decrease in Member Nonrecourse Debt Minimum Gain during a fiscal year, any Member with a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt as of the beginning of such fiscal year shall be allocated items of Company income and gain for such year (and, if necessary, subsequent years) equal to that Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain. A Member's share of net decrease in Member Nonrecourse Debt Minimum Gain shall be determined pursuant to Reg Section 1.704-2(i)(3). A Member shall not be subject to the foregoing chargeback to the extent permitted under Reg Section 1.704-2(i)(4).

(c)      Qualified Income Offset. If any Member unexpectedly receives an adjustment, allocation, or distribution described in Reg Sections 1.704-1(b)(2)(ii)(d)(4), (5), or (6), such Member shall be allocated items of Company income and gain (consisting of a pro rata portion of each item of Company income, including gross income and gain for such fiscal year) in an amount and manner sufficient to eliminate the Adjusted Capital Account Deficit created by such adjustment, allocation, or distribution.

4.5      Nonrecourse Deductions, as defined in Reg Section 1.704-2(c), for any fiscal year of the Company shall be allocated to the Members in the same proportion as Losses are allocated under Section 4.1(b)(2), provided that any Member Nonrecourse Deductions for any fiscal year or other period shall be allocated to the Member who bears (or is deemed to bear) the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Reg Section 1.704-2(i)(2).

4.6      Any unrealized appreciation or unrealized depreciation in the values of Property distributed in kind to Members shall be deemed to be Profits or Losses realized by the Company immediately prior to the distribution of the Property and such Profits or Losses shall be allocated to the Capital Accounts in the same proportions as Profits are allocated under Section 4.1.  Any Property so distributed shall be treated as a distribution to the Members to the extent of the fair market value of the Property, less the amount of any liability secured by and related to the Property. Nothing contained in this Agreement is intended to treat or cause such distributions to be treated as sales for value.  For the purposes of this Section 4.6, "unrealized appreciation" or "unrealized depreciation" shall mean the difference between the fair market value of such Property and the Company's federal adjusted tax basis for such Property.

4.7      Any item of income, gain, loss, or deduction with respect to any Property (other than cash) that has been contributed by a Member to the capital of the Company, or that has been revalued pursuant to the provisions of Section 3.4(g), and that is required or permitted to be allocated to such Member for income tax purposes under IRC Section 704(c) in order to take into account the variation between the tax basis of such Property and its fair market value at the time of its contribution, shall be

UC6th&Batt008743

Pltfs (UC) 000248

allocated solely for income tax purposes in the manner required or permitted under IRC Section 704(c) using the "traditional" method described in Reg Section 1.704-3(b), except that any other method allowable under applicable Regulations may be used for any contribution of Property with respect to which there is agreement among the contributing Member and the Manager(s) (and, if the Manager(s) and the contributing Member are Affiliates, a Majority of Members who are not Affiliates of the Manager(s)).

4.8     In the case of a Transfer of an Economic Interest during any fiscal year of the Company, the Assigning Member and Assignee shall each be allocated Profits or Losses based on the number of days each held the Economic Interest during that fiscal year.  If the Assigning Member and Assignee agree to a different proration and advise the Manager(s) of the agreed proration before the date of the Transfer, Profits or Losses from a Capital Event during that fiscal year shall be allocated to the holder of the Interest on the day such Capital Event occurred.  If an Assignee makes a subsequent Assignment, said Assignee shall be considered an "Assigning Member" with respect to the subsequent Assignee for purposes of the aforesaid allocations.

4.9     (a)     The Gross Asset Value of all Property shall be adjusted as of the following times: (i) the acquisition of an interest or additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (ii) the distribution of money or other Property (other than a de minimis amount) by the Company to a Member as consideration for an Economic Interest in the Company, and (iii) the liquidation of the Company within the meaning of Reg Section 1.704-1(b)(2)(ii)(g); provided, however, that adjustments under clauses (i) and (ii) above shall be made only in the event of a revaluation of Property under Section 3.4(g) in accordance with Reg Section 1.704-1(b)(2)(iv)(f);

(b)     The Gross Asset Value of Property shall be increased or decreased to reflect adjustments to the adjusted tax basis of such Property pursuant to IRC Section 732, IRC Section 733, or IRC Section 743, subject to the limitations imposed by IRC Section 755 and Reg Section 1.704-1(b)(2)(iv)(m); and

(c)     If the Gross Asset Value of an item of Property has been determined or adjusted pursuant to Section 1.25 or Paragraph (a) or (b) of this Section 4.9, such Gross Asset Value shall be adjusted by the Book Depreciation, if any, taken into account with respect to such Property for purposes of computing Profits and Losses.

4.10    It is the intent of the Members that each Member's allocated share of Company Tax Items be determined in accordance with this Agreement to the fullest extent permitted by IRC Sections 704(b) and 704(c).  Notwithstanding anything to the contrary contained in this Agreement, if the Company is advised that, as a result of the adoption of new or amended regulations pursuant to IRC Sections 704(b) and 704(c), or the issuance of authorized interpretations, the allocations provided in this Agreement are unlikely to be respected for federal income tax purposes, the Manager(s) is hereby granted the power to amend the allocation provisions of this Agreement, on advice of

UC6th&Batt008744

Pltfs (UC) 000249

accountants and legal counsel, to the minimum extent necessary to cause such allocation provisions to be respected for federal income tax purposes.

4.11   Available Cash Flow, excluding revenues or proceeds from a Capital Event or the dissolution of the Company, shall be distributed among the Members at least annually as determined by the Manager(s) as follows:

(a)   Eighty-five percent (85%) to the Members based on the Members' Capital Percentage Interests pro rata and fifteen percent (15%) to Urban Commons if the IRR on the aggregate Capital Contributions made by the Members is equal to fifteen percent (15%) or less;

(b)   Eighty percent (80%) to the Members based on the Members' Capital Percentage Interests pro rata and twenty percent (20%) to Urban Commons if the IRR on the aggregate Capital Contributions made by the Members is greater than fifteen percent (15%) but not more than thirty percent (30%);

(c)   Seventy-five percent (75%) to the Members based on the Members' Capital Percentage Interests pro rata and twenty-five percent (25%) to Urban Commons if the IRR on the aggregate Capital Contributions made by the Members is greater than thirty percent (30%) but not more than forty-five percent (45%); and

(d)   Seventy percent (70%) to the Members based on the Members' Capital Percentage Interests pro rata and thirty percent (30%) to Urban Commons if the IRR on the aggregate Capital Contributions made by the Members is greater than forty-five percent (45%).

4.12   All revenues or proceeds from a Capital Event or the dissolution of the Company shall be distributed among the Members as determined by the Manager(s) as follows:

(a)   First, to the Members pro rata in proportion to the Members' Unreturned Capital Contributions until each Member has recovered his or her Unreturned Capital Contributions;

(b)   Thereafter, eighty-five percent (85%) to the Members based on the Members' Capital Percentage Interests pro rata and fifteen percent (15%) to Urban Commons if the IRR on the aggregate Capital Contributions made by the Members is equal to fifteen percent (15%) or less;

(c)   Eighty percent (80%) to the Members based on the Members' Capital Percentage Interests pro rata and twenty percent (20%) to Urban Commons if the IRR on the aggregate Capital Contributions made by the Members is greater than fifteen percent (15%) but not more than thirty percent (30%);

(d)   Seventy-five percent (75%) to the Members based on the Members' Capital Percentage Interests pro rata and twenty-five percent (25%) to Urban

UC6th&Batt008745

Pltfs (UC) 000250

Commons if the IRR on the aggregate Capital Contributions made by the Members is greater than thirty percent (30%) but not more than forty-five percent (45%); and

(e)   Seventy percent (70%) to the Members based on the Members' Capital Percentage Interests pro rata and thirty percent (30%) to Urban Commons if the IRR on the aggregate Capital Contributions made by the Members is greater than forty-five percent (45%).

4.13   The distribution procedures in Sections 4.11 and 4.12 are further described (and examples of such procedures are provided) in Exhibit "B" attached hereto.  If, as a result of the IRR increasing above a threshold percentage and thus causing the distribution percentages to be adjusted as described in Sections 4.11 and 4.12, the total distributions to the Members (other than Urban Commons) are reduced below the distributions that would be made to such Members if the IRR had not increased above such threshold percentage and the distribution percentages adjusted, the Manager(s) shall continue to make distributions to the Members based on the distribution percentages at the lower IRR level until such time as the total distributions to the Members (other than Urban Commons) are greater at the higher IRR level and adjusted percentages then such distributions would be if the IRR had not increased above such threshold percentage.

4.14   If the proceeds from a sale or other disposition of an item of Property consist of Property other than cash, the value of that Property shall be as reasonably determined by the Manager(s) based on the current fair market value of the Property.  If such non-cash proceeds are subsequently reduced to cash, such cash shall be taken into account by the Manager(s) in determining Available Cash.

4.15   Notwithstanding any other provisions of this Agreement to the contrary, when there is a distribution in liquidation of the Company, or when any Member's interest is liquidated, all items of income and loss first shall be allocated to the Members' Capital Accounts under this Article IV, and other credits and deductions to the Members' Capital Accounts shall be made before the final distribution is made.  The final distribution to the Members shall be made as provided in Section 9.2(d) of this Agreement.  The provisions of this Section 4.14 and Section 9.2(d) shall be construed in accordance with the requirements of Reg Section 1.704-1(b)(2)(ii)(b)(2).

4.16   For purposes of allocating Profits and Losses under this Article IV, adjusting Capital Accounts and complying with applicable IRC and Reg Sections, the terms "Member" and "Members" shall be deemed to include Urban Commons.

## ARTICLE V:

## MANAGEMENT

5.1   The business of the Company shall be managed by the Persons named as Manager(s) in Section 2.9 or any successors, selected as provided in Section

5.3.  The Manager(s) may, but need not, be Members.  If any of the Managers ceases to serve as a Manager (whether due to death, disability, dissolution or otherwise), then the remaining Manager(s) shall have all of the management power and authority of the Manager(s) as set forth in this Agreement.   Except as otherwise provided in this Agreement, all decisions concerning the management of the Company's business shall be made by the majority Vote of the Managers, if more than one Manager exists, and the Manager(s) shall have full, complete and exclusive authority, power, and discretion to manage and control the business, property and affairs of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities with respect to the management of the Company's business, property and affairs on such basis and in such manner as determined by the Manager(s).   In carrying out the purposes of the Company described in Section 2.5, the Manager(s)'s responsibilities shall include, but not be limited to, acquiring, developing, constructing, operating, managing and directing the affairs of the Property; overseeing the marketing and sale of the Property; managing the accountants with respect to the preparation of tax returns and other tax and financial matters; obtaining appropriate insurance; and managing any leasing activities on the Property.

Without limiting the generality of the foregoing and in connection with the Manager(s) fulfilling its obligations under this Agreement, provided that all Major Decisions have been approved by a Majority of Members, the Manager(s) shall have power and authority on behalf of the Company:

(a)   To acquire tangible or intangible, real or personal property from any Person, and to develop, renovate, improve, lease, subdivide, sell, assign, convey or otherwise transfer title to any portion of, or interest in, Property.   In connection with the management and operation of the Property, the Manager(s) shall retain, enter into contracts with and pay any management company providing management services for the Property fair market rates from a portion of Property revenue and net operating income according to industry standards for providing such services;

(b)   To purchase, lease or otherwise acquire or obtain the use of machinery, equipment, tools, staff and personnel, and material, and other types of property that may be deemed necessary or desirable in connection with carrying on the business of the Company;

(c)   To borrow money for the Company from banks, other lending institutions, the Members, Affiliates of the Members or any other Person (as hereinafter defined) on such terms as the Manager(s) deems appropriate, and in connection with such borrowing, to hypothecate, encumber, and grant security interests in the assets of the Company to secure repayment of the borrowed sums, to have the Company guaranty or become surety for repayment of the borrowed sums or to have the Company indemnify any Member against any personal liability for repayment of the borrowed sums to the extent such Member guarantees repayment of the borrowed sums.  No debt shall be contracted or liability incurred by or on behalf of the Company

UC6th&Batt008747

Pltfs (UC) 000252

except by the Manager(s), or to the extent permitted under this Agreement, by agents or employees of the Company expressly authorized by the Manager(s) to contract such debt or incur such liability;

(d)     To prepay in whole or in part, refinance, recast, increase, modify, consolidate, correlate, or extend, on such terms as the Manager(s) may deem proper, any debts of the Company;

(e)     To purchase (i) liability and other insurance to protect the Property, the business of the Company and the Members and Manager(s); (ii) wrap insurance policies in connection with construction of improvements on the Property; and (iii) any other insurance that the Manager(s) deem proper for the Company, consistent with industry standards for other companies engaging in similar businesses.

(f)     To hold and own any Property in the name of the Company;

(g)     To invest any Company funds temporarily (by way of example but not limitation) in time deposits, short-term government obligations, commercial paper, or other low risk type investments;

(h)     To sell or otherwise dispose of, whether or not in the ordinary course of business, all or substantially all of the assets of the Company as part of a single transaction or plan so long as the disposition is not in violation of or a cause of a default under any other agreement to which the Company may be bound or in contravention of state law;

(i)     To execute on behalf of the Company all instruments and documents, including, without limitation: checks; drafts; notes and other negotiable instruments; mortgages, or deeds of trust; guaranties; dispositions of Property; assignments; bills of sale; leases; management agreements; construction contracts; partnership agreements; operating agreements of other limited liability companies; intercreditor agreements; reliance letters; economic disclosure letters; UCC documents and resolutions; easement agreements; guarantees; pledge and security agreements; purchase and sale agreements; any kind of third party service agreements; subordination agreements; and any other instruments or documents necessary, in the opinion of the Manager(s), to the best interests of the business of the Company;

(j)     To employ or engage the services of accountants, accounting firms, legal counsel, law firms, managing agents, development managers, property managers, brokers or other companies or employees or agents to perform services for the Company and to compensate them from Company funds in such manner and on such basis as reasonably determined by the Manager(s);

(k)     To enter into any and all other reasonable agreements on behalf of the Company, with any other Person for any purpose, in such forms as the Manager(s) may approve;

UC6th&Batt008748

Pltfs (UC) 000253

(l)     To adjust, compromise, settle or refer to arbitration any claims in favor of or against the Company or any nominee of the Company or any property held or owned by the Company or its nominee, and to institute, prosecute and defend any legal proceedings as the Manager(s) shall deem advisable;

(m)    To effect the sale, exchange or other disposition of all, or substantially all, of the Company's assets in the liquidation and winding up of the business of the Company upon its duly authorized dissolution and/or in accordance with Section 5.1(h), above;

(n)     To authorize any Manager, acting alone, to exercise any of the rights, powers and/or authority of the Manager(s) under this Agreement and to bind the Company; and

(o)     To do and perform all other acts as deemed necessary or appropriate by Manager(s) in connection with the conduct of the Company's business.

Unless authorized to do so by the Manager(s), no attorney-in-fact, employee, or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable pecuniary for any purpose.

5.2     Urban Commons shall serve as the initial Manager of the Company until Urban Commons' resignation as Manager.   Urban Commons is a member managed limited liability company with Howard Wu and Taylor Woods currently being the only members of Urban Commons.   During any period that Urban Commons is serving as the Manager of the Company, all Major Decisions of the Company shall require the unanimous approval of Howard Wu and Taylor Woods as the managing members of Urban Commons prior to approving any Major Decisions on behalf of the Company, as well as approval by a Majority of Members.   In the event of any dispute between Howard Wu and Taylor Woods that prevents Howard Wu and Taylor Woods from reaching an unanimous decision with respect to any Major Decisions of the Company requiring the unanimous approval of Howard Wu and Taylor Woods, said dispute shall be resolved by submission to binding arbitration in Los Angeles, California using applicable arbitration procedures of JAMS located in Los Angeles County, California in accordance with its rules and procedures regarding commercial disputes.

5.3     Each Manager, other than the initial Manager, shall be appointed by the Manager(s) or, if there is no Person serving as a Manager at that time, by a Majority of Members for (a) a term expiring with the appointment of a successor, or (b) a term expiring at a definite time specified by the Manager(s) or, if applicable, a Majority of Members in connection with such appointment.   A Manager, other than the initial Manager, may be removed on the vote of a Majority of Members.   For purposes of this Section 5.3, if the Manager is also a Member, the Manager's Percentage Interest shall not be taken into account in determining whether a Majority of Members have voted to remove the Manager.   The initial Manager may be removed solely for cause (as

UC6th&Batt008749

Pltfs (UC) 000254

specifically defined in subsections (i)-(iv) below by the affirmative vote of a Majority of Members at a meeting called expressly for that purpose, or by the written consent of a Majority of Members.  Such Members must deliver to the initial Manager a written notification of removal stating in reasonable detail the cause for that action ("Removal Notice").  The only grounds for removal for cause shall be either (i) any willful misconduct or material breach; or (ii) any fraud, gross negligence or willful misconduct in the performance by Manager of its obligations or covenants under this Agreement; or (iii) the Manager's making a Major Decision without first obtaining the affirmative vote or written consent of a Majority of Members, or (iv) Taylor Woods or Howard Wu shall no longer, due to death, disability or any other reason, actively and reasonably carry out or direct the performance by Urban Commons of the Manager's duties under this Agreement.  The initial Manager may not be removed for financial performance reasons unless said financial performance results from any of the causes described in subsections (i)-(iv) above.

Except as otherwise provided in this Section, if within twenty (20) days after its receipt of a Removal Notice (or longer, if such situation cannot by its nature be cured in twenty (20) days and the initial Manager has actively commenced and diligently continues to pursue a cure for the situation), the initial Manager fails to cure the situation described in subsections (i), (ii), (iii) or (iv) that gave rise to such Removal Notice, the Members may elect a new Manager by the affirmative vote or written consent of a Majority of Members.  The initial Manager may, within twenty (20) days after its notification in writing of its removal for cause, file an objection with the Company that its removal was not justified.  If its objection is timely filed, the question of whether its removal was justified shall be submitted to arbitration under Section 10.2 below on an expedited basis in Los Angeles, California using applicable arbitration procedures of JAMS located in Los Angeles County, California.   If such Rules conflict or are inconsistent with any provision of this Agreement, the provisions of this Agreement shall prevail.

The parties shall use commercially reasonable efforts to cause the arbitration to be completed no later than sixty (60) days after it was commenced.  Each party waives any right that it may have to any substantive review of any arbitration award by the courts of the jurisdiction in which the arbitration is conducted and agrees that the award of the arbitrators in any such arbitration proceedings shall be final and without any right of appeal.  The arbitration award may be entered as a final judgment in the court of any jurisdiction in which such entry shall be recognized under applicable law.   Any arbitration award shall include an award of costs of the arbitration and attorneys' fees to the prevailing party.

The refusal or failure of any party to appear at or participate in any hearing or other portion of any arbitration proceeding pursuant to this Section shall not prevent any such hearing or proceeding from going forward, and the arbitrator is empowered to make its decision or render an award ex parte that shall be binding on the non-appearing party as fully as though that party had participated in the hearing or proceeding.

UC6th&Batt008750

Pltfs (UC) 000255

5.4     Actions of the Managers, if more than one Manager, shall be taken at meetings or as otherwise provided in this Section 5.4 by a majority of the Managers. No regular meetings of the Managers need be held.

The transactions of the Managers at any meeting, however called or noticed, or wherever held, shall be as valid as though transacted at a meeting duly held after call and notice and if, either before or after the meeting, each Manager not present signs a written waiver of notice or a consent to the holding of such meeting or an approval of the minutes of such meeting.

Any action required or permitted to be taken by the Managers under this Agreement may be taken without a meeting if a majority of the Managers individually or collectively consent in writing to such action.

Managers may participate in the meeting through the use of a conference telephone or similar communications equipment, provided that all Managers participating in the meeting can hear one another.

The Managers shall keep or cause to be kept with the books and records of the Company full and accurate minutes of all meetings, notices and waivers of notices of meetings, and all written consents to actions of the Managers.

5.5     It is acknowledged that the Manager(s) have other business interests to which the Manager(s) devote part of the Managers'(s') time.   The Manager(s) shall devote to the Company such time as may be reasonably necessary for the proper performance of all duties hereunder and shall be bound by the duty of good faith and fiduciary duty in its dealings with the Company and the Members, but the Manager(s) shall not be required to devote full time to the performance of such duties. Nothing in this Agreement shall be deemed to restrict in any way the rights of the Manager(s) or any Member, or of any Affiliate of the Manger(s) or any Member, to conduct any other business or activity whatsoever, and the Manager(s) or any Member shall not be accountable to the Company or to any Member with respect to that business or activity even if the business or activity competes with the Company's business.   The organization of the Company shall be without prejudice to their respective rights (or the rights of their respective Affiliates) to maintain, expand, or diversify such other interests and activities and to receive and enjoy profits or compensation therefrom.  Each Member waives any rights the Member might otherwise have to share or participate in such other interests or activities of the Manager(s) or any other Member or the Manager(s) or Member's Affiliates.

5.6     The Manager(s) shall preside at all meetings of Members.  The Manager(s) may provide for additional officers of the Company and shall establish the powers and duties of all other officers and the compensation of all Company officers, provided that such powers and duties are consistent with the authority granted to the Manager(s) in this Agreement.  The signature of any Manager shall be necessary and

sufficient to convey title to any Property owned, either directly or indirectly through one or more entities, by the Company or to execute any promissory notes, trust deeds, mortgages or other instruments of hypothecation, or to execute any other documents or instruments approved by the Manager(s), and all of the Members agree that a copy of this Agreement may be shown to the appropriate parties in order to confirm the same, and further agree that the signature of a Manager shall be sufficient to execute any documents necessary to effectuate this or any other provision of this Agreement.

5.7    The Manager(s) shall cause all assets of the Company, whether real or personal, to be held in the name of the Company.

5.8    All funds of the Company shall be deposited in one or more accounts with one or more recognized financial institutions in the name of the Company, at such locations as shall be determined by the Manager(s). Withdrawal from such accounts shall require the signature of a Manager, or such other Person or Persons as the Manager(s) may designate.

5.9    In the event that a majority vote of the Manager(s) cannot be achieved on any matter requiring such a vote pursuant to this Article, then such impasse shall be broken by the Vote of a Majority of Members.

5.10    The Manager(s) may, on behalf of the Company and with the consent of a Majority of the Members, purchase or provide goods or services from the Manager(s), any Member and/or any of their Affiliates; provided that the amounts paid for, and other terms relating to the furnishing of, such goods or services may not be materially less advantageous to the Company than the amounts and terms for and upon which similar goods or services could be obtained or furnished in the same geographic area to or from good quality corporations or business enterprises which are not the Manager(s), a Member and/or their Affiliates.   The foregoing authorization shall also apply to a sale or disposition of substantially all of the Company's assets to the Manager(s), any Member and/or any Affiliate prior to or following dissolution or upon winding-up or liquidation of the Company.   Amounts paid to the Manager(s), any Member and/or any of their Affiliates either for goods or services in transactions authorized pursuant to this Section 5.10 shall be treated for all purposes as amounts paid to non-Members and any compensation or reimbursement received by any Member from any such Affiliate shall belong to it and not to the Company.

5.11    The Manager(s) shall not be liable, responsible, or accountable, in damages or otherwise, to any Member or to the Company for any act performed by the Manager(s), except for fraud, gross negligence, willful misconduct, or an intentional breach of this Agreement.   The Company shall indemnify the Manager(s) for any act performed by the Manager(s), except for fraud, gross negligence, willful misconduct or an intentional breach of this Agreement.

5.12    The Company hereby agrees to promptly reimburse the Manager(s) and any Affiliate of the Manager(s) for all reasonable and actual out-of-pocket costs

66644.1

UC6th&Batt008752

Pltfs (UC) 000257

incurred by them with respect to providing oversight and management of the Company, and for otherwise providing administrative services to the Company in connection with the offering of Membership Interests or in performing functions and services for the Company and otherwise in pursuit of the Company's business.  With respect to the operations of the Company following the acquisition of the Property, it is anticipated that the reasonable and actual out-of-pocket costs incurred by the Manager(s) in fulfilling their obligations under this Agreement shall be reimbursed from the cash flow from the Property but to the extent such costs are not paid as part of the Property expenses, then the Company shall reimburse the Manager(s) for such reasonable and actual out-of-pocket costs.

# ARTICLE VI:

## ACCOUNTS AND ACCOUNTING

6.1    Complete books of account of the Company's business, in which each Company transaction shall be fully and accurately entered, shall be kept at the Company's principal executive office and at such other locations as the Manager(s) shall determine from time to time and shall be open to inspection and copying on reasonable Notice by any Member or the Member's authorized representatives during normal business hours. The costs of such inspection and copying shall be borne by the Member.

6.2    Financial books and records of the Company shall be kept on the method of accounting adopted by the Company for federal income tax purposes.  The financial statements of the Company shall be prepared in accordance with standard accounting principles and shall be appropriate and adequate for the Company's business and for carrying out the provisions of this Agreement.  The fiscal year of the Company shall be January 1 through December 31.

6.3    At all times during the term of existence of the Company, and beyond that term if the Manager(s) deem it necessary, the Manager(s) shall keep or cause to be kept the books of account referred to in Section 6.2, together with:

(a)    A current list of the full name and last known business or residence address of each Member, together with the Capital Contribution and the share in Profits and Losses of each Member;

(b)    A current list of the full name and business or residence address of each Manager;

(c)    A copy of the Articles for the Company, as may be amended from time to time;

UC6th&Batt008753

Pltfs (UC) 000258

(d)     Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six most recent taxable years;

(e)     An original executed copy or counterparts of this Agreement, as may be amended from time to time;

(f)     Any powers of attorney under which the Articles or any amendments to the Articles were executed;

(g)     Financial statements of the Company for the six most recent fiscal years; and

(h)     The books and Records of the Company as they relate to the Company's internal affairs for the current and past four fiscal years.

(i)     If the Manager(s) deem that any of the foregoing items shall be kept beyond the term of existence of the Company, the repository of said items shall be as designated by the Manager(s).

6.4     At the end of each fiscal year the books of the Company shall be closed and examined and statements reflecting the financial condition of the Company and its Profits or Losses shall be prepared, and a report thereon shall be issued by the Company's certified public accountant.   Copies of the financial statements shall be given to all Members.   In addition, the Manager(s) shall deliver to the Members within twenty (20) days following the end of each month, copies of such financial statements and performance reports regarding the previous month, as may be prepared in the ordinary course of business, by the Manager(s), the property manager or accountants selected by the Manager(s).   Upon request of any Member, the Manager(s) shall deliver to each Member, within one hundred twenty (120) days after the end of the fiscal year of the Company, a financial statement that shall include:

(a)     A balance sheet and income statement, and a statement of changes in the financial position of the Company as of the close of the fiscal year;

(b)     A statement showing the Capital Account of each Member as of the close of the fiscal year and the distributions, if any, made to each Member during the fiscal year. Members holding at least seventy percent (70%) of the Capital Percentage Interests may request interim balance sheets and income statements, and may, at their own discretion and expense, obtain an audit of the Company books by certified public accountants selected by them; provided, however, that not more than one such audit shall be made during any fiscal year of the Company.

6.5     Within ninety (90) days after the end of each taxable year of the Company or as soon thereafter as reasonably practicable, the Manager(s) shall send to each of the Members all information necessary for the Members to complete their

UC6th&Batt008754

Pltfs (UC) 000259

federal and state income tax or information returns and a copy of the Company's federal, state, and local income tax or information returns for such year.

6.6    Taylor Woods shall act as Tax Matters Member ("Partner") of the Company pursuant to IRC Section 6231(a)(7).

6.7    The Partner is hereby authorized to do the following:

(a)    Keep the Members informed of administrative and judicial proceedings for the adjustment of Company items (as defined in IRC Section 6231(a)(3)) at the Company level, as required under IRC Section 6223(g) and the implementing Regulations;

(b)    Enter into settlement agreements under IRC Section 6224(c)(3) and applicable Regulations with the Internal Revenue Service or the Secretary of the Treasury (the "Secretary") with respect to any tax audit or judicial review, in which agreement the Tax Matters Member may expressly state that such agreement shall bind the other Members, except that such settlement agreement shall not bind any Member who (within the time prescribed under the Code and Regulations) files a statement with the Secretary providing that the Tax Matters Member shall not have the authority to enter into a settlement agreement on behalf of such Member;

(c)    On receipt of a notice of a final Company administrative adjustment, to file a petition for readjustment of the Company items with the Tax Court, the District Court of the United States for the district in which the Company's principal place of business is located, or the United States Court of Federal Claims, all as contemplated under IRC Section 6226(a) and applicable Regulations;

(d)    File requests for administrative adjustment of Company items on Company tax returns under IRC Section 6227(b) and applicable Regulations; and, to the extent such requests are not allowed in full, file a petition for adjustment with the Tax Court, the District Court of the United States for the district in which the Company's principal place of business is located, or the United States Court of Federal Claims, all as contemplated under IRC Section 6228(a); and

(e)    To take any other action on behalf of the Members or the Company in connection with any administrative or judicial tax proceeding to the extent permitted by law or regulations, including retaining tax advisers (at the expense of the Company) to whom the Tax Matters Member may delegate such rights and duties as deemed necessary and appropriate.

(f)    To take appropriate actions to achieve the most preferred tax benefits and advantages for the Members where possible.

UC6th&Batt008755

Pltfs (UC) 000260

## ARTICLE VII:

## MEMBERSHIP-MEETINGS, VOTING, INDEMNITY

7.1     There shall be only one class of membership and no Member shall have any rights or preferences in addition to or different from those possessed by any other Member except as specifically provided for in Article IV.  Members shall have the right and power to appoint, remove, and replace Manager(s) and officers of the Company to the extent permitted under Article V and the right to Vote on all other matters with respect to which this Agreement requires or permits such Member action.  Each Member shall Vote in proportion to the Member's Percentage Interest as of the governing record date, determined in accordance with Section 7.2.  If a Member has assigned all or part of the Member's Economic Interest to a Person who has not been admitted as a Member, the Assigning Member shall Vote in proportion to the Percentage Interest that the Assigning Member would have had, if the assignment had not been made.

7.2     The record date for determining the Members entitled to receive Notice of any meeting, to Vote, to receive any distribution, or to exercise any right in respect of any other lawful action, shall be the date set by the Manager(s) or by a Majority of Members; provided that such record date shall not be more than sixty (60), or less than five (5) days prior to the date of the meeting or such distributions, as the case may be, and not more than sixty (60) days prior to any other action.

7.3     The Company may, but shall not be required, to issue certificates evidencing Membership Interests ("Membership Interest Certificates") to Members of the Company.  Once Membership Interest Certificates have been issued, they shall continue to be issued as necessary to reflect current Membership Interests held by Members. Membership Interest Certificates shall be in such form as may be approved by the Manager(s), shall be manually signed by the Manager(s), and shall bear conspicuous legends evidencing the restrictions on Transfer and the purchase rights of the Company and Members set forth in Article VIII.  All issuances, re-issuances, exchanges, and other transactions in Membership Interests involving Members shall be recorded in a permanent ledger as part of the books and records of the Company.

7.4     Meetings of the Members may be called by the Manager(s) and upon the written request of Member(s) holding seventy percent (70%) or more of the Capital Percentage Interests.  The call shall state the nature of the business to be transacted.  Notice of any such meeting shall be given to all Members not less than five (5) days nor more than thirty (30) days prior to the date of such meeting.  Whenever the vote or consent of Members is permitted or required under this Agreement, such vote or consent may be given at a meeting of Members in person or by telephone or may be given by means of a written consent signed by Members holding the requisite percentage of Percentage Interests.  Except as otherwise expressly provided in this Agreement, the vote or consent of Members holding a majority of the Percentage

UC6th&Batt008756

Pltfs (UC) 000261

Interests whether given in person, by telephone or by means of a written consent shall control.

7.5     Each Member may authorize any Person or Persons to act for him by Proxy on all matters in which a Member is entitled to participate, including waiving notice of any meeting, or voting or participating at a meeting.  Every Proxy must be signed by the Member or its attorney-in-fact.  No Proxy shall be valid after the expiration of eleven (11) months from the date thereof unless otherwise provided in the Proxy. Every Proxy shall be revocable at the pleasure of the Member executing it unless otherwise provided in the Proxy.

7.6     Each meeting of Members shall be conducted by the Manager(s) or such other Person as the Manager(s) may appoint pursuant to such rules for the conduct of the meeting as the Manager(s) deem appropriate.  Unless otherwise agreed upon, all such meetings shall be held at the principal offices of the Company.

7.7     No Member acting solely in the capacity of a Member is an agent of the Company, nor can any Member acting solely in the capacity of a Member bind the Company or execute any instrument on behalf of the Company.  Accordingly, each Member shall indemnify, defend, and save harmless each other Member and the Company from and against any and all loss, cost, expense, liability or damage arising from or out of any claim based upon any action by such Member in contravention of the first sentence of this Section 7.7.  This Section 7.7 supersedes any authority granted to the Members pursuant to the Act.

7.8     The Members acknowledge and agree that they shall not owe any fiduciary duty towards each other and each hereby waives any such fiduciary duty that may exist (whether express or implied) under law.


## ARTICLE VIII:

## TRANSFERS OF MEMBERSHIP INTERESTS

8.1     A Member may withdraw from the Company at any time by giving Notice of withdrawal to all other Members at least ninety (90) days before the effective date of withdrawal. Withdrawal shall not release a Member from any obligations and liabilities under this Agreement accrued or incurred before the effective date of withdrawal. A withdrawing Member shall divest the Member's entire Membership Interest before the effective date of withdrawal in accordance with and subject to the provisions of this Article VIII.

8.2     Except as expressly provided in this Agreement, a Member shall not transfer any part of the Member's Membership Interest, whether now owned or later acquired, unless (a) the Member delivers Notice of such Transfer to the Company, (b) the Member provides such documentation and information regarding the Transfer as

requested by the Manager(s), (c) the Manager(s) approve the transferee's admission to the Company as a Member upon such Transfer, which approval may be granted or withheld in the Manager's(s') sole discretion, (d) the Member and its assignee execute such documents and instruments as required by the Manager(s), (e) the Membership Interest to be transferred, when added to the total of all other Membership Interests transferred in the preceding twelve (12) months, will not cause the termination of the Company under the Code, and (f) the Transfer does not violate any restrictions in any loan documents to which the Company is a party.  No Member may Encumber or permit or suffer any Encumbrance of all or any part of the Member's Membership Interest unless such Encumbrance has been approved in writing by the Manager(s) which approval may be granted or withheld in the Manager's(s') sole discretion.  Any Transfer or Encumbrance of a Membership Interest without such approval shall be void. Notwithstanding any other provision of this Agreement to the contrary, a Member who is a natural person may transfer all or any portion of his or her Membership Interest to immediately family members of such Member, to an entity that is owned or controlled directly or indirectly by immediately family members or to a revocable trust created for the benefit of the Member, or any combination between or among the Member, the Member's spouse, and the Member's issue.  As used herein, immediate family members shall include such Member's parents, spouse, siblings, children and grandchildren.  Each Member hereby acknowledges the reasonableness of the prohibition contained in this Section 8.2 in view of the purposes of the Company and the relationships of the Members.

8.3    If a Member wishes to transfer any or all of the Member's Membership Interest pursuant to a Bona Fide Offer (as defined below), the Member shall give Notice to all other Members at least thirty (30) days in advance of the proposed Transfer, indicating the terms of the Bona Fide Offer and the identity of the offeror.  The Company and the other Members shall have the option to purchase the Membership Interest proposed to be transferred at the price and on the terms provided in this Agreement.  If the price for the Membership Interest is other than cash, the fair value in dollars of the price shall be established in good faith by the Company.  For purposes of this Agreement, "Bona Fide Offer" means an offer in writing setting forth all relevant terms and conditions of purchase from an offeror who is ready, willing, and able to consummate the purchase and who is not an Affiliate of the transferring Member.  For thirty (30) days after the Notice is given, the other Members shall have the right to purchase a part of the Membership Interest offered in the proportion that the Member's Capital Percentage Interest bears to the total Capital Percentage Interests of all of the Members who choose to participate in the purchase, on the terms stated in the Notice, for the lesser of (a) the price stated in the Notice (or the price plus the dollar value of noncash consideration, as the case may be) and (b) the price determined under the appraisal procedures set forth in Section 8.8.

If the Members do not exercise the right to purchase all of the Membership Interest, then, with respect to the portion of the Membership Interest that the Members do not elect to purchase, that right shall be given to the Company for an additional thirty (30) day period, beginning on the day that the Members' right to

UC6th&Batt008758

Pltfs (UC) 000263

purchase expires.  The Company shall have the right to purchase, on the same terms, the remaining portion of the Membership Interest of the offering Member; provided, however, that the participating Members and the Company may not, in the aggregate, purchase less than the entire interest to be sold by the offering Member.

If the other Members and the Company do not exercise their rights to purchase all of the Membership Interest, the offering Member may, within ninety (90) days from the date the Notice is given and on the terms and conditions stated in the Notice, sell or exchange that Membership Interest to the offeror named in the Notice. Unless the requirements of Section 8.2 are met, other than the requirement for approval by the Manager(s), the offeror under this section shall become an Assignee, and shall be entitled to receive only the share of Profits or other compensation by way of income and the return of Capital Contribution to which the assigning Member would have been entitled.

8.4     On the happening of any of the following events ("Triggering Events") with respect to a Member, the other Members and the Company shall have the option to purchase the Membership Interest of such Member ("Selling Member") at the price and on the terms provided in Section 8.8 of this Agreement:

(a)     The bankruptcy, or withdrawal of a Member, or the winding up and dissolution of a corporate Member, or merger or other corporate reorganization of a corporate Member as a result of which the corporate Member does not survive as an entity; provided that the remaining Members have elected to continue the business of the Company as provided in Section 9.1(a).

(b)     The failure of a Member to make the Member's initial Capital Contribution pursuant to the provisions of Article III of this Agreement.

(c)     The occurrence of any other event that is, or that would cause, a Transfer in contravention of this Agreement.

Each Member agrees to promptly give Notice of a Triggering Event to all other Members.

8.5     Notwithstanding any other provisions of this Agreement:

(a)     If, in connection with the divorce or dissolution of the marriage of a Member, any court issues a decree or order that transfers, confirms, or awards a Membership Interest, or any portion thereof, to that Member's spouse (an "Award"), then, notwithstanding that such transfer would constitute an unpermitted Transfer under this Agreement, that Member shall have the right to purchase from his or her former spouse the Membership Interest, or portion thereof, that was so transferred, and such former spouse shall sell the Membership Interest or portion thereof to that Member at the price set forth below in Section 8.8 of this Agreement.  If the Member has failed to consummate the purchase within one hundred eighty (180) days after the

UC6th&Batt008759

Pltfs (UC) 000264

court award (the "Expiration Date"), the other Members and the Company shall have the option to purchase from the former spouse the Membership Interest or portion thereof pursuant to Section 8.6 of this Agreement; provided that the option period shall commence on the later of (1) the day following the Expiration Date, or (2) the date of actual notice of the Award.

(b)    If, by reason of the death of a spouse of a Member, any portion of a Membership Interest is transferred to a Transferee other than (i) that Member or (ii) a trust created for the benefit of that Member (or for the benefit of that Member and any combination between or among the Member and the Member's issue) in which the Member is the sole trustee and the Member, as trustee or individually possesses all of the Voting Interest included in that Membership Interest, then the Member shall have the right to purchase the Membership Interest or portion thereof from the estate or other successor of his or her deceased spouse or Transferee of such deceased spouse, and the estate, successor, or Transferee shall sell the Membership Interest or portion thereof at the price set forth in Section 8.8 of this Agreement. If the Member has failed to consummate the purchase within one hundred eighty (180) days after the date of death (the "Expiration Date"), the other Members and the Company shall have the option to purchase from the estate or other successor of the deceased spouse the Membership Interest or portion thereof pursuant to Section 8.6 of this Agreement; provided that the option period shall commence on the later of (1) the day following the Expiration Date, or (2) the date of actual notice of the death.

8.6    On the receipt of Notice by the Manager(s) and the other Members as contemplated by Sections 8.1, 8.3, and 8.5, and on receipt of actual notice of any Triggering Event as determined in good faith by the Manager(s) (the date of such receipt is hereinafter referred to as the "Option Date"), the Manager(s) shall promptly cause a Notice of the occurrence of such a Triggering Event to be sent to all Members and for thirty (30) days after the Notice is given, the other Members shall have the right to purchase, at the price and on the terms set forth in Section 8.8 of this Agreement, a part of the Membership Interest offered in the proportion that the Member's Capital Percentage Interest bears to the total Capital Percentage Interests of all of the Members who choose to participate in the purchase.  Following such thirty (30) day period, the Company shall then have the option, for a period of thirty (30) days thereafter, to purchase the Membership Interest not purchased by the other Members, on the same terms and conditions as apply to the Members.  The transferee of the Membership Interest that is not purchased shall hold such Membership Interest subject to all of the provisions of this Agreement.

8.7    Neither the Member whose interest is subject to purchase under this Article, nor such Member's Affiliate, shall participate in any Vote or discussion of any matter pertaining to the disposition of the Member's Membership Interest under this Agreement.

8.8    The purchase price of the Membership Interest that is the subject of an option under Section 8.6 shall be the "Fair Option Price" of the interest as

66644.1

UC6th&Batt008760

Pltfs (UC) 000265

determined under this Section 8.8. "Fair Option Price" means the cash price that a willing buyer would pay to a willing seller when neither is acting under compulsion and when both have reasonable knowledge of the relevant facts on the Option Date. Each of the selling and purchasing parties shall use his, her, or its best efforts to mutually agree upon the Fair Option Price. If the parties are unable to so agree within thirty (30) days of the Option Date, the Manager(s) shall appoint at the expense of the Company one MAI appraiser with a minimum of ten (10) years of commercial real estate experience. The appraiser shall, within thirty (30) days after the appointment, determine the Fair Option Price of the Membership Interest in writing and submit its report to all the parties. In the event either of the parties disagrees with the valuation established by the appraiser, each party shall within fifteen (15) days after the issuance of the appraiser's report, appoint one MAI appraiser with a minimum of ten (10) years of commercial real estate experience and notify each party of the appraiser's name and business address. Within thirty (30) days after being appointed as an appraiser by a party, such appraiser shall determine the Fair Option Price of the Membership Interest in writing and submit its report to all parties.

The Fair Option Price shall be determined by comparing all three appraisers' valuations and disregarding the appraiser's valuation that diverges the greatest from each of the other two appraisers' valuations, and the arithmetic mean of the remaining two appraisers' valuations shall be the Fair Option Price. Each party shall pay for the services of the appraiser selected by it, and one half of all other costs relating to the determination of Fair Option Price. The Fair Option Price as so determined shall be payable in cash.

8.9    Except as expressly permitted under Sections 8.2 and 8.3, a prospective transferee (other than an existing Member) of a Membership Interest shall be deemed an Assignee, and, therefore, the owner of only an Economic Interest until such prospective transferee has been admitted as a Substituted Member. Any such Assignee shall be entitled only to receive allocations and distributions under this Agreement with respect to such Membership Interest and shall have no right to Vote or exercise any rights of a Member until such Assignee has been admitted as a Substituted Member. Until the Assignee becomes a Substituted Member, the Assigning Member will continue to be a Member and to have the power to exercise any rights and powers of a Member under this Agreement, including the right to Vote in proportion to the Percentage Interest that the Assigning Member would have had in the event that the assignment had not been made.

8.10    Any Person admitted to the Company as a Substituted Member shall be subject to all the provisions of this Agreement that apply to the Member from whom the Membership Interest was assigned, provided that the Assigning Member shall not be released from liabilities as a Member solely as a result of the assignment, both with respect to obligations to the Company and to third parties, incurred prior to the assignment.

UC6th&Batt008761

Pltfs (UC) 000266

8.11   The initial sale of Membership Interests in the Company to the Initial Members has not been qualified or registered under the securities laws of any state or registered under the Securities Act of 1933, in reliance upon exemptions from the registration provisions of those laws.   Notwithstanding any other provision of this Agreement, Membership Interests may not be Transferred unless registered or qualified under applicable state and federal securities law unless, in the opinion of legal counsel satisfactory to the Company, such qualification or registration is not required.   The Member who desires to transfer a Membership Interest shall be responsible for all legal fees incurred in connection with said opinion.

## ARTICLE IX:

## DISSOLUTION AND WINDING UP

9.1   The Company shall be dissolved upon the first to occur of the following events:

(a)   The written agreement of a Majority of Members to dissolve the Company.

(b)   The sale or other disposition of substantially all of the Company's assets.

(c)   Entry of a decree of judicial dissolution.

9.2   On the dissolution of the Company, the Company shall engage in no further business other than that necessary to wind up the business and affairs of the Company.  The Manager(s) who have not wrongfully dissolved the Company or, if there is no such Manager, the Members, shall wind up the affairs of the Company.   The delegates winding up the affairs of the Company shall give Notice of the commencement of winding up by mail to all known creditors and claimants against the Company whose addresses appear in the records of the Company.   After paying or adequately providing for the payment of all known debts of the Company (except debts owing to Members), the remaining assets of the Company shall be distributed or applied in the following order:

(a)   To pay the expenses of liquidation.

(b)   To the establishment of reasonable reserves by the delegate for contingent liabilities or obligations of the Company. Upon the delegate's determination that such reserves are no longer necessary, said reserves shall be distributed as provided in this Section 9.2.

(c)   To repay outstanding loans from Members. If there are insufficient funds to pay such loans in full, each Member shall be repaid in the ratio that

UC6th&Batt008762

Pltfs (UC) 000267

the Member's loan, together with interest accrued and unpaid thereon, bears to the total of all such loans from Members, including all interest accrued and unpaid thereon. Such repayment shall first be credited to unpaid principal and the remainder shall be credited to accrued and unpaid interest.

       (d)     Among the Members as provided in Section 4.12.

      9.3    Each Member shall look solely to the assets of the Company for the return of the Member's investment, and if the Property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the investment of each Member, such Member shall have no recourse against any other Members for indemnification, contribution, or reimbursement, except as specifically provided in this Agreement.

## ARTICLE X:

## INDEMNIFICATION AND ARBITRATION

      10.1   None of any Member, any Manager or their respective Affiliates or the respective directors, officers, members, partners, employees, representatives, and managers of each of them shall be liable, responsible or accountable in damages or otherwise to the Company, any third party or to any other Indemnified Party (as defined below) for any act or omission performed or omitted to be performed by any of them to the extent the Person performing such act or responsible for such omission reasonably believes such act or omission was within the scope of the authority conferred upon such Person (or its Affiliates) by this Agreement, except for fraud, willful misconduct or material breach of this Agreement.  In addition, no Member shall have any personal liability for any guaranty provided by the Company, Urban Commons, Taylor Woods or Howard Wu.   In any threatened, pending, or completed action, suit or proceeding against a Member, a Manager or their respective Affiliates or the respective directors, officers, members, partners, employees, representatives, and managers of each of them (collectively, "Indemnified Parties", and each individually, an "Indemnified Party") relating to Company business or the furtherance thereof by an Indemnified Party, including, but not limited to, guarantying any repayment or completion obligations of the Company, each Indemnified Party shall be fully protected and indemnified and held harmless by the Company against all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, proceedings, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, reasonable attorneys' fees, costs of investigation, fines, judgments and amounts paid in settlement, actually incurred by such Indemnified Party by virtue of its status as an Indemnified Party (collectively "Liabilities"), other than Liabilities resulting from the fraud, willful misconduct or material breach of this Agreement of or by such Indemnified Party.  The indemnification provided by this Section 10.1 shall be recoverable only out of the assets of the Company, and no Member or Manager shall have any personal liability (or obligation to contribute capital to the Company) on account of the Company's indemnification.

UC6th&Batt008763

Pltfs (UC) 000268

10.2    This Agreement and the rights and obligations of the parties hereto shall be governed by the laws of the State of California.  Any controversy, dispute, or claim of any nature arising out of, in connection with, or in relation to the interpretation, performance, enforcement or breach of this Agreement, including any claim based on contract, tort or statute (collectively, a "Dispute"), that cannot be resolved by the parties within thirty (30) days shall first be submitted to mediation between the parties.  In the event that such mediation does not resolve the Dispute within ten (10) business days, the Dispute shall be resolved at the written request of any party to this Agreement by binding arbitration using applicable arbitration procedures of JAMS located in Los Angeles County, California.  The parties shall attempt to designate one arbitrator from JAMS.  If they are unable to do so within thirty (30) days after written demand therefor, then JAMS shall designate an arbitrator.  The arbitration shall be final and binding, and enforceable in any court of competent jurisdiction.  The arbitrator shall award attorneys' fees and costs to the prevailing party and charge the cost of arbitration to the party which is not the prevailing party.  Notwithstanding anything to the contrary contained herein, this Section 10.2 shall not prevent any party from seeking and obtaining equitable relief on a temporary or permanent basis, including, without limitation, a temporary restraining order, a preliminary or permanent injunction or similar equitable relief, from a court of competent jurisdiction located in the State of California (to which all parties hereto consent to venue and jurisdiction) by instituting a legal action or other court proceeding in order to protect or enforce the rights of such party under this Agreement or to prevent irreparable harm and injury.  The court's jurisdiction over any such equitable matter, however, shall be expressly limited only to the temporary, preliminary, or permanent equitable relief sought; all other claims initiated under this Agreement between the parties hereto shall be determined through final and binding arbitration in accordance with the terms of this Section 10.2.

## ARTICLE XI:

## INVESTMENT REPRESENTATIONS

Each Member represents and warrants to, and agrees with, the other Members and the Company as follows:

11.1    (a) The Member has a pre-existing personal or business relationship with the Company or one or more of its officers or control Persons, or (b) by reason of the Member's business or financial experience, or by reason of the business or financial experience of the Member's financial advisor who is unaffiliated with and who is not compensated, directly or indirectly, by the Company or any affiliate or selling agent of the Company, the Member is capable of evaluating the risks and merits of an investment in a Membership Interest and of protecting the Member's own interests in connection with this investment.

UC6th&Batt008764

Pltfs (UC) 000269

11.2    The Member understands that acquiring a Membership Interest involves a number of significant risk factors, including but not limited to, (a) the Company is newly formed and has no operating history or prior earnings to evaluate, (b) the Company will be subject to the risks generally incident to the ownership of real estate, (c) the Company will encounter considerable competition in operating its real estate, (d) all decisions with respect to management of the Company will be made exclusively by the Manager(s), (e) the Company's investment objectives must be considered speculative and there is no assurance the Company will achieve them, and (f) the Manager(s) may be subject to various conflicts of interest in the management of the Company.  The Member has evaluated all such risks, and agrees to accept such risks.

11.3    The Member is purchasing the Membership Interest for the Member's own account and not with a view to or for sale in connection with any distribution of the Membership Interests.

## ARTICLE XII:

## ATTORNEY-IN-FACT AND AGENT

12.1    Each Member, by execution of this Agreement, irrevocably constitutes and appoints each Manager and any of them acting alone as such Member's true and lawful attorney-in-fact and agent, with full power and authority in such Member's name, place, and stead to execute, acknowledge, and deliver, and to file or record in any appropriate public office: (a) any certificate or other instrument that may be necessary, desirable, or appropriate to qualify the Company as a limited liability company or to transact business as such in any jurisdiction in which the Company conducts business; (b) any amendment to the Company's Articles or to any certificate or other instrument that may be necessary, desirable, or appropriate to reflect an amendment approved by the Members in accordance with the provisions of this Agreement; (c) any certificates or instruments that may be necessary, desirable, or appropriate to reflect the dissolution and winding up of the Company; and (d) any certificates necessary to comply with the provisions of this Agreement. This power of attorney will be deemed to be coupled with an interest and will survive the Transfer of the Member's Economic Interest. Notwithstanding the existence of this power of attorney, each Member agrees to join in the execution, acknowledgment, and delivery of the instruments referred to above if requested to do so by a Manager. This power of attorney is a limited power of attorney and does not authorize any Manager to act on behalf of a Member except as described in this Article XII.

UC6th&Batt008765

Pltfs (UC) 000270

## ARTICLE XIII:

## GENERAL PROVISIONS

13.1   This Agreement constitutes the whole and entire agreement of the parties with respect to the subject matter of this Agreement, and it shall not be modified or amended in any respect except by a written instrument executed by all the parties. This Agreement replaces and supersedes all prior written and oral agreements and statements by and among the Members and Manager(s) or any of them.   No representation, statement, condition, or warranty not contained in this Agreement will be binding on the Members or have any force or effect whatsoever.

13.2   This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

13.3   If any provision of this Agreement is determined by any court of competent jurisdiction or arbitrator to be invalid, illegal, or unenforceable to any extent, that provision shall, if possible, be construed as though more narrowly drawn, if a narrower construction would avoid such invalidity, illegality, or unenforceability or, if that is not possible, such provision shall, to the extent of such invalidity, illegality, or unenforceability, be severed, and the remaining provisions of this Agreement shall remain in effect.

13.4   This Agreement shall be binding on and inure to the benefit of the parties and their heirs, personal representatives, and permitted successors and assigns.

13.5   Whenever used in this Agreement, the singular shall include the plural and the plural shall include the singular, and the neuter gender shall include the male and female as well as a trust, firm, company, or corporation, all as the context and meaning of this Agreement may require.

13.6   The parties to this Agreement shall promptly execute and deliver any and all additional documents, instruments, notices, and other assurances, and shall do any and all other acts and things, reasonably necessary in connection with the performance of their respective obligations under this Agreement and to carry out the intent of the parties.

13.7   Except as provided in this Agreement, no provision of this Agreement shall be construed to limit in any manner the Members in the carrying on of their own respective businesses or activities.

13.8   Except as provided in this Agreement, no provision of this Agreement shall be construed to appoint a Member, in the Member's capacity as such, the agent of any other Member.

UC6th&Batt008766

Pltfs (UC) 000271

13.9   Each Member represents and warrants to the other Members that the Member has the capacity and authority to enter into this Agreement.

13.10  The article, section, and paragraph titles and headings contained in this Agreement are inserted as matter of convenience and for ease of reference only and shall be disregarded for all other purposes, including the construction or enforcement of this Agreement or any of its provisions.

13.11  This Agreement may be altered, amended, or repealed only by a writing signed by all of the Members.

13.12  Time is of the essence of every provision of this Agreement that specifies a time for performance.

13.13  This Agreement is made solely for the benefit of the parties to this Agreement and their respective permitted successors and assigns, and no other Person shall have or acquire any right by virtue of this Agreement.

13.14  No Member or Assignee of an Economic Interest has any interest in specific Property or other assets of the Company.  Without limiting the foregoing, each Member and Assignee irrevocably waives any right that such Member or Assignee may have to maintain any action for partition with respect to the Property or other assets of the Company.

*[Remainder of page intentionally left blank]*

UC6th&Batt008767

Pltfs (UC) 000272

IN WITNESS WHEREOF, the parties have executed or caused to be executed this Agreement on the day and year first above written.

**MANAGER AND MEMBER:**

**URBAN COMMONS, LLC**,
a Delaware limited liability company

By:_____
　　　Taylor Woods, Member

By:_____
　　　Howard Wu, Member

66644.SIG

Signature Page

UC6th&Batt008768

Pltfs (UC) 000273

**MEMBERS:**

Printed Name of Member

CLIFFORD PORON

Printed Name(s) and Title(s) or
Capacity(ies) of any Officer(s)
Partner(s) or Agent(s) Acting on
Behalf of Member

By:_____

Title:_____

Signature of Member

Signature(s) of Any Officer(s),
Partner(s) or Agent(s) Acting
on Behalf of Member

By:_____

66644.SIG

SIGNATURE PAGE

**UC6th&Batt008769**

Pltfs (UC) 000274

# EXHIBIT "B"

# INTERNAL RATE OF RETURN EXPLANATION AND SAMPLE CALCULATION

XIRR

Returns the internal rate of return for a schedule of cash flows that is not necessarily periodic.  To calculate the internal rate of return for a series of periodic cash flows, use the IRR function.

XIRR (Values, Dates, Guess)

*        Values is a series of cash flows that corresponds to a schedule of payments in dates.  The first payment is optional and corresponds to a cost or payment that occurs at the beginning of the investment.  If the first value is a cost or payment, it must be a negative value.  All succeeding payments are discounted based on a 365-day year.  The series of values must contain at least one positive and one negative value.

*        Dates is a schedule of payment dates that corresponds to the cash flow payments.  The first payment date indicates the beginning of the schedule of payments.  All other dates must be later than this date, but they may occur in any order.

*        Guess is a number that you guess is close to the result of XIRR.

REMARKS

*        Microsoft Excel stores dates as sequential serial numbers so that it can perform calculations on them.  Excel stores January 1, 1900, as serial number 1 if your workbook uses the 1900 date system.  If your workbook uses the 1904 date system, Excel stores January 1, 1904, as serial number 0 (January 2, 1904, is serial number 1).  For example, in the 1900 date system, Excel stores January 1, 1998, as serial number 35796 because it is 35,795 days after January 1, 1900.

*        Numbers in dates are truncated to integers.

*        XIRR expects at least one positive cash flow and one negative cash flow; otherwise, XIRR returns the #NUM! error value.

*        If any number in dates is not a valid date, XIRR returns the #NUM! error value.

*        If any number in dates precedes the starting date, XIRR returns the #NUM! error value.

*        If values and dates contain a different number of values, XIRR returns the #NUM! error value.

*        In most cases you do not need to provide guess for the XIRR calculation.  If omitted, guess is assumed to be 0.1 (10 percent).

*        XIRR is closely related to XNPV, the net present value function. The rate of return calculated by XIRR is the interest rate corresponding to XNPV = 0.

*        Excel uses an iterative technique for calculating XIRR.  Using a changing rate (starting with guess), XIRR cycles through the calculation until the result is accurate within 0.000001 percent. If XIRR can't find a result that works after 100 tries, the #NUM! error value is returned. The rate is changed until:

        <<...OLE_Obj...>>  <<...OLE_Obj...>>

        where:

        di = the ith, or last, payment date.
        d1 = the 0th payment date.
        Pi = the ith, or last, payment.

EXAMPLE

Consider an investment that requires a $10,000 cash payment on January 1, 1998, and returns $2,750 on March 1, 1998, $4,250 on October 30, 1998, $3,250 on February 15, 1999, and $2,750 on April 1, 1999. The internal rate of return (in the 1900 date system) is:

        XIRR({-10000,2750,4250,3250,2750}, {"1/1/1998","3/1/1998","10/30/1998","2/15/1999","4/1/1999"},0.1) equals:

        0.374859 or 37.4859 percent

The IRR calculations under Sections 4.11 and 4.12 shall be determined at the time of each distribution and shall be calculated based on the total distributions made to the Members through the date of such distribution.  Once the IRR is calculated on the aggregate Capital Contributions made by the Members, the Available Cash Flow and revenues or

EXHIBIT B

**UC6th&Batt008770**

Pltfs (UC) 000275

proceeds from a Capital Event or the dissolution of the Company shall be divided between Urban Commons and the Members based on the applicable percentages in Sections 4.11 and 4.12 and appropriate adjustments shall be made to such distributions so that the total distributions to Urban Commons and the Members shall be equal to the required percentages.  Accordingly, for purposes of example, if (a) $100,000 is available to be distributed to the Members and (b) such amount plus any previous distributions to the Members equals a 30% IRR on the aggregate Capital Contributions made by the Members, then Urban Commons shall be entitled to 20% of the distribution plus such additional portion of the distribution as may be necessary in order for Urban Commons to receive 20% of the total amounts distributed under Sections 4.11 and 4.12 and the remaining share of such distribution shall be distributed to the Members based on the Members' Capital Percentage Interests pro rata.  At the time of each distribution to the Members of Available Cash Flow and revenues or proceeds from a Capital Event or the dissolution of the Company, the Manager(s) shall adjust as necessary the distributions to be made to Urban Commons and the Members in connection with such distribution in order to satisfy the distribution percentages in Sections 4.11 and 4.12.

EXHIBIT B

**UC6th&Batt008771**

Pltfs (UC) 000276

EXHIBIT E

# MARK R. RILEY

ATTORNEY AT LAW
CERTIFIED PUBLIC ACCOUNTANT
2731 ROBINHOOD ST.
HOUSTON, TEXAS  77005-2433

---

TELEPHONE (713) 822-8935
FACSIMILE (713) 583-2284
RILEY@RILEY-CPA-LAW.COM

May 17, 2020

*(Via Overnight Courier and Email)*

Urban Commons 6th Ave Seattle, LLC
10250 Constellation Blvd., Suite 1750
Los Angeles, California 90067

Urban Commons 6th Ave Seattle, LLC
c/o Urban Commons, LLC, Manager
10250 Constellation Blvd., Suite 1750
Los Angeles, California 90067

Mr. Taylor Woods, Member
Urban Commons, LLC
10250 Constellation Blvd, Suite1750
Los Angeles, CA 90067

Mr. Howard Wu, Member
Urban Commons, LLC
10250 Constellation Blvd, Suite1750
Los Angeles, CA 90067

Urban Commons Battery Park, LLC
10250 Constellation Blvd., Suite 1750
Los Angeles, California 90067

Urban Commons Battery Park, LLC
c/o Urban Commons, LLC, Manager
10250 Constellation Blvd., Suite 1750
Los Angeles, California 90067

**Re:    Notice of Rescission of Membership Interest Subscription Agreements in Urban Commons 6th Ave Seattle, LLC ("UC Seattle") and Urban Commons Battery Park, LLC ("UC Battery Park"; collectively with UC Seattle, the "Issuers")**

Gentlemen:

Please be advised that the undersigned represents Dr. Ronald A. Christensen and Dr. Clifford A. Rosen (collectively "Investors") in connection with their respective membership interest subscriptions in the Issuers. Accordingly, please address all future communication regarding this matter to the undersigned.

This letter constitutes notice by each of the Investors of rescission of their respective subscriptions for membership interests in the Issuers.  Please consider this correspondence the Investors' demand that the Issuers remit $750,000 to the Investors to reimburse them for their subscription for membership interests in the Issuers. The payment of this amount should be accomplished in accordance with the attached wiring instructions by **5:00 p.m. EDT on Friday, May 22, 2020**.  In exchange for the Investors' prompt receipt of $750,000, the Investors are willing to enter into a release of their claims against the Issuers and others that relate to this matter.

Messrs. Taylor and Wu
May 17, 2020
Page 2

As you are aware, on or about January 21, 2020, Dr. Christensen executed a Membership Interest Subscription Agreement with UC Seattle and wired $250,000 to UC Seattle's Bank of America, NA bank account.  On January 29, 2020, Dr. Rosen executed a Membership Interest Subscription Agreement with UC Seattle and wired $250,000 to UC Seattle's Bank of America, NA bank account. On February 27, 2020, Dr. Christensen executed a Membership Interest Subscription Agreement with UC Battery Park and on March 3, 2020, wired $250,000 to UC Battery Park's Wells Fargo Bank, N.A. bank account.

To date, UC Seattle has not completed its offering and has not raised the necessary funds of $40 million from its offering of membership interests. Neither has UC Seattle obtained a financing commitment for the acquisition loans in an approximate aggregate amount of $60 million in order to acquire and refurbish the property known as the Hilton Seattle, located at 1301 6th Avenue, Seattle, Washington.

Likewise, UC Battery Park has not completed its offering and has not raised the necessary funds of $70 million from its offering of membership interests.  Similarly, UC Battery Park has not obtained a financing commitment for the acquisition loans in an approximate aggregate amount of $100 million in order to acquire and refurbish the property known as the Wagner Hotel (formerly known as the Ritz-Carlton Battery Park), located in lower-Manhattan at 2 West Street, New York, New York.

The Issuers failed to disclose and omitted material facts concerning Urban Commons, LLC, Taylor Woods, and Howard Wu in the offering of the membership interests. The Investors relied on the creditworthiness and the reputation of Urban Commons, LLC, and its common interest owners, Taylor Woods and Howard Wu.  Urban Common, LLC failed to disclose the default by Urban Commons, LLC on the Master Lease Agreements with Eagle Hospitality Trust ("EHT") that occurred prior to the offering and EHT's subsequent default and acceleration of its $341 million loan with its Facility Lender.

The sale of the membership interests by the Issuers, Urban Commons, LLC, and its managers, members, and Advisory Board members constitutes the unlawful sale of unregistered securities not subject to an exemption from registration pursuant to the Securities Act of 1933. Likewise, the sales of membership interest subscriptions were sold in violation of the registration or qualification provisions of the securities laws of Arizona, California, and New York.

The sales of membership interest subscriptions to the Investors by unregistered broker-dealers constitutes a violation of the Securities Exchange Act of 1934, the California Corporate Securities Law of 1968, Arizona Revised Statutes Title 44 and the Martin Act. As a result, the Membership Interest Subscription Agreements executed by the Investors are void.

In connection with the unlawful sale of unregistered securities not subject to an exemption from registration pursuant to the Securities Act of 1933, the Issuers, Urban Commons, LLC, and others have: (1) made false and misleading statements or omissions in connection with illegal

Messrs. Taylor and Wu
May 17, 2020
Page 3

distributions of securities; (2) withheld the disclosure of material information; and (3) utilized unregistered broker-dealers in connection with the sales to the Investors.  As a result of these and other actions, the Issuers, Urban Commons, LLC, and others have, among other things, made it impossible for Investors to earn a rightful return on their investment, in violation of numerous federal and state security laws.

At this point, the Investors seek only the return of their investment and reimbursement of their professional fees.  But please be advised that should the Issuers refuse to comply with these demands, the Investors will have no choice but to direct their special litigation counsel to pursue the Issuers and their affiliated entities through the courts on behalf of themselves and other similarly situated investors in the Issuers.  If you do not comply, the Investors will fully pursue their legal remedies against the Issuers, Urban Commons, LLC, their unregistered broker-dealers, managers, members, and owners personally including, but not limited to, the recovery of their actual damages, consequential damages, exemplary damages, attorneys' fees, court costs, and interest.

Additionally, the Investors will request (1) a court-ordered accounting of the Issuers and its related entities; (2) a court-ordered distribution of assets; and (3) a court order appointing an independent receiver to liquidate the affected entities.

If you wish to resolve this matter short of litigation, please contact the undersigned prior to May 22, 2020.  We look forward to hearing from you.

Very truly yours,

Mark R. Riley

MRR
Enclosures

cc:     Dr. Ronald Christensen (*via email RonChristensenMD@aol.com*)
        11517 E. Paradise Lane
        Scottsdale, AZ 85255-8976

        Dr. Clifford A. Rosen (*via email CliffordRosen@gmail.com*)
        345 Majestic Dr.
        Lakeshore, Ontario, Canada N8N 4L5

EXHIBIT F

## MARK R. RILEY
ATTORNEY AT LAW
CERTIFIED PUBLIC ACCOUNTANT
2731 ROBINHOOD ST.
HOUSTON, TEXAS  77005-2433

---

TELEPHONE (713) 822-8935
FACSIMILE (713) 583-2284
RILEY@RILEY-CPA-LAW.COM

June 6, 2020

*(Via Email* MarkAdams@JMBM.com*)*

Mark S. Adams
Jeffer Mangels Butler & Mitchell LLP
3 Park Plaza, Suite 1100
Irvine, CA 92614

**Re:     Demand for Inspection of Books and Records of Urban Commons 6th Ave Seattle, LLC, and Urban Commons Battery Park, LLC Pursuant to 6 Del. C. § 18-305(a).**

Gentlemen:

Please be advised that the undersigned represents Dr. Ronald A. Christensen and Dr. Clifford A. Rosen (collectively "Investors") in connection with their respective membership interest subscriptions in the Issuers. Accordingly, please address all future communication regarding this matter to the undersigned.

Pursuant to Section 18-305 of the Delaware Limited Liability Company Act and the provision of each of the Operating Agreements[1][2] the Investors hereby demand the right (by its attorneys, consultants, or other agents), during the usual hours of business, to inspect the following books and records of the Company and to make copies or extracts therefrom:

   (1)     True and full information regarding the status of the business and financial condition of the limited liability company;

---

[1] 6.1 Complete books of account of the Company's business, in which each Company transaction shall be fully and accurately entered, shall be kept at the Company's principal executive office and at such other locations as the Manager(s) shall determine from time to time and shall be open to inspection and copying on reasonable Notice by any Member or the Member's authorized representatives during normal business hours. The costs of such inspection and copying shall be borne by the Member. *See* Operating Agreement For Urban Commons 6Th Ave Seattle, LLC.

[2] 6.1 Complete books of account of the Company's business, in which each Company transaction shall be fully and accurately entered, shall be kept at the Company's principal executive office and at such other locations as the Manager(s) shall determine from time to time and shall be open to inspection and copying on reasonable Notice by any Member or the Member's authorized representatives during normal business hours. The costs of such inspection and copying shall be borne by the Member. *See* Limited Liability Company Operating Agreement For Urban Commons Battery Park, LLC

(2)     a copy of the limited liability company's federal, state and local income tax returns for 2019;

(3)     A current list of the name and last known business, residence or mailing address of each member and manager;

(4)     A copy of any written limited liability company agreement and certificate of formation and all amendments thereto, together with executed copies of any written powers of attorney pursuant to which the limited liability company agreement and any certificate and all amendments thereto have been executed;

(5)     True and full information regarding the amount of cash and a description and statement of the agreed value of any other property or services contributed by each member and which each member has agreed to contribute in the future, and the date on which each became a member; and

(6)     Other information regarding the affairs of the limited liability company as is just and reasonable, including:

      a.     Copies of bank statements from January – May 2020;

      b.     Copy of the loan commitment from the lender the acquisition loans in an approximate aggregate amount of $60 million in order to acquire and refurbish the property known as the Hilton Seattle, located at 1301 6th Avenue, Seattle, Washington.

      c.     Copy of the loan commitment for the acquisition loans in an approximate aggregate amount of $100 million in order to acquire and refurbish the property known as the Wagner Hotel (formerly known as the Ritz-Carlton Battery Park), located in lower-Manhattan at 2 West Street, New York, New York.

      c.     Copies of Purchase and Sale Agreements for the acquisition of the Hilton Seattle and the Wagner Hotel; and

      d.     Financial statements of each of the companies since inception.

The purpose of inspecting such books and records is for the purpose of valuation of a member's interest and investigate the potential wrongdoing or mismanagement.

Please advise me where and when the aforementioned books, records and other documents will be available for inspection and copying.  I can be reached directly at (713) 822-8935 or Mark.R.Riley@gmail.com or at 2731 Robinhood St., Houston, Texas 77005.

Very truly yours,

Mark R. Riley

MRR

cc:     Dr. Ronald Christensen (*via email RonChristensenMD@aol.com*)
        11517 E. Paradise Lane
        Scottsdale, AZ 85255-8976

        Dr. Clifford A. Rosen (*via email CliffordRosen@gmail.com*)
        345 Majestic Dr.
        Lakeshore, Ontario, Canada N8N 4L5

EXHIBIT G

# MARK R. RILEY

ATTORNEY AT LAW
CERTIFIED PUBLIC ACCOUNTANT
2731 ROBINHOOD ST.
HOUSTON, TEXAS  77005-2433

TELEPHONE (713) 822-8935
FACSIMILE (713) 583-2284
RILEY@RILEY-CPA-LAW.COM

June 21, 2020

(*Via Email* MarkAdams@JMBM.com)

Mark S. Adams
Jeffer Mangels Butler & Mitchell LLP
3 Park Plaza, Suite 1100
Irvine, CA 92614

Re:     **Reply to Urban Commons LLC's Response to Demand for Inspection of Books and Records of Urban Commons 6th Ave Seattle, LLC ("UC Seattle"), and Urban Commons Battery Park, LLC ("UC Battery Park"; collectively with UC Seattle, the "Issuers") Pursuant to 6 Del. C. § 18-305(a).**

Mr. Adams:

On June 6, 2020,  Dr. Ronald A. Christensen and Dr. Clifford A. Rosen (collectively "Investors") demanded in writing the right (by its attorneys, consultants, or other agents), during the usual hours of business, to inspect the books and records of the Issuers and to make copies or extracts therefrom pursuant to Section 18-305 of the Delaware Limited Liability Company Act and the provisions of each of the respective Operating Agreements of the Issuers. The Investors' requests were specific, provided for by statute[1], and for a proper purpose. The Issuers failed to reply within 5 business days, June 12, 2020, of the demand as required by law.[2]

On June 19, 2020, you produced 282 bates stamped documents comprised of 11,966 pages. Utilizing litigation software and technical support, counsel for the Investors reviewed these documents for responsiveness to the Investors' demands.  We have concluded that your document dump was, with limited exception, nonresponsive to the Investors' demands.  ***Not a single page was produced evidencing that*** (i) either of the Investors is a member of either of the Issuers; (ii) the 2020 offering of membership interests occurred; (iii) the Investors' funds were deposited into an interest-bearing secure bank account; (iv) initial membership interests of the Investors were reflected in the Operating Agreement for either of the Issuers: (v) UC Seattle completed its offering and raised the necessary funds of $40 million from its offering of membership interests; (vii) UC Seattle obtained a financing commitment for the acquisition loan in an approximate aggregate amount of $60 million in order to acquire and refurbish the property known as the Hilton Seattle,

---

[1] See California Corporations Code § 17704.10
[2] *See* 6 Del. C. § 18-305(f)

Mark S. Adams, Esquire
June 21, 2020
Page 2

located at 1301 6th Avenue, Seattle, Washington; and (viii) UC Battery Park completed its offering and raised the necessary funds of $70 million from its offering of membership interests.

Urban Commons LLC's document production does not include the following books and records specifically requested by Investors and required to be provided by the Issuers:

| Books and Records Requested for Inspection | UC Seattle | UC Battery Park |
|---|---|---|
| True and full information regarding the status of the business and financial condition of the limited liability company | **Not Produced** | **Not Produced** |
| A copy of the limited liability company's federal, state and local income tax returns for 2019 | **Not Produced** | **Not Produced** |
| A current list of the name and last known business, residence or mailing address of each member and manager | **Not Produced** | **Not Produced** |
| A copy of any written limited liability company agreement and certificate of formation and all amendments thereto, together with executed copies of any written powers of attorney pursuant to which the limited liability company agreement and any certificate and all amendments thereto have been executed | **Not Produced** | **Not Produced**[3] |
| True and full information regarding the amount of cash and a description and statement of the agreed value of any other property or services contributed by each member and which each member has agreed to contribute in the future, and the date on which each became a member | **Not Produced** | **Not Produced** |
| Copies of bank statements from January – May 2020 | **Not Produced** | **Not Produced** |
| Copy of the loan commitment from the lender the acquisition loans in an approximate aggregate amount of $60 million in order to acquire and refurbish the property known as the Hilton Seattle, located at 1301 6th Avenue, Seattle, Washington. | **Not Produced**[4] | **N/A** |
| Copies of Purchase and Sale Agreements for the acquisition of the Hilton Seattle and the Wagner Hotel and | **Produced** | **Produced** |
| Financial statements of each of the companies since inception. | **Not Produced** | **Not Produced** |

---

[3] The Operating Agreement as of September 20, 2018, was provided, although incomplete and improperly redacted. No amendments were provided.

[4] A draft of a purported Loan Agreement with 1301 6th Ave, LLC as Borrower was provided completely redacted except for the Table of Contents.

Mark S. Adams, Esquire
June 21, 2020
Page 3

It is apparent from the lack of responsive production and the intentional omission of requested documents that Urban Commons, LLC, Taylor Woods, and Howard Wu are not acting in good faith are attempting to conceal their ongoing deception of the Investors.

At this point, the Investors renew their demand of May 17, 2020, for the return of their investment and reimbursement of their professional fees.  Urban Commons, LLC has previously been provided with the Investors' wire instructions. Please be advised that should the Issuers refuse to comply with these demands, the Investors will have no choice but to direct their special litigation counsel to pursue the Issuers and their affiliated entities through the courts on behalf of themselves and other similarly situated investors in the Issuers.  If you do not comply, the Investors will fully pursue their legal remedies against the Issuers, Urban Commons, LLC, their unregistered broker-dealers, managers, members, and owners personally including, but not limited to, the recovery of their actual damages, consequential damages, exemplary damages, attorneys' fees, court costs, and interest.

Additionally, the Investors will request (1) a court-ordered accounting of the Issuers and its related entities; (2) a court-ordered distribution of assets; and (3) a court order appointing an independent receiver to liquidate the affected entities.

If you wish to resolve this matter short of litigation, please contact the undersigned prior to June 24, 2020.  We look forward to hearing from you.


Very truly yours,


Mark R. Riley


MRR

cc:     Dr. Ronald Christensen (*via email RonChristensenMD@aol.com*)
        11517 E. Paradise Lane
        Scottsdale, AZ 85255-8976

        Dr. Clifford A. Rosen (*via email CliffordRosen@gmail.com*)
        345 Majestic Dr.
        Lakeshore, Ontario, Canada N8N 4L5

EXHIBIT H

# MARK R. RILEY

ATTORNEY AT LAW
CERTIFIED PUBLIC ACCOUNTANT
2731 ROBINHOOD ST.
HOUSTON, TEXAS  77005-2433

TELEPHONE (713) 822-8935
FACSIMILE (713) 583-2284
RILEY@RILEY-CPA-LAW.COM

June 30, 2020

*(Via Overnight Courier and Email)*

Mr. C. Brian Egnatz
c/o Digital Capital Markets LLC
10211 Fleming Avenue
Bethesda, MD 20814

Mr. C. Brian Egnatz
Milepost Real Estate LLC
229 South Dubuque Street, Suite 133
Iowa City, IA 52240

Mr. John R. Nix, Jr., CEO
Chicago Analytic Trading Company, LLC
d/b/a Little River Capital, LLC
216 Cahaba Oaks Trail
Indian Springs, AL 35124

Chicago Analytic Trading Company, LLC
d/b/a Little River Capital, LLC
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, New Castle, DE 19808

Mr. Jason Kyle Birt
Milepost Real Estate LLC
615 McCoy Dr.
Carroll, IA 51401-1435
Email: jbirt@milepostglobal.com

Mr. C. Brian Egnatz
Milepost Capital Management, LLC
19 East 54th Street
New York, NY 10022
Email: brian.egnatz@milepostcm.com

**Re:    Demand for Rescission of Membership Interest Subscription Agreements in Urban Commons 6th Ave Seattle, LLC ("UC Seattle") and Urban Commons Battery Park, LLC ("UC Battery Park"; collectively with UC Seattle, the "Issuers")**

Gentlemen:

Please be advised that the undersigned represents Dr. Ronald A. Christensen and Dr. Clifford A. Rosen (collectively "Investors") in connection with their respective membership interest subscriptions in the Issuers. Accordingly, please address all future communication regarding this matter to the undersigned.

From their headquarters in California, Urban Common, LLC, Taylor Woods, and Howard Wu (collectively, "Urban Commons") raised millions of dollars through the offer and sale to each investor of purported membership interests of UC Battery Park and UC Seattle – a form of security which  Urban Commons failed to register or qualify pursuant to the federal Securities Act of 1933 or the securities laws of any state and failed to obtain an exemption from such registration or qualification. The offer and sale of membership interests purportedly issued by UC Battery Park and UC Seattle violated provisions of federal and state securities laws.

Messrs. Egnatz, Nix and Birt
June 30, 2020
Page 2

Mr. Egnatz and Mr. Birt acted as compensated unregistered sales agents on behalf of Urban Commons to market, offer, and sell membership interests in UC Seattle and UC Battery Park, to the Investors. Mr. Egnatz and Mr. Birt operated individually and through Milepost Real Estate LLC, Milepost Capital Management, LLC, and Chicago Analytic Trading Company, LLC d/b/a Little River Capital, LLC (collectively, the "Unregistered Agents").

The Unregistered Agents aggressively solicited and induced the Investors to invest $750,000 in membership interests of the Issuers by falsely representing that prior investment with Urban Commons earned cash on cash return of 30% in three and one-half months. In reliance on these and other representations, Dr. Christensen executed a Membership Interest Subscription Agreement with UC Seattle on or about January 21, 2020, and wired $250,000 to UC Seattle's Bank of America, NA bank account.  On January 29, 2020, Dr. Rosen executed a Membership Interest Subscription Agreement with UC Seattle and wired $250,000 to UC Seattle's Bank of America, NA bank account. On February 27, 2020, Dr. Christensen executed a Membership Interest Subscription Agreement with UC Battery Park and on March 3, 2020, wired $250,000 to UC Battery Park's Wells Fargo Bank, N.A. bank account.

When the Unregistered Agents sold the Investors unregistered securities in the Issuers, the Unregistered Agents were not licensed under federal and state law or exempt from licensing.  As such, the membership interest subscription agreements are rendered void and the Unregistered Agents are jointly and severally liable to the Investors for effecting sales of unregistered securities not subject to an exemption as unlicensed sales representatives.

To date, UC Seattle has not completed its offering and has not raised the necessary funds of $40 million from its offering of membership interests. Neither has UC Seattle obtained a financing commitment for the acquisition loans in an approximate aggregate amount of $60 million in order to acquire and refurbish the property known as the Hilton Seattle, located at 1301 6th Avenue, Seattle, Washington.

Likewise, UC Battery Park has not completed its offering and has not raised the necessary funds of $70 million from its offering of membership interests.  Similarly, UC Battery Park has not obtained a financing commitment for the acquisition loans in an approximate aggregate amount of $100 million in order to acquire and refurbish the property known as the Wagner Hotel (formerly known as the Ritz-Carlton Battery Park), located in lower-Manhattan at 2 West Street, New York, New York.

Urban Commons and the Unregistered Agents failed to disclose and omitted material facts concerning Urban Commons, LLC, Taylor Woods, and Howard Wu in the offering of the membership interests. The Investors relied on the creditworthiness and the reputation of Urban Commons, LLC, and its common interest owners, Taylor Woods and Howard Wu.  Urban Common, LLC failed to disclose the default by Urban Commons, LLC on the Master Lease Agreements with Eagle Hospitality Trust ("EHT") that occurred prior to the offering and EHT's subsequent default and acceleration of its $341 million loan with its Facility Lender.

Messrs. Egnatz, Nix and Birt
June 30, 2020
Page 3

When the Investors demanded to inspect the books and records of the Issuers, ***Urban Commons failed to produce a single page evidencing that:*** (i) either of the Investors is a member of either of the Issuers; (ii) the 2020 offering of membership interests occurred; (iii) the Investors' funds were deposited into an interest-bearing secure bank account; (iv) initial membership interests of the Investors were reflected in the Operating Agreement for either of the Issuers: (v) UC Seattle completed its offering and raised the necessary funds of $40 million from its offering of membership interests; (vii) UC Seattle obtained a financing commitment for the acquisition loan in an approximate aggregate amount of $60 million in order to acquire and refurbish the property known as the Hilton Seattle, located at 1301 6th Avenue, Seattle, Washington; and (viii) UC Battery Park completed its offering and raised the necessary funds of $70 million from its offering of membership interests.

The sale of the membership interests by the Issuers, Urban Commons, LLC, and its managers, members, and Advisory Board members constitutes the unlawful sale of unregistered securities not subject to an exemption from registration pursuant to the Securities Act of 1933. Likewise, the sales of membership interest subscriptions were sold in violation of the registration or qualification provisions of the securities laws of Arizona, California, and New York.

The sales of membership interest subscriptions to the Investors by unregistered broker-dealers constitutes a violation of the Securities Exchange Act of 1934, the California Corporate Securities Law of 1968, Arizona Revised Statutes Title 44 and the Martin Act. As a result, the Membership Interest Subscription Agreements executed by the Investors are rendered void.

In connection with the unlawful sale of unregistered securities not subject to an exemption from registration pursuant to the Securities Act of 1933, the Issuers, Urban Commons, LLC, and Unregistered Agents have: (1) made false and misleading statements or omissions in connection with illegal distributions of securities; (2) withheld the disclosure of material information; and (3) utilized unregistered broker-dealers in connection with the sales to the Investors.  As a result of these and other actions, the Issuers, Urban Commons, LLC, and the Unregistered Agents have, among other things, made it impossible for Investors to earn a rightful return on their investment, in violation of numerous federal and state security laws.

This letter constitutes notice and demand by each of the Investors of rescission of their respective subscriptions for membership interests in the Issuers. Please consider this correspondence the Investors' demand that the Unregistered Agents remit $750,000 plus reimbursement of their professional fees to the Investors to reimburse them for their subscription for membership interests in the Issuers. The payment of this amount should be accomplished by wire transfer by **5:00 p.m. EDT on Friday, July 10, 2020**.  In exchange for the Investors' prompt receipt of $750,000 plus attorneys' fees, the Investors are willing to enter into a release of their claims against the Unregistered Agents, Issuers, and others that relate to this matter. Please contact the undersigned to facilitate this transaction.

At this point, the Investors seek only the return of their investment and reimbursement of their professional fees.  But please be advised that should the Unregistered Agents refuse to comply

Messrs. Egnatz, Nix and Birt
June 30, 2020
Page 4

with these demands, the Investors will have no choice but to direct their special litigation counsel
to pursue the Unregistered Agents, Issuers and their affiliated entities through the courts on behalf
of themselves and other similarly situated investors in the Issuers.  If you do not comply, the
Investors will fully pursue their legal remedies against the Issuers, Urban Commons, LLC, the
Unregistered Agents, managers, members, and owners personally including, but not limited to, the
recovery of their actual damages, consequential damages, exemplary damages, attorneys' fees,
court costs, and interest.

Additionally, the Investors will request (1) a court-ordered accounting of the Unregistered
Agents, the Issuers, and its related entities; (2) a court-ordered distribution of assets; and (3) a
court order appointing an independent receiver to liquidate the affected entities.

If you wish to resolve this matter short of litigation, please contact the undersigned before
July 10, 2020.  We look forward to hearing from you.

Very truly yours,

Mark R. Riley

MRR

cc:    Dr. Ronald Christensen (***via email RonChristensenMD@aol.com***)
       11517 E. Paradise Lane
       Scottsdale, AZ 85255-8976

       Dr. Clifford A. Rosen (***via email CliffordRosen@gmail.com***)
       345 Majestic Dr.
       Lakeshore, Ontario, Canada N8N 4L5

# EXHIBIT I

**URBAN COMMONS 6TH AVE SEATTLE, LLC**
**MEMBERSHIP INTEREST SUBSCRIPTION AGREEMENT**

TO:     Urban Commons 6th Ave Seattle, LLC

I hereby irrevocably offer to purchase a membership interest (the "Interest") in Urban Commons 6th Ave Seattle, LLC, a Delaware limited liability company (the "Company"), for a purchase price of $ _250,600.00_ , upon the terms and conditions described below. The membership interest shall be calculated using my capital contribution divided by the total capital contribution of $40,000,000, which shall result in an ownership percentage of _.625_ %. I agree to make an initial deposit of 25% of the purchase price for the Interest to the Company not later than January 10, 2019. I agree to pay the balance of the purchase price for the Interest to the Company not later than January 30, 2019. I will deliver to the Company the purchase price for the Interest in the manner set forth in Section 14 below.

I understand that up to 100% of the membership qualified purchasers may purchase interests in the Company in this offering. I further understand that the Company may terminate this offering at any time, that the Company, in its discretion, may accept or reject my subscription, provided that notification of such rejection must be given to me within 15 days after this Agreement, properly completed and signed by me, and full payment of the purchase price for the Interest is delivered to the Company, and that, if there is such rejection notification, the purchase price will be promptly returned to me without interest. The Company anticipates completing this offering by February 5, 2019.

I understand the Company will not use or apply the purchase price until the Company has raised the necessary funds from this offering. The funds raised from the offerings will be used to invest in an entity which shall acquire, own, operate, and eventually sell that certain property known as the Hilton Seattle, located at 1301 6th Avenue, Seattle, Washington (the "Property"). I further understand that (i) the purchase price will be deposited into an interest-bearing secure bank account and (ii) all interest earned on such account will be used by the Company to pay all cost and expenses (including, but not limited to, all legal, accounting and management costs and expenses) incurred in connection with this offering and the formation of the Company. The initial membership interests of the members will be reflected in the Operating Agreement for the Company. If this subscription is terminated, all funds raised by the Company will be returned to the applicable investors, together with any interest remaining on such funds following the payment of all costs and expenses.

I understand the Company is obtaining acquisition loans in an approximate aggregate amount of approximately $60,000,000 in order to acquire and refurbish the Property but that the terms for such financing have not yet been finalized.

I understand that the terms of the Interest and related agreements are set forth in the Operating Agreement for the Company, a copy of which has been or will be provided separately to me. The Company's acceptance of my subscription will be conditioned on my entering into the Operating Agreement and agreeing to be bound by all of its terms. I understand that the Operating Agreement for the Company will name Urban Commons, LLC as the sole manager of the Company (the "Manager") with exclusive authority and control over all Company decisions in entering into and managing real estate investments. The Operating Agreement will provide that each investor's capital will be returned at the time of a capital event(s) and prior to any profits from such capital event(s) being distributed to the members.

I understand that the purchase of the Interest involves certain risks, including, but not limited to, the risks identified on the **Schedule of Investment Risks** attached to this Agreement. I have carefully read and considered these risks before making this offer to purchase the Interest.

In connection with my subscription for and purchase of the Interest, I hereby represent and warrant to the Company and agree as follows:

1.      I am acquiring the Interest for my own account for investment and not with a view to or for sale in connection with any distribution of the Interest.

2.      In making this investment, I am relying upon my own investigation and analysis and have determined that the Interest is a suitable investment for me. The Company has made available to me information, and the opportunity to question its representatives, concerning the terms of this offering and the proposed investment of the Company in various real investments. I have been furnished with such information as I have requested. It has never been guaranteed or warranted by the Company, or any person connected with or acting on the Company's behalf, that I will be able to sell or liquidate the Interest in any specified period of time or that there will be any particular profit to be realized as a result of this investment. I have adequate means to provide for my current and expected financial needs and reasonable contingencies, can bear the economic risks (including a complete loss of the purchase price) associated with my purchase of the Interest and have no need for liquidity in this investment.

1

UC6th&Batt008822

Pltfs (UC) 000327

3.    The Company has advised me that the Interest is not being registered under the Securities Act of 1933, as amended (the "1933 Act"), in reliance upon the exemption from the registration requirements provided by Section 4(2), Rule 506 of Regulation D and/or Regulation S under the 1933 Act, and are not being qualified or registered under any state securities laws in reliance upon applicable exemptions from the qualification and registration requirements.  I understand that no federal or state agency has made any finding or determination as to the fairness of this investment, nor any recommendation or endorsement of the Interest.  I understand that the Company is relying in part on my representations set forth in this Agreement for purposes of claiming such exemptions.  I understand the Company is under no obligation to register the Interest on my behalf.

4.    I agree that I, and any transferees of the Interest, shall be bound by the restrictions on transfers of the Interest which are described in this paragraph or are otherwise applicable under federal or state securities laws.  I also understand that any certificate representing the Interest will bear a legend substantially in the following form, and any legend appropriate to comply with applicable state securities laws, which I agree to abide by:

"THE MEMBERSHIP INTEREST REPRESENTED BY THIS CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 NOR REGISTERED OR QUALIFIED UNDER ANY STATE SECURITIES LAWS, AND MAY NOT BE SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS DULY QUALIFIED AND REGISTERED UNDER APPLICABLE STATE AND FEDERAL SECURITIES LAWS OR UNLESS, BASED ON AN OPINION OF COUNSEL OR OTHER EVIDENCE SATISFACTORY TO THE COMPANY, SUCH QUALIFICATION AND REGISTRATION ARE NOT REQUIRED."

I agree that stop transfer instructions prohibiting transfers of the Interest may be filed in the Company's records or issued to the Company's transfer agent as a means of preventing the sale or disposition of the Interest in violation of the restrictions and legends set forth in this paragraph above and that any transfer of the Interest or any portion thereof causing such a violation shall be void.

5.    The offer to sell the Interest was directly communicated to me by direct communication with the Company's director(s), officer(s) or manager(s), and I was not presented with or solicited by any leaflet, public promotional meeting, television advertisement or other form of general advertising.  (FILL IN THE FOLLOWING)   I am a citizen of _United States of America_____ or, if I am an entity, I was formed and exist under the laws of _____.

6.    I have a substantial preexisting personal or business relationship with the Company's management personnel and/or, by reason of my business or financial experience, or the business or financial experience of my management if I am an entity, am capable of evaluating the merits and risks of my purchase of the Interest and have the capacity to protect my interests in connection with this investment.

7.    I am an "Accredited Investor," as defined in Rule 501(a) of Regulation D under the 1933 Act, as follows (CHECK EACH APPLICABLE BOX--AT LEAST ONE MUST BE APPLICABLE AND CHECKED):

[✓]   (a)   I am a natural person whose individual net worth, or joint net worth with my spouse, including the estimated net fair market value of my principal residence, presently exceeds $1,000,000; and/or

[✓]   (b)   I am a natural person who had individual income, without that of my spouse, in excess of $200,000 in each of the two most recent years and reasonably expects to have income in excess of $200,000 in the current year; and/or

[ ]   (c)   I am a natural person who had joint income with my spouse in excess of $300,000 in each of the two most recent years and reasonably expects to have such joint income in excess of $300,000 in the current year; and/or

[ ]   (d)   I am (circle which one) a corporation, partnership, limited liability company, or organization described in Section 501(c)(3) of the Internal Revenue Code, not formed for the specific purpose of acquiring the Interest, with total assets in excess of $5,000,000; and/or

[ ]   (e)   I am a trust, not formed for the specific purpose of acquiring the Interest, with total assets in excess of $5,000,000 whose purchase is directed by a sophisticated person (i.e., a person who has such knowledge and experience in financial and business matters that he or she is capable of evaluating the merits and risks of this prospective investment); and/or

[ ]   (f)   I am any of the following (CIRCLE WHICH ONE):  a bank (as defined in Section 3(a)(2) of the 1933 Act), or a savings and loan association or other institution (as defined in Section 3(a)(5) of the 1933 Act), whether acting in an individual or fiduciary capacity; or a broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934; or an insurance company (as defined in Section 2(13) of the 1933 Act; or an investment company registered under the Investment Company Act of 1940; or a business development company (as defined in Section 2(a)(48) of the Investment Company Act of 1940; or a Small Business Investment Company licensed by the U.S. Small Business

2

UC6th&Batt008823

Pltfs (UC) 000328

Administration under Section 301(c) or (d) of the Small Business Administration Act of 1958; or a plan established and maintained by a state, its political subdivisions or any agency or instrumentality of a state or its political subdivisions for the benefit of its employees, if such plan has total assets in excess of $5,000,000; or an employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary (as defined in Section 3(21) of such Act), which is either a bank, savings and loan association, insurance company or registered investment adviser or, if a self-directed plan, with investment decisions made solely by persons who are accredited investors; and/or

[ ]    (g)    I am an entity in which all of the equity owners are Accredited Investors.

8.    (CHECK THIS BOX IF APPLICABLE:    [ ])  The offer to sell the Interest was not made to me by the Company or its agents while I was in, and I have made this offer to buy the Interest and signed this Agreement when I have been outside of the, the United States of America (which for purposes of this Agreement includes all of its states, territories and possessions and the District of Columbia).

9.    The information set forth in this Agreement is correct with respect to me as of the date of my execution of this Agreement. I will promptly notify the Company of any change in such information occurring before I am notified of the acceptance of my subscription by the Company and will provide any further supplementary information, which is requested by the Company.

10.    I hereby agree to indemnify the Company and its officers, directors, managers and agents against, and hold such parties harmless from, any and all liabilities, damages, costs or expenses, including, without limitation, those arising under federal or state securities laws, incurred on account of or arising out of: (a) any inaccuracy in my representations and covenants set forth herein; or (b) the disposition of any of portion of the Interest which I will receive, contrary to my foregoing representations and covenants.

11.    If a corporation, partnership, trust, limited liability company or other form of business entity, I am authorized and otherwise duly qualified to purchase and hold the Interest and have not been formed for the specific purpose of making an investment in the Company. If an undersigned individual is executing this Agreement, as well as all other related documents, on behalf of any entity, such individual represents that he or she is duly authorized to execute all such documents on behalf of that entity. If an individual, I am under no legal disability with respect to entering into this Agreement or purchasing the Interest.

12.    At the Company's request, I will promptly execute such other instruments or documents as may be reasonably required in connection with my purchase of the Interest. Whenever the context hereof so requires, use of either the masculine, feminine or neuter shall include the masculine, feminine and neuter, and use of the singular or the plural form shall include the singular and plural. This Agreement shall be governed by and construed in accordance with the laws of the State of California, excluding conflict of laws provisions. In any dispute or legal proceeding relating to the enforcement of rights under this Agreement, the prevailing party shall be entitled to recover its reasonable legal fees and costs. This Agreement constitutes the entire agreement between me and the Company, and supersedes any prior or contemporaneous representations, warranties, understandings or agreements, with respect to the subject matter of this Agreement. Neither this Agreement nor any provision hereof may be amended, waived or canceled except by an instrument in writing signed by the party against whom any such amendment, waiver or cancellation is sought. Any provision of this Agreement which is invalid or unenforceable under applicable laws shall be deemed inoperative to the extent it conflicts with such laws, but shall not affect the enforceability of other provisions of this Agreement. No waiver of any of the provisions of this Agreement shall be deemed a waiver of any other provision, whether or not similar, nor will any waiver constitute a continuing waiver.

13.    This Agreement shall be binding upon my heirs, executors, administrators, successors and assigns. However, my rights and obligations to purchase the Interest under this Agreement may not be assigned or transferred to any other person without the Company's prior written consent and any assignment or transfer in violation of this paragraph shall be void.

14.    The purchase price for the Interest will be paid in the form of a (wire, check, transfer, etc): __Wire_____.

UC6th&Batt008824

Pltfs (UC) 000329

DATED: __01/17/2020__

---

Printed Name of Purchaser

Ronald A. Christensen

---

Printed Name(s) and Title(s) or
Capacity(ies) of any Officer(s)
Partner(s) or Agent(s) Acting on
Behalf of Purchaser (if an entity):

Name: _____

Title: _____

Signature of Purchaser

Ronald A. Christensen

---

Signature(s) of Any Officer(s),
Partner(s) or Agent(s) Acting
on Behalf of Purchaser if an entity:

Signature: _____

4

UC6th&Batt008825

Pltfs (UC) 000330

## ADDITIONAL INFORMATION

[COMPLETE EACH ITEM. MODIFY AS APPROPRIATE IF THERE ARE TWO OR MORE PURCHASERS.  ADD ADDITIONAL SHEETS IF NECESSARY TO COMPLETE ANY OF THE ITEMS.]

1.    Give the exact name(s) in which title to the Interest is to be taken:

_Ronald A. Christensen_____

Indicate the type of ownership [check one]:

[✓]   Individual ownership            [ ]   Joint Tenancy
      (One signature required)              (Both parties must sign)

[ ]   Trust (Include                  [ ]   Community Property
      name of trustee(s) and date           (Spouse or spouses named
      trust was established)                as record holder(s)
                                            must sign)

[ ]   Partnership (Include            [ ]   Tenants in Common
      copy of the statement                 (Both parties must sign)
      of partnership or the
      partnership agreement
      or certificate authorizing
      signature)

[ ]   Corporation (Include            [ ]   Other:_____
      certified corporate
      resolution authorizing
      purchase and signature)

2.    If the purchaser is other than an individual purchasing for his or her own account (a corporation, trustee, partnership, custodian, estate, etc.), indicate the nature of the purchaser and the capacity of any person(s) signing above on behalf of the purchaser:

_____
_____

3.    Residence address of purchaser or principal business address (if an entity):

_11517 E. Paradise Lane, Scottsdale, AZ 85255_____

4.    Mailing address (if different than residence address) to be used for notices from the Company:

_____

5.    Telephone numbers:

Business:    (602) 750-7600

Residence:   (980) 699-2900

Facsimile:   (___) _____

6.    Tax ID Number (Social Security Number if an individual): _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_

7.    E-Mail Address: _Ron ChristensenMD@aol.com_

5

**UC6th&Batt008826**

Pltfs (UC) 000331

**ACCEPTANCE BY THE COMPANY**

its provisions.

URBAN COMMONS 6TH AVE SEATTLE, LLC hereby accepts the foregoing agreement and agrees to be bound by

DATED: 1/21/2020

URBAN COMMONS 6TH AVE SEATTLE, LLC,
a California limited liability company

By:     Urban Commons, LLC,
        a Delaware limited liability company,
        Its Manager

By: _____
         Signature

_Alec Robinson_
Printed Name

_Authorized Signer_
Title

6

UC6th&Batt008827

Pltfs (UC) 000332

# EXHIBIT J

# OPERATING AGREEMENT
# FOR
# URBAN COMMONS 6TH AVE SEATTLE, LLC

THE MEMBERSHIP INTERESTS IN URBAN COMMONS 6TH AVE SEATTLE, LLC HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE FEDERAL SECURITIES ACT OF 1933, AS AMENDED, OR QUALIFIED WITH THE CORPORATIONS OR SECURITIES COMMISSIONER OF ANY STATE, AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION AND QUALIFICATION REQUIREMENTS OF SUCH LAWS.   ANY ATTEMPTED TRANSFER OF THE SECURITIES IS RESTRICTED BY SUCH LAWS AS WELL AS RESTRICTIONS DESCRIBED IN THE WITHIN AGREEMENT.

Dated:  December 16, 2019

66644.1

UC6th&Batt008778

Pltfs (UC) 000283

## TABLE OF CONTENTS

ARTICLE I:  DEFINITIONS ......................................................................... 1

ARTICLE II:  ORGANIZATION..................................................................... 7

ARTICLE III:  CAPITAL AND CAPITAL CONTRIBUTIONS................................ 8

ARTICLE IV:  ALLOCATIONS AND DISTRIBUTIONS ................................... 10

ARTICLE V:  MANAGEMENT .................................................................... 17

ARTICLE VI:  ACCOUNTS AND ACCOUNTING............................................ 24

ARTICLE VII:  MEMBERSHIP-MEETINGS, VOTING, INDEMNITY ................. 27

ARTICLE VIII:  TRANSFERS OF MEMBERSHIP INTERESTS ....................... 28

ARTICLE IX:  DISSOLUTION AND WINDING UP.......................................... 33

ARTICLE X:  INDEMNIFICATION AND ARBITRATION.................................. 34

ARTICLE XI:  INVESTMENT REPRESENTATIONS ...................................... 35

ARTICLE XII:  ATTORNEY-IN-FACT AND AGENT........................................ 36

ARTICLE XIII:  GENERAL PROVISIONS ..................................................... 37

66644.1

UC6th&Batt008779

Pltfs (UC) 000284

# OPERATING AGREEMENT
## for
## URBAN COMMONS 6TH AVE SEATTLE, LLC

A.     THIS OPERATING AGREEMENT is effective as of December 16, 2019 by and among the individuals and entities identified on the signature pages attached to this Agreement and listed on Exhibit "A" attached hereto (referred to individually as a "Member" and collectively as the "Members").

B.     The Members have formed a limited liability company (the "Company") under the Delaware Limited Liability Company Act (currently Chapter 18 of Title 6 of the Delaware Code) (the "Act") by filing Articles of Organization with the Delaware Secretary of State.

C.     The Members enter into this Agreement to form and provide for the governance of the Company and the conduct of its business, and to specify their relative rights and obligations.

NOW THEREFORE, the Members agree as follows:

## ARTICLE I:

## DEFINITIONS

Capitalized terms used in this Agreement have the meanings specified in this Article or elsewhere in this Agreement.

1.1     "Act" is defined in Recital A.

1.2     "Adjusted Capital Account Deficit" is defined in Section 4.3(a).

1.3     "Affiliate" of a Member or a Manager means (a) any Person directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the Member or (b) the parent, spouse, sibling (including the sibling's spouse) or child (including the child's spouse) of any Member, Manager or Person with direct or indirect, through one or more intermediaries, control over any Member or Manager. The term "control" (including the terms "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through membership, ownership of voting securities, by contract, or otherwise.

1.4     "Agreement" means this Operating Agreement, as originally executed and as amended from time to time.

1.5     "Articles" is defined in Section 2.7.

66644.1

UC6th&Batt008780

Pltfs (UC) 000285

1.6    "Assignee" means a Person who has acquired a Member's Economic Interest in the Company, by way of a Transfer in accordance with the terms of this Agreement, but who has not become a Member.

1.7    "Assigning Member" means a Member who by means of a Transfer has transferred an Economic Interest in the Company to an Assignee.

1.8    "Available Capital Proceeds" means, with respect to any fiscal year, the net cash proceeds remaining in the Company and available for distribution derived from any Capital Event, after deduction of amounts required for all expenses incurred by the Company in connection with obtaining such proceeds and any amounts required for the payment of Company indebtedness, as determined by the Manager(s).

1.9    "Available Cash Flow" means all cash received from Company operations not including amounts received as Capital Contributions, reduced by all cash paid as determined by the Manager(s), including payment of Company indebtedness or amounts used to establish Reserves.

1.10    "Award" is defined in Section 8.5(a).

1.11    "Book Depreciation" is defined in Section 4.3(b).

1.12    "Bona Fide Offer" is defined in Section 8.3.

1.13    "Capital Account" means, with respect to any Member, the account reflecting the capital interest of the Member in the Company, consisting of the Member's initial Capital Contribution maintained and adjusted in accordance with Section 3.4.

1.14    "Capital Contribution" means, with respect to any Member, the amount of money and the fair market value of any property (other than money) at the time such property is contributed to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take "subject to" under IRC Section 752) (a) in consideration of a Capital Percentage Interest held by such Member or (b) as additional Capital Contributions made in accordance with Sections 3.2 and 3.3.  A Capital Contribution shall not be deemed a loan.

1.15    "Capital Event" means a sale or disposition of any of the Company's capital assets, the receipt of insurance and other proceeds derived from the involuntary conversion of Property, the receipt of proceeds from a refinancing of Property, or a similar event with respect to Property or assets.

1.16    "Capital Percentage Interest" means the ratio of a Member's total Capital Contributions to the total Capital Contributions by all Members expressed as a percentage and represents a Member's entire Economic Interest in the Company, including a Member's share of the Company's Profits, Losses and distributions of the Company's Available Cash Flow and Available Capital Proceeds pursuant to this Agreement.  The Membership List shall be amended upon the admission of any new Members to the Company and upon any adjustments to a Member's Capital Percentage

UC6th&Batt008781

Pltfs (UC) 000286

Interest pursuant to the terms and conditions of this Agreement.   The initial Capital Percentage Interests of the Members are listed on Exhibit "A" attached hereto.

1.17   "Code" or "IRC" means the Internal Revenue Code of 1986, as amended, and any successor provision.

1.18   "Company" means the company named in Section 2.2 of this Agreement.

1.19   "Company Minimum Gain" is defined in Section 4.3(c).

1.20   "Economic Interest" means a Person's share of (a) the Company's items of income, gain, deduction, loss and expense, and (b) the distributions of the Company's assets pursuant to this Agreement and the Act, but shall not include any other rights of a Member, including, without limitation, the right to vote or participate in the management of the Company, or any right to information concerning the business and affairs of the Company.

1.21   "Encumber" means the act of creating or purporting to create an Encumbrance, whether or not perfected under applicable law.

1.22   "Encumbrance" means, with respect to any Membership Interest, or any element thereof, a mortgage, pledge, security interest, lien, proxy coupled with an interest (other than as contemplated in this Agreement), option, or preferential right to purchase.

1.23   "Expiration Date" is defined in Section 8.5.

1.24   "Fair Option Price" is defined in Section 8.8.

1.25   "Gross Asset Value" means, with respect to any item of Property, the item's adjusted basis for federal income tax purposes, except as follows:

(a)   The initial Gross Asset Value of any item of property contributed by a Member to the Company shall be the fair market value of such property, as mutually agreed by the contributing Member and the Company;

(b)   The Gross Asset Value of any item of Property distributed to any Member shall be the fair market value of such item of Property on the date of distribution; and

(c)   The Gross Asset Value of any item of Property shall be subject to the adjustments specified in Section 4.9.

1.26   "Indemnified Party" is defined in Section 10.1.

1.27   "Initial Members" means those Persons whose names are set forth on the original Membership List maintained by the Company and are listed on Exhibit

UC6th&Batt008782

Pltfs (UC) 000287

"A" attached hereto.  A reference to an "Initial Member" means any of the Initial Members.

1.29   "Involuntary Transfer" means, with respect to any Membership Interest, or any element thereof, any Transfer or Encumbrance, whether by operation of law, pursuant to court order, foreclosure of a security interest, execution of a judgment or other legal process, or otherwise, including a purported transfer to or from a trustee in bankruptcy, receiver, or assignee for the benefit of creditors.

1.30   "IRR" means the annualized discount rate, determined by iterative process on a cumulative basis, which results in a net present value of zero, calculated and compounded on a monthly basis (as calculated using the XIRR function using Excel or equivalent accounting program), when such discount rate is applied to specified Capital Contributions from the date when such contributions were made and to specified distributions to the date such distributions were initially made.  A further explanation and sample Internal Rate of Return calculation is attached hereto as Exhibit "B."

1.31   "Liabilities" is defined in Section 10.1.

1.32   "Losses" is defined in Section 4.2.

1.33   "Major Decision" means the decision by the Manager(s) and a Majority of Members on behalf of the Company to do any of the following:  (a) the merger of the Company with another limited liability company or corporation, general partnership, limited partnership or other entity (except that any act which would cause a Member to incur personal liability for the obligations of the Company or its successor shall also require the consent of such Member); (b) any act which would make it impossible to carry on the ordinary business of the Company; (c) the confession of a judgment against the Company if the amount of the judgment is in excess of Three Hundred Thousand Dollars ($300,000) and is not covered by insurance carried by the Company; (d) the incurring of any capital expense that costs in excess of Five Hundred Thousand Dollars ($500,000) unless such capital expense had been accounted for in the operating budgets for the Company; (e) lending money to, or guaranteeing the debts or other obligations of, a Member or any other Person; (f) the filing of a petition in bankruptcy or the entering into of an arrangement among creditors; (g) the entering into, on behalf of the Company, of any transaction constituting a "reorganization"; (h) the amendment of this Agreement, provided that this Agreement cannot be amended without the consent of each Member adversely affected if such amendment would (i) appoint such Member as a Manager of the Company, (ii) modify the limited liability of a Member, or (iii) alter the interest of a Member in Profits, Losses, other items of income, gain, loss and deduction, or any Company distributions; and (i) the compromise of any obligation of a Member to make a Capital Contribution or return an improper distribution.

1.34   "Majority of Members" means a Member or Members whose Percentage Interests when taken together represent more than 50% of the Percentage Interests of all the Members.

UC6th&Batt008783

Pltfs (UC) 000288

1.35   "Manager" or "Managers" means the Person(s) named as such in Section 2.9 or the Persons who from time to time succeed any Person as a Manager and who, in either case, are serving at the relevant time as a Manager.

1.36   "Member" means an Initial Member or a Person who otherwise acquires a Membership Interest, as permitted under this Agreement, for as long as it continues to own such Membership Interest.

1.37   "Member Nonrecourse Debt" is defined in Section 4.3(d).

1.38   "Member Nonrecourse Debt Minimum Gain" is defined in Section 4.3(e).

1.39   "Member Nonrecourse Deductions" is defined in Section 4.3(f).

1.40   "Membership Interest" means a Member's rights in the Company, including the Member's Capital Percentage Interest and Percentage Interest, any right to Vote or participate in management, and any right to information concerning the business and affairs of the Company.

1.41   "Membership Interest Certificates" is defined in Section 7.3.

1.42   "Non-Contributing Member" is defined in Section 3.3.

1.43   "Nonrecourse Deductions" is defined in Section 4.3(g).

1.44   "Nonrecourse Liability" is defined in Section 4.3(h).

1.45   "Notice" means a written notice required or permitted under this Agreement. A notice shall be deemed given or sent when deposited, as certified mail or for overnight delivery, postage and fees prepaid, in the United States mails; when delivered to Federal Express, United Parcel Service or other similar overnight delivery service, for overnight delivery, charges prepaid or charged to the sender's account; when personally delivered to the recipient; when transmitted by electronic means, and such transmission is electronically confirmed as having been successfully transmitted; or when delivered to the home or office of a recipient in the care of a person whom the sender has reason to believe will promptly communicate the notice to the recipient.

1.46   "Option Date" is defined in Section 8.6.

1.47   "Partner" is defined in Section 6.6.

1.48   "Percent of the Members" means the specified total of Percentage Interests of all the Members.

1.49   "Percentage Interest" means the ownership interest of a Member in the Company from time-to-time, including a Member's right to Vote on Company matters.  The Membership List shall be amended upon the admission of any new

Members to the Company and upon any adjustments to a Member's Percentage Interest pursuant to the terms and conditions of this Agreement.  The initial Percentage Interests of the Members are listed on Exhibit "A" attached hereto.

1.50   "Person" means an individual, partnership, limited partnership, trust, estate, association, corporation, limited liability company, or other entity, whether domestic or foreign.

1.51   "Profits" and "Losses" are defined in Section 4.2.

1.52   "Property" means those certain properties knows as the Hilton Seattle at 1301 6th Ave., Seattle, Washington, 98101 and any other tangible or intangible, real or personal property contributed to or acquired or owned directly or indirectly by the Company.

1.53   "Proxy" means a written authorization signed or an electronic transmission authorized by a Member or the Member's attorney-in-fact giving another Person the power to exercise the voting rights of that Member.

1.54   "Regulations" ("Reg") means the income tax regulations promulgated by the United States Department of the Treasury and published in the Federal Register for the purpose of interpreting and applying the provisions of the Code, as such Regulations may be amended from time to time, including corresponding provisions of applicable successor regulations.

1.55   "Reserves" means the aggregate of reserve accounts that the Manager(s), in the Manager's(s') sole discretion, deems reasonably necessary to meet accrued or contingent liabilities of the Company, reasonably anticipated operating expenses, and working capital requirements.

1.56   "Secretary" is defined in Section 6.7(b).

1.57   "Selling Member" is defined in Section 8.4.

1.58   "Substituted Member" is defined in Section 8.9.

1.59   "Successor in Interest" means an Assignee, a successor of a Person by merger or otherwise by operation of law, or a transferee of all or substantially all of the business or assets of a Person.

1.60   "Tax Item" means each item of income, gain, loss, deduction, or credit of the Company.

1.61   "Tax Matters Member" means such Person as may be designated under Section 6.6.

1.62   "Transfer" means, with respect to a Membership Interest or any element of a Membership Interest, any sale, assignment, gift, Involuntary Transfer,

UC6th&Batt008785

Pltfs (UC) 000290

Encumbrance, or other disposition of such a Membership Interest or any element of such Membership Interest, directly or indirectly, other than an Encumbrance that is expressly permitted under this Agreement.

1.63   "Triggering Event" is defined in Section 8.4.

1.64   "Unreturned Capital Contributions" means, with respect to a Member, such Member's Capital Contributions that have not been returned to such Member pursuant to Section 4.12(a).

1.65   "Urban Commons" means Urban Commons, LLC, a Delaware limited liability company.

1.66   "Voluntary Contributing Member" is defined in Section 3.3.

1.67   "Vote" means a written consent or approval, a ballot cast at a meeting, or a voice vote.

1.68   "Voting Interest" means, with respect to a Member, the right to Vote or participate in management and any right to information concerning the business and affairs of the Company as provided under this Agreement. A Member's Voting Interest shall be directly proportional to that Member's Percentage Interest.

## ARTICLE II:

## ORGANIZATION

2.1   The Manager(s) has caused the Articles of Organization for the Company to be executed and filed with the Secretary of State of the State of California.

2.2   The name of the Company is **URBAN COMMONS 6TH AVE SEATTLE, LLC**.

2.3   The mailing address of the Company shall be at 10250 Constellation Blvd., Suite 1750, Los Angeles, California 90067, or such other place or places as may be determined by the Manager(s) from time to time.

2.4   The initial agent for service of process on the Company shall be Taylor Woods, whose mailing address is 10250 Constellation Blvd., Suite 1750, Los Angeles, California 90067.   The Manager(s) may from time to time change the Company's agent for service of process.

2.5   The purpose of the Company is to acquire, own, develop, redevelop, operate, manage, lease, finance and/or sell the Property, and to do all things necessary, convenient or incidental to that purpose, including, but not limited to, engaging a qualified, licensed third party manager to manage the operations of all or any portion of the Property.

UC6th&Batt008786

Pltfs (UC) 000291

2.6     The Members intend the Company to be a limited liability company under the Act. Neither the Manager(s) nor any Member shall take any action inconsistent with the express intent of the parties to this Agreement.

2.7     The term of existence of the Company shall commence upon the acceptance of the Articles of Organization of the Company (the "Articles") by the Office of the California Secretary of State, and shall continue until the Company is dissolved and wound up pursuant to Article IX.

2.8     The names and addresses of the Initial Members are set forth on Exhibit "A" attached hereto.

2.9     The initial Manager of the Company will be Urban Commons:

> Urban Commons, LLC
> 10250 Constellation Blvd., Suite 1750
> Los Angeles, California  90067
> Phone No.:  (949) 400-8808
> Attention:  Taylor Woods

# ARTICLE III:

## CAPITAL AND CAPITAL CONTRIBUTIONS

3.1     Each Member shall contribute to the capital of the Company as the Member's initial Capital Contribution the money and property specified on the Subscription Agreement signed by the Member.  The initial fair market value of each item of contributed property (net of liabilities secured by such property) that the Company is considered to assume or to take "subject to" under IRC Section 752, is also set forth on the Subscription Agreement, together with the description and amount of these liabilities.  If a Member fails to make the initial Capital Contributions specified in this Section by January 25, 2016, that Member's entire Membership Interest shall terminate, and that Member shall indemnify and hold the Company and the other Members harmless from any loss, cost, or expense, including reasonable attorney fees caused by the failure to make the initial Capital Contribution.

3.2     The Manager(s) does not anticipate that any additional Capital Contributions will be required from the Members in addition to the initial Capital Contributions made by the Members in accordance with Section 3.1 above.  However, if the Manager(s) reasonably determines from time to time that additional cash capital contributions are needed to carry out the purposes of the Company (in connection with making such determination the Manager(s) will take into account any projected Available Cash Flow which may be available and the availability of additional financing to pay for any such items), the Manager(s) shall deliver written notice to the Members as to the amount of additional capital that is needed.  Within thirty (30) days after receipt of such written notice, each Member may, but without any obligation to do so, make

UC6th&Batt008787

Pltfs (UC) 000292

additional cash Capital Contributions to the Company in an amount equal to the product obtained by multiplying its Capital Percentage Interest by the additional capital amount that the Manager(s) reasonably determined is necessary to carry out the purposes of the Company.

3.3    If any Member (a "Non-Contributing Member") shall decide not to make any additional Capital Contribution within such thirty (30) day period then, within the following ten (10) day period, all or any portion of the contributing Members (such contributing Members who elect to make such additional Capital Contribution in place of the Non-Contributing Member shall be hereinafter referred to as a "Voluntary Contributing Member") may, pro rata in accordance with the Voluntary Contributing Members' aggregate Capital Percentage Interests, make such additional Capital Contribution(s) in place of the Non-Contributing Member; in which case the Capital Percentage Interests of the Non-Contributing Member and the Voluntary Contributing Members shall be adjusted so that each such Member's Capital Percentage Interest shall equal a fraction, which shall be expressed as a percentage, the numerator of which is the Capital Contributions, including the additional Capital Contributions, made by such Member and the denominator of which is the total Capital Contributions, including the additional Capital Contributions, made by all Members.   All such adjustments to the Capital Percentage Interests of the Non-Contributing Member and the Voluntary Contributing Members shall be effective immediately after the making by the Voluntary Contributing Members of the additional Capital Contributions in place of the Non-Contributing Member.

3.4    An individual Capital Account for each Member shall be maintained in accordance with the requirements of Reg Section 1.704-1(b)(2)(iv) and adjusted in accordance with the following provisions:

(a)    A Member's Capital Account shall be increased by that Member's Capital Contributions, that Member's share of Profits, and any items in the nature of income or gain that are specially allocated to that Member pursuant to Article IV.

(b)    A Member's Capital Account shall be increased by the amount of any Company liabilities assumed by that Member subject to and in accordance with the provisions of Reg Section 1.704-1(b)(2)(iv)(c).

(c)    A Member's Capital Account shall be decreased by (a) the amount of cash distributed to that Member; (b) the fair market value of any Property so distributed, net of liabilities secured by such distributed Property that the distributee Member is considered to assume or to be subject to under IRC Section 752; and (c) the amount of any items in the nature of expenses or losses that are specially allocated to that Member pursuant to Article IV.

(d)    A Member's Capital Account shall be reduced by the Member's share of any expenditures of the Company described in IRC Section 705(a)(2)(B) or which are treated as IRC Section 705(a)(2)(B) expenditures pursuant to

Reg Section 1.704-1(b)(2)(iv)(i) (including syndication expenses and losses nondeductible under IRC Sections 267(a)(1) or 707(b)).

(e)     If any Economic Interest (or portion thereof) is transferred, the transferee of such Economic Interest or portion shall succeed to the transferor's Capital Account attributable to such interest or portion.

(f)     The principal amount of a promissory note that is not readily traded on an established securities market and that is contributed to the Company by the maker of the note shall not be included in the Capital Account of any Person until the Company makes a taxable disposition of the note or until (and to the extent) principal payments are made on the note, all in accordance with Reg Section 1.704-1(b)(2)(iv)(d)(2).

(g)     Each Member's Capital Account shall be increased or decreased as necessary to reflect a revaluation of the Company's property assets in accordance with the requirements of Reg Sections 1.704-1(b)(2)(iv)(f) and 1.704-1(b)(2)(iv)(g), including the special rules under Reg Section 1.701-1(b)(4), as applicable. The provisions of this Agreement respecting the maintenance of Capital Accounts are intended to comply with Reg Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with those Regulations.

3.5     A Member shall not be entitled to withdraw any part of the Member's Capital Contribution or to receive any distributions, whether of money or property, from the Company except as provided in this Agreement.

3.6     No interest shall be paid on Capital Contributions or on the balance of a Member's Capital Account except as provided in this Agreement.

3.7     A Member shall not be bound by, or be personally liable for, the expenses, liabilities, or obligations of the Company except as otherwise provided in this Agreement.

3.8     Except as otherwise expressly provided in the Act or in this Agreement, no Member shall have priority over any other Member with respect to the return of a Capital Contribution or distributions or allocations of income, gain, losses, deductions, credits, or items thereof.

## ARTICLE IV:

## ALLOCATIONS AND DISTRIBUTIONS

4.1     (a)     Profits shall be allocated among the Members as follows:

1.     First, to the Members to the extent of, and in proportion to, the cumulative Losses, if any,

UC6th&Batt008789

Pltfs (UC) 000294

previously allocated to such Members pursuant to Sections 4.1(b)(2), reduced by any prior allocations of Profits pursuant to this Section 4.1(a)(1).

2. Second, to the Members to the extent of, and in proportion to, the excess, if any, of the cumulative Losses previously allocated to each such Member pursuant to Section 4.1(b) (including any such Losses described in Section 4.1(b)(2)) over the cumulative Profits previously allocated to such Member pursuant to Section 4.1(a), until such excess is entirely eliminated with respect to each such Member.

3. Third, to the Members in accordance with and to the extent of distributions made in accordance with Sections 4.11(a), 4.11(b), 4.11(c) and 4.11(d), in that order.

4. Fourth, to the Members in accordance with and to the extent of distributions made in accordance with Sections 4.12(b), 4.12(c), 4.12(d) and 4.12(e), in that order.

(b) Losses shall be allocated among the Members as follows:

1. To the Members to the extent of and in proportion to the cumulative Profits, if any, previously allocated to such Members pursuant to Sections 4.1(a)(4) and (3), in that order, reduced in each case by any prior allocations of offsetting Losses pursuant to this Section 4.1(b)(1).

2. Thereafter, one hundred percent (100%) to the Members based on the Members' Capital Percentage Interests.

(c) Notwithstanding Sections 4.1(a) and (b) above, to the extent the Code requires that Losses be allocated other than as set forth in Section 4.1(b) ("Tax Loss Allocations"), gross income and Profits shall be allocated so as to minimize as quickly as possible the difference between the balances in a Member's Capital Account reflecting such Tax Loss Allocations and what the Capital Account balances would be absent such Tax Loss Allocations.

4.2 As used in this Agreement, "Profits and Losses" means, for each fiscal year or other period specified in this Agreement, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance

with IRC Section 703(a), including all Tax Items required to be stated separately pursuant to IRC Section 703(a)(1), with the following adjustments:

(a)     Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses shall be added to such taxable income or loss;

(b)     Any expenditures of the Company described in IRC Section 705(a)(2)(B) or treated as IRC Section 705(a)(2)(B) expenditures pursuant to Reg Section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Profits or Losses shall be subtracted from such taxable income or shall increase such loss;

(c)     Gain or loss resulting from any disposition of Property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the fair market value of the Property disposed of, notwithstanding that the adjusted tax basis of such Property differs from its fair market value;

(d)     In lieu of depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Book Depreciation for such fiscal year or other period, computed in accordance with the definition of "Book Depreciation" in Section 4.3(b); and

(e)     Notwithstanding the foregoing provisions of this Section 4.2, any items of income, gain, loss, or deduction that are specially allocated shall not be taken into account in computing Profits or Losses under Section 4.1.

4.3     The following definitions shall apply with respect to this Article IV.

(a)     "Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year of the Company, after such Member's Capital Account has been adjusted as follows: (1) the Member's Capital Account shall be increased by the amount of such Member's share of Company Minimum Gain and Member Nonrecourse Debt Minimum Gain; and (2) the Member's Capital Account shall be decreased by the amount of the items described in Reg Sections 1.704-1(b)(2)(ii)(d)(4), (5), and (6).

This definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Reg Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently with that Regulation.

(b)     "Book Depreciation" means, with respect to any item of Property for a given fiscal year, a percentage of depreciation or other cost recovery deduction allowable for federal income tax purposes for such item during that fiscal year equal to the result (expressed as a percentage) obtained by dividing (1) the fair market value of that item at the beginning of the fiscal year (or the acquisition date during the

UC6th&Batt008791

Pltfs (UC) 000296

fiscal year), by (2) the federal adjusted tax basis of the item at the beginning of the fiscal year (or the acquisition date during the fiscal year). If the adjusted tax basis of an item is zero, the Manager(s) may determine Book Depreciation, provided that the Manager(s) does so in a reasonable and consistent manner.

(c)     "Company Minimum Gain" has the meaning set forth in Reg Section 1.704-2(d)(1).

(d)     "Member Nonrecourse Debt" is defined in Reg Section 1.704-2(b)(4).

(e)     "Member Nonrecourse Debt Minimum Gain" for a fiscal year of the Company means the net increase in Minimum Gain attributable to Member Nonrecourse Debt, determined as set forth in Reg Section 1.704-2(i)(2).

(f)     "Member Nonrecourse Deductions" has the meaning set forth in Reg Section 1.704-2(i)(2). For any fiscal year of the Company, the amount of Member Nonrecourse Deductions with respect to a Member Nonrecourse Debt equals the net increase during that fiscal year in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt during that fiscal year, reduced (but not below zero) by the amount of any distributions during such year to the Member bearing the economic risk of loss for such Member Nonrecourse Debt if such distributions are both from the proceeds of such Member Nonrecourse Debt and are allocable to an increase in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, all as determined according to the provisions of Reg Section 1.704-2(i)(2). In determining Member Nonrecourse Deductions, the ordering rules of Reg Section 1.704-2(j) shall be followed.

(g)     "Nonrecourse Deductions" has the meaning set forth in Reg Section 1.704-2(c).  The amount of Nonrecourse Deductions for a Company fiscal year equals the net increase in the amount of Company Minimum Gain during that fiscal year, reduced (but not below zero) by the aggregate amount of any distributions during that fiscal year of proceeds of a Nonrecourse Liability that are allocable to an increase in Company Minimum Gain.

(h)     "Nonrecourse Liability" is defined in Reg Section 1.752-1(a)(2).

4.4.     The following special allocations shall be made in the following order:

(a)     Company Minimum Gain Chargeback.  If there is a net decrease in Company Minimum Gain during a fiscal year, each Member shall be allocated, before any other allocation under this Section, items of Company income and gain for such fiscal year equal to such Member's share of the net decrease in Company Minimum Gain as determined in accordance with Reg Section 1.704-2(g)(2).

UC6th&Batt008792

Pltfs (UC) 000297

(b)     Member Nonrecourse Debt Minimum Gain Chargeback. If there is a net decrease in Member Nonrecourse Debt Minimum Gain during a fiscal year, any Member with a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt as of the beginning of such fiscal year shall be allocated items of Company income and gain for such year (and, if necessary, subsequent years) equal to that Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain. A Member's share of net decrease in Member Nonrecourse Debt Minimum Gain shall be determined pursuant to Reg Section 1.704-2(i)(3). A Member shall not be subject to the foregoing chargeback to the extent permitted under Reg Section 1.704-2(i)(4).

(c)     Qualified Income Offset. If any Member unexpectedly receives an adjustment, allocation, or distribution described in Reg Sections 1.704-1(b)(2)(ii)(d)(4), (5), or (6), such Member shall be allocated items of Company income and gain (consisting of a pro rata portion of each item of Company income, including gross income and gain for such fiscal year) in an amount and manner sufficient to eliminate the Adjusted Capital Account Deficit created by such adjustment, allocation, or distribution.

4.5     Nonrecourse Deductions, as defined in Reg Section 1.704-2(c), for any fiscal year of the Company shall be allocated to the Members in the same proportion as Losses are allocated under Section 4.1(b)(2), provided that any Member Nonrecourse Deductions for any fiscal year or other period shall be allocated to the Member who bears (or is deemed to bear) the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Reg Section 1.704-2(i)(2).

4.6     Any unrealized appreciation or unrealized depreciation in the values of Property distributed in kind to Members shall be deemed to be Profits or Losses realized by the Company immediately prior to the distribution of the Property and such Profits or Losses shall be allocated to the Capital Accounts in the same proportions as Profits are allocated under Section 4.1.  Any Property so distributed shall be treated as a distribution to the Members to the extent of the fair market value of the Property, less the amount of any liability secured by and related to the Property. Nothing contained in this Agreement is intended to treat or cause such distributions to be treated as sales for value.  For the purposes of this Section 4.6, "unrealized appreciation" or "unrealized depreciation" shall mean the difference between the fair market value of such Property and the Company's federal adjusted tax basis for such Property.

4.7     Any item of income, gain, loss, or deduction with respect to any Property (other than cash) that has been contributed by a Member to the capital of the Company, or that has been revalued pursuant to the provisions of Section 3.4(g), and that is required or permitted to be allocated to such Member for income tax purposes under IRC Section 704(c) in order to take into account the variation between the tax basis of such Property and its fair market value at the time of its contribution, shall be

UC6th&Batt008793

Pltfs (UC) 000298

allocated solely for income tax purposes in the manner required or permitted under IRC Section 704(c) using the "traditional" method described in Reg Section 1.704-3(b), except that any other method allowable under applicable Regulations may be used for any contribution of Property with respect to which there is agreement among the contributing Member and the Manager(s) (and, if the Manager(s) and the contributing Member are Affiliates, a Majority of Members who are not Affiliates of the Manager(s)).

4.8     In the case of a Transfer of an Economic Interest during any fiscal year of the Company, the Assigning Member and Assignee shall each be allocated Profits or Losses based on the number of days each held the Economic Interest during that fiscal year.  If the Assigning Member and Assignee agree to a different proration and advise the Manager(s) of the agreed proration before the date of the Transfer, Profits or Losses from a Capital Event during that fiscal year shall be allocated to the holder of the Interest on the day such Capital Event occurred.  If an Assignee makes a subsequent Assignment, said Assignee shall be considered an "Assigning Member" with respect to the subsequent Assignee for purposes of the aforesaid allocations.

4.9     (a)     The Gross Asset Value of all Property shall be adjusted as of the following times: (i) the acquisition of an interest or additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (ii) the distribution of money or other Property (other than a de minimis amount) by the Company to a Member as consideration for an Economic Interest in the Company, and (iii) the liquidation of the Company within the meaning of Reg Section 1.704-1(b)(2)(ii)(g); provided, however, that adjustments under clauses (i) and (ii) above shall be made only in the event of a revaluation of Property under Section 3.4(g) in accordance with Reg Section 1.704-1(b)(2)(iv)(f);

(b)     The Gross Asset Value of Property shall be increased or decreased to reflect adjustments to the adjusted tax basis of such Property pursuant to IRC Section 732, IRC Section 733, or IRC Section 743, subject to the limitations imposed by IRC Section 755 and Reg Section 1.704-1(b)(2)(iv)(m); and

(c)     If the Gross Asset Value of an item of Property has been determined or adjusted pursuant to Section 1.25 or Paragraph (a) or (b) of this Section 4.9, such Gross Asset Value shall be adjusted by the Book Depreciation, if any, taken into account with respect to such Property for purposes of computing Profits and Losses.

4.10    It is the intent of the Members that each Member's allocated share of Company Tax Items be determined in accordance with this Agreement to the fullest extent permitted by IRC Sections 704(b) and 704(c).  Notwithstanding anything to the contrary contained in this Agreement, if the Company is advised that, as a result of the adoption of new or amended regulations pursuant to IRC Sections 704(b) and 704(c), or the issuance of authorized interpretations, the allocations provided in this Agreement are unlikely to be respected for federal income tax purposes, the Manager(s) is hereby granted the power to amend the allocation provisions of this Agreement, on advice of

accountants and legal counsel, to the minimum extent necessary to cause such allocation provisions to be respected for federal income tax purposes.

4.11   Available Cash Flow, excluding revenues or proceeds from a Capital Event or the dissolution of the Company, shall be distributed among the Members at least annually as determined by the Manager(s) as follows:

(a)   Eighty-five percent (85%) to the Members based on the Members' Capital Percentage Interests pro rata and fifteen percent (15%) to Urban Commons if the IRR on the aggregate Capital Contributions made by the Members is equal to fifteen percent (15%) or less;

(b)   Eighty percent (80%) to the Members based on the Members' Capital Percentage Interests pro rata and twenty percent (20%) to Urban Commons if the IRR on the aggregate Capital Contributions made by the Members is greater than fifteen percent (15%) but not more than thirty percent (30%);

(c)   Seventy-five percent (75%) to the Members based on the Members' Capital Percentage Interests pro rata and twenty-five percent (25%) to Urban Commons if the IRR on the aggregate Capital Contributions made by the Members is greater than thirty percent (30%) but not more than forty-five percent (45%); and

(d)   Seventy percent (70%) to the Members based on the Members' Capital Percentage Interests pro rata and thirty percent (30%) to Urban Commons if the IRR on the aggregate Capital Contributions made by the Members is greater than forty-five percent (45%).

4.12   All revenues or proceeds from a Capital Event or the dissolution of the Company shall be distributed among the Members as determined by the Manager(s) as follows:

(a)   First, to the Members pro rata in proportion to the Members' Unreturned Capital Contributions until each Member has recovered his or her Unreturned Capital Contributions;

(b)   Thereafter, eighty-five percent (85%) to the Members based on the Members' Capital Percentage Interests pro rata and fifteen percent (15%) to Urban Commons if the IRR on the aggregate Capital Contributions made by the Members is equal to fifteen percent (15%) or less;

(c)   Eighty percent (80%) to the Members based on the Members' Capital Percentage Interests pro rata and twenty percent (20%) to Urban Commons if the IRR on the aggregate Capital Contributions made by the Members is greater than fifteen percent (15%) but not more than thirty percent (30%);

(d)   Seventy-five percent (75%) to the Members based on the Members' Capital Percentage Interests pro rata and twenty-five percent (25%) to Urban

UC6th&Batt008795

Pltfs (UC) 000300

Commons if the IRR on the aggregate Capital Contributions made by the Members is greater than thirty percent (30%) but not more than forty-five percent (45%); and

(e)     Seventy percent (70%) to the Members based on the Members' Capital Percentage Interests pro rata and thirty percent (30%) to Urban Commons if the IRR on the aggregate Capital Contributions made by the Members is greater than forty-five percent (45%).

4.13   The distribution procedures in Sections 4.11 and 4.12 are further described (and examples of such procedures are provided) in Exhibit "B" attached hereto.  If, as a result of the IRR increasing above a threshold percentage and thus causing the distribution percentages to be adjusted as described in Sections 4.11 and 4.12, the total distributions to the Members (other than Urban Commons) are reduced below the distributions that would be made to such Members if the IRR had not increased above such threshold percentage and the distribution percentages adjusted, the Manager(s) shall continue to make distributions to the Members based on the distribution percentages at the lower IRR level until such time as the total distributions to the Members (other than Urban Commons) are greater at the higher IRR level and adjusted percentages then such distributions would be if the IRR had not increased above such threshold percentage.

4.14   If the proceeds from a sale or other disposition of an item of Property consist of Property other than cash, the value of that Property shall be as reasonably determined by the Manager(s) based on the current fair market value of the Property.  If such non-cash proceeds are subsequently reduced to cash, such cash shall be taken into account by the Manager(s) in determining Available Cash.

4.15   Notwithstanding any other provisions of this Agreement to the contrary, when there is a distribution in liquidation of the Company, or when any Member's interest is liquidated, all items of income and loss first shall be allocated to the Members' Capital Accounts under this Article IV, and other credits and deductions to the Members' Capital Accounts shall be made before the final distribution is made.  The final distribution to the Members shall be made as provided in Section 9.2(d) of this Agreement.  The provisions of this Section 4.14 and Section 9.2(d) shall be construed in accordance with the requirements of Reg Section 1.704-1(b)(2)(ii)(b)(2).

4.16   For purposes of allocating Profits and Losses under this Article IV, adjusting Capital Accounts and complying with applicable IRC and Reg Sections, the terms "Member" and "Members" shall be deemed to include Urban Commons.

## ARTICLE V:

## MANAGEMENT

5.1   The business of the Company shall be managed by the Persons named as Manager(s) in Section 2.9 or any successors, selected as provided in Section

5.3.  The Manager(s) may, but need not, be Members.  If any of the Managers ceases to serve as a Manager (whether due to death, disability, dissolution or otherwise), then the remaining Manager(s) shall have all of the management power and authority of the Manager(s) as set forth in this Agreement.   Except as otherwise provided in this Agreement, all decisions concerning the management of the Company's business shall be made by the majority Vote of the Managers, if more than one Manager exists, and the Manager(s) shall have full, complete and exclusive authority, power, and discretion to manage and control the business, property and affairs of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities with respect to the management of the Company's business, property and affairs on such basis and in such manner as determined by the Manager(s).   In carrying out the purposes of the Company described in Section 2.5, the Manager(s)'s responsibilities shall include, but not be limited to, acquiring, developing, constructing, operating, managing and directing the affairs of the Property; overseeing the marketing and sale of the Property; managing the accountants with respect to the preparation of tax returns and other tax and financial matters; obtaining appropriate insurance; and managing any leasing activities on the Property.

Without limiting the generality of the foregoing and in connection with the Manager(s) fulfilling its obligations under this Agreement, provided that all Major Decisions have been approved by a Majority of Members, the Manager(s) shall have power and authority on behalf of the Company:

(a)   To acquire tangible or intangible, real or personal property from any Person, and to develop, renovate, improve, lease, subdivide, sell, assign, convey or otherwise transfer title to any portion of, or interest in, Property.   In connection with the management and operation of the Property, the Manager(s) shall retain, enter into contracts with and pay any management company providing management services for the Property fair market rates from a portion of Property revenue and net operating income according to industry standards for providing such services;

(b)   To purchase, lease or otherwise acquire or obtain the use of machinery, equipment, tools, staff and personnel, and material, and other types of property that may be deemed necessary or desirable in connection with carrying on the business of the Company;

(c)   To borrow money for the Company from banks, other lending institutions, the Members, Affiliates of the Members or any other Person (as hereinafter defined) on such terms as the Manager(s) deems appropriate, and in connection with such borrowing, to hypothecate, encumber, and grant security interests in the assets of the Company to secure repayment of the borrowed sums, to have the Company guaranty or become surety for repayment of the borrowed sums or to have the Company indemnify any Member against any personal liability for repayment of the borrowed sums to the extent such Member guarantees repayment of the borrowed sums.  No debt shall be contracted or liability incurred by or on behalf of the Company

UC6th&Batt008797

Pltfs (UC) 000302

except by the Manager(s), or to the extent permitted under this Agreement, by agents or employees of the Company expressly authorized by the Manager(s) to contract such debt or incur such liability;

(d)     To prepay in whole or in part, refinance, recast, increase, modify, consolidate, correlate, or extend, on such terms as the Manager(s) may deem proper, any debts of the Company;

(e)     To purchase (i) liability and other insurance to protect the Property, the business of the Company and the Members and Manager(s); (ii) wrap insurance policies in connection with construction of improvements on the Property; and (iii) any other insurance that the Manager(s) deem proper for the Company, consistent with industry standards for other companies engaging in similar businesses.

(f)     To hold and own any Property in the name of the Company;

(g)     To invest any Company funds temporarily (by way of example but not limitation) in time deposits, short-term government obligations, commercial paper, or other low risk type investments;

(h)     To sell or otherwise dispose of, whether or not in the ordinary course of business, all or substantially all of the assets of the Company as part of a single transaction or plan so long as the disposition is not in violation of or a cause of a default under any other agreement to which the Company may be bound or in contravention of state law;

(i)     To execute on behalf of the Company all instruments and documents, including, without limitation: checks; drafts; notes and other negotiable instruments; mortgages, or deeds of trust; guaranties; dispositions of Property; assignments; bills of sale; leases; management agreements; construction contracts; partnership agreements; operating agreements of other limited liability companies; intercreditor agreements; reliance letters; economic disclosure letters; UCC documents and resolutions; easement agreements; guarantees; pledge and security agreements; purchase and sale agreements; any kind of third party service agreements; subordination agreements; and any other instruments or documents necessary, in the opinion of the Manager(s), to the best interests of the business of the Company;

(j)     To employ or engage the services of accountants, accounting firms, legal counsel, law firms, managing agents, development managers, property managers, brokers or other companies or employees or agents to perform services for the Company and to compensate them from Company funds in such manner and on such basis as reasonably determined by the Manager(s);

(k)     To enter into any and all other reasonable agreements on behalf of the Company, with any other Person for any purpose, in such forms as the Manager(s) may approve;

UC6th&Batt008798

Pltfs (UC) 000303

(l)     To adjust, compromise, settle or refer to arbitration any claims in favor of or against the Company or any nominee of the Company or any property held or owned by the Company or its nominee, and to institute, prosecute and defend any legal proceedings as the Manager(s) shall deem advisable;

(m)     To effect the sale, exchange or other disposition of all, or substantially all, of the Company's assets in the liquidation and winding up of the business of the Company upon its duly authorized dissolution and/or in accordance with Section 5.1(h), above;

(n)     To authorize any Manager, acting alone, to exercise any of the rights, powers and/or authority of the Manager(s) under this Agreement and to bind the Company; and

(o)     To do and perform all other acts as deemed necessary or appropriate by Manager(s) in connection with the conduct of the Company's business.

Unless authorized to do so by the Manager(s), no attorney-in-fact, employee, or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable pecuniary for any purpose.

5.2     Urban Commons shall serve as the initial Manager of the Company until Urban Commons' resignation as Manager.   Urban Commons is a member managed limited liability company with Howard Wu and Taylor Woods currently being the only members of Urban Commons.   During any period that Urban Commons is serving as the Manager of the Company, all Major Decisions of the Company shall require the unanimous approval of Howard Wu and Taylor Woods as the managing members of Urban Commons prior to approving any Major Decisions on behalf of the Company, as well as approval by a Majority of Members.   In the event of any dispute between Howard Wu and Taylor Woods that prevents Howard Wu and Taylor Woods from reaching an unanimous decision with respect to any Major Decisions of the Company requiring the unanimous approval of Howard Wu and Taylor Woods, said dispute shall be resolved by submission to binding arbitration in Los Angeles, California using applicable arbitration procedures of JAMS located in Los Angeles County, California in accordance with its rules and procedures regarding commercial disputes.

5.3     Each Manager, other than the initial Manager, shall be appointed by the Manager(s) or, if there is no Person serving as a Manager at that time, by a Majority of Members for (a) a term expiring with the appointment of a successor, or (b) a term expiring at a definite time specified by the Manager(s) or, if applicable, a Majority of Members in connection with such appointment.   A Manager, other than the initial Manager, may be removed on the vote of a Majority of Members.   For purposes of this Section 5.3, if the Manager is also a Member, the Manager's Percentage Interest shall not be taken into account in determining whether a Majority of Members have voted to remove the Manager.   The initial Manager may be removed solely for cause (as

UC6th&Batt008799

Pltfs (UC) 000304

specifically defined in subsections (i)-(iv) below by the affirmative vote of a Majority of Members at a meeting called expressly for that purpose, or by the written consent of a Majority of Members.  Such Members must deliver to the initial Manager a written notification of removal stating in reasonable detail the cause for that action ("Removal Notice").   The only grounds for removal for cause shall be either (i) any willful misconduct or material breach; or (ii) any fraud, gross negligence or willful misconduct in the performance by Manager of its obligations or covenants under this Agreement; or (iii) the Manager's making a Major Decision without first obtaining the affirmative vote or written consent of a Majority of Members, or (iv) Taylor Woods or Howard Wu shall no longer, due to death, disability or any other reason, actively and reasonably carry out or direct the performance by Urban Commons of the Manager's duties under this Agreement.  The initial Manager may not be removed for financial performance reasons unless said financial performance results from any of the causes described in subsections (i)-(iv) above.

Except as otherwise provided in this Section, if within twenty (20) days after its receipt of a Removal Notice (or longer, if such situation cannot by its nature be cured in twenty (20) days and the initial Manager has actively commenced and diligently continues to pursue a cure for the situation), the initial Manager fails to cure the situation described in subsections (i), (ii), (iii) or (iv) that gave rise to such Removal Notice, the Members may elect a new Manager by the affirmative vote or written consent of a Majority of Members.  The initial Manager may, within twenty (20) days after its notification in writing of its removal for cause, file an objection with the Company that its removal was not justified.  If its objection is timely filed, the question of whether its removal was justified shall be submitted to arbitration under Section 10.2 below on an expedited basis in Los Angeles, California using applicable arbitration procedures of JAMS located in Los Angeles County, California.   If such Rules conflict or are inconsistent with any provision of this Agreement, the provisions of this Agreement shall prevail.

The parties shall use commercially reasonable efforts to cause the arbitration to be completed no later than sixty (60) days after it was commenced.  Each party waives any right that it may have to any substantive review of any arbitration award by the courts of the jurisdiction in which the arbitration is conducted and agrees that the award of the arbitrators in any such arbitration proceedings shall be final and without any right of appeal.  The arbitration award may be entered as a final judgment in the court of any jurisdiction in which such entry shall be recognized under applicable law.   Any arbitration award shall include an award of costs of the arbitration and attorneys' fees to the prevailing party.

The refusal or failure of any party to appear at or participate in any hearing or other portion of any arbitration proceeding pursuant to this Section shall not prevent any such hearing or proceeding from going forward, and the arbitrator is empowered to make its decision or render an award ex parte that shall be binding on the non-appearing party as fully as though that party had participated in the hearing or proceeding.

5.4     Actions of the Managers, if more than one Manager, shall be taken at meetings or as otherwise provided in this Section 5.4 by a majority of the Managers. No regular meetings of the Managers need be held.

The transactions of the Managers at any meeting, however called or noticed, or wherever held, shall be as valid as though transacted at a meeting duly held after call and notice and if, either before or after the meeting, each Manager not present signs a written waiver of notice or a consent to the holding of such meeting or an approval of the minutes of such meeting.

Any action required or permitted to be taken by the Managers under this Agreement may be taken without a meeting if a majority of the Managers individually or collectively consent in writing to such action.

Managers may participate in the meeting through the use of a conference telephone or similar communications equipment, provided that all Managers participating in the meeting can hear one another.

The Managers shall keep or cause to be kept with the books and records of the Company full and accurate minutes of all meetings, notices and waivers of notices of meetings, and all written consents to actions of the Managers.

5.5     It is acknowledged that the Manager(s) have other business interests to which the Manager(s) devote part of the Managers'(s') time.   The Manager(s) shall devote to the Company such time as may be reasonably necessary for the proper performance of all duties hereunder and shall be bound by the duty of good faith and fiduciary duty in its dealings with the Company and the Members, but the Manager(s) shall not be required to devote full time to the performance of such duties. Nothing in this Agreement shall be deemed to restrict in any way the rights of the Manager(s) or any Member, or of any Affiliate of the Manger(s) or any Member, to conduct any other business or activity whatsoever, and the Manager(s) or any Member shall not be accountable to the Company or to any Member with respect to that business or activity even if the business or activity competes with the Company's business.   The organization of the Company shall be without prejudice to their respective rights (or the rights of their respective Affiliates) to maintain, expand, or diversify such other interests and activities and to receive and enjoy profits or compensation therefrom.  Each Member waives any rights the Member might otherwise have to share or participate in such other interests or activities of the Manager(s) or any other Member or the Manager(s) or Member's Affiliates.

5.6     The Manager(s) shall preside at all meetings of Members.  The Manager(s) may provide for additional officers of the Company and shall establish the powers and duties of all other officers and the compensation of all Company officers, provided that such powers and duties are consistent with the authority granted to the Manager(s) in this Agreement.  The signature of any Manager shall be necessary and

UC6th&Batt008801

Pltfs (UC) 000306

sufficient to convey title to any Property owned, either directly or indirectly through one or more entities, by the Company or to execute any promissory notes, trust deeds, mortgages or other instruments of hypothecation, or to execute any other documents or instruments approved by the Manager(s), and all of the Members agree that a copy of this Agreement may be shown to the appropriate parties in order to confirm the same, and further agree that the signature of a Manager shall be sufficient to execute any documents necessary to effectuate this or any other provision of this Agreement.

5.7     The Manager(s) shall cause all assets of the Company, whether real or personal, to be held in the name of the Company.

5.8     All funds of the Company shall be deposited in one or more accounts with one or more recognized financial institutions in the name of the Company, at such locations as shall be determined by the Manager(s). Withdrawal from such accounts shall require the signature of a Manager, or such other Person or Persons as the Manager(s) may designate.

5.9     In the event that a majority vote of the Manager(s) cannot be achieved on any matter requiring such a vote pursuant to this Article, then such impasse shall be broken by the Vote of a Majority of Members.

5.10     The Manager(s) may, on behalf of the Company and with the consent of a Majority of the Members, purchase or provide goods or services from the Manager(s), any Member and/or any of their Affiliates; provided that the amounts paid for, and other terms relating to the furnishing of, such goods or services may not be materially less advantageous to the Company than the amounts and terms for and upon which similar goods or services could be obtained or furnished in the same geographic area to or from good quality corporations or business enterprises which are not the Manager(s), a Member and/or their Affiliates.  The foregoing authorization shall also apply to a sale or disposition of substantially all of the Company's assets to the Manager(s), any Member and/or any Affiliate prior to or following dissolution or upon winding-up or liquidation of the Company.  Amounts paid to the Manager(s), any Member and/or any of their Affiliates either for goods or services in transactions authorized pursuant to this Section 5.10 shall be treated for all purposes as amounts paid to non-Members and any compensation or reimbursement received by any Member from any such Affiliate shall belong to it and not to the Company.

5.11     The Manager(s) shall not be liable, responsible, or accountable, in damages or otherwise, to any Member or to the Company for any act performed by the Manager(s), except for fraud, gross negligence, willful misconduct, or an intentional breach of this Agreement.  The Company shall indemnify the Manager(s) for any act performed by the Manager(s), except for fraud, gross negligence, willful misconduct or an intentional breach of this Agreement.

5.12     The Company hereby agrees to promptly reimburse the Manager(s) and any Affiliate of the Manager(s) for all reasonable and actual out-of-pocket costs

UC6th&Batt008802

Pltfs (UC) 000307

incurred by them with respect to providing oversight and management of the Company, and for otherwise providing administrative services to the Company in connection with the offering of Membership Interests or in performing functions and services for the Company and otherwise in pursuit of the Company's business.  With respect to the operations of the Company following the acquisition of the Property, it is anticipated that the reasonable and actual out-of-pocket costs incurred by the Manager(s) in fulfilling their obligations under this Agreement shall be reimbursed from the cash flow from the Property but to the extent such costs are not paid as part of the Property expenses, then the Company shall reimburse the Manager(s) for such reasonable and actual out-of-pocket costs.

# ARTICLE VI:

## ACCOUNTS AND ACCOUNTING

6.1    Complete books of account of the Company's business, in which each Company transaction shall be fully and accurately entered, shall be kept at the Company's principal executive office and at such other locations as the Manager(s) shall determine from time to time and shall be open to inspection and copying on reasonable Notice by any Member or the Member's authorized representatives during normal business hours. The costs of such inspection and copying shall be borne by the Member.

6.2    Financial books and records of the Company shall be kept on the method of accounting adopted by the Company for federal income tax purposes.  The financial statements of the Company shall be prepared in accordance with standard accounting principles and shall be appropriate and adequate for the Company's business and for carrying out the provisions of this Agreement.  The fiscal year of the Company shall be January 1 through December 31.

6.3    At all times during the term of existence of the Company, and beyond that term if the Manager(s) deem it necessary, the Manager(s) shall keep or cause to be kept the books of account referred to in Section 6.2, together with:

(a)    A current list of the full name and last known business or residence address of each Member, together with the Capital Contribution and the share in Profits and Losses of each Member;

(b)    A current list of the full name and business or residence address of each Manager;

(c)    A copy of the Articles for the Company, as may be amended from time to time;

UC6th&Batt008803

Pltfs (UC) 000308

(d)     Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six most recent taxable years;

(e)     An original executed copy or counterparts of this Agreement, as may be amended from time to time;

(f)     Any powers of attorney under which the Articles or any amendments to the Articles were executed;

(g)     Financial statements of the Company for the six most recent fiscal years; and

(h)     The books and Records of the Company as they relate to the Company's internal affairs for the current and past four fiscal years.

(i)     If the Manager(s) deem that any of the foregoing items shall be kept beyond the term of existence of the Company, the repository of said items shall be as designated by the Manager(s).

6.4     At the end of each fiscal year the books of the Company shall be closed and examined and statements reflecting the financial condition of the Company and its Profits or Losses shall be prepared, and a report thereon shall be issued by the Company's certified public accountant.   Copies of the financial statements shall be given to all Members.   In addition, the Manager(s) shall deliver to the Members within twenty (20) days following the end of each month, copies of such financial statements and performance reports regarding the previous month, as may be prepared in the ordinary course of business, by the Manager(s), the property manager or accountants selected by the Manager(s).   Upon request of any Member, the Manager(s) shall deliver to each Member, within one hundred twenty (120) days after the end of the fiscal year of the Company, a financial statement that shall include:

(a)     A balance sheet and income statement, and a statement of changes in the financial position of the Company as of the close of the fiscal year;

(b)     A statement showing the Capital Account of each Member as of the close of the fiscal year and the distributions, if any, made to each Member during the fiscal year. Members holding at least seventy percent (70%) of the Capital Percentage Interests may request interim balance sheets and income statements, and may, at their own discretion and expense, obtain an audit of the Company books by certified public accountants selected by them; provided, however, that not more than one such audit shall be made during any fiscal year of the Company.

6.5     Within ninety (90) days after the end of each taxable year of the Company or as soon thereafter as reasonably practicable, the Manager(s) shall send to each of the Members all information necessary for the Members to complete their

UC6th&Batt008804

Pltfs (UC) 000309

federal and state income tax or information returns and a copy of the Company's federal, state, and local income tax or information returns for such year.

6.6     Taylor Woods shall act as Tax Matters Member ("Partner") of the Company pursuant to IRC Section 6231(a)(7).

6.7     The Partner is hereby authorized to do the following:

(a)     Keep the Members informed of administrative and judicial proceedings for the adjustment of Company items (as defined in IRC Section 6231(a)(3)) at the Company level, as required under IRC Section 6223(g) and the implementing Regulations;

(b)     Enter into settlement agreements under IRC Section 6224(c)(3) and applicable Regulations with the Internal Revenue Service or the Secretary of the Treasury (the "Secretary") with respect to any tax audit or judicial review, in which agreement the Tax Matters Member may expressly state that such agreement shall bind the other Members, except that such settlement agreement shall not bind any Member who (within the time prescribed under the Code and Regulations) files a statement with the Secretary providing that the Tax Matters Member shall not have the authority to enter into a settlement agreement on behalf of such Member;

(c)     On receipt of a notice of a final Company administrative adjustment, to file a petition for readjustment of the Company items with the Tax Court, the District Court of the United States for the district in which the Company's principal place of business is located, or the United States Court of Federal Claims, all as contemplated under IRC Section 6226(a) and applicable Regulations;

(d)     File requests for administrative adjustment of Company items on Company tax returns under IRC Section 6227(b) and applicable Regulations; and, to the extent such requests are not allowed in full, file a petition for adjustment with the Tax Court, the District Court of the United States for the district in which the Company's principal place of business is located, or the United States Court of Federal Claims, all as contemplated under IRC Section 6228(a); and

(e)     To take any other action on behalf of the Members or the Company in connection with any administrative or judicial tax proceeding to the extent permitted by law or regulations, including retaining tax advisers (at the expense of the Company) to whom the Tax Matters Member may delegate such rights and duties as deemed necessary and appropriate.

(f)     To take appropriate actions to achieve the most preferred tax benefits and advantages for the Members where possible.

UC6th&Batt008805

Pltfs (UC) 000310

## ARTICLE VII:

## MEMBERSHIP-MEETINGS, VOTING, INDEMNITY

7.1     There shall be only one class of membership and no Member shall have any rights or preferences in addition to or different from those possessed by any other Member except as specifically provided for in Article IV.  Members shall have the right and power to appoint, remove, and replace Manager(s) and officers of the Company to the extent permitted under Article V and the right to Vote on all other matters with respect to which this Agreement requires or permits such Member action. Each Member shall Vote in proportion to the Member's Percentage Interest as of the governing record date, determined in accordance with Section 7.2.  If a Member has assigned all or part of the Member's Economic Interest to a Person who has not been admitted as a Member, the Assigning Member shall Vote in proportion to the Percentage Interest that the Assigning Member would have had, if the assignment had not been made.

7.2     The record date for determining the Members entitled to receive Notice of any meeting, to Vote, to receive any distribution, or to exercise any right in respect of any other lawful action, shall be the date set by the Manager(s) or by a Majority of Members; provided that such record date shall not be more than sixty (60), or less than five (5) days prior to the date of the meeting or such distributions, as the case may be, and not more than sixty (60) days prior to any other action.

7.3     The Company may, but shall not be required, to issue certificates evidencing Membership Interests ("Membership Interest Certificates") to Members of the Company.  Once Membership Interest Certificates have been issued, they shall continue to be issued as necessary to reflect current Membership Interests held by Members. Membership Interest Certificates shall be in such form as may be approved by the Manager(s), shall be manually signed by the Manager(s), and shall bear conspicuous legends evidencing the restrictions on Transfer and the purchase rights of the Company and Members set forth in Article VIII.  All issuances, re-issuances, exchanges, and other transactions in Membership Interests involving Members shall be recorded in a permanent ledger as part of the books and records of the Company.

7.4     Meetings of the Members may be called by the Manager(s) and upon the written request of Member(s) holding seventy percent (70%) or more of the Capital Percentage Interests.  The call shall state the nature of the business to be transacted.  Notice of any such meeting shall be given to all Members not less than five (5) days nor more than thirty (30) days prior to the date of such meeting.  Whenever the vote or consent of Members is permitted or required under this Agreement, such vote or consent may be given at a meeting of Members in person or by telephone or may be given by means of a written consent signed by Members holding the requisite percentage of Percentage Interests.  Except as otherwise expressly provided in this Agreement, the vote or consent of Members holding a majority of the Percentage

UC6th&Batt008806

Pltfs (UC) 000311

Interests whether given in person, by telephone or by means of a written consent shall control.

7.5     Each Member may authorize any Person or Persons to act for him by Proxy on all matters in which a Member is entitled to participate, including waiving notice of any meeting, or voting or participating at a meeting.  Every Proxy must be signed by the Member or its attorney-in-fact.  No Proxy shall be valid after the expiration of eleven (11) months from the date thereof unless otherwise provided in the Proxy. Every Proxy shall be revocable at the pleasure of the Member executing it unless otherwise provided in the Proxy.

7.6     Each meeting of Members shall be conducted by the Manager(s) or such other Person as the Manager(s) may appoint pursuant to such rules for the conduct of the meeting as the Manager(s) deem appropriate.  Unless otherwise agreed upon, all such meetings shall be held at the principal offices of the Company.

7.7     No Member acting solely in the capacity of a Member is an agent of the Company, nor can any Member acting solely in the capacity of a Member bind the Company or execute any instrument on behalf of the Company.  Accordingly, each Member shall indemnify, defend, and save harmless each other Member and the Company from and against any and all loss, cost, expense, liability or damage arising from or out of any claim based upon any action by such Member in contravention of the first sentence of this Section 7.7.  This Section 7.7 supersedes any authority granted to the Members pursuant to the Act.

7.8     The Members acknowledge and agree that they shall not owe any fiduciary duty towards each other and each hereby waives any such fiduciary duty that may exist (whether express or implied) under law.

## ARTICLE VIII:

## TRANSFERS OF MEMBERSHIP INTERESTS

8.1     A Member may withdraw from the Company at any time by giving Notice of withdrawal to all other Members at least ninety (90) days before the effective date of withdrawal. Withdrawal shall not release a Member from any obligations and liabilities under this Agreement accrued or incurred before the effective date of withdrawal. A withdrawing Member shall divest the Member's entire Membership Interest before the effective date of withdrawal in accordance with and subject to the provisions of this Article VIII.

8.2     Except as expressly provided in this Agreement, a Member shall not transfer any part of the Member's Membership Interest, whether now owned or later acquired, unless (a) the Member delivers Notice of such Transfer to the Company, (b) the Member provides such documentation and information regarding the Transfer as

requested by the Manager(s), (c) the Manager(s) approve the transferee's admission to the Company as a Member upon such Transfer, which approval may be granted or withheld in the Manager's(s') sole discretion, (d) the Member and its assignee execute such documents and instruments as required by the Manager(s), (e) the Membership Interest to be transferred, when added to the total of all other Membership Interests transferred in the preceding twelve (12) months, will not cause the termination of the Company under the Code, and (f) the Transfer does not violate any restrictions in any loan documents to which the Company is a party.  No Member may Encumber or permit or suffer any Encumbrance of all or any part of the Member's Membership Interest unless such Encumbrance has been approved in writing by the Manager(s) which approval may be granted or withheld in the Manager's(s') sole discretion.  Any Transfer or Encumbrance of a Membership Interest without such approval shall be void. Notwithstanding any other provision of this Agreement to the contrary, a Member who is a natural person may transfer all or any portion of his or her Membership Interest to immediately family members of such Member, to an entity that is owned or controlled directly or indirectly by immediately family members or to a revocable trust created for the benefit of the Member, or any combination between or among the Member, the Member's spouse, and the Member's issue.  As used herein, immediate family members shall include such Member's parents, spouse, siblings, children and grandchildren.  Each Member hereby acknowledges the reasonableness of the prohibition contained in this Section 8.2 in view of the purposes of the Company and the relationships of the Members.

8.3    If a Member wishes to transfer any or all of the Member's Membership Interest pursuant to a Bona Fide Offer (as defined below), the Member shall give Notice to all other Members at least thirty (30) days in advance of the proposed Transfer, indicating the terms of the Bona Fide Offer and the identity of the offeror.  The Company and the other Members shall have the option to purchase the Membership Interest proposed to be transferred at the price and on the terms provided in this Agreement.  If the price for the Membership Interest is other than cash, the fair value in dollars of the price shall be established in good faith by the Company.  For purposes of this Agreement, "Bona Fide Offer" means an offer in writing setting forth all relevant terms and conditions of purchase from an offeror who is ready, willing, and able to consummate the purchase and who is not an Affiliate of the transferring Member.  For thirty (30) days after the Notice is given, the other Members shall have the right to purchase a part of the Membership Interest offered in the proportion that the Member's Capital Percentage Interest bears to the total Capital Percentage Interests of all of the Members who choose to participate in the purchase, on the terms stated in the Notice, for the lesser of (a) the price stated in the Notice (or the price plus the dollar value of noncash consideration, as the case may be) and (b) the price determined under the appraisal procedures set forth in Section 8.8.

If the Members do not exercise the right to purchase all of the Membership Interest, then, with respect to the portion of the Membership Interest that the Members do not elect to purchase, that right shall be given to the Company for an additional thirty (30) day period, beginning on the day that the Members' right to

UC6th&Batt008808

Pltfs (UC) 000313

purchase expires.  The Company shall have the right to purchase, on the same terms, the remaining portion of the Membership Interest of the offering Member; provided, however, that the participating Members and the Company may not, in the aggregate, purchase less than the entire interest to be sold by the offering Member.

If the other Members and the Company do not exercise their rights to purchase all of the Membership Interest, the offering Member may, within ninety (90) days from the date the Notice is given and on the terms and conditions stated in the Notice, sell or exchange that Membership Interest to the offeror named in the Notice. Unless the requirements of Section 8.2 are met, other than the requirement for approval by the Manager(s), the offeror under this section shall become an Assignee, and shall be entitled to receive only the share of Profits or other compensation by way of income and the return of Capital Contribution to which the assigning Member would have been entitled.

8.4     On the happening of any of the following events ("Triggering Events") with respect to a Member, the other Members and the Company shall have the option to purchase the Membership Interest of such Member ("Selling Member") at the price and on the terms provided in Section 8.8 of this Agreement.

(a)     The bankruptcy, or withdrawal of a Member, or the winding up and dissolution of a corporate Member, or merger or other corporate reorganization of a corporate Member as a result of which the corporate Member does not survive as an entity; provided that the remaining Members have elected to continue the business of the Company as provided in Section 9.1(a).

(b)     The failure of a Member to make the Member's initial Capital Contribution pursuant to the provisions of Article III of this Agreement.

(c)     The occurrence of any other event that is, or that would cause, a Transfer in contravention of this Agreement.

Each Member agrees to promptly give Notice of a Triggering Event to all other Members.

8.5     Notwithstanding any other provisions of this Agreement:

(a)     If, in connection with the divorce or dissolution of the marriage of a Member, any court issues a decree or order that transfers, confirms, or awards a Membership Interest, or any portion thereof, to that Member's spouse (an "Award"), then, notwithstanding that such transfer would constitute an unpermitted Transfer under this Agreement, that Member shall have the right to purchase from his or her former spouse the Membership Interest, or portion thereof, that was so transferred, and such former spouse shall sell the Membership Interest or portion thereof to that Member at the price set forth below in Section 8.8 of this Agreement.  If the Member has failed to consummate the purchase within one hundred eighty (180) days after the

UC6th&Batt008809

Pltfs (UC) 000314

court award (the "Expiration Date"), the other Members and the Company shall have the option to purchase from the former spouse the Membership Interest or portion thereof pursuant to Section 8.6 of this Agreement; provided that the option period shall commence on the later of (1) the day following the Expiration Date, or (2) the date of actual notice of the Award.

(b)     If, by reason of the death of a spouse of a Member, any portion of a Membership Interest is transferred to a Transferee other than (i) that Member or (ii) a trust created for the benefit of that Member (or for the benefit of that Member and any combination between or among the Member and the Member's issue) in which the Member is the sole trustee and the Member, as trustee or individually possesses all of the Voting Interest included in that Membership Interest, then the Member shall have the right to purchase the Membership Interest or portion thereof from the estate or other successor of his or her deceased spouse or Transferee of such deceased spouse, and the estate, successor, or Transferee shall sell the Membership Interest or portion thereof at the price set forth in Section 8.8 of this Agreement. If the Member has failed to consummate the purchase within one hundred eighty (180) days after the date of death (the "Expiration Date"), the other Members and the Company shall have the option to purchase from the estate or other successor of the deceased spouse the Membership Interest or portion thereof pursuant to Section 8.6 of this Agreement; provided that the option period shall commence on the later of (1) the day following the Expiration Date, or (2) the date of actual notice of the death.

8.6     On the receipt of Notice by the Manager(s) and the other Members as contemplated by Sections 8.1, 8.3, and 8.5, and on receipt of actual notice of any Triggering Event as determined in good faith by the Manager(s) (the date of such receipt is hereinafter referred to as the "Option Date"), the Manager(s) shall promptly cause a Notice of the occurrence of such a Triggering Event to be sent to all Members and for thirty (30) days after the Notice is given, the other Members shall have the right to purchase, at the price and on the terms set forth in Section 8.8 of this Agreement, a part of the Membership Interest offered in the proportion that the Member's Capital Percentage Interest bears to the total Capital Percentage Interests of all of the Members who choose to participate in the purchase.  Following such thirty (30) day period, the Company shall then have the option, for a period of thirty (30) days thereafter, to purchase the Membership Interest not purchased by the other Members, on the same terms and conditions as apply to the Members.  The transferee of the Membership Interest that is not purchased shall hold such Membership Interest subject to all of the provisions of this Agreement.

8.7     Neither the Member whose interest is subject to purchase under this Article, nor such Member's Affiliate, shall participate in any Vote or discussion of any matter pertaining to the disposition of the Member's Membership Interest under this Agreement.

8.8     The purchase price of the Membership Interest that is the subject of an option under Section 8.6 shall be the "Fair Option Price" of the interest as

determined under this Section 8.8.  "Fair Option Price" means the cash price that a willing buyer would pay to a willing seller when neither is acting under compulsion and when both have reasonable knowledge of the relevant facts on the Option Date.  Each of the selling and purchasing parties shall use his, her, or its best efforts to mutually agree upon the Fair Option Price.  If the parties are unable to so agree within thirty (30) days of the Option Date, the Manager(s) shall appoint at the expense of the Company one MAI appraiser with a minimum of ten (10) years of commercial real estate experience.  The appraiser shall, within thirty (30) days after the appointment, determine the Fair Option Price of the Membership Interest in writing and submit its report to all the parties.  In the event either of the parties disagrees with the valuation established by the appraiser, each party shall within fifteen (15) days after the issuance of the appraiser's report, appoint one MAI appraiser with a minimum of ten (10) years of commercial real estate experience and notify each party of the appraiser's name and business address. Within thirty (30) days after being appointed as an appraiser by a party, such appraiser shall determine the Fair Option Price of the Membership Interest in writing and submit its report to all parties.

The Fair Option Price shall be determined by comparing all three appraisers' valuations and disregarding the appraiser's valuation that diverges the greatest from each of the other two appraisers' valuations, and the arithmetic mean of the remaining two appraisers' valuations shall be the Fair Option Price.  Each party shall pay for the services of the appraiser selected by it, and one half of all other costs relating to the determination of Fair Option Price.   The Fair Option Price as so determined shall be payable in cash.

8.9   Except as expressly permitted under Sections 8.2 and 8.3, a prospective transferee (other than an existing Member) of a Membership Interest shall be deemed an Assignee, and, therefore, the owner of only an Economic Interest until such prospective transferee has been admitted as a Substituted Member.  Any such Assignee shall be entitled only to receive allocations and distributions under this Agreement with respect to such Membership Interest and shall have no right to Vote or exercise any rights of a Member until such Assignee has been admitted as a Substituted Member.  Until the Assignee becomes a Substituted Member, the Assigning Member will continue to be a Member and to have the power to exercise any rights and powers of a Member under this Agreement, including the right to Vote in proportion to the Percentage Interest that the Assigning Member would have had in the event that the assignment had not been made.

8.10   Any Person admitted to the Company as a Substituted Member shall be subject to all the provisions of this Agreement that apply to the Member from whom the Membership Interest was assigned, provided that the Assigning Member shall not be released from liabilities as a Member solely as a result of the assignment, both with respect to obligations to the Company and to third parties, incurred prior to the assignment.

66644.1

UC6th&Batt008811

Pltfs (UC) 000316

8.11   The initial sale of Membership Interests in the Company to the Initial Members has not been qualified or registered under the securities laws of any state or registered under the Securities Act of 1933, in reliance upon exemptions from the registration provisions of those laws.   Notwithstanding any other provision of this Agreement, Membership Interests may not be Transferred unless registered or qualified under applicable state and federal securities law unless, in the opinion of legal counsel satisfactory to the Company, such qualification or registration is not required.   The Member who desires to transfer a Membership Interest shall be responsible for all legal fees incurred in connection with said opinion.

# ARTICLE IX:

## DISSOLUTION AND WINDING UP

9.1   The Company shall be dissolved upon the first to occur of the following events:

(a)   The written agreement of a Majority of Members to dissolve the Company.

(b)   The sale or other disposition of substantially all of the Company's assets.

(c)   Entry of a decree of judicial dissolution.

9.2   On the dissolution of the Company, the Company shall engage in no further business other than that necessary to wind up the business and affairs of the Company.  The Manager(s) who have not wrongfully dissolved the Company or, if there is no such Manager, the Members, shall wind up the affairs of the Company.   The delegates winding up the affairs of the Company shall give Notice of the commencement of winding up by mail to all known creditors and claimants against the Company whose addresses appear in the records of the Company.   After paying or adequately providing for the payment of all known debts of the Company (except debts owing to Members), the remaining assets of the Company shall be distributed or applied in the following order:

(a)   To pay the expenses of liquidation.

(b)   To the establishment of reasonable reserves by the delegate for contingent liabilities or obligations of the Company. Upon the delegate's determination that such reserves are no longer necessary, said reserves shall be distributed as provided in this Section 9.2.

(c)   To repay outstanding loans from Members. If there are insufficient funds to pay such loans in full, each Member shall be repaid in the ratio that

UC6th&Batt008812

Pltfs (UC) 000317

the Member's loan, together with interest accrued and unpaid thereon, bears to the total of all such loans from Members, including all interest accrued and unpaid thereon. Such repayment shall first be credited to unpaid principal and the remainder shall be credited to accrued and unpaid interest.

      (d)     Among the Members as provided in Section 4.12.

      9.3    Each Member shall look solely to the assets of the Company for the return of the Member's investment, and if the Property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the investment of each Member, such Member shall have no recourse against any other Members for indemnification, contribution, or reimbursement, except as specifically provided in this Agreement.

## ARTICLE X:

## INDEMNIFICATION AND ARBITRATION

      10.1   None of any Member, any Manager or their respective Affiliates or the respective directors, officers, members, partners, employees, representatives, and managers of each of them shall be liable, responsible or accountable in damages or otherwise to the Company, any third party or to any other Indemnified Party (as defined below) for any act or omission performed or omitted to be performed by any of them to the extent the Person performing such act or responsible for such omission reasonably believes such act or omission was within the scope of the authority conferred upon such Person (or its Affiliates) by this Agreement, except for fraud, willful misconduct or material breach of this Agreement.  In addition, no Member shall have any personal liability for any guaranty provided by the Company, Urban Commons, Taylor Woods or Howard Wu.  In any threatened, pending, or completed action, suit or proceeding against a Member, a Manager or their respective Affiliates or the respective directors, officers, members, partners, employees, representatives, and managers of each of them (collectively, "Indemnified Parties", and each individually, an "Indemnified Party") relating to Company business or the furtherance thereof by an Indemnified Party, including, but not limited to, guarantying any repayment or completion obligations of the Company, each Indemnified Party shall be fully protected and indemnified and held harmless by the Company against all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, proceedings, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, reasonable attorneys' fees, costs of investigation, fines, judgments and amounts paid in settlement, actually incurred by such Indemnified Party by virtue of its status as an Indemnified Party (collectively "Liabilities"), other than Liabilities resulting from the fraud, willful misconduct or material breach of this Agreement of or by such Indemnified Party.  The indemnification provided by this Section 10.1 shall be recoverable only out of the assets of the Company, and no Member or Manager shall have any personal liability (or obligation to contribute capital to the Company) on account of the Company's indemnification.

UC6th&Batt008813

Pltfs (UC) 000318

10.2    This Agreement and the rights and obligations of the parties hereto shall be governed by the laws of the State of California.  Any controversy, dispute, or claim of any nature arising out of, in connection with, or in relation to the interpretation, performance, enforcement or breach of this Agreement, including any claim based on contract, tort or statute (collectively, a "Dispute"), that cannot be resolved by the parties within thirty (30) days shall first be submitted to mediation between the parties.  In the event that such mediation does not resolve the Dispute within ten (10) business days, the Dispute shall be resolved at the written request of any party to this Agreement by binding arbitration using applicable arbitration procedures of JAMS located in Los Angeles County, California.  The parties shall attempt to designate one arbitrator from JAMS.  If they are unable to do so within thirty (30) days after written demand therefor, then JAMS shall designate an arbitrator.  The arbitration shall be final and binding, and enforceable in any court of competent jurisdiction.  The arbitrator shall award attorneys' fees and costs to the prevailing party and charge the cost of arbitration to the party which is not the prevailing party.  Notwithstanding anything to the contrary contained herein, this Section 10.2 shall not prevent any party from seeking and obtaining equitable relief on a temporary or permanent basis, including, without limitation, a temporary restraining order, a preliminary or permanent injunction or similar equitable relief, from a court of competent jurisdiction located in the State of California (to which all parties hereto consent to venue and jurisdiction) by instituting a legal action or other court proceeding in order to protect or enforce the rights of such party under this Agreement or to prevent irreparable harm and injury.  The court's jurisdiction over any such equitable matter, however, shall be expressly limited only to the temporary, preliminary, or permanent equitable relief sought; all other claims initiated under this Agreement between the parties hereto shall be determined through final and binding arbitration in accordance with the terms of this Section 10.2.

## ARTICLE XI:

## INVESTMENT REPRESENTATIONS

Each Member represents and warrants to, and agrees with, the other Members and the Company as follows:

11.1   (a) The Member has a pre-existing personal or business relationship with the Company or one or more of its officers or control Persons, or (b) by reason of the Member's business or financial experience, or by reason of the business or financial experience of the Member's financial advisor who is unaffiliated with and who is not compensated, directly or indirectly, by the Company or any affiliate or selling agent of the Company, the Member is capable of evaluating the risks and merits of an investment in a Membership Interest and of protecting the Member's own interests in connection with this investment.

UC6th&Batt008814

Pltfs (UC) 000319

11.2    The Member understands that acquiring a Membership Interest involves a number of significant risk factors, including but not limited to, (a) the Company is newly formed and has no operating history or prior earnings to evaluate, (b) the Company will be subject to the risks generally incident to the ownership of real estate, (c) the Company will encounter considerable competition in operating its real estate, (d) all decisions with respect to management of the Company will be made exclusively by the Manager(s), (e) the Company's investment objectives must be considered speculative and there is no assurance the Company will achieve them, and (f) the Manager(s) may be subject to various conflicts of interest in the management of the Company.  The Member has evaluated all such risks, and agrees to accept such risks.

11.3    The Member is purchasing the Membership Interest for the Member's own account and not with a view to or for sale in connection with any distribution of the Membership Interests.

## ARTICLE XII:

## ATTORNEY-IN-FACT AND AGENT

12.1    Each Member, by execution of this Agreement, irrevocably constitutes and appoints each Manager and any of them acting alone as such Member's true and lawful attorney-in-fact and agent, with full power and authority in such Member's name, place, and stead to execute, acknowledge, and deliver, and to file or record in any appropriate public office: (a) any certificate or other instrument that may be necessary, desirable, or appropriate to qualify the Company as a limited liability company or to transact business as such in any jurisdiction in which the Company conducts business; (b) any amendment to the Company's Articles or to any certificate or other instrument that may be necessary, desirable, or appropriate to reflect an amendment approved by the Members in accordance with the provisions of this Agreement; (c) any certificates or instruments that may be necessary, desirable, or appropriate to reflect the dissolution and winding up of the Company; and (d) any certificates necessary to comply with the provisions of this Agreement. This power of attorney will be deemed to be coupled with an interest and will survive the Transfer of the Member's Economic Interest. Notwithstanding the existence of this power of attorney, each Member agrees to join in the execution, acknowledgment, and delivery of the instruments referred to above if requested to do so by a Manager. This power of attorney is a limited power of attorney and does not authorize any Manager to act on behalf of a Member except as described in this Article XII.

UC6th&Batt008815

Pltfs (UC) 000320

## ARTICLE XIII:

## GENERAL PROVISIONS

13.1   This Agreement constitutes the whole and entire agreement of the parties with respect to the subject matter of this Agreement, and it shall not be modified or amended in any respect except by a written instrument executed by all the parties. This Agreement replaces and supersedes all prior written and oral agreements and statements by and among the Members and Manager(s) or any of them.   No representation, statement, condition, or warranty not contained in this Agreement will be binding on the Members or have any force or effect whatsoever.

13.2   This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

13.3   If any provision of this Agreement is determined by any court of competent jurisdiction or arbitrator to be invalid, illegal, or unenforceable to any extent, that provision shall, if possible, be construed as though more narrowly drawn, if a narrower construction would avoid such invalidity, illegality, or unenforceability or, if that is not possible, such provision shall, to the extent of such invalidity, illegality, or unenforceability, be severed, and the remaining provisions of this Agreement shall remain in effect.

13.4   This Agreement shall be binding on and inure to the benefit of the parties and their heirs, personal representatives, and permitted successors and assigns.

13.5   Whenever used in this Agreement, the singular shall include the plural and the plural shall include the singular, and the neuter gender shall include the male and female as well as a trust, firm, company, or corporation, all as the context and meaning of this Agreement may require.

13.6   The parties to this Agreement shall promptly execute and deliver any and all additional documents, instruments, notices, and other assurances, and shall do any and all other acts and things, reasonably necessary in connection with the performance of their respective obligations under this Agreement and to carry out the intent of the parties.

13.7   Except as provided in this Agreement, no provision of this Agreement shall be construed to limit in any manner the Members in the carrying on of their own respective businesses or activities.

13.8   Except as provided in this Agreement, no provision of this Agreement shall be construed to appoint a Member, in the Member's capacity as such, the agent of any other Member.

UC6th&Batt008816

Pltfs (UC) 000321

13.9    Each Member represents and warrants to the other Members that the Member has the capacity and authority to enter into this Agreement.

13.10  The article, section, and paragraph titles and headings contained in this Agreement are inserted as matter of convenience and for ease of reference only and shall be disregarded for all other purposes, including the construction or enforcement of this Agreement or any of its provisions.

13.11  This Agreement may be altered, amended, or repealed only by a writing signed by all of the Members.

13.12  Time is of the essence of every provision of this Agreement that specifies a time for performance.

13.13  This Agreement is made solely for the benefit of the parties to this Agreement and their respective permitted successors and assigns, and no other Person shall have or acquire any right by virtue of this Agreement.

13.14  No Member or Assignee of an Economic Interest has any interest in specific Property or other assets of the Company.  Without limiting the foregoing, each Member and Assignee irrevocably waives any right that such Member or Assignee may have to maintain any action for partition with respect to the Property or other assets of the Company.

*[Remainder of page intentionally left blank]*

UC6th&Batt008817

Pltfs (UC) 000322

IN WITNESS WHEREOF, the parties have executed or caused to be executed this Agreement on the day and year first above written.

**MANAGER AND MEMBER:**

**URBAN COMMONS, LLC,**
a Delaware limited liability company

By: _____
     Taylor Woods, Member

By: _____
     Howard Wu, Member

SIGNATURE PAGE

UC6th&Batt008818

Pltfs (UC) 000323

**MEMBERS:**

Printed Name of Member

_Ronald A. Christensen_

Printed Name(s) and Title(s) or
Capacity(ies) of any Officer(s)
Partner(s) or Agent(s) Acting on
Behalf of Member

By:_____

Title:_____

Signature of Member

_Ronald A. Christensen_

Signature(s) of Any Officer(s),
Partner(s) or Agent(s) Acting
on Behalf of Member

By:_____

66644.SIG

# EXHIBIT "B"

# INTERNAL RATE OF RETURN EXPLANATION AND SAMPLE CALCULATION

XIRR
Returns the internal rate of return for a schedule of cash flows that is not necessarily periodic.  To calculate the internal rate of return for a series of periodic cash flows, use the IRR function.

XIRR (Values, Dates, Guess)
*         Values is a series of cash flows that corresponds to a schedule of payments in dates.  The first payment is optional and corresponds to a cost or payment that occurs at the beginning of the investment.  If the first value is a cost or payment, it must be a negative value.  All succeeding payments are discounted based on a 365-day year.  The series of values must contain at least one positive and one negative value.
*         Dates is a schedule of payment dates that corresponds to the cash flow payments.  The first payment date indicates the beginning of the schedule of payments.  All other dates must be later than this date, but they may occur in any order.
*         Guess is a number that you guess is close to the result of XIRR.

REMARKS
*         Microsoft Excel stores dates as sequential serial numbers so that it can perform calculations on them.  Excel stores January 1, 1900, as serial number 1 if your workbook uses the 1900 date system.  If your workbook uses the 1904 date system, Excel stores January 1, 1904, as serial number 0 (January 2, 1904, is serial number 1).  For example, in the 1900 date system, Excel stores January 1, 1998, as serial number 35796 because it is 35,795 days after January 1, 1900.

*         Numbers in dates are truncated to integers.

*         XIRR expects at least one positive cash flow and one negative cash flow; otherwise, XIRR returns the #NUM! error value.

*         If any number in dates is not a valid date, XIRR returns the #NUM! error value.

*         If any number in dates precedes the starting date, XIRR returns the #NUM! error value.

*         If values and dates contain a different number of values, XIRR returns the #NUM! error value.

*         In most cases you do not need to provide guess for the XIRR calculation.  If omitted, guess is assumed to be 0.1 (10 percent).

*         XIRR is closely related to XNPV, the net present value function. The rate of return calculated by XIRR is the interest rate corresponding to XNPV = 0.
*         Excel uses an iterative technique for calculating XIRR.  Using a changing rate (starting with guess), XIRR cycles through the calculation until the result is accurate within 0.000001 percent. If XIRR can't find a result that works after 100 tries, the #NUM! error value is returned. The rate is changed until:

<<...OLE_Obj...>> <<...OLE_Obj...>>

where:

di = the ith, or last, payment date.
d1 = the 0th payment date.
Pi = the ith, or last, payment.

EXAMPLE
Consider an investment that requires a $10,000 cash payment on January 1, 1998, and returns $2,750 on March 1, 1998, $4,250 on October 30, 1998, $3,250 on February 15, 1999, and $2,750 on April 1, 1999. The internal rate of return (in the 1900 date system) is:

XIRR({-10000,2750,4250,3250,2750}, {"1/1/1998","3/1/1998","10/30/1998","2/15/1999","4/1/1999"},0.1) equals:

0.374859 or 37.4859 percent

The IRR calculations under Sections 4.11 and 4.12 shall be determined at the time of each distribution and shall be calculated based on the total distributions made to the Members through the date of such distribution.  Once the IRR is calculated on the aggregate Capital Contributions made by the Members, the Available Cash Flow and revenues or

proceeds from a Capital Event or the dissolution of the Company shall be divided between Urban Commons and the Members based on the applicable percentages in Sections 4.11 and 4.12 and appropriate adjustments shall be made to such distributions so that the total distributions to Urban Commons and the Members shall be equal to the required percentages.  Accordingly, for purposes of example, if (a) $100,000 is available to be distributed to the Members and (b) such amount plus any previous distributions to the Members equals a 30% IRR on the aggregate Capital Contributions made by the Members, then Urban Commons shall be entitled to 20% of the distribution plus such additional portion of the distribution as may be necessary in order for Urban Commons to receive 20% of the total amounts distributed under Sections 4.11 and 4.12 and the remaining share of such distribution shall be distributed to the Members based on the Members' Capital Percentage Interests pro rata.  At the time of each distribution to the Members of Available Cash Flow and revenues or proceeds from a Capital Event or the dissolution of the Company, the Manager(s) shall adjust as necessary the distributions to be made to Urban Commons and the Members in connection with such distribution in order to satisfy the distribution percentages in Sections 4.11 and 4.12.

# EXHIBIT K

| | |
|---|---|
| **From:** | Tina Ellis |
| **To:** | Mark Riley |
| **Subject:** | Fwd: Urban Commons 6th Ave. Seattle, LLC |
| **Date:** | Wednesday, April 29, 2020 1:01:50 PM |
| **Attachments:** | Subscription Agreement.pdf |
| | Operating Agreement Signature Page.pdf |

---------- Forwarded message ---------
From: **Tina Ellis** <tinaann395@gmail.com>
Date: Fri, Jan 17, 2020 at 10:03 AM
Subject: Fwd: Urban Commons 6th Ave. Seattle, LLC
To: Jason Birt <jbirt@milepostglobal.com>, Brian Egnatz <brian.egnatz@milepostcm.com>


FYI

Tina Ellis

Begin forwarded message:


> **From:** Ron Christensen <ronchristensenmd@aol.com>
> **Date:** January 17, 2020 at 9:44:49 AM CST
> **To:** taylor@urban-commons.com
> **Cc:** tinaann395@gmail.com
> **Subject: Urban Commons 6th Ave. Seattle, LLC**


> Hi Taylor,

> Attached are the Subscription Agreement and the Signature Page of the
> Operating Agreement for Urban Commons 6th Ave. Seattle, LLC.  A wire for
> $250,000 will be forthcoming today from Charles Schwab.

> I want to thank you for the opportunity to become involved in your investment
> family.

> Best regards,
> Ron Christensen

Pltfs (UC) 000664

EXHIBIT L

# URBAN COMMONS, LLC 

February 25, 2020

Dear Potential Investor,

The attached investment offering memorandum represents an exciting repositioning opportunity, in a premium location in the heart of the business district of New York City, for the acquisition of the 298-room Wagner Hotel (formerly known as the Ritz-Carlton Battery Park), located in lower-Manhattan at 2 West Street, New York, New York. As you can see, this opportunity is significantly more compelling than most. We had the tremendous benefit of curating it over nearly 18 months while in escrow, and of watching the NYC hospitality market rebound from the low point in 2016 by 12-15% in that period as well as AirBnB has become regulated.  We believe our timing is ideal. These kinds of NY opportunities are very rare. Among other things, the NYC Javits convention center renovation should be a huge boon for us as well as they complete their massive renovation next year and conferences return en masse, much like what is taking place in San Francisco this year.  This 14-story hotel, initially built to 5-star specifications in 2001 and adjacent to a mixed-use condominium tower, provides outstanding amenities and was the recipient of the prestigious AAA Five Diamond Award.  Nearly every room has a panoramic view of the Statue of Liberty and is proximate to the heart of downtown Manhattan.  Despite the attractiveness of the asset, we have the opportunity to purchase it for just $150MM, or $500k per door, and it needs only a moderate renovation given its relatively recent and high quality construction. This is far below typical trades for high-end properties in New York, which are generally valued at $1MM per door and above. Further, upon stabilization our transaction implies an astounding 13%+ capitalization rate, and a discount to market of as much as 50%!

We've now engaged with the Luxury Collection by Marriott brand.  Marriott believes that this hotel will be one of their premier flagship locations.  Given their satisfaction with the current state of the property, we are expecting a faster renovation and one that ultimately starts us toward stabilization by mid-2020 — which is more than a full year ahead of what we initially forecast the stabilization period to begin.  Marriott also contributing $5.5M in cash to reimburse us for a large portion of the renovation costs.  Further, our Food and Beverage plans continue to be refined, and we have entered a deal with a leading restaurateur to lease out our F&B spaces, and in turn convert the formerly negative F&B division into a profit center.  This group also shares our vision and excitement for creating a new rooftop lounge with panoramic water views, which would be a destination venue for both tourists, businesses, and locals alike. We are quite excited about each of these accomplishments.

While the hotel itself is in excellent shape, it suffered from a simple problem — and with a correspondingly simple solution — of being misbranded. Rates, while strong, were not high enough to sustain the Ritz-Carlton service levels under the labor costs of New York City, although they would have been very lucrative under most other brands.  Most Ritz-Carlton's are well known for generating very little net income due to the high staffing/labor requirement. Converting to a Luxury Collection Hotel will provide comparable rates and occupancy but with much greater efficiency due to the lower service and labor requirements. It will also provide the property with the flexibility to lease out the currently unprofitable restaurant operation, providing stronger and more predictable cash flows from a strong

Pltfs (UC) 000467

# URBAN COMMONS, LLC 

restaurant tenant. Complementing these changes will be implementation of operational best practices and sound pricing strategies. Overall, we anticipate the property can be taken from only modest profitability today to greater than $20MM in NOI after repositioning and ultimate stabilization. These changes were not possible for the prior owner, as the property historically has been encumbered by existing brand and management agreements. Urban Commons recognized the potential that now exists and seeks to move quickly to make the change to brand and management as part of our closing conditions. Support for the following high-level overview and projections is in the attached document:

- 298 guestrooms, including 39 suites, with rooms featuring panoramic views of the Statue of Liberty, Ellis Island, and New York Harbor.

- Located in Lower Manhattan, home of iconic Wall St. and enjoying a resurgence in creative industries and residential demand, and very strong RevPar growth forecasts this year and next.

- Rebrand and light renovation to commence post-acquisition.

- Hotel purchase price: $150MM.

- Purchase price per door: $535k / key after a light renovation (a 50% discount to comparable properties).

- Projected Annual Distributable Income: Stabilized at greater than 20% annual cash-on-cash returns.

- Estimated Returns on Capital: 50%-200% depending on timing of a sale or a dividend recapitalization.

We believe this is a highly compelling opportunity given the steep discount to market values and the relatively simple corrections that can be made to dramatically increase profitability. An ultimate sale of the property at capitalization rates typical for the type of asset and area would bring a substantial windfall for investors. However, should investors choose to retain the asset as a longer-term income generating investment, dividend recapitalization options can also be explored at that time.

Thank you again for your participation,

Taylor Woods
Urban Commons
10250 Constellation Blvd, Suite 1750
Los Angeles, CA 90067
m. 949-400-8808

Pltfs (UC) 000468





# Offering Memorandum for the Acquisition of The Ritz-Carlton Battery Park



Pltfs (UC) 000480

 Table of Contents

**Executive Summary**

Property Overview

**Competitive Set**

Financial Analysis / Projections

**Area Overview**

Economy

**Urban Commons**

Appendix



Pltfs (UC) 000481



# EXECUTIVE SUMMARY

Urban Commons has the exciting opportunity to purchase the leasehold interest in the Ritz-Carlton Battery Park in New York City, a 298-room luxury hotel on the lower 14 floors of a 39-story mixed-use residential condominium tower. While built relatively recently in 2001, it presents an undervalued purchase with a quick fix to maximize income by simply switching brands, which was not an option until 2017. A prior effort to market the property was unsuccessful in 2015 precisely because it remained encumbered by the Ritz brand, which is economically not viable. The transaction also contains highly-valuable vacant land buildable to over 75,000 sq. ft.

### PURCHASE PRICE

5-star properties in New York typically transact for over $1MM per key. At an approximate cost of $500k per key, it is well below both comparables and replacement cost.

### MISBRANDED

This is one of the assets within a portfolio deal of 13 Ritz-Carlton hotels. This property is ill-suited for the Ritz brand. The rates are simply not high enough to sustain the union labor costs in New York City, but they are high enough to be very profitable under other available brands, including within Marriott. At a $500 ADR and with occupancy rates in the low 90%s, this hotel can easily achieve greater than $20MM in NOI upon stabilization (using conservative efficiency to the bottom line), implying a 13%+ capitalization rate Ritz-Carlton in downtown New York City!

### BRAND CONVERSION OPPORTUNITY

A logical solution is to convert to the Marriott brand one level down, Autograph, which will enjoy the same rate and occupancy but at much higher efficiency due to the lower service and labor requirements. Converting within the same family will also reduce the ramp-up period. Further, Autograph provides much greater flexibility and will allow us to lease out the restaurant to another operator, eliminating a high number of union workers and generating safer and more consistent cash flow for the property. However, we continue to explore all possible options that might yield even higher performance.

### ADDITIONAL LAND

New York parcels are extremely valuable, and an adjacent piece of land – currently used as patio space – provides investors with the opportunity to develop an additional tower. This entire region is based on land lease and it is the only region that allows condominium entitlement on land lease. As condominiums or apartments of over 75,000 sq. ft., the opportunity is lucrative enough to bring the end capitalization rate down substantially. Applying a conservative $40MM to the incremental development opportunity simply adds to the already exceptional capitalization rate on the stabilized hotel component.

Pltfs (UC) 000482

 **EXECUTIVE SUMMARY**

**OPTIMAL TIMING**

New York has recently passed regulation on Airbnb that implements high fees on Airbnb operators and includes costly fines for illegal operators and is expected to result in a rebound for New York hotels. Estimates are that New York hotel revenues will grow by 10%-15% in the next 24 months.

To conclude, by converting to a lower brand without spending too much on Property Improvement Plans (~$10MM), we will have a brand-new Autograph property for $160MM which is only ~$530k per door. Upon Stabilization, we will have NOI above $20MM, which brings the deal capitalization rate to ~13%, and with the land valued at a conservative ~$40MM, the deal capitalization rate is then closer to an exceptional 17%+.



Pltfs (UC) 000483



# PROPERTY OVERVIEW

### PROPERTY SUMMARY

The Ritz-Carlton Battery Park is a newly constructed Five Diamond Award winning hotel featuring 298 oversized guestrooms. Designed by Handel Architects and the Polishek Partnership, the 39-story tower is comprised of the Hotel on the lower 14 floors with 26 floors of residential condominiums above. The Property juxtaposes the historic charm of Downtown with its contemporary architecture and upscale amenities. Its highly visible location, where Battery Park City meets Battery Park, offers guests access to all of Downtown's major attractions including the Statue of Liberty, Ellis Island, the World Trade Center Memorial and Wall Street. Benefitting from the redevelopment of Downtown, which has caused a migration of many corporations to the area as well as an unprecedented increase in tourism, the Ritz-Carlton is well positioned for both leisure and business travelers.

The oversized lobby creates a warm and impressive entrance to this well-maintained asset. The guestrooms contain a multitude of upscale amenities including designer finishes, an abundance of light and air and high definition LCD televisions. The large average room size of 491 square feet makes travelers feel at home, while 57% of these rooms boast gorgeous views of the Statue of Liberty and New York Harbor through large floor to ceiling windows.



Pltfs (UC) 000484



# PROPERTY OVERVIEW

## LOCATION

Nestled at the southern tip of Manhattan, about 100 yards from the harbor, the Property offers guests a tranquil New York hotel experience. The Ritz-Carlton sits on the southernmost parcel of Battery Park City, a 92-acre planned community owned by the Battery Park City Authority ("BPCA"), a public benefit corporation created by New York State in 1968. Benefitting from its waterfront location, 7.2 MM square feet of housing, 9.3MM square feet of commercial space and over 36 acres of park space, today Battery Park City is one of Manhattan's most amenity rich mixed use neighborhoods. Guests of the Hotel have access to a multitude of historic and cultural attractions that surround the Property. The departure point for tours of Ellis Island and the Statue of Liberty is right around the corner. Also nearby are the Museum of Jewish Heritage, the Museum of the American Indian, the Staten Island Ferry and the 25-acre Battery Park. The Ritz-Carlton is also within close proximity to a number of public transportation options. The Bowling Green station, with access to the 4/5 express train, is just a block away while the 1 and R are accessible just a few blocks north on Rector Street.



Pltfs (UC) 000485

 PROPERTY OVERVIEW

SUMMARY STATISTICS

| | |
|---|---|
| Address | 2 West Street, New York, New York 10004 |
| Year Build / Renovated | 2001 / 2009 |
| Guest Rooms | 298 |
| Stories | 14 |
| Meeting Space | 13,419 Square Feet |
| Food and Beverage | 2 West Restaurant |
| Amenities | Fitness facility, spa facilities, fully equipped business center, WiFi in all public spaces |
| Ownership Interest | Leasehold |
| Gross Building Area | 335,000 Square Feet |
| Labor | Union |

Pltfs (UC) 000486



# PROPERTY OVERVIEW

### FOOD & BEVERAGE

The Hotel's restaurant features a spacious and elegant atmosphere with floor to ceiling windows that look out onto Battery Park. The expansive restaurant space can currently seat 121 diners including a large bar with stool seating. A new owner can rebrand 2West, convert all or a portion to retail space, or choose to expand the restaurant through the conversion of an adjacent portion of the lobby that is currently being used as a lounge. Other under-utilized space that is available to be converted into revenue generating food and beverage outlets includes the Ritz Club Lounge and the approximately 1,400 square foot meeting space that once served as the Hotel's Rise Bar. The Rise Bar space includes a large outdoor terrace and three rooms featuring floor to ceiling windows and panoramic views of the Statue of Liberty and New York Harbor.





8

 PROPERTY OVERVIEW

**MEETING AND EVENT SPACE**

The Ritz-Carlton Battery Park offers 13,419 total square feet of recently renovated meeting and banquet space throughout 12 function rooms including the 4,400 square foot Ritz-Carlton ballroom, the 2,800 square foot Harbor Vista Ballroom, three multi-purpose function rooms and one boardroom. The meeting space located on the second floor is elegantly finished and maintained to the highest standards, serving as a perfect option for weddings, large parties and corporate events. Pre-function space with floor to ceiling windows is located outside the Harbor Vista Ballroom. A winding staircase from the lobby leads up to the foyer of the second floor which splits into the two major ballrooms, providing the capability to have two large group events simultaneously. The chart below outlines all meeting space on the second floor and seating capacity for each.

| Room Name | Square Feet | Banquet | Reception | Conference | Classroom | Theater |
|---|---|---|---|---|---|---|
| Salon III | 1,477 | 140 | 200 | 45 | 100 | 150 |
| Salon II | 1,477 | 140 | 200 | 45 | 100 | 150 |
| Salon I | 1,477 | 140 | 200 | 45 | 100 | 150 |
| Ritz-Carlton Ballroom (3 Salons) | 4,443 | 500 | 600 | – | 300 | 500 |
| Harbor Vista | 2,800 | 200 | 300 | – | – | – |
| Salon B | 873 | 80 | 100 | 25 | 50 | 100 |
| Salon A | 873 | 80 | 100 | 25 | 50 | 100 |
| Manhattan Ballroom (Salon A & B) | 1,747 | 150 | 250 | 55 | 100 | 200 |
| Skyline Vista | 1,500 | 100 | 160 | – | – | – |
| Heritage | 613 | 50 | 60 | 20 | 36 | 55 |
| Boardroom | 463 | – | – | 16 | – | – |
| Liberty Room | 425 | 30 | 45 | 20 | 24 | 45 |
| **Total** | **11,991** | | | | | |

9



# PROPERTY OVERVIEW



### Meeting and Event Space Cont'd

Additional meeting space on the top floor of the Hotel (fourteenth floor), which once served as the Hotel's Rise Bar, includes three private event rooms that can be combined for a total of 1,428 square feet. The Rise rooms provide an elegant atmosphere with an expansive outdoor terrace to admire panoramic breathtaking views of the Statue of Liberty and New York Harbor. The Rise space can accommodate up to 170 guests. The chart below shows the size and seating capacity for each meeting space on the fourteenth floor.

| Room Name | Square Feet | Banquet | Reception | Conference | Theater |
|-----------|------------|---------|-----------|------------|---------|
| Rise III | 364 | 30 | 40 | 18 | 30 |
| Rise II | 378 | 30 | 40 | 18 | 30 |
| Rise I | 686 | 50 | 60 | 24 | - |
| Rise (3 Rooms) | 1,428 | 90 | 170 | 40 | 60 |





10

Pltfs (UC) 000489



# PROPERTY OVERVIEW

**AMENITIES**

The Hotel features numerous other luxurious amenities and services, including:

**Fitness Center**
The Ritz-Carlton offers a 2,500 square foot, state-of-the-art fitness center with locker rooms. The fitness center is recently renovated and features cardiovascular and strength training equipment, a weight room and incredible panoramic views of the New York skyline & Harbor.

**Business Center**
The Property includes a fully equipped business center with high-speed Internet access, color copier, fax and administrative services.

**Spa**
The Hotel features a small, private and relaxing spa including three treatment rooms.









11

Pltfs (UC) 000490



# PROPERTY OVERVIEW

## CAPITAL EXPENDITURES

Historical capital improvements have kept the Hotel maintained to five-star standards. In 2010, new health club equipment and cardio vascular machines were purchased, meeting rooms' walls and carpets were renovated and all common bar/ lounge areas including the 14th floor Rise were renovated. In 2011, an additional $600,000 was invested in ballroom and meeting rooms, including all new chairs and entertainment/ media technology. 2012 projects included new computers throughout the Property as well as a brand new phone system. The rooms are in good condition and were renovated in 2009.

| Projects | Total | Per Key |
|---|---|---|
| Property-Wide Renovation including Rooms, Meeting Space, Fitness Center, New TVs, and Computer & Telephone-System | $10,258,687 | $34,425 |





12

Pltfs (UC) 000491

# NEW YORK CITY MARKET

New York City is the leading global financial, media, entertainment, and cultural hub in the world – as a result, New York City hotel room-night demand benefits significantly. New York City consistently ranks as one of the most popular and visited destinations in the country.

Although there is some seasonality within the lodging market, the demand seen in New York has proven to be far less volatile and somewhat less affected from overall national market trends.



Pltfs (UC) 000492



# CURRENT COMPETITIVE SET

## COMPETITIVE SET SUMMARY

The Ritz-Carlton Battery Park's current competitive set consists of five full-service hotels located in Downtown Manhattan totaling 2,083 rooms. The properties in the competitive set include the Marriott New York, Hilton Millenium, SoHo Grand, Tribeca Grand and the Conrad New York. This competitive set includes a mix of branded and independent hotels that feature upscale amenities and are able to attract both leisure and business travelers.



Pltfs (UC) 000493

 PRO FORMA COMPETITIVE DATA

### IMMEDIATE MARKET OCCUPANCIES

The table below reflects 2016 occupancy data for three comparable properties to our hotel post-renovation / re-brand. This data has been provided by the management company that we intend to hire, and it is their view that Property 1 is the most directly similar. All are located in Manhattan.

Our assumption around ADR is that we will see some uplift to rates today due to the renovation and a much wider base of business, including groups and corporate travelers who are typically disallowed from staying at the Ritz-Carlton under company policies.

|  | Property 1 | Property 2 | Property 3 |
|---|---|---|---|
| Rooms Available | 358 | 166 | 379 |
| Occupancy % | 93.8% | 86.1% | 91.7% |



Pltfs (UC) 000494

 **AREA OVERVIEW**

### REGION OVERVIEW

The fourth largest Central Business District in the nation, Lower Manhattan is undergoing a transformation on a scale not seen in New York since developments like Rockefeller Center or the original World Trade Center. Over the last decade, nearly $20 billion of public and private capital has been invested within a one square mile area of Downtown transforming a 9-to-5 submarket into a vibrant 24/7 livework- play destination. The new World Trade Center will function as the centerpiece for a global business and tourism, drawing millions more to a neighborhood that is already one of the most visited in New York City.

Battery Park City is a 92-acre planned community located on the southwest tip of Lower Manhattan, balancing commercial, residential, retail, and park space. Benefitting from its waterfront location, over 36 acres of park space and some of New York City's leading public schools, today, Battery Park City is one of Manhattan's most amenity rich and family friendly neighborhoods. Battery Park City is an attractive location for both residents and tourists as it provides a tranquil setting for out of town guests who enjoy the area's expansive parks and green spaces, tree-lined streets and spectacular water views. The Hudson River esplanade that runs along the entire length of the neighborhood is a popular recreational destination. Many families and professionals enjoy the neighborhood's proximity to the Financial District, World Trade Center and Brookfield Place.



17

Pltfs (UC) 000495



# AREA OVERVIEW

## TOURIST ATTRACTIONS

Lower Manhattan contains numerous tourist attractions to drive transient demand, including some of the most iconic in the city:

- **The September 11 Memorial** has welcomed more than six million visitors since opening in September 2011. The museum will have 110,000 square feet of exhibition space upon completion in 2014 and is expected to be one of New York's most popular tourist destinations. The Memorial consists of two pools set within the footprints of the Twin Towers. Surrounded by more than 400 trees, the pools feature the names of the individuals who died in the September 11 attacks in New York City, Pennsylvania, and at the Pentagon, and the February 1993 WTC attack. The entrance to the museum is located on the Memorial Plaza and visitors will descend to exhibition spaces which will feature salvaged building elements of monumental size to modest personal mementos.

- **The Statue of Liberty**, one of New York's most popular tourist attractions, has captivated travelers from every corner of the world for over one hundred years. One of the most recognizable and well-known women in the world, Lady Liberty is a universal symbol of freedom and democracy

  The Statue of Liberty stands 151 feet tall and recently underwent $30 million in renovations to make the monument more accessible. The monument on Liberty Island can be reached by ferry rides from Battery Park and tourists can climb to the crown of the statue to experience unbeatable views of New York City. This iconic American monument attracts nearly 3.5 million visitors every year.

- Located at 11 Wall Street, the **New York Stock Exchange** is the largest stock exchange in the world. Although the NYSE no longer allows private tours, the Roman-style building of the stock exchange continues to attract tourists from around the world. Other attractions along Wall Street that continue to attract visitors include the Federal Reserve Bank of New York, the Trinity Church and Cemetery, the Federal Hall National Memorial and the Charging Bull Sculpture. Snapping a photo in front of the Charging Bull and learning the deep history of the Financial District continue to be a must on travelers' New York to-do list.



18



# URBAN COMMONS' COMPANY OVERVIEW

Urban Commons is one of the nation's fastest growing private real estate development and investment management firms and provides a wide range of real estate offerings to a substantial and diversified client base that includes corporations, financial institutions and high-net-worth individuals. Founded in 2005, the firm is headquartered in Los Angeles, CA and maintains presence in major real estate markets throughout the nation.

## REAL ESTATE DEVELOPMENT

Specializing in hospitality, yet very diversified in all asset classes, we target acquisitions for under-managed-utilized assets in need of re-positioning/re-branding as well as ground-up urban smart growth[1] development. Development opportunities range from acquisition of raw land, to entitlements, renovations, and ground-up construction projects in prime locations.

## RE-POSITIONING / RE-BRANDING / EXPANSION

We focus on re-positioning and re-branding assets in need of improved management or better brand alignment in the hospitality sector to create greater market penetration and value. We thoroughly analyze economic data alongside local area statistics to assess viability for property re-alignment or expansion.

## INVESTMENT MANAGEMENT

We offer investment products across several major real estate asset classes through separately managed accounts for each of our privately held investment funds to a diverse set of institutional and high-net-worth individuals and families. We also provide investment management services for each our portfolio of private offerings.

1. Smart growth is an urban planning and transportation theory that concentrates growth in compact walkable urban centers to avoid sprawl. Its sustainable development goals are to achieve a unique sense of community and place; expand the range of transportation, employment, and housing choices; equitably distribute the costs and benefits of development; preserve and enhance natural and cultural resources; and promote public health.



19

Pltfs (UC) 000497

 **URBAN COMMONS' BUSINESS STRATEGY**



Urban Commons focuses on impacting under-managed and under-utilized assets by developing innovative and emerging properties to promote optimal economic, social and environmental returns.

Urban Commons deploys the firm's capital to help transform assets into sustainable and vibrant properties of choice and opportunity, while maintaining attractive investment opportunities. We work closely with municipalities, communities, and neighborhoods to ensure our developments optimize space and contain a variety of value added revitalization to the area.

Our ultimate objective is to build or enhance an aesthetically progressive project, with an eye on delivering tremendous long-term and short-term value for the community, our investors and other stakeholders. This approach ensures a constant market appeal, long-term investment value preservation and expansion, and exponential investor returns.

Urban Commons is committed to ensuring that our practices and standards are of the highest quality and that we meet or exceed the expectations of our partners and stakeholders. We are committed to producing quality, stability, transparency and economic opportunity.

20

Pltfs (UC) 000498




Westin Sacramento, CA

## URBAN COMMONS' CORE BUSINESS

Urban Commons helps to create properties that better the environment and improves the quality of life.  We focus on meeting the growing demand for walkable areas near transit, cultural attractions, restaurants, parks and other amenities that  welcome a sense of community.  With decades of cumulative real estate investment, development, and management experience, we have a team that is strategically aligned and we have proven our ability to thrive throughout all economic conditions and cycles.  Most notably, we have proven our strength to operate, acquire, and relinquish assets most profitably even in the most diverse and challenging economic cycles.

### CORE BUSINESS

*Value-Add*. We identify assets in densely populated premier areas in need of improved management or better brand alignment.  By re-positioning, re-branding, renovating and stabilizing these assets, we deepen its market penetration, generate higher revenues, and quickly increase market value.  Our hospitality partners include, but are not limited to, Westin®, Sheraton®, DoubleTree®, Embassy Suites®, Crowne Plaza®, and Holiday Inn®.

*Development*. We target premium, highly predictable urban infill sites where smart growth development would produce optimal levels of economical, sociological and environmental benefits.  Our specialized entitlement expertise brings forth best of class development opportunities, allowing us to integrate aesthetically progressive designs for walkable properties near existing transit infrastructure to accommodate the new urbanites' demands for live, work, and play.  We focus on entitling and building green buildings that help improve the air quality and reduce greenhouse gas emissions.  Development projects range from re-development of existing properties to ground-up developments for hospitality, multifamily, office, senior housing, warehousing and retail.

21

Pltfs (UC) 000499



# URBAN COMMONS' CASE STUDIES

### CASE STUDY 01: DOUBLETREE NORWALK, CA.

Urban Commons committed approximately $20M to the formerly deeply distressed DoubleTree Norwalk Hotel to revitalize the property and preserve the infrastructure that employs almost one hundred individuals.  The acquisition of this property began in 2011 with the purchase of the senior non-performing note which securitized the property, and eventually resulted in a take over of the hotel via foreclosure in 2012.  The underperforming hotel required extensive deferred maintenance and was in jeopardy of losing its flag.  Since its take over, Urban Commons smoothly transitioned into a long term Franchise agreement with the brand and incorporated a strong management team to convert the troubled hotel into a stabilized, high occupancy, high performing asset.  Year-end 2013 resulted in total revenues of $8M versus the $3.7M in the year of its inception, a staggering 116% increase!  NOI for 2013 came in at $1.9M versus the $683k at inception, an increase of 179%!  Nearly all of the capital deployed in the acquisition and renovation has already been returned.

Urban Commons continues to work with the community and brand to  further improve the hotel and has begun implementing green-friendly designs and energy saving management systems to the property wherever possible.  This includes LED light bulbs throughout the hotel, motion sensors in all public spaces, water saving equipment for all facilities, recycling programs and initiatives, and also promoting consumer efficiencies and programs for our guests.  Property improvements are targeted for completion by year end 2014, and expected to generate even higher overall ecological and economic efficiencies for both the community and its investors.

DoubleTree Norwalk, CA




23



 URBAN COMMONS' CASE STUDIES

### CASE STUDY 02: HOLIDAY INN HOTEL & SUITES, ANAHEIM, CA.

Urban Commons identified and acquired the Holiday Inn Hotel & Suites, Anaheim as a unique opportunity due to the fact that this was a distressed  (including that the former owner's loan was due in full less than 60 days from the date of escrow, and the owner was losing the national flag due to numerous contractual failures with his brand).   By the time Urban closed the acquisition, Urban had leveraged our relationships with the brand and started off with on day-one with a 10-year contract with the flag.   Urban had also established and funded a $2.5M reserve for improvements (including a Splash-park, a building façade makeover, Disney's Good Neighbor Status, and numerous additional updates necessary to re-energize the staff and the property and to capture greater market share, revenues, and income.

Financial Performance (Pre acquisition vs.  post acquisition for the same period):

| 2010 - Full Year Prior to Acquisition | 2012 - Full Year Post Acquisition |
|---|---|
| Revenue: $8.2M | Revenue: $9.3M |
| NOI: $2.7M | NOI: $3.7M |
| RevPar Penetration: 80% | RevPar Penetration: 105% |
| Customer Service: 60% | Customer Service: 82% |
| Purchase Price: $26.5M | Est.  Market Value: $40M+ |

24

Pltfs (UC) 000501





 **URBAN COMMONS' CASE STUDIES**

### CASE STUDY 03: VIRGIL APARTMENTS, LOS ANGELES, CA.

Urban Commons completed the entitlement on a 74-unit, 95,000 square foot, multi-family apartment building and has recently commenced construction for this ground up development project. Since 2004, the property faced years of challenges amongst the previous owners and the City, from permits and approvals, to limitations and city ordinances, as well as the major economic downturn of the Great Recession. As the project was nearing Building Permit expiration date in 2013, Urban Commons acquired the property and revived the project to finally see it come to fruition.

Urban Commons was able to easily navigate the extensive process and complexities of the property which came with several hurdles, including major revisions to architectural and engineering plans to comply with new building codes, several rounds of re-submittals to the various city departments and its committees, and the most difficult, an effectuation ("vesting") of an expired zone change which allows for the development of a multi-family dwelling.

In addition, during the entitlement process, Urban Commons actively sought opportunities to work with the City to promote and create a green building. We have included energy efficient electric outlets, motion sensors in all public commons spaces, double pane windows, water saving equipment, recycling programs for tenants, and most notably, the latest bicycle parking ordinance to help individuals further reduce their overall carbon emissions and carbon footprint. Construction completion is targeted for early 2015, and expected to generate even greater overall ecological and economic efficiencies for both the community and its investors.

25

Pltfs (UC) 000502



# URBAN COMMONS' PHILANTHROPY

Urban Commons and our team are committed to helping communities where we work and live, where our ideas, people and resources can make a difference.  We insist that each property participate at least annually in at least one major philanthropic endeavor.  Some of our sponsored events and engagements are shown on the following page.

In all of our philanthropic investments, we adhere to four guiding principles:

- Engage the time and talent of the people of Urban Commons at all levels of the firm.
- Contribute in a meaningful way to those with the greatest need or largest impact in the community.
- Align with our core business to utilize all company resources and assets.
- Establish networks of nonprofit and educational partners who have world-class expertise and experience.



26

Pltfs (UC) 000503

 # URBAN COMMONS' PHILANTHROPY - SPONSORSHIPS





































27

Pltfs (UC) 000504

 FINANCIALS – Returns and Profit Sharing

### ESTIMATED RETURNS

We expect that cash available for distributions (after all expenses and reserves including property taxes, interest, insurance and FF&E reserves) are expected to be approximately 8% for year two, 16% for year three, 23% for year four, and 26% for year five (there is not expected to be cash available for distributions in the first year, before our rebrand/renovation has been completed). Additionally, income from sale of the property, estimated as a factor against Net Operating Income at a Cap Rate of 5%, is expected to yield potential profits of approximately $335M (including the land component) after year five. Returns on capital at sale are 500%. Lastly, if the investors should choose to retain the asset as a longer term income generating asset, an option to refinance and take capital off the table will be determined at that time.

### MANAGEMENT FEES

Urban Commons believes that our compensation as Manager should be based on Total Investor Annualized Return performance. Therefore, our compensation is based entirely on a proportion of the total capital return ratio with consideration for total duration and total cash distributions (including distributions of operating income and from profit distributions as a result of capital events such as a sale or refinance). Urban Commons will receive a share of total net distributable cash flow based on the total annualized return (calculated as total XIRR performance using the Excel formula for XIRR) and calculated at the time of final liquidation according to the total XIRR performance level reached on the scale below:

| Investor Annualized Return (XIRR) | Management Fee (% of total net distributable cash flow) |
|---|---|
| 0 – 15 % | 15% |
| 15.01 – 30 % | 20% |
| 30.01 – 45 % | 25% |
| 45.01 % + | 30% |

29

 APPENDIX

## Words From Our Partners

- Starwood Hotels and Resorts
- InterContinental Hotels Group
- Bernards
    - Bernards Company Overview







Appendix

Pltfs (UC) 000506



# APPENDIX
## Words From Our Partners



Urban Commons
777 S. Figueroa St. Suite 825
Los Angeles CA 90017
Attn:   Mr. Howard Wu
        Mr. Taylor Woods

July 1, 2014

Dear Mr. Wu and Mr. Woods,

On behalf of Starwood Hotels & Resorts, I am writing to you to acknowledge that as an owner of three Starwood branded hotels, Urban Commons has proven to be a good owner of Starwood branded hotels.

Urban Commons operate three different Starwood brands including The Westin Sacramento which continues to achieve GEI scores in the top 25% for the Westin Brand in North America YTD 2014. Although Urban Commons have only recently taken over the Sheraton Pasadena, there have already shown signs of Operational improvement and with the completion of the scheduled renovation work the Sheraton Pasadena will be a stronger representation of the Sheraton brand.

In addition, we look forward to continued success with the upcoming opening of the Four Points by Sheraton San Jose Airport in the summer of 2014.

Starwood appreciates the partnership with Urban Common and look forward to continued growth in the future.

Please let me know if you have any questions or concerns

Richard Veilleux
Starwood Hotels & Resorts Worldwide, Inc.
Sr. Director, Franchise Owner Services



Pltfs (UC) 000507



# APPENDIX
## Words From Our Partners

**InterContinental Hotels Group**

Three Ravinia Drive
Suite 100
Atlanta, GA 30346-2149
www.ihg.com

June 20, 2014

Howard Wu
Taylor Woods
Urban Commons
777 S Figueroa, Suite 825
Los Angeles, CA 90017

Re: Urban Commons

To Whom It May Concern:

Urban Commons is an active developer and owner of IHG hotels, operating a number of brands, including Crowne Plaza and Holiday Inn.

Urban Commons is an excellent partner in the growth and positioning of IHG's brands in strategic markets. Currently, Brighton Management and Urban Commons are working with us on several exciting projects.

We value our relationship with Urban Commons and look forward to future success together.

Sincerely,

Richard P. Carlson
Regional Director of Development

Six Continents Hotels, LLC
A Member of the InterContinental Hotels Group



Appendix

Pltfs (UC) 000508



# APPENDIX

## Words From Our Partners





July 2, 2014

Mr. Howard Wu
President
Urban Commons
777 South Figueroa Street
Suite 825
Los Angeles, CA 90017

Dear Howard,

The Bernards Team would like to again acknowledge the terrific working relationship we established with you and your team. We attribute the success of our projects to a number of factors. It is safe to say that having a knowledgeable client that appreciates our expertise as builders, is responsive during project development and construction, fulfills their obligations as an owner, and partners with us from commencement to project close out, is key to realizing an enjoyable and successful project experience.

Our business thrives on creating, developing and maintaining such collaborative relationships with our clients. We are most appreciative of the relationship Urban Commons and Bernards has forged and we look forward to the opportunity of working with you and your team on future development projects.

Sincerely,

Steve Pellegren, DBIA
Executive Vice President

*Los Angeles Corporate Office*
555 First Street                    T 818.898.1521
San Fernando, CA 91340              F 818.361.9208
License No. 302007                  www.bernards.com



Appendix

Pltfs (UC) 000509



# APPENDIX
## Words From Our Partners

# COMPANY OVERVIEW
## ABOUT BERNARDS



A nationally ranked, multidisciplinary commercial builder headquartered in Los Angeles, Bernards delivers outstanding full-service construction services to public and private corporations, developers, colleges, universities, California K-14 districts, government and civic organizations, and healthcare organizations.

We deliver projects under all variations of general contracting, construction management and program management contracts. Our diverse workforce leverages the experience and talents of our Operations, Virtual Design & Construction/BIM and Estimating Departments.

### ORIGINS

Bernards is a private company founded in 1974 by brothers Doug, Greg and Jeff Bernards. We've honed our business to integrate the hallmarks of integrity, quality and value for a wide range of project types. This philosophy has won the trust of a number of major Southern California companies, including Disney, Universal Studios and Lockheed, as well as for prominent public clients like the Cities of Los Angeles, Calabasas, Newport Beach, the County of Los Angeles, and the University of California. A long list of significant projects has been completed for these and other entities, such as prominent developers Caruso Affiliated, Wolff Development, and BRE (now Essex Property Trust).

### A BETTER EXPERIENCE

Bernards creates a better experience by providing solutions that give our clients the freedom to focus on their business and allow them to compete more effectively. In all we do, we value and foster collaborative, long term relationships with our employees, clients, architect partners and trade contractors.

Our projects are implemented with the stakeholders' goals in mind — early planning, clearly defined roles, and a team-focused approach streamline our processes and enable us to deliver the highest level of service during all phases of a project, from design through closeout. Bernards' broad base of repeat customers and distinguished business portfolio attest to the satisfaction of the clients we have served.

### OUR TEAM NOW

Bernards currently has a staff of over 260 professionals. Our estimating department is comprised of 18 professionals who prepare bids of approximately $4.7 billion annually. We have successfully completed individual projects and programs exceeding $250 million in value. Our dedicated Virtual Design & Construction (VDC) and Building Information Modeling (BIM) Department offers advanced skills in sophisticated BIM applications. We also offer experience with Integrated Project Delivery (IPD) and all forms of general contracting, project management and construction management. With a strong focus on sustainability, we have 44 LEED® Accredited Professional (APs) and 25 LEED® Certified projects to our credit.

### RANKINGS

We're currently ranked No. 13 on California Construction's list of California Contractors, No. 4 on the Los Angeles Business Journal's list of Largest Los Angeles Contractors, No. 94 nationally among the "Top 100 CM for Fee Firms Nationwide," and No. "62 Top 100 Green Contractors Nationwide."



Appendix



# URBAN COMMONS, LLC

**Managing Partners:**

Urban Commons, LLC

Mailing Address:

Urban Commons, LLC
777 S. Figueroa Street, Suite #2850
Los Angeles, CA 90017
www.urban-commons.com
contact@urban-commons.com

CONFIDENTIALITY AGREEMENT

This is a confidential document intended solely for your limited use and benefit in determining whether you desire to express further interest in an investment with the company. This document contains selected information pertaining to the company and does not purport to be a representation of the state of affairs of Urban Commons, LLC ("Urban Commons"), to be all-inclusive or to contain all or part of the information which prospective investors may require to evaluate a purchase of real property. All financial projections and information are provided for general reference purposes only and are based on assumptions relating to the general economy, market conditions, competition and other factors beyond the control of Urban Commons. Therefore, all projections, assumptions and other information provided and made herein are subject to material variation. All references to acreages, square footages and other measurements are approximations. Additional information will be made available to interested and qualified prospective investors. Neither Urban Commons nor any of their respective partners, directors, members, officers, affiliates or representatives make any representation or warranty, expressed or implied, as to the accuracy or completeness of this document or any of its contents and no legal commitment or obligation shall arise by reason of your receipt of this document or use of its contents.

Urban Commons expressly reserves the right, at its sole discretion, to reject any or all expressions of interest or offers to invest with the company, and/or to terminate discussions with any entity or person(s) at any time with or without notice which may arise as a result of review of this document. Urban Commons shall have no legal commitment or obligation to any entity or person(s) reviewing this document or making an offer to invest with the company unless and until written agreement(s) have been fully executed, delivered and approved by Urban Commons and obligations therein have been satisfied or waived.

By receipt of this document, you agree that this document and its contents are of a confidential nature, that you will hold and treat it in the strictest confidence and that you will not disclose this document or any of its contents to any other entity without the prior written authorization of Urban Commons. You also agree that you will not use this document or any of its contents in any manner detrimental to the interest of Urban Commons.

In this document, certain documents and other materials are described in summary form. These summaries do not purport to be complete nor necessarily accurate descriptions of the full agreements referenced. Interested parties are expected to review all such summaries and other documents of whatever nature independently and not rely on the contents of this document in any manner.

Pltfs (UC) 000511

# EXHIBIT M

| From: | Tina Ellis |
|---|---|
| To: | Mark Riley |
| Subject: | Fwd: Hospitality Investment Opportunity |
| Date: | Thursday, April 30, 2020 11:14:49 AM |
| Attachments: | Outlook-1474295839.png |
| | Outlook-q0mggf25.png |
| | UC Company Overview.pdf |
| | Urban Commons LLC Letter.pdf |
| | Hilton Seattle Investment Opportunity v3.1.pdf |
| | Hilton Seattle - Introduction (1).pdf |
| | Wagner Urban Commons LLC Letter.pdf |
| | Wagner at the Battery.pdf |
| | Battery Park Teaser - Urban Commons v2.pdf |
| | Battery Park Initial Offering Memorandum Highlights - (12.2019) copy (2).pdf |

---------- Forwarded message ---------
From: **Brian Egnatz** <brian.egnatz@milepostcm.com>
Date: Tue, Feb 25, 2020 at 9:30 AM
Subject: Hospitality Investment Opportunity
To: Tina Ellis <tinaann395@gmail.com>

I have been working with Urban Commons ("UC"), a privately held REIT management company in California with properties solely based in the US, for over a year (holdings over $1B). Last May they went public on the Singapore Stock Exchange as EAGLEHT SP.  Singapore allows firms to use forward projections of future earnings for valuation, where other exchanges require trailing returns which penalizes properties needing improvement through investment in valuations.  Full disclosure EAGLEHT equity has not performed well for a number of reasons. Some are realistic, while others are not. Certainly the hospitality space is under pressure from fears of the corona virus, but to a lesser extent in the United States.

EAGLEHT is a high dividend yielding asset in Asia. There are few that offer this yield and therefore it is in high demand from both institutional and family office clients. For this investor base to participate EAGLEHT needs a much higher market cap.  UC is obligated to produce a pipeline of higher yielding properties in the US for that growth - going from a natural 1 to 3 purchases in previous years towards 6 to 8 annually. The two co-founders and principals of UC own 17% of the equity in EAGLEHT and are Chairman and Deputy Chairman of the EAGLEHT board. As a vote confidence, they are currently taking the REIT management fee in equity shares of EAGLEHT rather than cash.

EAGLEHT is tax efficient. Every dollar earned at any of it's properties in the US **flows tax free** to the REIT (designed and implemented by KPMG). Additionally, UC's fifteen year experience in real estate and reputation as a quick decision and buyer allows them to see many properties well before they hit the general market and they have a proven track record of right sizing hotels to stabilize earnings and increase profitability is their value add. **Tax efficiency, early pricing and value add creates significant lift** when properties are sold from UC's balance sheet into the REIT. The math is simple and easily understandable.

When UC purchases a property, it creates a single purpose LLC. The LLC owns the liquor license, labor contracts, facilities etc. and the property is simultaneously underwritten for UC's and EAGLEHT's ownership reducing holding period between UC ownership and sale into the REIT. The previous acquisition was one day.  Each LLC is typically 50% Equity (the LP Investors) and 50% Debt (Household names) with UC investing 10-25% of the equity in each deal. The LLC is sold into the REIT and the LP's are bought out with LLC becoming part of the EAGLEHT portfolio. The net returns are significant to the investor and repeatable as they add properties and grow.

I am an investor - I am in the process of rolling my first investment into the second. Right now it is estimated that I will earn a cash on cash return of 30% (the transaction will be finalized in mid-March). That means for every $1.00 I have invested, I am returned $1.30 over the 3.5 month horizon. The next transaction appears to be the same economics but probably a shorter horizon. The advantage of this structure is that I own a percentage of a property through the LLC (I am not invested in a fund) and **only while it is held in the US**. This means that I have no exposure to Singapore market fluctuations or risk. EAGLEHT has debt in place to acquire the properties through a significant line of credit and then will periodically issue additional shares to create long term financing.

I have attached the investment information for the Wagner (former RITZ Carlton Hotel in lower Manhattan) It is tentatively scheduled for sale to the REIT in the fourth quarter of 2020 and the Seattle Hilton scheduled to be sold early summer. The investment period for the Wagner is longer as there was more work and restructuring needed to stabilize earnings, including outsourcing the management of food and beverage and the restaurant. Keep in mind, at a $500k/door purchase price there will be significant return to the investor on price alone. The Seattle Hilton - a shorter transaction - needs far less work and is currently producing income in the high teens - perfect for the REIT's dividend formula.


Regards,



**C. Brian Egnatz**
Chief Investment Officer
**Milepost Capital Management**
19 East 54th Street
New York, NY 10022
T: (212) 441-3130
C: (917) 796-5354

# EXHIBIT N

## URBAN COMMONS BATTERY PARK, LLC
## MEMBERSHIP INTEREST SUBSCRIPTION AGREEMENT

TO:     Urban Commons Battery Park, LLC

    I hereby irrevocably offer to purchase a membership interest (the "Interest") in Urban Commons Battery Park, LLC, a New York limited liability company (the "Company"), for a purchase price of $ __250,000.00__ , upon the terms and conditions described below.  The membership interest shall be calculated using my capital contribution divided by the total capital contribution of $70,000,000, which shall result in an ownership percentage of __.357__ %.   I agree to pay the balance of the purchase price for the Interest to the Company not later than February 27, 2020.  I will deliver to the Company the purchase price for the Interest in the manner set forth in Section 14 below.

    I understand that up to 100% of the membership qualified purchasers may purchase interests in the Company in this offering. I further understand that the Company may terminate this offering at any time, that the Company, in its discretion, may accept or reject my subscription, provided that notification of such rejection must be given to me within 15 days after this Agreement, properly completed and signed by me, and full payment of the purchase price for the Interest is delivered to the Company, and that, if there is such rejection notification, the purchase price will be promptly returned to me without interest.  The Company anticipates completing this offering by March 6, 2020.

    I understand that the Company will not use or apply the purchase price until the Company has raised the necessary funds from this offering.  The funds raised from the offerings will be used to invest in an entity that shall acquire, own, operate, and eventually sell that certain property formerly known as The Ritz-Carlton New York, Battery Park, NY (the "Property").  I further understand that (i) the purchase price will be deposited into an interest-bearing secure bank account and (ii) all interest earned on such account will be used by the Company to pay all cost and expenses (including, but not limited to, all legal, accounting and management costs and expenses) incurred in connection with this offering and the formation of the Company.   The initial membership interests of the members will be reflected in the Operating Agreement for the Company.  If this subscription is terminated, all funds raised by the Company will be returned to the applicable investors, together with any interest remaining on such funds following the payment of all costs and expenses.

    I understand the Company is obtaining acquisition loans in an approximate aggregate amount of approximately $100,000,000 in order to acquire the Property but that the terms for such financing have not yet been finalized.

    I understand that the terms of the Interest and related agreements are set forth in the Operating Agreement for the Company, a copy of which has been or will be provided separately to me.  The Company's acceptance of my subscription will be conditioned on my entering into the Operating Agreement and agreeing to be bound by all of its terms.  I understand that the Operating Agreement for the Company will name Urban Commons, LLC as the sole manager of the Company (the "Manager") with exclusive authority and control over all Company decisions in entering into and managing real estate investments.  The Operating Agreement will provide that each investor's capital will be returned at the time of a capital event(s) and prior to any profits from such capital event(s) being distributed to the members.

    I understand that the purchase of the Interest involves certain risks, including, but not limited to, the risks identified on the **Schedule of Investment Risks** attached to this Agreement.  I have carefully read and considered these risks before making this offer to purchase the Interest.

    In connection with my subscription for and purchase of the Interest, I hereby represent and warrant to the Company and agree as follows:

    1.    I am acquiring the Interest for my own account for investment and not with a view to or for sale in connection with any distribution of the Interest.

    2.    In making this investment, I am relying upon my own investigation and analysis and have determined that the Interest is a suitable investment for me.  The Company has made available to me information, and the opportunity to question its representatives, concerning the terms of this offering and the proposed investment of the Company in various real investments.  I have been furnished with such information as I have requested.  It has never been guaranteed or warranted by the Company, or any person connected with or acting on the Company's behalf, that I will be able to sell or liquidate the Interest in any specified period of time or that there will be any particular profit to be realized as a result of this investment.  I have adequate means to provide for my current and expected financial needs and reasonable contingencies, can bear the economic risks (including a complete loss of the purchase price) associated with my purchase of the Interest and have no need for liquidity in this investment.

    3.    The Company has advised me that the Interest is not being registered under the Securities Act of 1933, as amended (the "1933 Act"), in reliance upon the exemption from the registration requirements provided by Section 4(2), Rule 506 of Regulation

<div align="center">1</div>

Pltfs (UC) 000199

D and/or Regulation S under the 1933 Act, and are not being qualified or registered under any state securities laws in reliance upon applicable exemptions from the qualification and registration requirements. I understand that no federal or state agency has made any finding or determination as to the fairness of this investment, nor any recommendation or endorsement of the Interest. I understand that the Company is relying in part on my representations set forth in this Agreement for purposes of claiming such exemptions. I understand the Company is under no obligation to register the Interest on my behalf.

4.       I agree that I, and any transferees of the Interest, shall be bound by the restrictions on transfers of the Interest which are described in this paragraph or are otherwise applicable under federal or state securities laws. I also understand that any certificate representing the Interest will bear a legend substantially in the following form, and any legend appropriate to comply with applicable state securities laws, which I agree to abide by:

"THE MEMBERSHIP INTEREST REPRESENTED BY THIS CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 NOR REGISTERED OR QUALIFIED UNDER ANY STATE SECURITIES LAWS, AND MAY NOT BE SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS DULY QUALIFIED AND REGISTERED UNDER APPLICABLE STATE AND FEDERAL SECURITIES LAWS OR UNLESS, BASED ON AN OPINION OF COUNSEL OR OTHER EVIDENCE SATISFACTORY TO THE COMPANY, SUCH QUALIFICATION AND REGISTRATION ARE NOT REQUIRED."

I agree that stop transfer instructions prohibiting transfers of the Interest may be filed in the Company's records or issued to the Company's transfer agent as a means of preventing the sale or disposition of the Interest in violation of the restrictions and legends set forth in this paragraph above and that any transfer of the Interest or any portion thereof causing such a violation shall be void.

5.       The offer to sell the Interest was directly communicated to me by direct communication with the Company's director(s), officer(s) or manager(s), and I was not presented with or solicited by any leaflet, public promotional meeting, television advertisement or other form of general advertising.   (FILL IN THE FOLLOWING)   I am a citizen of _United States of America_____ or, if I am an entity, I was formed and exist under the laws of _____.

6.       I have a substantial preexisting personal or business relationship with the Company's management personnel and/or, by reason of my business or financial experience, or the business or financial experience of my management if I am an entity, am capable of evaluating the merits and risks of my purchase of the Interest and have the capacity to protect my interests in connection with this investment.

7.       I am an "Accredited Investor," as defined in Rule 501(a) of Regulation D under the 1933 Act, as follows (CHECK EACH APPLICABLE BOX--AT LEAST ONE MUST BE APPLICABLE AND CHECKED):

[✓]   (a)   I am a natural person whose individual net worth, or joint net worth with my spouse, including the estimated net fair market value of my principal residence, presently exceeds $1,000,000; and/or

[✓]   (b)   I am a natural person who had individual income, without that of my spouse, in excess of $200,000 in each of the two most recent years and reasonably expects to have income in excess of $200,000 in the current year; and/or

[ ]   (c)   I am a natural person who had joint income with my spouse in excess of $300,000 in each of the two most recent years and reasonably expects to have such joint income in excess of $300,000 in the current year; and/or

[ ]   (d)   I am (circle which one) a corporation, partnership, limited liability company, or organization described in Section 501(c)(3) of the Internal Revenue Code, not formed for the specific purpose of acquiring the Interest, with total assets in excess of $5,000,000; and/or

[ ]   (e)   I am a trust, not formed for the specific purpose of acquiring the Interest, with total assets in excess of $5,000,000 whose purchase is directed by a sophisticated person (i.e., a person who has such knowledge and experience in financial and business matters that he or she is capable of evaluating the merits and risks of this prospective investment); and/or

[ ]   (f)   I am any of the following (CIRCLE WHICH ONE):   a bank (as defined in Section 3(a)(2) of the 1933 Act), or a savings and loan association or other institution (as defined in Section 3(a)(5) of the 1933 Act), whether acting in an individual or fiduciary capacity; or a broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934; or an insurance company (as defined in Section 2(13) of the 1933 Act; or an investment company registered under the Investment Company Act of 1940; or a business development company (as defined in Section 2(a)(48) of the Investment Company Act of 1940; or a Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Administration Act of 1958; or a

2

Pltfs (UC) 000200

plan established and maintained by a state, its political subdivisions or any agency or instrumentality of a state or its political subdivisions for the benefit of its employees, if such plan has total assets in excess of $5,000,000; or an employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary (as defined in Section 3(21) of such Act), which is either a bank, savings and loan association, insurance company or registered investment adviser or, if a self-directed plan, with investment decisions made solely by persons who are accredited investors; and/or

[ ]     (g)     I am an entity in which all of the equity owners are Accredited Investors.

8.     (CHECK THIS BOX IF APPLICABLE:     [ ])   The offer to sell the Interest was not made to me by the Company or its agents while I was in, and I have made this offer to buy the Interest and signed this Agreement when I have been outside of, the United States of America (which for purposes of this Agreement includes all of its states, territories and possessions and the District of Columbia).

9.     The information set forth in this Agreement is correct with respect to me as of the date of my execution of this Agreement. I will promptly notify the Company of any change in such information occurring before I am notified of the acceptance of my subscription by the Company and will provide any further supplementary information, which is requested by the Company.

10.     I hereby agree to indemnify the Company and its officers, directors, managers and agents against, and hold such parties harmless from, any and all liabilities, damages, costs or expenses, including, without limitation, those arising under federal or state securities laws, incurred on account of or arising out of: (a) any inaccuracy in my representations and covenants set forth herein; or (b) the disposition of any of portion of the Interest which I will receive, contrary to my foregoing representations and covenants.

11.     If a corporation, partnership, trust, limited liability company or other form of business entity, I am authorized and otherwise duly qualified to purchase and hold the Interest and have not been formed for the specific purpose of making an investment in the Company. If an undersigned individual is executing this Agreement, as well as all other related documents, on behalf of any entity, such individual represents that he or she is duly authorized to execute all such documents on behalf of that entity. If an individual, I am under no legal disability with respect to entering into this Agreement or purchasing the Interest.

12.     At the Company's request, I will promptly execute such other instruments or documents as may be reasonably required in connection with my purchase of the Interest. Whenever the context hereof so requires, use of either the masculine, feminine or neuter shall include the masculine, feminine and neuter, and use of the singular or the plural form shall include the singular and plural. This Agreement shall be governed by and construed in accordance with the laws of the State of California, excluding conflict of laws provisions. In any dispute or legal proceeding relating to the enforcement of rights under this Agreement, the prevailing party shall be entitled to recover its reasonable legal fees and costs. This Agreement constitutes the entire agreement between me and the Company, and supersedes any prior or contemporaneous representations, warranties, understandings or agreements, with respect to the subject matter of this Agreement. Neither this Agreement nor any provision hereof may be amended, waived or canceled except by an instrument in writing signed by the party against whom any such amendment, waiver or cancellation is sought. Any provision of this Agreement which is invalid or unenforceable under applicable laws shall be deemed inoperative to the extent it conflicts with such laws, but shall not affect the enforceability of other provisions of this Agreement. No waiver of any of the provisions of this Agreement shall be deemed a waiver of any other provision, whether or not similar, nor will any waiver constitute a continuing waiver.

13.     This Agreement shall be binding upon my heirs, executors, administrators, successors and assigns. However, my rights and obligations to purchase the Interest under this Agreement may not be assigned or transferred to any other person without the Company's prior written consent and any assignment or transfer in violation of this paragraph shall be void.

14.     The purchase price for the Interest will be paid in the form of a (wire, check, transfer, etc):   _Wire_____.

3

DATED: _2/27/2020_

Printed Name of Purchaser

_Ronald A. Christenson_

Printed Name(s) and Title(s) or
Capacity(ies) of any Officer(s)
Partner(s) or Agent(s) Acting on
Behalf of Purchaser (if an entity):

Name: _____

Title: _____

Signature of Purchaser

_Ronald D. Christensen_

Signature(s) of Any Officer(s),
Partner(s) or Agent(s) Acting
on Behalf of Purchaser if an entity:

Signature: _____

4

Pltfs (UC) 000202

### ADDITIONAL INFORMATION

[COMPLETE EACH ITEM. MODIFY AS APPROPRIATE IF THERE ARE TWO OR MORE PURCHASERS.  ADD
ADDITIONAL SHEETS IF NECESSARY TO COMPLETE ANY OF THE ITEMS.]

1.　Give the exact name(s) in which title to the Interest is to be taken:

_Ronald A. Christensen_

Indicate the type of ownership [check one]:

[✓] Individual ownership　　　　　　　　[ ] Joint Tenancy
    (One signature required)　　　　　　　    (Both parties must sign)

[ ] Trust (Include　　　　　　　　　　　　[ ] Community Property
    name of trustee(s) and date　　　　　　    (Spouse or spouses named
    trust was established)　　　　　　　　　    as record holder(s)
    　　　　　　　　　　　　　　　　　　    must sign)

[ ] Partnership (Include　　　　　　　　　[ ] Tenants in Common
    copy of the statement　　　　　　　　    (Both parties must sign)
    of partnership or the
    partnership agreement
    or certificate authorizing
    signature)

[ ] Corporation (Include　　　　　　　　　[ ] Other:_____
    certified corporate
    resolution authorizing
    purchase and signature)

2.　If the purchaser is other than an individual purchasing for his or her own account (a corporation, trustee, partnership, custodian, estate, etc.), indicate the nature of the purchaser and the capacity of any person(s) signing above on behalf of the purchaser:

_____
_____

3.　Residence address of purchaser or principal business address (if an entity):

_11517 E. Paradise Lane, Scottsdale, AZ 85255_

4.　Mailing address (if different than residence address) to be used for notices from the Company:

_____

5.　Telephone numbers:

Business:　_(602) 758-7666_

Residence:　_(480) 699-2A00_

Facsimile:　_(____) _____

6.　Tax ID Number (Social Security Number if an individual):　_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_

7.　E-Mail Address: _RonChristensenMD@aol.com_

5

Pltfs (UC) 000203

**ACCEPTANCE BY THE COMPANY**

provisions.     Urban Commons Battery Park, LLC hereby accepts the foregoing agreement and agrees to be bound by its

DATED:  _2 — 27 — 2020_

                                        Urban Commons Battery Park, LLC,
                                        a Delaware limited liability company

                                    By:     Urban Commons, LLC,
                                            a Delaware limited liability company,
                                            Its Manager

                                        By: _____
                                        Signature

                                        _____Alec Robinson_____
                                        Printed Name

                                        _____Authorized Signer_____
                                        Title

6

Pltfs (UC) 000204

# EXHIBIT O

**LIMITED LIABILITY COMPANY OPERATING AGREEMENT**

**FOR**

**URBAN COMMONS BATTERY PARK, LLC**

THE MEMBERSHIP INTERESTS IN URBAN COMMONS BATTERY PARK, LLC HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE FEDERAL SECURITIES ACT OF 1933, AS AMENDED, OR QUALIFIED WITH THE CORPORATIONS OR SECURITIES COMMISSIONER OF ANY STATE, AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION AND QUALIFICATION REQUIREMENTS OF SUCH LAWS.   ANY ATTEMPTED TRANSFER OF THE SECURITIES IS RESTRICTED BY SUCH LAWS AS WELL AS RESTRICTIONS DESCRIBED IN THE WITHIN AGREEMENT.

Dated:  As of September ___, 2018

Pltfs (UC) 000097

# TABLE OF CONTENTS

**Page**

ARTICLE I: DEFINITIONS ..................................................................................................1

ARTICLE II: ORGANIZATION ..........................................................................................7

ARTICLE III: CAPITAL AND CAPITAL CONTRIBUTIONS .............................................8

ARTICLE IV: ALLOCATIONS AND DISTRIBUTIONS .....................................................10

ARTICLE V: MANAGEMENT ............................................................................................16

ARTICLE VI: ACCOUNTS AND ACCOUNTING ...............................................................22

ARTICLE VII: MEMBERSHIP MEETINGS, VOTING, INDEMNITY ..............................24

ARTICLE VIII: TRANSFERS OF MEMBERSHIP INTERESTS; ADMISSION OF MEMBERS .................................................................................................25

ARTICLE IX: DISSOLUTION AND WINDING UP ...........................................................30

ARTICLE X: INDEMNIFICATION AND ARBITRATION ..................................................30

ARTICLE XI: INVESTMENT REPRESENTATIONS ..........................................................32

ARTICLE XII: ATTORNEY-IN-FACT AND AGENT .........................................................32

ARTICLE XIII: GENERAL PROVISIONS .........................................................................33

Pltfs (UC) 000098

# LIMITED LIABILITY COMPANY

## OPERATING AGREEMENT

### FOR

## URBAN COMMONS BATTERY PARK, LLC

THIS LIMITED LIABILITY COMPANY OPERATING AGREEMENT is effective as of September __, 2018 by and among the individuals and entities identified on the signature pages attached to this Agreement and listed on Exhibit "A" attached hereto (referred to individually as a "Member" and collectively as the "Members").

<u>Recitals</u>

A.      The Members have formed a limited liability company (the "Company") under the Delaware Limited Liability Company Act (currently Chapter 18 of Title 6 of the Delaware Code) (the "Act") by filing a Certificate of Formation with the Delaware Secretary of State on April 20, 2017.

B.      The Members enter into this Agreement to form and provide for the governance of the Company and the conduct of its business, and to specify their relative rights and obligations.

NOW THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged and agreed, the Members hereby agree as follows:

## ARTICLE I:

## DEFINITIONS

Capitalized terms used in this Agreement have the meanings specified in this Article or elsewhere in this Agreement.

1.1      "Act" is defined in Recital A.

1.2      "Additional Member" is defined in Section 8.12.

1.3      "Adjusted Capital Account Deficit" is defined in Section 4.3(a).

1.4      "Affiliate" of a Member or a Manager means (a) any Person directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the Member or (b) the parent, spouse, sibling (including the sibling's spouse) or child (including the child's spouse) of any Member, Manager or Person with direct or indirect, through one or more intermediaries, control over any Member or Manager. The term "control" (including the terms "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through membership, ownership of voting securities, by contract, or otherwise.

USA01\11815093.5\C087855\0556982

1.5     "Agreement" means this Limited Liability Company Operating Agreement, as originally executed and as amended from time to time.

1.6     "Assignee" means a Person who has acquired a Member's Economic Interest in the Company, by way of a Transfer in accordance with the terms of this Agreement, but who has not become a Member.

1.7     "Assigning Member" means a Member who by means of a Transfer has transferred an Economic Interest in the Company to an Assignee.

1.8     "Available Capital Proceeds" means, with respect to any fiscal year, the net cash proceeds remaining in the Company and available for distribution derived from any Capital Event, after deduction of amounts required for all expenses incurred by the Company in connection with obtaining such proceeds and any amounts required for the payment of Company indebtedness, as determined by the Manager(s).

1.9     "Available Cash Flow" means all cash received from Company operations not including amounts received as Capital Contributions, reduced by all cash paid as determined by the Manager(s), including payment of Company indebtedness or amounts used to establish Reserves.

1.10     "Award" is defined in Section 8.5(a).

1.11     "Book Depreciation" is defined in Section 4.3(b).

1.12     "Bona Fide Offer" is defined in Section 8.3.

1.13     "Capital Account" means, with respect to any Member, the account reflecting the capital interest of the Member in the Company, consisting of the Member's initial Capital Contribution maintained and adjusted in accordance with Section 3.4.

1.14     "Capital Contribution" means, with respect to any Member, the amount of money and the fair market value of any property (other than money) at the time such property is contributed to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take "subject to" under IRC Section 752) (a) in consideration of a Capital Percentage Interest held by such Member or (b) as additional Capital Contributions made in accordance with Sections 3.2 and 3.3.  A Capital Contribution shall not be deemed a loan.

1.15     "Capital Event" means a sale or disposition of any of the Company's capital assets, the receipt of insurance and other proceeds derived from the involuntary conversion of Property, the receipt of proceeds from a refinancing of Property, or a similar event with respect to Property or assets.

1.16     "Capital Percentage Interest" means the ratio of a Member's total Capital Contributions to the total Capital Contributions by all Members expressed as a percentage and represents a Member's entire Economic Interest in the Company, including a Member's share of the Company's Profits, Losses and distributions of the Company's Available Cash Flow and Available Capital Proceeds pursuant to this Agreement.  The Membership List shall be amended upon the admission of any new Members to the Company and upon any adjustments to a Member's Capital Percentage Interest pursuant to the terms and conditions of this Agreement.

2

Pltfs (UC) 000100

1.17     "Certificate of Formation" is defined in Section 2.7.

1.18     "Code" or "IRC" means the Internal Revenue Code of 1986, as amended, and any successor provision.

1.19     "Company" means the company named in Section 2.2 of this Agreement.

1.20     "Company Minimum Gain" is defined in Section 4.3(c).

1.21     "Economic Interest" means a Person's share of (a) the Company's items of income, gain, deduction, loss and expense, and (b) the distributions of the Company's assets pursuant to this Agreement and the Act, but shall not include any other rights of a Member, including, without limitation, the right to vote or participate in the management of the Company, or any right to information concerning the business and affairs of the Company.

1.22     "Encumber" means the act of creating or purporting to create an Encumbrance, whether or not perfected under applicable law.

1.23     "Encumbrance" means, with respect to any Membership Interest, or any element thereof, a mortgage, pledge, security interest, lien, proxy coupled with an interest (other than as contemplated in this Agreement), option, or preferential right to purchase.

1.24     "Expiration Date" is defined in Section 8.5.

1.25     "Fair Option Price" is defined in Section 8.8.

1.26     "Gross Asset Value" means, with respect to any item of Property, the item's adjusted basis for federal income tax purposes, except as follows:

    (a).     The initial Gross Asset Value of any item of property contributed by a Member to the Company shall be the fair market value of such property, as mutually agreed by the contributing Member and the Company;

    (b).     The Gross Asset Value of any item of Property distributed to any Member shall be the fair market value of such item of Property on the date of distribution; and

    (c).     The Gross Asset Value of any item of Property shall be subject to the adjustments specified in Section 4.9.

1.27     "Indemnified Party" is defined in Section 10.1.

1.28     "Initial Members" means those Persons whose names are set forth on the original Membership List maintained by the Company and are listed on Exhibit "A" attached hereto.  A reference to an "Initial Member" means any of the Initial Members.

1.29     "Involuntary Transfer" means, with respect to any Membership Interest, or any element thereof, any Transfer or Encumbrance, whether by operation of law, pursuant to court order, foreclosure of a security interest, execution of a judgment or other legal process, or otherwise,

USA01\11815093.5\C087855\0556982

Pltfs (UC) 000101

including a purported transfer to or from a trustee in bankruptcy, receiver, or assignee for the benefit of creditors.

1.30    "IRR" means the annualized discount rate, determined by iterative process on a cumulative basis, which results in a net present value of zero, calculated and compounded on a monthly basis (as calculated using the XIRR function using Excel or equivalent accounting program), when such discount rate is applied to specified Capital Contributions from the date when such contributions were made and to specified distributions to the date such distributions were initially made.  A further explanation and sample Internal Rate of Return calculation is attached hereto as Exhibit "B."

1.31    "Liabilities" is defined in Section 10.1.

1.32    "Losses" is defined in Section 4.2.

1.33    "Major Decision" means the decision by the Manager(s) and a Majority of Members on behalf of the Company to do any of the following:  (a) the merger of the Company with another limited liability company or corporation, general partnership, limited partnership or other entity (except that any act which would cause a Member to incur personal liability for the obligations of the Company or its successor shall also require the consent of such Member); (b) any act which would make it impossible to carry on the ordinary business of the Company, except as expressly provided in the last paragraph of Section 5.1; (c) the confession of a judgment against the Company if the amount of the judgment is in excess of Three Hundred Thousand Dollars ($300,000) and is not covered by insurance carried by the Company; (d) the incurring of any capital expense that costs in excess of Two Hundred Fifty Thousand Dollars ($250,000) unless such capital expense had been accounted for in the operating budgets for the Company; (e) lending money to, or guaranteeing the debts or other obligations of, a Member or any other Person; (f) the filing of a petition in bankruptcy or the entering into of an arrangement among creditors; (g) the entering into, on behalf of the Company, of any transaction constituting a "reorganization"; and (h) the compromise of any obligation of a Member to make a Capital Contribution or return an improper distribution.

1.34    "Majority of Members" means a Member or Members whose Percentage Interests when taken together represent more than 50% of the Percentage Interests of all the Members.

1.35    "Manager" or "Managers" means the Person(s) named as such in Section 2.9 or the Persons who from time to time succeed any Person as a Manager and who, in either case, are serving at the relevant time as a Manager.

1.36    "Member" means an Initial Member or a Person who otherwise acquires a Membership Interest, as permitted under this Agreement, for as long as it continues to own such Membership Interest.

1.37    "Member Nonrecourse Debt" is defined in Section 4.3(d).

1.38    "Member Nonrecourse Debt Minimum Gain" is defined in Section 4.3(e).

1.39    "Member Nonrecourse Deductions" is defined in Section 4.3(f).

4

Pltfs (UC) 000102

1.40    "Membership Interest" means a Member's rights in the Company, including the Member's Capital Percentage Interest and Percentage Interest, any right to Vote or participate in management, and any right to information concerning the business and affairs of the Company.

1.41    "Membership Interest Certificates" is defined in Section 7.3.

1.42    "Membership List" shall mean the list of Members and their respective Percentage Interests and Capital Percentage Interests maintained by the Company.

1.43    "Non-Contributing Member" is defined in Section 3.3.

1.44    "Nonrecourse Deductions" is defined in Section 4.3(g).

1.45    "Nonrecourse Liability" is defined in Section 4.3(h).

1.46    "Notice" means a written notice required or permitted under this Agreement. A notice shall be deemed given or sent when deposited, as certified mail or for overnight delivery, postage and fees prepaid, in the United States mails; when delivered to Federal Express, United Parcel Service or other similar overnight delivery service, for overnight delivery, charges prepaid or charged to the sender's account; when personally delivered to the recipient; when transmitted by electronic means, and such transmission is electronically confirmed as having been successfully transmitted; or when delivered to the home or office of a recipient in the care of a person whom the sender has reason to believe will promptly communicate the notice to the recipient.

1.47    "Option Date" is defined in Section 8.6.

1.48    "Partner" is defined in Section 6.6.

1.49    "Percent of the Members" means the specified total of Percentage Interests of all the Members.

1.50    "Percentage Interest" means the ownership interest of a Member in the Company from time-to-time, including a Member's right to Vote on Company matters.  The Membership List shall be amended upon the admission of any new Members to the Company and upon any adjustments to a Member's Percentage Interest pursuant to the terms and conditions of this Agreement.  The initial Percentage Interests of the Members are listed on Exhibit "A" attached hereto.  In no event shall the Percentage Interest of Urban Commons be less than 50%.

1.51    "Person" means an individual, partnership, limited partnership, trust, estate, association, corporation, limited liability company, or other entity, whether domestic or foreign.

1.52    "Profits" and "Losses" are defined in Section 4.2.

1.53    "Property" means that certain property known as The Wagner Hotel located at 2 West Street, New York, NY, any tenancy-in-common interest in the Wagner Hotel owned by the Company or its Subsidiary, and any other tangible or intangible, real or personal property contributed to or acquired or owned directly or indirectly by the Company.

USA01\11815093.5\C087855\0556982

Pltfs (UC) 000103

1.54    "Proxy" means a written authorization signed or an electronic transmission authorized by a Member or the Member's attorney-in-fact giving another Person the power to exercise the voting rights of that Member.

1.55    "Regulations" ("Reg") means the income tax regulations promulgated by the United States Department of the Treasury and published in the Federal Register for the purpose of interpreting and applying the provisions of the Code, as such Regulations may be amended from time to time, including corresponding provisions of applicable successor regulations.

1.56    "Reserves" means the aggregate of reserve accounts that the Manager(s), in the Manager's(s') sole discretion, deems reasonably necessary to meet accrued or contingent liabilities of the Company, reasonably anticipated operating expenses, and working capital requirements.

1.57    "Secretary" is defined in Section 6.7(b).

1.58    "Selling Member" is defined in Section 8.4.

1.59    "Subsidiary" is defined in Section 2.5.

1.60    "Substituted Member" is defined in Section 8.9.

1.61    "Successor in Interest" means an Assignee, a successor of a Person by merger or otherwise by operation of law, or a transferee of all or substantially all of the business or assets of a Person.

1.62    "Tax Item" means each item of income, gain, loss, deduction, or credit of the Company.

1.63    "Tax Matters Member" means such Person as may be designated under Section 6.6.

1.64    "Transfer" means, with respect to a Membership Interest or any element of a Membership Interest, any sale, assignment, gift, Involuntary Transfer, Encumbrance, or other disposition of such a Membership Interest or any element of such Membership Interest, directly or indirectly, other than an Encumbrance that is expressly permitted under this Agreement.

1.65    "Triggering Event" is defined in Section 8.4.

1.66    "Unreturned Capital Contributions" means, with respect to a Member, such Member's Capital Contributions that have not been returned to such Member pursuant to Section 4.12(a).

1.67    "Urban Commons" means Urban Commons, LLC, a Delaware limited liability company.

1.68    "Voluntary Contributing Member" is defined in Section 3.3.

1.69    "Vote" means a written consent or approval, a ballot cast at a meeting, or a voice vote.

USA01\11815093.5\C087855\0556982

Pltfs (UC) 000104

1.70   "Voting Interest" means, with respect to a Member, the right to Vote or participate in management and any right to information concerning the business and affairs of the Company as provided under this Agreement. A Member's Voting Interest shall be directly proportional to that Member's Percentage Interest.

## ARTICLE II:

## ORGANIZATION

2.1   The Manager(s) has caused the Certificate of Formation for the Company to be executed and filed with the Secretary of State of the State of Delaware.

2.2   The name of the Company is **URBAN COMMONS BATTERY PARK, LLC**.

2.3   The mailing address of the Company shall be at 10250 Constellation Blvd., Suite 1750, Los Angeles, California 90067, or such other place or places as may be determined by the Manager(s) from time to time.

2.4   The address of the registered office of the Company in the State of Delaware is c/o The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.  The name and address of the registered agent of the Company for service of process on the Company in the State of Delaware are The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.  The Manager(s) may from time to time change the Company's registered office and/or its registered agent.

2.5   The purpose of the Company is to (a) acquire and own 100% of the limited liability company interest in an entity (the "Subsidiary") formed to acquire, own, develop, redevelop, operate, manage, lease, finance and/or sell the Property or a tenancy-in-common interest in the Property, and to do all things necessary, convenient or incidental to the foregoing, including, but not limited to, causing the Subsidiary to engage a qualified, licensed third party manager to manage the operations of all or any portion of the Property, (b) enter into a limited liability company agreement of the Subsidiary pursuant to which the Company shall own, control and manage the Subsidiary, which limited liability company agreement shall be in such form and contain such terms as the Manager(s) may determine, (c) carry on any other lawful business, purpose or activity, whether or not for profit, to the fullest extent provided in the Act, as the Majority of Members may agree, and (d) to do all things necessary, convenient or incidental to each of the foregoing.

2.6   The Members intend the Company to be a limited liability company under the Act. Neither the Manager(s) nor any Member shall take any action inconsistent with the express intent of the parties to this Agreement.

2.7   The term of existence of the Company commenced upon the filing of the Certificate of Formation of the Company (the "Certificate of Formation") with the Secretary of State of the State of Delaware, and shall continue until the Company is dissolved and wound up pursuant to Article IX.

2.8   The names of the Initial Members are set forth on Exhibit "A" attached hereto.

USA01\11815093.5\C087855\0556982

Pltfs (UC) 000105

2.9     The initial Manager of the Company will be Urban Commons:

> Urban Commons, LLC
> 10250 Constellation Blvd., Suite 1750
> Los Angeles, California 90067
> Phone No.:  (949) 400-8808
> Attention:  Taylor Woods

## ARTICLE III:

## CAPITAL AND CAPITAL CONTRIBUTIONS

3.1     Each Member (including Additional Members and Substituted Members) other than the Initial Member shall contribute to the capital of the Company as the Member's initial Capital Contribution the money and property specified on the Subscription Agreement signed by the Member.  The initial fair market value of each item of contributed property (net of liabilities secured by such property) that the Company is considered to assume or to take "subject to" under IRC Section 752, is also set forth on the Subscription Agreement, together with the description and amount of these liabilities.  If a Member fails to make the initial Capital Contributions specified in this Section within five days after execution of the Subscription Agreement, that Member's entire Membership Interest shall terminate, and that Member shall indemnify and hold the Company and the other Members harmless from any loss, cost, or expense, including reasonable attorney fees caused by the failure to make the initial Capital Contribution.

3.2     The Manager(s) does not anticipate that any additional Capital Contributions will be required from the Members in addition to the initial Capital Contributions made by the Members in accordance with Section 3.1 above.  However, if the Manager(s) reasonably determines from time to time that additional cash capital contributions are needed to carry out the purposes of the Company (in connection with making such determination the Manager(s) will take into account any projected Available Cash Flow which may be available and the availability of additional financing to pay for any such items), the Manager(s) shall deliver written notice to the Members as to the amount of additional capital that is needed.  Within thirty (30) days after receipt of such written notice, each Member may, but without any obligation to do so, make additional cash Capital Contributions to the Company in an amount equal to the product obtained by multiplying its Capital Percentage Interest by the additional capital amount that the Manager(s) reasonably determined is necessary to carry out the purposes of the Company.

3.3     If any Member (a "Non-Contributing Member") shall decide not to make any additional Capital Contribution within such thirty (30) day period then, within the following ten (10) day period, all or any portion of the contributing Members (such contributing Members who elect to make such additional Capital Contribution in place of the Non-Contributing Member shall be hereinafter referred to as a "Voluntary Contributing Member") may, pro rata in accordance with the Voluntary Contributing Members' aggregate Capital Percentage Interests, make such additional Capital Contribution(s) in place of the Non-Contributing Member; in which case the Capital Percentage Interests of the Non-Contributing Member and the Voluntary Contributing Members shall be adjusted so that each such Member's Capital Percentage Interest shall equal a fraction, which shall be expressed as a percentage, the numerator of which is the Capital Contributions, including the additional Capital Contributions, made by such Member and the denominator of

8

Pltfs (UC) 000106

which is the total Capital Contributions, including the additional Capital Contributions, made by all Members.   All such adjustments to the Capital Percentage Interests of the Non-Contributing Member and the Voluntary Contributing Members shall be effective immediately after the making by the Voluntary Contributing Members of the additional Capital Contributions in place of the Non-Contributing Member.

3.4     An individual Capital Account for each Member shall be maintained in accordance with the requirements of Reg Section 1.704-1(b)(2)(iv) and adjusted in accordance with the following provisions:

(a).     A Member's Capital Account shall be increased by that Member's Capital Contributions, that Member's share of Profits, and any items in the nature of income or gain that are specially allocated to that Member pursuant to Article IV.

(b).     A Member's Capital Account shall be increased by the amount of any Company liabilities assumed by that Member subject to and in accordance with the provisions of Reg Section 1.704-1(b)(2)(iv)(c).

(c).     A Member's Capital Account shall be decreased by (a) the amount of cash distributed to that Member; (b) the fair market value of any Property so distributed, net of liabilities secured by such distributed Property that the distributee Member is considered to assume or to be subject to under IRC Section 752; and (c) the amount of any items in the nature of expenses or losses that are specially allocated to that Member pursuant to Article IV.

(d).     A Member's Capital Account shall be reduced by the Member's share of any expenditures of the Company described in IRC Section 705(a)(2)(B) or which are treated as IRC Section 705(a)(2)(B) expenditures pursuant to Reg Section 1.704-1(b)(2)(iv)(i) (including syndication expenses and losses nondeductible under IRC Sections 267(a)(1) or 707(b)).

(e).     If any Economic Interest (or portion thereof) is transferred, the transferee of such Economic Interest or portion shall succeed to the transferor's Capital Account attributable to such interest or portion.

(f).     The principal amount of a promissory note that is not readily traded on an established securities market and that is contributed to the Company by the maker of the note shall not be included in the Capital Account of any Person until the Company makes a taxable disposition of the note or until (and to the extent) principal payments are made on the note, all in accordance with Reg Section 1.704-1(b)(2)(iv)(d)(2).

(g).     Each Member's Capital Account shall be increased or decreased as necessary to reflect a revaluation of the Company's property assets in accordance with the requirements of Reg Sections 1.704-1(b)(2)(iv)(f) and 1.704-1(b)(2)(iv)(g), including the special rules under Reg Section 1.701-1(b)(4), as applicable. The provisions of this Agreement respecting the maintenance of Capital Accounts are intended to comply with Reg Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with those Regulations.

3.5     A Member shall not be entitled to withdraw any part of the Member's Capital Contribution or to receive any distributions, whether of money or property, from the Company except as provided in this Agreement.

9

Pltfs (UC) 000107

3.6     No interest shall be paid on Capital Contributions or on the balance of a Member's Capital Account except as provided in this Agreement.

3.7     A Member shall not be bound by, or be personally liable for, the expenses, liabilities, or obligations of the Company.

3.8     Except as otherwise expressly provided in the Act or in this Agreement, no Member shall have priority over any other Member with respect to the return of a Capital Contribution or distributions or allocations of income, gain, losses, deductions, credits, or items thereof.

## ARTICLE IV:

## ALLOCATIONS AND DISTRIBUTIONS

4.1     (a)     Profits shall be allocated among the Members as follows:

(1)     First, to the Members to the extent of, and in proportion to, the cumulative Losses, if any, previously allocated to such Members pursuant to Sections 4.1(b)(2), reduced by any prior allocations of Profits pursuant to this Section 4.1(a)(1).

(2)     Second, to the Members to the extent of, and in proportion to, the excess, if any, of the cumulative Losses previously allocated to each such Member pursuant to Section 4.1(b) (including any such Losses described in Section 4.1(b)(2)) over the cumulative Profits previously allocated to such Member pursuant to Section 4.1(a), until such excess is entirely eliminated with respect to each such Member.

(3)     Third, to the Members in accordance with and to the extent of distributions made in accordance with Sections 4.11(a), 4.11(b), 4.11(c) and 4.11(d), in that order.

(4)     Fourth, to the Members in accordance with and to the extent of distributions made in accordance with Sections 4.12(b), 4.12(c), 4.12(d) and 4.12(e), in that order.

(b).     Losses shall be allocated among the Members as follows:

(1)     To the Members to the extent of and in proportion to the cumulative Profits, if any, previously allocated to such Members pursuant to Sections 4.1(a)(4) and (3), in that order, reduced in each case by any prior allocations of offsetting Losses pursuant to this Section 4.1(b)(1).

(2)     Thereafter, one hundred percent (100%) to the Members based on the Members' Capital Percentage Interests.

(c).     Notwithstanding Sections 4.1(a) and (b) above, to the extent the Code requires that Losses be allocated other than as set forth in Section 4.1(b) ("Tax Loss Allocations"), gross income and Profits shall be allocated so as to minimize as quickly as possible the difference

Pltfs (UC) 000108

between the balances in a Member's Capital Account reflecting such Tax Loss Allocations and what the Capital Account balances would be absent such Tax Loss Allocations.

4.2     As used in this Agreement, "Profits and Losses" means, for each fiscal year or other period specified in this Agreement, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with IRC Section 703(a), including all Tax Items required to be stated separately pursuant to IRC Section 703(a)(1), with the following adjustments:

(a).     Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses shall be added to such taxable income or loss;

(b).     Any expenditures of the Company described in IRC Section 705(a)(2)(B) or treated as IRC Section 705(a)(2)(B) expenditures pursuant to Reg Section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Profits or Losses shall be subtracted from such taxable income or shall increase such loss;

(c).     Gain or loss resulting from any disposition of Property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the fair market value of the Property disposed of, notwithstanding that the adjusted tax basis of such Property differs from its fair market value;

(d).     In lieu of depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Book Depreciation for such fiscal year or other period, computed in accordance with the definition of "Book Depreciation" in Section 4.3(b); and

(e).     Notwithstanding the foregoing provisions of this Section 4.2, any items of income, gain, loss, or deduction that are specially allocated shall not be taken into account in computing Profits or Losses under Section 4.1.

4.3     The following definitions shall apply with respect to this Article IV.

(a).     "Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year of the Company, after such Member's Capital Account has been adjusted as follows: (1) the Member's Capital Account shall be increased by the amount of such Member's share of Company Minimum Gain and Member Nonrecourse Debt Minimum Gain; and (2) the Member's Capital Account shall be decreased by the amount of the items described in Reg Sections 1.704-1(b)(2)(ii)(d)(4), (5), and (6).

This definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Reg Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently with that Regulation.

(b).     "Book Depreciation" means, with respect to any item of Property for a given fiscal year, a percentage of depreciation or other cost recovery deduction allowable for federal income tax purposes for such item during that fiscal year equal to the result (expressed as a percentage) obtained by dividing (1) the fair market value of that item at the beginning of the fiscal

11

Pltfs (UC) 000109

year (or the acquisition date during the fiscal year), by (2) the federal adjusted tax basis of the item at the beginning of the fiscal year (or the acquisition date during the fiscal year). If the adjusted tax basis of an item is zero, the Manager(s) may determine Book Depreciation, provided that the Manager(s) does so in a reasonable and consistent manner.

(c).    "Company Minimum Gain" has the meaning set forth in Reg Section 1.704-2(d)(1).

(d).    "Member Nonrecourse Debt" is defined in Reg Section 1.704-2(b)(4).

(e).    "Member Nonrecourse Debt Minimum Gain" for a fiscal year of the Company means the net increase in Minimum Gain attributable to Member Nonrecourse Debt, determined as set forth in Reg Section 1.704-2(i)(2).

(f).    "Member Nonrecourse Deductions" has the meaning set forth in Reg Section 1.704-2(i)(2). For any fiscal year of the Company, the amount of Member Nonrecourse Deductions with respect to a Member Nonrecourse Debt equals the net increase during that fiscal year in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt during that fiscal year, reduced (but not below zero) by the amount of any distributions during such year to the Member bearing the economic risk of loss for such Member Nonrecourse Debt if such distributions are both from the proceeds of such Member Nonrecourse Debt and are allocable to an increase in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, all as determined according to the provisions of Reg Section 1.704-2(i)(2). In determining Member Nonrecourse Deductions, the ordering rules of Reg Section 1.704-2(j) shall be followed.

(g).    "Nonrecourse Deductions" has the meaning set forth in Reg Section 1.704-2(c).  The amount of Nonrecourse Deductions for a Company fiscal year equals the net increase in the amount of Company Minimum Gain during that fiscal year, reduced (but not below zero) by the aggregate amount of any distributions during that fiscal year of proceeds of a Nonrecourse Liability that are allocable to an increase in Company Minimum Gain.

(h).    "Nonrecourse Liability" is defined in Reg Section 1.752-1(a)(2).

4.4    The following special allocations shall be made in the following order:

(a).    Company Minimum Gain Chargeback.  If there is a net decrease in Company Minimum Gain during a fiscal year, each Member shall be allocated, before any other allocation under this Section, items of Company income and gain for such fiscal year equal to such Member's share of the net decrease in Company Minimum Gain as determined in accordance with Reg Section 1.704-2(g)(2).

(b).    Member Nonrecourse Debt Minimum Gain Chargeback. If there is a net decrease in Member Nonrecourse Debt Minimum Gain during a fiscal year, any Member with a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt as of the beginning of such fiscal year shall be allocated items of Company income and gain for such year (and, if necessary, subsequent years) equal to that Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain. A Member's share of net decrease in Member Nonrecourse Debt Minimum Gain shall be determined pursuant to Reg Section 1.704-2(i)(3). A

Pltfs (UC) 000110

Member shall not be subject to the foregoing chargeback to the extent permitted under Reg Section 1.704-2(i)(4).

        (c).    Qualified Income Offset. If any Member unexpectedly receives an adjustment, allocation, or distribution described in Reg Sections 1.704-1(b)(2)(ii)(d)(4), (5), or (6), such Member shall be allocated items of Company income and gain (consisting of a pro rata portion of each item of Company income, including gross income and gain for such fiscal year) in an amount and manner sufficient to eliminate the Adjusted Capital Account Deficit created by such adjustment, allocation, or distribution.

    4.5    Nonrecourse Deductions, as defined in Reg Section 1.704-2(c), for any fiscal year of the Company shall be allocated to the Members in the same proportion as Losses are allocated under Section 4.1(b)(2), provided that any Member Nonrecourse Deductions for any fiscal year or other period shall be allocated to the Member who bears (or is deemed to bear) the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Reg Section 1.704-2(i)(2).

    4.6    Any unrealized appreciation or unrealized depreciation in the values of Property distributed in kind to Members shall be deemed to be Profits or Losses realized by the Company immediately prior to the distribution of the Property and such Profits or Losses shall be allocated to the Capital Accounts in the same proportions as Profits are allocated under Section 4.1. Any Property so distributed shall be treated as a distribution to the Members to the extent of the fair market value of the Property, less the amount of any liability secured by and related to the Property. Nothing contained in this Agreement is intended to treat or cause such distributions to be treated as sales for value. For the purposes of this Section 4.6, "unrealized appreciation" or "unrealized depreciation" shall mean the difference between the fair market value of such Property and the Company's federal adjusted tax basis for such Property.

    4.7    Any item of income, gain, loss, or deduction with respect to any Property (other than cash) that has been contributed by a Member to the capital of the Company, or that has been revalued pursuant to the provisions of Section 3.4(g), and that is required or permitted to be allocated to such Member for income tax purposes under IRC Section 704(c) in order to take into account the variation between the tax basis of such Property and its fair market value at the time of its contribution, shall be allocated solely for income tax purposes in the manner required or permitted under IRC Section 704(c) using the "traditional" method described in Reg Section 1.704-3(b), except that any other method allowable under applicable Regulations may be used for any contribution of Property with respect to which there is agreement among the contributing Member and the Manager(s) (and, if the Manager(s) and the contributing Member are Affiliates, a Majority of Members who are not Affiliates of the Manager(s)).

    4.8    In the case of a Transfer of an Economic Interest during any fiscal year of the Company, the Assigning Member and Assignee shall each be allocated Profits or Losses based on the number of days each held the Economic Interest during that fiscal year. If the Assigning Member and Assignee agree to a different proration and advise the Manager(s) of the agreed proration before the date of the Transfer, Profits or Losses from a Capital Event during that fiscal year shall be allocated to the holder of the Interest on the day such Capital Event occurred. If an Assignee makes a subsequent Assignment, said Assignee shall be considered an "Assigning Member" with respect to the subsequent Assignee for purposes of the aforesaid allocations.

<div align="center">13</div>

Pltfs (UC) 000111

4.9     (a).     The Gross Asset Value of all Property shall be adjusted as of the following times: (i) the acquisition of an interest or additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (ii) the distribution of money or other Property (other than a de minimis amount) by the Company to a Member as consideration for an Economic Interest in the Company, and (iii) the liquidation of the Company within the meaning of Reg Section 1.704-1(b)(2)(ii)(g); provided, however, that adjustments under clauses (i) and (ii) above shall be made only in the event of a revaluation of Property under Section 3.4(g) in accordance with Reg Section 1.704-1(b)(2)(iv)(f);

(b).     The Gross Asset Value of Property shall be increased or decreased to reflect adjustments to the adjusted tax basis of such Property pursuant to IRC Section 732, IRC Section 733, or IRC Section 743, subject to the limitations imposed by IRC Section 755 and Reg Section 1.704-1(b)(2)(iv)(m); and

(c).     If the Gross Asset Value of an item of Property has been determined or adjusted pursuant to Section 1.25 or Paragraph (a) or (b) of this Section 4.9, such Gross Asset Value shall be adjusted by the Book Depreciation, if any, taken into account with respect to such Property for purposes of computing Profits and Losses.

4.10     It is the intent of the Members that each Member's allocated share of Company Tax Items be determined in accordance with this Agreement to the fullest extent permitted by IRC Sections 704(b) and 704(c).  Notwithstanding anything to the contrary contained in this Agreement, if the Company is advised that, as a result of the adoption of new or amended regulations pursuant to IRC Sections 704(b) and 704(c), or the issuance of authorized interpretations, the allocations provided in this Agreement are unlikely to be respected for federal income tax purposes, the Manager(s) is hereby granted the power to amend the allocation provisions of this Agreement, on advice of accountants and legal counsel, to the minimum extent necessary to cause such allocation provisions to be respected for federal income tax purposes.

4.11     Available Cash Flow, excluding revenues or proceeds from a Capital Event or the dissolution of the Company, shall be distributed among the Members at least annually as determined by the Manager(s) as follows:

(a).     Eighty-five percent (85%) to the Members based on the Members' Capital Percentage Interests pro rata and fifteen percent (15%) to Urban Commons if the IRR on the aggregate Capital Contributions made by the Members is equal to fifteen percent (15%) or less;

(b).     Eighty percent (80%) to the Members based on the Members' Capital Percentage Interests pro rata and twenty percent (20%) to Urban Commons if the IRR on the aggregate Capital Contributions made by the Members is greater than fifteen percent (15%) but not more than thirty percent (30%);

(c).     Seventy-five percent (75%) to the Members based on the Members' Capital Percentage Interests pro rata and twenty-five percent (25%) to Urban Commons if the IRR on the aggregate Capital Contributions made by the Members is greater than thirty percent (30%) but not more than forty-five percent (45%); and

14

(d).     Seventy percent (70%) to the Members based on the Members' Capital Percentage Interests pro rata and thirty percent (30%) to Urban Commons if the IRR on the aggregate Capital Contributions made by the Members is greater than forty-five percent (45%).

4.12     All revenues or proceeds from a Capital Event or the dissolution of the Company shall be distributed among the Members as determined by the Manager(s) as follows:

(a).     First, to the Members pro rata in proportion to the Members' Unreturned Capital Contributions until each Member has recovered his or her Unreturned Capital Contributions;

(b).     Thereafter, eighty-five percent (85%) to the Members based on the Members' Capital Percentage Interests pro rata and fifteen percent (15%) to Urban Commons if the IRR on the aggregate Capital Contributions made by the Members is equal to fifteen percent (15%) or less;

(c).     Eighty percent (80%) to the Members based on the Members' Capital Percentage Interests pro rata and twenty percent (20%) to Urban Commons if the IRR on the aggregate Capital Contributions made by the Members is greater than fifteen percent (15%) but not more than thirty percent (30%);

(d).     Seventy-five percent (75%) to the Members based on the Members' Capital Percentage Interests pro rata and twenty-five percent (25%) to Urban Commons if the IRR on the aggregate Capital Contributions made by the Members is greater than thirty percent (30%) but not more than forty-five percent (45%); and

(e).     Seventy percent (70%) to the Members based on the Members' Capital Percentage Interests pro rata and thirty percent (30%) to Urban Commons if the IRR on the aggregate Capital Contributions made by the Members is greater than forty-five percent (45%).

4.13     The distribution procedures in Sections 4.11 and 4.12 are further described (and examples of such procedures are provided) in Exhibit "B" attached hereto.  If, as a result of the IRR increasing above a threshold percentage and thus causing the distribution percentages to be adjusted as described in Sections 4.11 and 4.12, the total distributions to the Members (other than Urban Commons) are reduced below the distributions that would be made to such Members if the IRR had not increased above such threshold percentage and the distribution percentages adjusted, the Manager(s) shall continue to make distributions to the Members based on the distribution percentages at the lower IRR level until such time as the total distributions to the Members (other than Urban Commons) are greater at the higher IRR level and adjusted percentages then such distributions would be if the IRR had not increased above such threshold percentage.

4.14     If the proceeds from a sale or other disposition of an item of Property consist of Property other than cash, the value of that Property shall be as reasonably determined by the Manager(s) based on the current fair market value of the Property.  If such non-cash proceeds are subsequently reduced to cash, such cash shall be taken into account by the Manager(s) in determining Available Cash.

4.15     Notwithstanding any other provisions of this Agreement to the contrary, when there is a distribution in liquidation of the Company, or when any Member's interest is liquidated, all items

Pltfs (UC) 000113

of income and loss first shall be allocated to the Members' Capital Accounts under this Article IV, and other credits and deductions to the Members' Capital Accounts shall be made before the final distribution is made.  The final distribution to the Members shall be made as provided in Section 9.2(d) of this Agreement.  The provisions of this Section 4.14 and Section 9.2(d) shall be construed in accordance with the requirements of Reg Section 1.704-1(b)(2)(ii)(b)(2).

4.16    For purposes of allocating Profits and Losses under this Article IV, adjusting Capital Accounts and complying with applicable IRC and Reg Sections, the terms "Member" and "Members" shall be deemed to include Urban Commons.

## ARTICLE V:

## MANAGEMENT

5.1    The business of the Company shall be managed by the Persons named as Manager(s) in Section 2.9 or any successors, selected as provided in Section 5.3.  The Manager(s) may, but need not, be Members.  If any of the Managers ceases to serve as a Manager (whether due to death, disability, dissolution or otherwise), then the remaining Manager(s) shall have all of the management power and authority of the Manager(s) as set forth in this Agreement.  Except as otherwise provided in this Agreement, all decisions concerning the management of the Company's business shall be made by the majority Vote of the Managers, if more than one Manager exists, and the Manager(s) shall have full, complete and exclusive authority, power, and discretion to manage and control the business, property and affairs of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities with respect to the management of the Company's business, property and affairs on such basis and in such manner as determined by the Manager(s). In carrying out the purposes of the Company described in Section 2.5, the Manager(s)'s responsibilities shall include, but not be limited to, acquiring, developing, constructing, operating, managing and directing the affairs of the Property; overseeing the marketing and sale of the Property; managing the accountants with respect to the preparation of tax returns and other tax and financial matters; obtaining appropriate insurance; and managing any leasing activities on the Property.

Without limiting the generality of the foregoing and in connection with the Manager(s) fulfilling its obligations under this Agreement, provided that all Major Decisions have been approved by a Majority of Members, the Manager(s) shall have power and authority on behalf of the Company (whether on its own behalf or in its capacity as the sole member and/or manager of the Subsidiary):

(a).    To acquire tangible or intangible, real or personal property from any Person, and to develop, renovate, improve, lease, subdivide, sell, assign, convey or otherwise transfer title to any portion of, or interest in, Property.  In connection with the management and operation of the Property, the Manager(s) shall retain, enter into contracts with and pay any management company providing management services for the Property fair market rates from a portion of Property revenue and net operating income according to industry standards for providing such services;

(b).    To purchase, lease or otherwise acquire or obtain the use of machinery, equipment, tools, staff and personnel, and material, and other types of property that may be deemed necessary or desirable in connection with carrying on the business of the Company;

Pltfs (UC) 000114

(c).    To borrow money for the Company from banks, other lending institutions, the Members, Affiliates of the Members or any other Person (as hereinafter defined) on such terms as the Manager(s) deems appropriate, and in connection with such borrowing, to hypothecate, encumber, and grant security interests in the assets of the Company to secure repayment of the borrowed sums, to have the Company guaranty or become surety for repayment of the borrowed sums or to have the Company indemnify any Member against any personal liability for repayment of the borrowed sums to the extent such Member guarantees repayment of the borrowed sums.  No debt shall be contracted or liability incurred by or on behalf of the Company except by the Manager(s), or to the extent permitted under this Agreement, by agents or employees of the Company expressly authorized by the Manager(s) to contract such debt or incur such liability;

(d).    To prepay in whole or in part, refinance, recast, increase, modify, consolidate, correlate, or extend, on such terms as the Manager(s) may deem proper, any debts of the Company;

(e).    To purchase (i) liability and other insurance to protect the Property, the business of the Company and the Members and Manager(s); (ii) wrap insurance policies in connection with construction of improvements on the Property; and (iii) any other insurance that the Manager(s) deem proper for the Company, consistent with industry standards for other companies engaging in similar businesses.

(f).    To hold and own any Property in the name of the Company;

(g).    To invest any Company funds temporarily (by way of example but not limitation) in time deposits, short-term government obligations, commercial paper, or other low risk type investments;

(h).    To sell or otherwise dispose of, whether or not in the ordinary course of business, all or substantially all of the assets of the Company as part of a single transaction or plan so long as the disposition is not in violation of or a cause of a default under any other agreement to which the Company may be bound or in contravention of state law;

(i).    To execute on behalf of the Company all instruments and documents, including, without limitation: checks; drafts; notes and other negotiable instruments; mortgages, or deeds of trust; guaranties; dispositions of Property; assignments; bills of sale; leases; management agreements; construction contracts; partnership agreements; operating agreements of other limited liability companies; intercreditor agreements; reliance letters; economic disclosure letters; UCC documents and resolutions; easement agreements; guarantees; pledge and security agreements; purchase and sale agreements; any kind of third party service agreements; subordination agreements; and any other instruments or documents necessary, in the opinion of the Manager(s), to the best interests of the business of the Company;

(j).    To employ or engage the services of accountants, accounting firms, legal counsel, law firms, managing agents, development managers, property managers, brokers or other companies or employees or agents to perform services for the Company and to compensate them from Company funds in such manner and on such basis as reasonably determined by the Manager(s);

17

Pltfs (UC) 000115

(k).     To enter into any and all other reasonable agreements on behalf of the Company, with any other Person for any purpose, in such forms as the Manager(s) may approve;

(l).     To adjust, compromise, settle or refer to arbitration any claims in favor of or against the Company or any nominee of the Company or any property held or owned by the Company or its nominee, and to institute, prosecute and defend any legal proceedings as the Manager(s) shall deem advisable;

(m).     To effect the sale, exchange or other disposition of all, or substantially all, of the Company's assets in the liquidation and winding up of the business of the Company upon its duly authorized dissolution and/or in accordance with Section 5.1(h), above;

(n).     To authorize any Manager, acting alone, to exercise any of the rights, powers and/or authority of the Manager(s) under this Agreement and to bind the Company;

(o).     To do and perform all other acts as deemed necessary or appropriate by Manager(s) in connection with the conduct of the Company's business; and

(p).     To take any of the above actions with respect to any entity in which the Company owns a direct or indirect interest including, without limitation, the Subsidiary.

Unless authorized to do so by the Manager(s), no attorney-in-fact, employee, or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable pecuniary for any purpose.

Without limiting the generality of the foregoing, but notwithstanding any other Section of this Agreement to the contrary, the Manager(s) shall have the unilateral right, power, and authority at any time to sell or otherwise dispose (or cause the sale or other disposition) of all of the Company's direct or indirect interests in the Property, so long as following distribution of the Available Capital Proceeds resulting from such sale or other disposition, each Member will have received aggregate distributions from the Company of no less than the Minimum Multiple Percentage of such Member's aggregate Capital Contributions to the Company.  For purposes hereof, "Minimum Multiple Percentage" means a percentage equal to the sum of 130% plus the product of (x) 30% multiplied by (y) the number of complete 12 month periods that elapse between the Company's (or Subsidiary's) acquisition of the Property and the closing of such sale or other disposition (e.g., if the sale or other disposition closes prior to the first anniversary of the Company's acquisition of the Property, the Minimum Multiple Percentage will be 130%; if the sale or other disposition is effected on or after the first anniversary, but prior to the second anniversary, of the Company's acquisition of the Property, the Minimum Multiple Percentage will be 160%, etc.).

5.2     Urban Commons shall serve as the initial Manager of the Company until Urban Commons' resignation as Manager.  Urban Commons is a member managed limited liability company with Howard Wu and Taylor Woods currently being the only members of Urban Commons.  During any period that Urban Commons is serving as the Manager of the Company, all Major Decisions of the Company shall require the unanimous approval of Howard Wu and Taylor Woods as the managing members of Urban Commons prior to approving any Major Decisions on behalf of the Company, as well as approval by a Majority of Members.  In the event of any dispute between Howard Wu and Taylor Woods that prevents Howard Wu and Taylor Woods from

USA01\11815093.5\C087855\0556982

Pltfs (UC) 000116

reaching an unanimous decision with respect to any Major Decisions of the Company requiring the unanimous approval of Howard Wu and Taylor Woods, said dispute shall be resolved by submission to binding arbitration in Los Angeles, California using applicable arbitration procedures of JAMS located in Los Angeles County, California in accordance with its rules and procedures regarding commercial disputes.

      5.3     Each Manager, other than the initial Manager, shall be appointed by a Majority of Members for (a) a term expiring with the appointment of a successor, or (b) a term expiring at a definite time specified by a Majority of Members in connection with such appointment. A Manager, other than the initial Manager, may be removed on the vote of a Majority of Members. For purposes of this Section 5.3, if the Manager is also a Member, the Manager's Percentage Interest shall not be taken into account in determining whether a Majority of Members have voted to remove the Manager. The initial Manager may be removed solely for cause (as specifically defined in subsections (i)-(iv) below) by the affirmative vote of a Majority of Members at a meeting called expressly for that purpose, or by the written consent of a Majority of Members. Such Members must deliver to the initial Manager a written notification of removal stating in reasonable detail the cause for that action ("Removal Notice"). The only grounds for removal for cause shall be either (i) any willful misconduct or material breach; or (ii) any fraud, gross negligence or willful misconduct in the performance by Manager of its obligations or covenants under this Agreement; or (iii) the Manager's making a Major Decision without first obtaining the affirmative vote or written consent of a Majority of Members, or (iv) Taylor Woods or Howard Wu shall no longer, due to death, disability or any other reason, actively and reasonably carry out or direct the performance by Urban Commons of the Manager's duties under this Agreement. The initial Manager may not be removed for financial performance reasons unless said financial performance results from any of the causes described in subsections (i)-(iv) above.

      Except as otherwise provided in this Section, if within twenty (20) days after its receipt of a Removal Notice (or longer, if such situation cannot by its nature be cured in twenty (20) days and the initial Manager has actively commenced and diligently continues to pursue a cure for the situation), the initial Manager fails to cure the situation described in subsections (i), (ii), (iii) or (iv) that gave rise to such Removal Notice, the Members may elect a new Manager by the affirmative vote or written consent of a Majority of Members. The initial Manager may, within twenty (20) days after its notification in writing of its removal for cause, file an objection with the Company that its removal was not justified. If its objection is timely filed, the question of whether its removal was justified shall be submitted to arbitration under Section 10.2 below on an expedited basis in Los Angeles, California using applicable arbitration procedures of JAMS located in Los Angeles County, California. If such Rules conflict or are inconsistent with any provision of this Agreement, the provisions of this Agreement shall prevail.

      The parties shall use commercially reasonable efforts to cause the arbitration to be completed no later than sixty (60) days after it was commenced. Each party waives any right that it may have to any substantive review of any arbitration award by the courts of the jurisdiction in which the arbitration is conducted and agrees that the award of the arbitrators in any such arbitration proceedings shall be final and without any right of appeal. The arbitration award may be entered as a final judgment in the court of any jurisdiction in which such entry shall be recognized under applicable law. Any arbitration award shall include an award of costs of the arbitration and attorneys' fees to the prevailing party.

USA01\11815093.5\C087855\0556982

Pltfs (UC) 000117

The refusal or failure of any party to appear at or participate in any hearing or other portion of any arbitration proceeding pursuant to this Section shall not prevent any such hearing or proceeding from going forward, and the arbitrator is empowered to make its decision or render an award ex parte that shall be binding on the non-appearing party as fully as though that party had participated in the hearing or proceeding.

5.4     Actions of the Managers, if more than one Manager, shall be taken at meetings or as otherwise provided in this Section 5.4 by a majority of the Managers. No regular meetings of the Managers need be held.

The transactions of the Managers at any meeting, however called or noticed, or wherever held, shall be as valid as though transacted at a meeting duly held after call and notice and if, either before or after the meeting, each Manager not present signs a written waiver of notice or a consent to the holding of such meeting or an approval of the minutes of such meeting.

Any action required or permitted to be taken by the Managers under this Agreement may be taken without a meeting if a majority of the Managers individually or collectively consent in writing to such action.

Managers may participate in the meeting through the use of a conference telephone or similar communications equipment, provided that all Managers participating in the meeting can hear one another.

The Managers shall keep or cause to be kept with the books and records of the Company full and accurate minutes of all meetings, notices and waivers of notices of meetings, and all written consents to actions of the Managers.

5.5     It is acknowledged that the Manager(s) have other business interests to which the Manager(s) devote part of the Managers's(s') time.  The Manager(s) shall devote to the Company such time as may be reasonably necessary for the proper performance of all duties hereunder and shall be bound by the duty of good faith and fiduciary duty in its dealings with the Company and the Members, but the Manager(s) shall not be required to devote full time to the performance of such duties.   Nothing in this Agreement shall be deemed to restrict in any way the rights of the Manager(s) or any Member, or of any Affiliate of the Manger(s) or any Member, to conduct any other business or activity whatsoever, and the Manager(s) or any Member shall not be accountable to the Company or to any Member with respect to that business or activity even if the business or activity competes with the Company's business.  The organization of the Company shall be without prejudice to their respective rights (or the rights of their respective Affiliates) to maintain, expand, or diversify such other interests and activities and to receive and enjoy profits or compensation therefrom.   Each Member waives any rights the Member might otherwise have to share or participate in such other interests or activities of the Manager(s) or any other Member or the Manager(s) or Member's Affiliates.

5.6     The Manager(s) shall preside at all meetings of Members.  The Manager(s) may provide for additional officers of the Company and shall establish the powers and duties of all other officers and the compensation of all Company officers, provided that such powers and duties are consistent with the authority granted to the Manager(s) in this Agreement.  The signature of any Manager shall be necessary and sufficient to convey title to any Property owned, either directly or

20

Pltfs (UC) 000118

indirectly through one or more entities, by the Company or to execute any promissory notes, trust deeds, mortgages or other instruments of hypothecation, or to execute any other documents or instruments approved by the Manager(s), and all of the Members agree that a copy of this Agreement may be shown to the appropriate parties in order to confirm the same, and further agree that the signature of a Manager shall be sufficient to execute any documents necessary to effectuate this or any other provision of this Agreement.

5.7     The Manager(s) shall cause all assets of the Company, whether real or personal, to be held in the name of the Company.

5.8     All funds of the Company shall be deposited in one or more accounts with one or more recognized financial institutions in the name of the Company, at such locations as shall be determined by the Manager(s). Withdrawal from such accounts shall require the signature of a Manager, or such other Person or Persons as the Manager(s) may designate.

5.9     In the event that a majority vote of the Manager(s) cannot be achieved on any matter requiring such a vote pursuant to this Article, then such impasse shall be broken by the Vote of a Majority of Members.

5.10     The Manager(s) may, on behalf of the Company, purchase or provide goods or services from the Manager(s), any Member and/or any of their Affiliates; provided that the amounts paid for, and other terms relating to the furnishing of, such goods or services may not be materially less advantageous to the Company than the amounts and terms for and upon which similar goods or services could be obtained or furnished in the same geographic area to or from good quality corporations or business enterprises which are not the Manager(s), a Member and/or their Affiliates. The foregoing authorization shall also apply to (i) a sale or disposition of substantially all of the Company's assets to the Manager(s), any Member and/or any Affiliate prior to or following dissolution or upon winding-up or liquidation of the Company, and (ii) the purchase of the Property by the Subsidiary in connection with the 1031 exchange transaction and all other transactions between the Subsidiary, the Manager(s) and its Affiliates with respect to the Subsidiary's acquisition of the Property and operation of the Property in connection with the 1031 exchange transaction, including, without limitation, the agreements among tenants-in-common and master lease agreements relating to the Property.   Notwithstanding anything to the contrary, the transactions permitted under this Section 5.10 do not violate any Member's duty of loyalty under the Act. Amounts paid to the Manager(s), any Member and/or any of their Affiliates either for goods or services in transactions authorized pursuant to this Section 5.10 shall be treated for all purposes as amounts paid to non-Members and any compensation or reimbursement received by any Member from any such Affiliate shall belong to it and not to the Company.

5.11     The Manager(s) shall not be liable, responsible, or accountable, in damages or otherwise, to any Member or to the Company for any act performed by the Manager(s), except for fraud, gross negligence, willful misconduct, or an intentional breach of this Agreement.   The Company shall indemnify the Manager(s) for any act performed by the Manager(s), except for fraud, gross negligence, willful misconduct or an intentional breach of this Agreement.

5.12     The Company hereby agrees to promptly reimburse the Manager(s) and any Affiliate of the Manager(s) for all reasonable and actual out-of-pocket costs incurred by them with respect to providing oversight and management of the Company, and for otherwise providing administrative

services to the Company in connection with the offering of Membership Interests or in performing functions and services for the Company and otherwise in pursuit of the Company's business. With respect to the operations of the Company following the acquisition of the Property, it is anticipated that the reasonable and actual out-of-pocket costs incurred by the Manager(s) in fulfilling their obligations under this Agreement shall be reimbursed from the cash flow from the Property but to the extent such costs are not paid as part of the Property expenses, then the Company shall reimburse the Manager(s) for such reasonable and actual out-of-pocket costs.

## ARTICLE VI:

## ACCOUNTS AND ACCOUNTING

6.1     Complete books of account of the Company's business, in which each Company transaction shall be fully and accurately entered, shall be kept at the Company's principal executive office and at such other locations as the Manager(s) shall determine from time to time and shall be open to inspection and copying on reasonable Notice by any Member or the Member's authorized representatives during normal business hours. The costs of such inspection and copying shall be borne by the Member.

6.2     Financial books and records of the Company shall be kept on the method of accounting adopted by the Company for federal income tax purposes.  The financial statements of the Company shall be prepared in accordance with standard accounting principles and shall be appropriate and adequate for the Company's business and for carrying out the provisions of this Agreement.  The fiscal year of the Company shall be January 1 through December 31.

6.3     At all times during the term of existence of the Company, and beyond that term if the Manager(s) deem it necessary, the Manager(s) shall keep or cause to be kept the books of account referred to in Section 6.2, together with:

(a).     A current list of the full name and last known business or residence address of each Member, together with the Capital Contribution and the share in Profits and Losses of each Member;

(b).     A current list of the full name and business or residence address of each Manager;

(c).     A copy of the Certificate of Formation, as may be amended from time to time;

(d).     Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six most recent taxable years;

(e).     An original executed copy or counterparts of this Agreement, as may be amended from time to time;

(f).     Any powers of attorney under which the Certificate of Formation or any amendments to the Certificate of Formation were executed;

(g).     Financial statements of the Company for the six most recent fiscal years; and

22

Pltfs (UC) 000120

(h).    The books and records of the Company as they relate to the Company's internal affairs for the current and past four fiscal years.

If the Manager(s) deem that any of the foregoing items shall be kept beyond the term of existence of the Company, the repository of said items shall be as designated by the Manager(s).

6.4    At the end of each fiscal year the books of the Company shall be closed and examined and statements reflecting the financial condition of the Company and its Profits or Losses shall be prepared, and a report thereon shall be issued by the Company's certified public accountant. Copies of the financial statements shall be given to all Members.  In addition, the Manager(s) shall deliver to the Members within twenty (20) days following the end of each month, copies of such financial statements and performance reports regarding the previous month, as may be prepared in the ordinary course of business, by the Manager(s), the property manager or accountants selected by the Manager(s).  Upon request of any Member, the Manager(s) shall deliver to each Member, within one hundred twenty (120) days after the end of the fiscal year of the Company, a financial statement that shall include:

(a).    A balance sheet and income statement, and a statement of changes in the financial position of the Company as of the close of the fiscal year;

(b).    A statement showing the Capital Account of each Member as of the close of the fiscal year and the distributions, if any, made to each Member during the fiscal year. Members holding at least seventy percent (70%) of the Capital Percentage Interests may request interim balance sheets and income statements, and may, at their own discretion and expense, obtain an audit of the Company books by certified public accountants selected by them; provided, however, that not more than one such audit shall be made during any fiscal year of the Company.

6.5    Within ninety (90) days after the end of each taxable year of the Company or as soon thereafter as reasonably practicable, the Manager(s) shall send to each of the Members all information necessary for the Members to complete their federal and state income tax or information returns and a copy of the Company's federal, state, and local income tax or information returns for such year.

6.6    Taylor Woods shall act as Tax Matters Member ("Partner") of the Company pursuant to IRC Section 6231(a)(7).

6.7    The Partner is hereby authorized to do the following:

(a).    Keep the Members informed of administrative and judicial proceedings for the adjustment of Company items (as defined in IRC Section 6231(a)(3)) at the Company level, as required under IRC Section 6223(g) and the implementing Regulations;

(b).    Enter into settlement agreements under IRC Section 6224(c)(3) and applicable Regulations with the Internal Revenue Service or the Secretary of the Treasury (the "Secretary") with respect to any tax audit or judicial review, in which agreement the Tax Matters Member may expressly state that such agreement shall bind the other Members, except that such settlement agreement shall not bind any Member who (within the time prescribed under the Code and Regulations) files a statement with the Secretary providing that the Tax Matters Member shall not have the authority to enter into a settlement agreement on behalf of such Member;

23

Pltfs (UC) 000121

(c).     On receipt of a notice of a final Company administrative adjustment, to file a petition for readjustment of the Company items with the Tax Court, the District Court of the United States for the district in which the Company's principal place of business is located, or the United States Court of Federal Claims, all as contemplated under IRC Section 6226(a) and applicable Regulations;

(d).     File requests for administrative adjustment of Company items on Company tax returns under IRC Section 6227(b) and applicable Regulations; and, to the extent such requests are not allowed in full, file a petition for adjustment with the Tax Court, the District Court of the United States for the district in which the Company's principal place of business is located, or the United States Court of Federal Claims, all as contemplated under IRC Section 6228(a); and

(e).     To take any other action on behalf of the Members or the Company in connection with any administrative or judicial tax proceeding to the extent permitted by law or regulations, including retaining tax advisers (at the expense of the Company) to whom the Tax Matters Member may delegate such rights and duties as deemed necessary and appropriate.

(f).     To take appropriate actions to achieve the most preferred tax benefits and advantages for the Members where possible.

## ARTICLE VII:

## MEMBERSHIP MEETINGS, VOTING, INDEMNITY

7.1     There shall be only one class of membership and no Member shall have any rights or preferences in addition to or different from those possessed by any other Member except as specifically provided for in Article IV.  Members shall have the right and power to appoint, remove, and replace Manager(s) and officers of the Company to the extent permitted under Article V and the right to Vote on all other matters with respect to which this Agreement requires or permits such Member action.  Each Member shall Vote in proportion to the Member's Percentage Interest as of the governing record date, determined in accordance with Section 7.2.  If a Member has assigned all or part of the Member's Economic Interest to a Person who has not been admitted as a Member, the Assigning Member shall Vote in proportion to the Percentage Interest that the Assigning Member would have had, if the assignment had not been made.

7.2     The record date for determining the Members entitled to receive Notice of any meeting, to Vote, to receive any distribution, or to exercise any right in respect of any other lawful action, shall be the date set by the Manager(s) or by a Majority of Members; provided that such record date shall not be more than sixty (60), or less than five (5) days prior to the date of the meeting or such distributions, as the case may be, and not more than sixty (60) days prior to any other action.

7.3     The Company may, but shall not be required, to issue certificates evidencing Membership Interests ("Membership Interest Certificates") to Members of the Company.  Once Membership Interest Certificates have been issued, they shall continue to be issued as necessary to reflect current Membership Interests held by Members. Membership Interest Certificates shall be in such form as may be approved by the Manager(s), shall be manually signed by the Manager(s), and shall bear conspicuous legends evidencing the restrictions on Transfer and the purchase rights of the

Pltfs (UC) 000122

Company and Members set forth in Article VIII.  All issuances, re-issuances, exchanges, and other transactions in Membership Interests involving Members shall be recorded in a permanent ledger as part of the books and records of the Company.

7.4     Meetings of the Members may be called by the Manager(s) and upon the written request of Member(s) holding seventy percent (70%) or more of the Capital Percentage Interests. The call shall state the nature of the business to be transacted.  Notice of any such meeting shall be given to all Members not less than fifteen (15) days nor more than thirty (30) days prior to the date of such meeting.  Whenever the vote or consent of Members is permitted or required under this Agreement, such vote or consent may be given at a meeting of Members in person or by telephone or may be given by means of a written consent signed by Members holding the requisite percentage of Percentage Interests.  Except as otherwise expressly provided in this Agreement, the vote or consent of Members holding a majority of the Percentage Interests whether given in person, by telephone or by means of a written consent shall control.

7.5     Each Member may authorize any Person or Persons to act for him by Proxy on all matters in which a Member is entitled to participate, including waiving notice of any meeting, or voting or participating at a meeting.  Every Proxy must be signed by the Member or its attorney-in-fact.  No Proxy shall be valid after the expiration of eleven (11) months from the date thereof unless otherwise provided in the Proxy.  Every Proxy shall be revocable at the pleasure of the Member executing it unless otherwise provided in the Proxy.

7.6     Each meeting of Members shall be conducted by the Manager(s) or such other Person as the Manager(s) may appoint pursuant to such rules for the conduct of the meeting as the Manager(s) deem appropriate.  Unless otherwise agreed upon, all such meetings shall be held at the principal offices of the Company.

7.7     No Member acting solely in the capacity of a Member is an agent of the Company, nor can any Member acting solely in the capacity of a Member bind the Company or execute any instrument on behalf of the Company.  Accordingly, each Member shall indemnify, defend, and save harmless each other Member and the Company from and against any and all loss, cost, expense, liability or damage arising from or out of any claim based upon any action by such Member in contravention of the first sentence of this Section 7.7.  This Section 7.7 supersedes any authority granted to the Members pursuant to the Act.

7.8     The Members acknowledge and agree that they shall not owe any fiduciary duty towards each other and each hereby waives any such fiduciary duty that may exist (whether express or implied) under law.

## ARTICLE VIII:

## TRANSFERS OF MEMBERSHIP INTERESTS;
## ADMISSION OF MEMBERS

8.1     A Member may withdraw from the Company at any time by giving Notice of withdrawal to all other Members at least ninety (90) days before the effective date of withdrawal. Withdrawal shall not release a Member from any obligations and liabilities under this Agreement accrued or incurred before the effective date of withdrawal. A withdrawing Member shall divest the

25

Pltfs (UC) 000123

Member's entire Membership Interest before the effective date of withdrawal in accordance with and subject to the provisions of this Article VIII.

8.2     Except as expressly provided in this Agreement, a Member shall not transfer any part of the Member's Membership Interest, whether now owned or later acquired, unless (a) the Member delivers Notice of such Transfer to the Company, (b) the Member provides such documentation and information regarding the Transfer as requested by the Manager(s), (c) the Manager(s) approve the transferee's admission to the Company as a Member upon such Transfer, which approval may be granted or withheld in the Manager's(s') sole discretion, (d) the Member and its assignee execute such documents and instruments as required by the Manager(s), (e) the Membership Interest to be transferred, when added to the total of all other Membership Interests transferred in the preceding twelve (12) months, will not cause the termination of the Company under the Code, and (f) the Transfer does not violate any restrictions in any loan documents to which the Company is a party. No Member may Encumber or permit or suffer any Encumbrance of all or any part of the Member's Membership Interest unless such Encumbrance has been approved in writing by the Manager(s) which approval may be granted or withheld in the Manager's(s') sole discretion.  Any Transfer or Encumbrance of a Membership Interest without such approval shall be void. Notwithstanding any other provision of this Agreement to the contrary, a Member who is a natural person may transfer all or any portion of his or her Membership Interest to immediately family members of such Member, to an entity that is owned or controlled directly or indirectly by immediately family members or to a revocable trust created for the benefit of the Member, or any combination between or among the Member, the Member's spouse, and the Member's issue.  As used herein, immediate family members shall include such Member's parents, spouse, siblings, children and grandchildren.   Each Member hereby acknowledges the reasonableness of the prohibition contained in this Section 8.2 in view of the purposes of the Company and the relationships of the Members.

8.3     If a Member wishes to transfer any or all of the Member's Membership Interest pursuant to a Bona Fide Offer (as defined below), the Member shall give Notice to all other Members at least thirty (30) days in advance of the proposed Transfer, indicating the terms of the Bona Fide Offer and the identity of the offeror.  The Company and the other Members shall have the option to purchase the Membership Interest proposed to be transferred at the price and on the terms provided in this Agreement.  If the price for the Membership Interest is other than cash, the fair value in dollars of the price shall be established in good faith by the Company.  For purposes of this Agreement, "Bona Fide Offer" means an offer in writing setting forth all relevant terms and conditions of purchase from an offeror who is ready, willing, and able to consummate the purchase and who is not an Affiliate of the transferring Member.  For thirty (30) days after the Notice is given, the other Members shall have the right to purchase a part of the Membership Interest offered in the proportion that the Member's Capital Percentage Interest bears to the total Capital Percentage Interests of all of the Members who choose to participate in the purchase, on the terms stated in the Notice, for the lesser of (a) the price stated in the Notice (or the price plus the dollar value of noncash consideration, as the case may be) and (b) the price determined under the appraisal procedures set forth in Section 8.8.

If the Members do not exercise the right to purchase all of the Membership Interest, then, with respect to the portion of the Membership Interest that the Members do not elect to purchase, that right shall be given to the Company for an additional thirty (30) day period, beginning on the day that the Members' right to purchase expires.  The Company shall have the right to purchase, on

26

Pltfs (UC) 000124

the same terms, the remaining portion of the Membership Interest of the offering Member; provided, however, that the participating Members and the Company may not, in the aggregate, purchase less than the entire interest to be sold by the offering Member.

If the other Members and the Company do not exercise their rights to purchase all of the Membership Interest, the offering Member may, within ninety (90) days from the date the Notice is given and on the terms and conditions stated in the Notice, sell or exchange that Membership Interest to the offeror named in the Notice.  Unless the requirements of Section 8.2 are met, other than the requirement for approval by the Manager(s), the offeror under this section shall become an Assignee, and shall be entitled to receive only the share of Profits or other compensation by way of income and the return of Capital Contribution to which the assigning Member would have been entitled.

8.4     On the happening of any of the following events ("Triggering Events") with respect to a Member, the other Members and the Company shall have the option to purchase the Membership Interest of such Member ("Selling Member") at the price and on the terms provided in Section 8.8 of this Agreement:

(a).     The bankruptcy, or withdrawal of a Member, or the winding up and dissolution of a corporate Member, or merger or other corporate reorganization of a corporate Member as a result of which the corporate Member does not survive as an entity; provided that the remaining Members have elected to continue the business of the Company as provided in Section 9.1(a).

(b).     The failure of a Member to make the Member's initial Capital Contribution pursuant to the provisions of Article III of this Agreement.

(c).     The occurrence of any other event that is, or that would cause, a Transfer in contravention of this Agreement.

Each Member agrees to promptly give Notice of a Triggering Event to all other Members.

8.5     Notwithstanding any other provisions of this Agreement:

(a).     If, in connection with the divorce or dissolution of the marriage of a Member, any court issues a decree or order that transfers, confirms, or awards a Membership Interest, or any portion thereof, to that Member's spouse (an "Award"), then, notwithstanding that such transfer would constitute an unpermitted Transfer under this Agreement, that Member shall have the right to purchase from his or her former spouse the Membership Interest, or portion thereof, that was so transferred, and such former spouse shall sell the Membership Interest or portion thereof to that Member at the price set forth below in Section 8.8 of this Agreement.  If the Member has failed to consummate the purchase within one hundred eighty (180) days after the court award (the "Expiration Date"), the other Members and the Company shall have the option to purchase from the former spouse the Membership Interest or portion thereof pursuant to Section 8.6 of this Agreement; provided that the option period shall commence on the later of (1) the day following the Expiration Date, or (2) the date of actual notice of the Award.

27

Pltfs (UC) 000125

(b).     If, by reason of the death of a spouse of a Member, any portion of a Membership Interest is transferred to a Transferee other than (i) that Member or (ii) a trust created for the benefit of that Member (or for the benefit of that Member and any combination between or among the Member and the Member's issue) in which the Member is the sole trustee and the Member, as trustee or individually possesses all of the Voting Interest included in that Membership Interest, then the Member shall have the right to purchase the Membership Interest or portion thereof from the estate or other successor of his or her deceased spouse or Transferee of such deceased spouse, and the estate, successor, or Transferee shall sell the Membership Interest or portion thereof at the price set forth in Section 8.8 of this Agreement. If the Member has failed to consummate the purchase within one hundred eighty (180) days after the date of death (the "Expiration Date"), the other Members and the Company shall have the option to purchase from the estate or other successor of the deceased spouse the Membership Interest or portion thereof pursuant to Section 8.6 of this Agreement; provided that the option period shall commence on the later of (1) the day following the Expiration Date, or (2) the date of actual notice of the death.

8.6     On the receipt of Notice by the Manager(s) and the other Members as contemplated by Sections 8.1, 8.3, and 8.5, and on receipt of actual notice of any Triggering Event as determined in good faith by the Manager(s) (the date of such receipt is hereinafter referred to as the "Option Date"), the Manager(s) shall promptly cause a Notice of the occurrence of such a Triggering Event to be sent to all Members and for thirty (30) days after the Notice is given, the other Members shall have the right to purchase, at the price and on the terms set forth in Section 8.8 of this Agreement, a part of the Membership Interest offered in the proportion that the Member's Capital Percentage Interest bears to the total Capital Percentage Interests of all of the Members who choose to participate in the purchase. Following such thirty (30) day period, the Company shall then have the option, for a period of thirty (30) days thereafter, to purchase the Membership Interest not purchased by the other Members, on the same terms and conditions as apply to the Members. The transferee of the Membership Interest that is not purchased shall hold such Membership Interest subject to all of the provisions of this Agreement.

8.7     Neither the Member whose interest is subject to purchase under this Article, nor such Member's Affiliate, shall participate in any Vote or discussion of any matter pertaining to the disposition of the Member's Membership Interest under this Agreement.

8.8     The purchase price of the Membership Interest that is the subject of an option under Section 8.6 shall be the "Fair Option Price" of the interest as determined under this Section 8.8. "Fair Option Price" means the cash price that a willing buyer would pay to a willing seller when neither is acting under compulsion and when both have reasonable knowledge of the relevant facts on the Option Date. Each of the selling and purchasing parties shall use his, her, or its best efforts to mutually agree upon the Fair Option Price. If the parties are unable to so agree within forty-five (45) days of the Option Date, the Manager(s) shall appoint at the expense of the Company one MAI appraiser with a minimum of ten (10) years of commercial real estate experience. The appraiser shall, within thirty (30) days after the appointment, determine the Fair Option Price of the Membership Interest in writing and submit its report to all the parties. In the event either of the parties disagrees with the valuation established by the appraiser, each party shall within fifteen (15) days after the issuance of the appraiser's report, appoint one MAI appraiser with a minimum of ten (10) years of commercial real estate experience and notify each party of the appraiser's name and business address. Within thirty (30) days after being appointed as an appraiser by a party, such

28

Pltfs (UC) 000126

appraiser shall determine the Fair Option Price of the Membership Interest in writing and submit its report to all parties.

The Fair Option Price shall be determined by comparing all three appraisers' valuations and disregarding the appraiser's valuation that diverges the greatest from each of the other two appraisers' valuations, and the arithmetic mean of the remaining two appraisers' valuations shall be the Fair Option Price. Each party shall pay for the services of the appraiser selected by it, and one half of all other costs relating to the determination of Fair Option Price. The Fair Option Price as so determined shall be payable in cash.

8.9     Except as expressly permitted under Sections 8.2 and 8.3, a prospective transferee (other than an existing Member) of a Membership Interest shall be deemed an Assignee, and, therefore, the owner of only an Economic Interest until such prospective transferee has been admitted as a Member in substitution of the Assigning Member (a "Substituted Member"). Any such Assignee shall be entitled only to receive allocations and distributions under this Agreement with respect to such Membership Interest and shall have no right to Vote or exercise any rights of a Member until such Assignee has been admitted as a Substituted Member. Until the Assignee becomes a Substituted Member, the Assigning Member will continue to be a Member and to have the power to exercise any rights and powers of a Member under this Agreement, including the right to Vote in proportion to the Percentage Interest that the Assigning Member would have had in the event that the assignment had not been made.

8.10     Any Person admitted to the Company as a Substituted Member shall be subject to all the provisions of this Agreement that apply to the Member from whom the Membership Interest was assigned, provided that the Assigning Member shall not be released from liabilities as a Member solely as a result of the assignment, both with respect to obligations to the Company and to third parties, incurred prior to the assignment.

8.11     The initial sale of Membership Interests in the Company to the Initial Members has not been qualified or registered under the securities laws of any state or registered under the Securities Act of 1933, in reliance upon exemptions from the registration provisions of those laws. Notwithstanding any other provision of this Agreement, Membership Interests may not be Transferred unless registered or qualified under applicable state and federal securities law unless, in the opinion of legal counsel satisfactory to the Company, such qualification or registration is not required. The Member who desires to transfer a Membership Interest shall be responsible for all legal fees incurred in connection with said opinion.

8.12     The Manager may from time to time admit additional members of the Company (each, an "Additional Member"), and upon the admission of each Additional Member and the payment of its initial Capital Contribution, the Capital Percentage Interest of each other Member shall be adjusted as provided in this Agreement. Each Additional Member shall have the Percentage Interest as set forth on the Membership List, and the Percentage Interest of each other Member (other than Urban Commons) shall be adjusted pro rata as determined by the Manager.

USA01\11815093.5\C087855\0556982

Pltfs (UC) 000127

## ARTICLE IX:

## DISSOLUTION AND WINDING UP

9.1     The Company shall be dissolved upon the first to occur of the following events:

(a).     The written agreement of a Majority of Members to dissolve the Company.

(b).     The sale or other disposition of substantially all of the Company's assets.

(c).     Entry of a decree of judicial dissolution.

9.2     On the dissolution of the Company, the Company shall engage in no further business other than that necessary to wind up the business and affairs of the Company.  The Manager(s) who have not wrongfully dissolved the Company or, if there is no such Manager, the Members, shall wind up the affairs of the Company.  The delegates winding up the affairs of the Company shall give Notice of the commencement of winding up by mail to all known creditors and claimants against the Company whose addresses appear in the records of the Company.   After paying or adequately providing for the payment of all known debts of the Company (except debts owing to Members), the remaining assets of the Company shall be distributed or applied in the following order:

(a).     To pay the expenses of liquidation.

(b).     To the establishment of reasonable reserves by the delegate for contingent liabilities or obligations of the Company. Upon the delegate's determination that such reserves are no longer necessary, said reserves shall be distributed as provided in this Section 9.2.

(c).     To repay outstanding loans from Members. If there are insufficient funds to pay such loans in full, each Member shall be repaid in the ratio that the Member's loan, together with interest accrued and unpaid thereon, bears to the total of all such loans from Members, including all interest accrued and unpaid thereon.  Such repayment shall first be credited to unpaid principal and the remainder shall be credited to accrued and unpaid interest.

(d).     Among the Members as provided in Section 4.12.

9.3     Each Member shall look solely to the assets of the Company for the return of the Member's investment, and if the Property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the investment of each Member, such Member shall have no recourse against any other Members for indemnification, contribution, or reimbursement, except as specifically provided in this Agreement.

## ARTICLE X:

## INDEMNIFICATION AND ARBITRATION

10.1     None of any Member, any Manager or their respective Affiliates or the respective directors, officers, members, partners, employees, representatives, and managers of each of them shall be liable, responsible or accountable in damages or otherwise to the Company, any third party

30

Pltfs (UC) 000128

or to any other Indemnified Party (as defined below) for any act or omission performed or omitted to be performed by any of them to the extent the Person performing such act or responsible for such omission reasonably believes such act or omission was within the scope of the authority conferred upon such Person (or its Affiliates) by this Agreement, except for fraud, willful misconduct or material breach of this Agreement. In addition, no Member shall have any personal liability for any guaranty provided by the Company, Urban Commons, Taylor Woods or Howard Wu. In any threatened, pending, or completed action, suit or proceeding against a Member, a Manager or their respective Affiliates or the respective directors, officers, members, partners, employees, representatives, and managers of each of them (collectively, "Indemnified Parties", and each individually, an "Indemnified Party") relating to Company business or the furtherance thereof by an Indemnified Party, including, but not limited to, guarantying any repayment or completion obligations of the Company, each Indemnified Party shall be fully protected and indemnified and held harmless by the Company against all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, proceedings, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, reasonable attorneys' fees, costs of investigation, fines, judgments and amounts paid in settlement, actually incurred by such Indemnified Party by virtue of its status as an Indemnified Party (collectively "Liabilities"), other than Liabilities resulting from the fraud, willful misconduct or material breach of this Agreement of or by such Indemnified Party. The indemnification provided by this Section 10.1 shall be recoverable only out of the assets of the Company, and no Member or Manager shall have any personal liability (or obligation to contribute capital to the Company) on account of the Company's indemnification.

10.2    This Agreement and the rights and obligations of the parties hereto shall be governed by the laws of the State of Delaware. Any controversy, dispute, or claim of any nature arising out of, in connection with, or in relation to the interpretation, performance, enforcement or breach of this Agreement, including any claim based on contract, tort or statute (collectively, a "Dispute"), that cannot be resolved by the parties within thirty (30) days shall first be submitted to mediation between the parties. In the event that such mediation does not resolve the Dispute within ten (10) business days, the Dispute shall be resolved at the written request of any party to this Agreement by binding arbitration using applicable arbitration procedures of JAMS located in Los Angeles County, California. The parties shall attempt to designate one arbitrator from JAMS. If they are unable to do so within thirty (30) days after written demand therefor, then JAMS shall designate an arbitrator. The arbitration shall be final and binding, and enforceable in any court of competent jurisdiction. The arbitrator shall award attorneys' fees and costs to the prevailing party and charge the cost of arbitration to the party which is not the prevailing party. Notwithstanding anything to the contrary contained herein, this Section 10.2 shall not prevent any party from seeking and obtaining equitable relief on a temporary or permanent basis, including, without limitation, a temporary restraining order, a preliminary or permanent injunction or similar equitable relief, from a court of competent jurisdiction located in the State of California (to which all parties hereto consent to venue and jurisdiction) by instituting a legal action or other court proceeding in order to protect or enforce the rights of such party under this Agreement or to prevent irreparable harm and injury. The court's jurisdiction over any such equitable matter, however, shall be expressly limited only to the temporary, preliminary, or permanent equitable relief sought; all other claims initiated under this Agreement between the parties hereto shall be determined through final and binding arbitration in accordance with the terms of this Section 10.2.

USA01\11815093.5\C087855\0556982

Pltfs (UC) 000129

## ARTICLE XI:

## INVESTMENT REPRESENTATIONS

Each Member represents and warrants to, and agrees with, the other Members and the Company as follows:

11.1     (a) The Member has a pre-existing personal or business relationship with the Company or one or more of its officers or control Persons, or (b) by reason of the Member's business or financial experience, or by reason of the business or financial experience of the Member's financial advisor who is unaffiliated with and who is not compensated, directly or indirectly, by the Company or any affiliate or selling agent of the Company, the Member is capable of evaluating the risks and merits of an investment in a Membership Interest and of protecting the Member's own interests in connection with this investment.

11.2     The Member understands that acquiring a Membership Interest involves a number of significant risk factors, including but not limited to, (a) the Company is newly formed and has no operating history or prior earnings to evaluate, (b) the Company will be subject to the risks generally incident to the ownership of real estate, (c) the Company will encounter considerable competition in operating its real estate, (d) all decisions with respect to management of the Company will be made exclusively by the Manager(s), (e) the Company's investment objectives must be considered speculative and there is no assurance the Company will achieve them, and (f) the Manager(s) may be subject to various conflicts of interest in the management of the Company.  The Member has evaluated all such risks, and agrees to accept such risks.

11.3     The Member is purchasing the Membership Interest for the Member's own account and not with a view to or for sale in connection with any distribution of the Membership Interests.

## ARTICLE XII:

## ATTORNEY-IN-FACT AND AGENT

12.1     Each Member, by execution of this Agreement, irrevocably constitutes and appoints each Manager and any of them acting alone as such Member's true and lawful attorney-in-fact and agent, with full power and authority in such Member's name, place, and stead to execute, acknowledge, and deliver, and to file or record in any appropriate public office: (a) any certificate or other instrument that may be necessary, desirable, or appropriate to qualify the Company as a limited liability company or to transact business as such in any jurisdiction in which the Company conducts business; (b) any amendment to the Company's Certificate of Formation or to any certificate or other instrument that may be necessary, desirable, or appropriate to reflect an amendment approved by the Members in accordance with the provisions of this Agreement; (c) any certificates or instruments that may be necessary, desirable, or appropriate to reflect the dissolution and winding up of the Company; and (d) any certificates solely to the extent necessary to comply with the provisions of this Agreement. This power of attorney will be deemed to be coupled with an interest and will survive the Transfer of the Member's Economic Interest. Notwithstanding the existence of this power of attorney, each Member agrees to join in the execution, acknowledgment, and delivery of the instruments referred to above if requested to do so by a Manager. This power of

32

attorney is a limited power of attorney and does not authorize any Manager to act on behalf of a Member except as described in this Article XII.

## ARTICLE XIII:

## GENERAL PROVISIONS

13.1    This Agreement constitutes the whole and entire agreement of the parties with respect to the subject matter of this Agreement. This Agreement replaces and supersedes all prior written and oral agreements and statements by and among the Members and Manager(s) or any of them.  No representation, statement, condition, or warranty not contained in this Agreement will be binding on the Members or have any force or effect whatsoever.

13.2    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

13.3    If any provision of this Agreement is determined by any court of competent jurisdiction or arbitrator to be invalid, illegal, or unenforceable to any extent, that provision shall, if possible, be construed as though more narrowly drawn, if a narrower construction would avoid such invalidity, illegality, or unenforceability or, if that is not possible, such provision shall, to the extent of such invalidity, illegality, or unenforceability, be severed, and the remaining provisions of this Agreement shall remain in effect.

13.4    This Agreement shall be binding on and inure to the benefit of the parties and their heirs, personal representatives, and permitted successors and assigns.

13.5    Whenever used in this Agreement, the singular shall include the plural and the plural shall include the singular, and the neuter gender shall include the male and female as well as a trust, firm, company, or corporation, all as the context and meaning of this Agreement may require.

13.6    The parties to this Agreement shall promptly execute and deliver any and all additional documents, instruments, notices, and other assurances, and shall do any and all other acts and things, reasonably necessary in connection with the performance of their respective obligations under this Agreement and to carry out the intent of the parties.

13.7    Except as provided in this Agreement, no provision of this Agreement shall be construed to limit in any manner the Members in the carrying on of their own respective businesses or activities.

13.8    Except as provided in this Agreement, no provision of this Agreement shall be construed to appoint a Member, in the Member's capacity as such, the agent of any other Member.

13.9    Each Member represents and warrants to the other Members that the Member has the capacity and authority to enter into this Agreement.

13.10    The article, section, and paragraph titles and headings contained in this Agreement are inserted as matter of convenience and for ease of reference only and shall be disregarded for all other purposes, including the construction or enforcement of this Agreement or any of its provisions.

33

Pltfs (UC) 000131

13.11   This Agreement may not be modified or amended in any manner unless in writing and signed by a Majority of Members; provided, however, that no amendment or modification to this Agreement may be made without the approval of each Member adversely affected thereby if such amendment would: (i) appoint such Member as a Manager of the Company, (ii) modify the limited liability of a Member, or (iii) alter the interest of a Member in Profits, Losses, other items of income, gain, loss and deduction, or any Company distributions.   Notwithstanding the foregoing, the Manager(s) may amend from time to time Exhibit "A" hereto to reflect the Members and their respective Percentage Interests.

13.12   Time is of the essence of every provision of this Agreement that specifies a time for performance.

13.13   This Agreement is made solely for the benefit of the parties to this Agreement and their respective permitted successors and assigns, and no other Person shall have or acquire any right by virtue of this Agreement.

13.14   No Member or Assignee of an Economic Interest has any interest in specific Property or other assets of the Company.   Without limiting the foregoing, each Member and Assignee irrevocably waives any right that such Member or Assignee may have to maintain any action for partition with respect to the Property or other assets of the Company.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the parties have executed or caused to be executed this Agreement on the day and year first above written.

**MANAGER AND MEMBER:**

**URBAN COMMONS, LLC**,
a Delaware limited liability company

By: _____
        Taylor Woods, Member


By: _____
        Howard Wu, Member

[Signature Page to Limited Liability Company Agreement

Pltfs (UC) 000133

**COUNTERPART SIGNATURE PAGE**
**TO**
**LIMITED LIABILITY COMPANY OPERATING AGREEMENT**
**OF**
**URBAN COMMONS BATTERY PARK, LLC**

**MEMBER:**

Printed Name of Member                          Signature of Member

_____              _____

Printed Name(s) and Title(s) or              Signature(s) of Any Officer(s),
Capacity(ies) of any Officer(s)              Partner(s) or Agent(s) Acting
Partner(s) or Agent(s) Acting on              on Behalf of Member
Behalf of Member

By: _____              By: _____

Title: _____

Dated:  as of _____

Pltfs (UC) 000134

**EXHIBIT "A"**

**MEMBERS AND**
**PERCENTAGE INTERESTS**

**URBAN COMMONS BATTERY PARK, LLC**

**As of September ___, 2018**

| Name | Percentage Interest |
|------|---------------------|
|      |                     |
|      |                     |
|      |                     |
|      |                     |
|      |                     |
|      |                     |
|      |                     |
|      |                     |
|      |                     |
|      |                     |
| **Total** | **100%** |

Pltfs (UC) 000135

# EXHIBIT "B"

# INTERNAL RATE OF RETURN EXPLANATION AND SAMPLE CALCULATION

XIRR
Returns the internal rate of return for a schedule of cash flows that is not necessarily periodic.  To calculate the internal rate of return for a series of periodic cash flows, use the IRR function.

XIRR (Values, Dates, Guess)
*        Values is a series of cash flows that corresponds to a schedule of payments in dates.  The first payment is optional and corresponds to a cost or payment that occurs at the beginning of the investment.  If the first value is a cost or payment, it must be a negative value.  All succeeding payments are discounted based on a 365-day year.  The series of values must contain at least one positive and one negative value.
*        Dates is a schedule of payment dates that corresponds to the cash flow payments.  The first payment date indicates the beginning of the schedule of payments.  All other dates must be later than this date, but they may occur in any order.
*        Guess is a number that you guess is close to the result of XIRR.

REMARKS
*        Microsoft Excel stores dates as sequential serial numbers so that it can perform calculations on them.  Excel stores January 1, 1900, as serial number 1 if your workbook uses the 1900 date system.  If your workbook uses the 1904 date system, Excel stores January 1, 1904, as serial number 0 (January 2, 1904, is serial number 1).  For example, in the 1900 date system, Excel stores January 1, 1998, as serial number 35796 because it is 35,795 days after January 1, 1900.

*        Numbers in dates are truncated to integers.

*        XIRR expects at least one positive cash flow and one negative cash flow; otherwise, XIRR returns the #NUM! error value.

*        If any number in dates is not a valid date, XIRR returns the #NUM! error value.

*        If any number in dates precedes the starting date, XIRR returns the #NUM! error value.

*        If values and dates contain a different number of values, XIRR returns the #NUM! error value.

*        In most cases you do not need to provide guess for the XIRR calculation.  If omitted, guess is assumed to be 0.1 (10 percent).

*        XIRR is closely related to XNPV, the net present value function. The rate of return calculated by XIRR is the interest rate corresponding to XNPV = 0.
*        Excel uses an iterative technique for calculating XIRR.  Using a changing rate (starting with guess), XIRR cycles through the calculation until the result is accurate within 0.000001 percent. If XIRR can't find a result that works after 100 tries, the #NUM! error value is returned. The rate is changed until:

         <<...OLE_Obj...>>  <<...OLE_Obj...>>

         where:

         di = the ith, or last, payment date.
         d1 = the 0th payment date.
         Pi = the ith, or last, payment.

EXAMPLE

Consider an investment that requires a $10,000 cash payment on January 1, 1998, and returns $2,750 on March 1, 1998, $4,250 on October 30, 1998, $3,250 on February 15, 1999, and $2,750 on April 1, 1999. The internal rate of return (in the 1900 date system) is:

XIRR({-10000,2750,4250,3250,2750},
{"1/1/1998","3/1/1998","10/30/1998","2/15/1999","4/1/1999"},0.1) equals:

0.374859 or 37.4859 percent

The IRR calculations under Sections 4.11 and 4.12 shall be determined at the time of each distribution and shall be calculated based on the total distributions made to the Members through the date of such distribution. Once the IRR is calculated on the aggregate Capital Contributions made by the Members, the Available Cash Flow and revenues or proceeds from a Capital Event or the dissolution of the Company shall be divided between Urban Commons and the Members based on the applicable percentages in Sections 4.11 and 4.12 and appropriate adjustments shall be made to such distributions so that the total distributions to Urban Commons and the Members shall be equal to the required percentages. Accordingly, for purposes of example, if (a) $100,000 is available to be distributed to the Members and (b) such amount plus any previous distributions to the Members equals a 30% IRR on the aggregate Capital Contributions made by the Members, then Urban Commons shall be entitled to 20% of the distribution plus such additional portion of the distribution as may be necessary in order for Urban Commons to receive 20% of the total amounts distributed under Sections 4.11 and 4.12 and the remaining share of such distribution shall be distributed to the Members based on the Members' Capital Percentage Interests pro rata. At the time of each distribution to the Members of Available Cash Flow and revenues or proceeds from a Capital Event or the dissolution of the Company, the Manager(s) shall adjust as necessary the distributions to be made to Urban Commons and the Members in connection with such distribution in order to satisfy the distribution percentages in Sections 4.11 and 4.12.

# EXHIBIT P

| | |
|---|---|
| **From:** | Tina Ellis |
| **To:** | Mark Riley |
| **Subject:** | Fwd: Questions for Urban Commons |
| **Date:** | Wednesday, April 29, 2020 12:52:03 PM |

Tina Ellis

Begin forwarded message:

> **From:** Brian Egnatz <brian.egnatz@milepostcm.com>
> **Date:** April 28, 2020 at 8:11:26 PM CDT
> **To:** Tina Ellis <tinaann395@gmail.com>
> **Cc:** Jason Birt <jbirt@milepostglobal.com>
> **Subject: Re:  Questions for Urban Commons**

> Tina,

> In the future, please go through Jason or myself with questions for your clients.
> We will reach out to The appropriate parties at Urban to get the answers. You
> effectively work as agent for milepost and that is the appropriate method for
> correspondence, calls, etc.. Thank you.

> Brian

> Sent from my iPhone

>> On Apr 28, 2020, at 6:44 PM, Tina Ellis <tinaann395@gmail.com>
>> wrote:

>> Dear Taylor,

>> Sorry we didn't get a chance to connect yesterday . I am trying to
>> help my clients get a better understanding and comfort level for the
>> Seattle hotel investment.  Ron Christensen has reached out to me for
>> an update as well.  He has $250K in Seattle and $250K in Wagner.
>> Please see questions below.


>> 1. What requirements does the REIT need to purchase the hotel from
>> Urban Commons?
>> 2.  Does the REIT's low share price affect it's ability to make the
>> purchase?
>> 3.  Does the REIT have enough cash to make the purchase?
>> 4.  Is a lender already in place for the REIT's purchase?
>> 5.  What would prevent the REIT from buying the Hotel?

Pltfs (UC) 000672

6.  How long will the REIT need to close after Urban Commons purchases the Hotel? It is my understanding that REIT can not close for 4-6 months after Urban Commons closes. Is this still accurate?

URBAN COMMON'S PURCHASE OF HOTEL
1. How much of the $32mm has been raised for Urban Common's purchase of the hotel? (Please provide proof of funds in escrow)
2.  How much longer does Urban Commons need to close?
3.  What still needs to be done/completed?
4.  What lender is in place for Urban Common's purchase of the hotel?
5.  When is revised expected close?

Hotel Numbers:
1.  What are the occupancy numbers, currently? (Please provide report from reservation system)
2.  REVPAR? (report)
3.  Does the hotel need to be at minimum revenues / occupancy for the REIT to complete the purchase?

I look forward to your reply.  If it's easier to answer by phone, I am available all day tomorrow and Thursday afternoon.

Regards,

Tina Ellis
512.550.1117

Pltfs (UC) 000673

EXHIBIT Q

GARCIA RAINEY BLANK & BOWERBANK LLP
    A LIMITED LIABILITY PARTNERSHIP
NORMA V. GARCIA, Cal. Bar No. 223512
ngarciaguillen@garciarainey.com
JEFFREY M. BLANK, Cal. Bar No. 217522
jblank@garciarainey.com
HUGO A. LOPEZ, Cal. Bar No. 315846
hlopez@garciarainey.com
695 Town Center Drive, Suite 700
Costa Mesa, CA 92626
Telephone:    (714) 382-7000
Facsimile:    (714) 784-0031

Attorneys for Plaintiffs
Clifford A. Rosen, MD and Ronald A. Christensen, MD.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLIFFORD A. ROSEN, an individual; RONALD A. CHRISTENSEN, an individual | **Case No.:** 8:20-cv-01973-JLS-DFM |
| Plaintiffs, | **PLAINTIFFS CLIFFORD A. ROSEN AND RONALD A. CHRISTENSEN'S NOTICE OF DEPOSITION OF PERSON(S) MOST KNOWLEDGEABLE OF URBAN COMMONS, LLC AND REQUEST FOR PRODUCTION OF DOCUMENTS** |
| vs. URBAN COMMONS, LLC, a Delaware Limited Liability Company; URBAN COMMONS 6TH AVE SEATTLE, LLC, a Delaware Limited Liability Company; URBAN COMMONS BATTERY PARK, LLC, a Delaware Limited Liability Company; CHICAGO ANALYTIC TRADING COMPANY, LLC, d/b/a LITTLERIVER CAPITAL, LLC, a Delaware Limited Liability Company; DIGITAL CAPITAL MARKETS, LLC, a Maryland Limited Liability Company; TAYLOR WOODS, an individual; HOWARD WU, an individual; C. BRIAN EGNATZ, an individual; and DOES 1 through 10, inclusive | |
| | Date:   Friday, May 7, 2021 Time:   9:00 a.m. PST Place:  Virtual Deposition Coordinated By Veritext Legal Solutions 707 Wilshire Blvd., Suite 3500 Los Angeles, CA 90017 |
| Defendants | Complaint Filed: October 13, 2020 |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT,** pursuant to Rule 30 of the Federal Rules of Civil Procedure Plaintiffs Clifford A. Rosen and Ronald A. Christensen (collectively, "Plaintiffs") will take the virtual deposition of the Person(s) Most Knowledgeable of Defendant Urban Commons, LLC ("Urban Commons"). The virtual deposition will be coordinated by Veritext Legal Solutions, whose physical address is 707 Wilshire Boulevard, Suite 3500, Los Angeles, California 90017 and will take place on Friday, May 7, 2021 commencing at 9:00 a.m. PST.

**PLEASE TAKE FURTHER NOTICE** we reserve the right to conduct this deposition utilizing the secure web-based deposition option afforded by Veritext or in the alternative video conferencing (VTC) services or telephonically to provide remote/virtual access for those parties wishing to participate in the deposition via the internet and/or telephone. Also take notice that we reserve the right to record the deposition either by stenographic means by a court reporter certified to record depositions through the instant visual display of the testimony through a software program such as LiveNote Stream or a digital reporter utilizing state-of-the-art digital recording equipment. Both the court reporter and digital reporter are authorized to administer the oath and serve as the deposition officer in the State of California. Take note that the deposition officer may also be remote and out of the presence of the deponent via one of the options above for purposes of providing the oath/affirmation to the deponent and capturing the proceeding. We further reserve the right to utilize the following: (1) Record the deposition utilizing audio or video technology; (2) Instant visual display such that the reporter's writing of the proceeding will be available to all who are a party to this proceeding to request and receive it in real-time; (3) Exhibit Capture (picture-in-picture) technology in which any exhibit reviewed by the deponent during the deposition can be captured visually; and (4) To conduct this deposition utilizing a paperless exhibit display process called Exhibit Share or a similar paperless virtual display platform. The parties are advised that in lieu of a paper set of exhibits they may be provided and displayed digitally to the deposition officer,

deponent, parties and counsel. The exhibits will be compiled by the deposition officer for the purposes of exhibit stamping, and ultimate production of the final certified transcript.

DATED:  April 16, 2021

GARCIA RAINEY BLANK & BOWERBANK LLP

By

NORMA V. GARCIA
JEFFREY M. BLANK
HUGO A. LOPEZ
Attorneys for Plaintiffs Clifford A. Rosen, MD and Ronald Christensen, MD

## **INSTRUCTIONS AND DEFINITIONS**

1. As used herein, the term "YOU," "YOUR," and "Defendant" means Defendant URBAN COMMONS, LLC and any of its parents or subsidiaries, and any of its employees, agents, independent contractors, representatives, attorneys, accountants, affiliates and any other PERSON(S) acting or purporting to act on its behalf or at its direction.

2. As used herein, the term "WOODS" means Defendant Taylor Woods and his employees, agents, representatives, attorneys, accountants, affiliates, and any other PERSON(S) acting or purporting to act on his behalf or at his direct.

3. As used herein, the term "WU" means Defendant Howard Wu and his employees, agents, representatives, attorneys, accountants, affiliates, and any other PERSON(S) acting or purporting to act on his behalf or at his direct.

4. As used herein, the term "UC BATTERY PARK" means Defendant Urban Commons Battery Park, LLC and any of its parents or subsidiaries, and any of its employees, agents, independent contractors, representatives, attorneys, accountants, affiliates and any other PERSON(S) acting or purporting to act on its behalf or at its direction.

5. As used herein "UC SEATTLE" means Defendant Urban Commons 6th Ave Seattle, LLC and any of its parents or subsidiaries, and any of its employees, agents, independent contractors, representatives, attorneys, accountants, affiliates and any other PERSON(S) acting or purporting to act on its behalf or at its direction.

6. As used herein "EGNATZ" means Defendant Brian Egnatz and his employees, agents, representatives, attorneys, accountants, affiliates, and any other PERSON(S) acting or purporting to act on his behalf or at his direct.

7. As used herein "EHT" means Eagle Hospitality Trust, LLC and any of its parents or subsidiaries, and any of its employees, agents, independent contractors, representatives, attorneys, accountants, affiliates and any other PERSON(S) acting or purporting to act on its behalf or at its direction.

8.      As used herein, the term "RELATING TO" means embodying, discussing, constituting evidence of, having a relationship to (in whole or in part) pertaining, referring to, reflecting, describing, or setting forth the subject matter to which reference is made.

9.      As used herein, the term "COMMUNICATIONS" shall mean all inquiries, discussions, conversations, negotiations, agreements, understandings, meetings, conferences, telephone conversations, interviews, cards, letters, notes, correspondence, telegrams, telexes, cables, or other forms of interpersonal discourse, whether oral or written, however transmitted, including reports, notes, memoranda, lists, agenda, and other reports of communication.

10.     As used herein, the terms "AND" and "OR" shall be construed either conjunctively or disjunctively as necessary to bring within the scope of these requests matters which might otherwise be construed to be the outside of their scope.  A singular form of a word shall also be construed to include the plural form in any instances where such construction would expand the scope of these requests.

11.     As used herein, the terms "DOCUMENT" and/or "DOCUMENTS" mean any and all documents, tangible things and property, of any kind, as defined by Fed. R. Civ. P. 34(a)(1), California , and all writings as defined by California Evidence Code Section 250, including the originals and non-identical copies, whether different from the originals by reason of any notation made on such copies or otherwise, and including, without limitation, communication, memoranda, notes, diaries, statistics, letters, telegrams, telex, telefax, minutes, contracts, reports, studies, checks, statements, receipts, returns, summaries, pamphlets, books, inter office and intra office communications, notations of any sort of conversations, telephone calls, meetings, or other communications, bulletins, computer printouts, invoices, worksheets, all forms of drafts, notations, workings, alterations, modifications, changes and amendments of any of the foregoing, graphical or aural records or representations of any kind, including, without limitation, emails, texts, photographs, charts, microfiche, microfilm, videotape, records, motion pictures, and electronic, mechanical, or electrical records or representations of any kind, including,

without limitation, tapes, cassettes, discs, and recordings, computer discs, computer tapes, computer cards, computer programs, computer software, computer readable media, machine sensible media, electronically stored media, and any other form of stored information.

12.     With respect to any document(s) which YOU withhold under a claim of privilege or otherwise, please provide a statement setting forth as to each of the following documents:

(a) the name and address of the sender of the document;

(b) the name and address of the author of the document;

(c) the name and address of the person to whom the document was addressed;

(d) the name(s) and address(es) of the person(s) to whom a copy of the document was addressed;

(e) the name(s) and address(es) of all persons known to YOU who have seen the document or participated in communications about the document;

(f) the job title of each person listed in (a) through (e) above;

(g) the date of the document;

(h) the date upon which the document was received by those having possession of the document;

(i) a brief description of the nature and subject matter of the document; and, the statute, rule, division or other basis which has been claimed to give rise to the privilege.

13.     As used herein, the term "COMPUTER(S)" shall include, but is not limited to, microcomputers (also known as personal computers or desktops), laptop computers, portable computers, smartphones, personal digital assistants, Blackberrys, minicomputers, iPads, tablets, and mainframe computers.

14.     As used herein, the term "ELECTRONIC DATA" means all information stored in a digital format, including electronically stored information ("ESI"). ELECTRONIC DATA includes, but is not limited to, electronic mail messages and attachments, contacts, journal entries, calendar entries, word processing documents,

spreadsheets, databases including all records and fields and structural information, charts, graphs, and any and all miscellaneous files responsive to the following requests. The responding party is expected to search for any and all information stored on hard disks, floppy disks, CDs, DVDs, USB devices, Personal Digital Assistants (including, but not limited to, electronic tablets, iPads, iPhones, Palm Pilots, Blackberrys and Treos), and in any other vehicle for digital data storage and/or transmittal. The term ELECTRONIC DATA also includes the file, folder tabs and/or containers and labels appended to, or associated with, any physical storage device associated with the information described above.

15.    As used herein, the term "ESI" means any information, including electronically stored information, on any COMPUTERS AND/OR operational systems including accounting, financial, distribution, or manufacturing systems; e-mail; Instant Messages (IM); web pages; text messages; cell phone data; Excel spreadsheets and underlying formulae; metadata; computer databases (i.e., Access); erased, fragmented or damaged data; Blackberry data; and anything stored on COMPUTER or other electronic means located on or in, but not limited to cache memory; optical disks; magnetic tapes/back-up tapes; magnetic disks (hard drive, floppy disks, etc.); PDAs, Blackberries and Palm Pilots; cell phones; IM tools; or USB drives.

16.    "DELETED FILE(S)" means any ELECTRONIC DATA or ESI file that has been erased or deleted from the electronic media, COMPUTER, or DOCUMENT in which it resided.

## **TOPICS OF EXAMINATION**

The matters on which the deponent(s) will be examined are as follows:

1.    The corporate structure of Urban Commons, LLC.

2.    The corporate structure of Urban Commons 6th Ave. Seattle, LLC.

3.    The corporate structure of Urban Commons Battery Park, LLC.

4.    Any agreements between Urban Commons, LLC and EHT, Urban Commons

6th Ave Seattle, LLC, Urban Commons Battery Park, LLC, Taylor Woods, Brian Egnatz, Howard Wu, or any Urban Common related entities.

     5.       Urban Commons, LLC's relationship to defendant Taylor Woods.

     6.       Urban Commons, LLC's relationship to defendant Howard Wu.

     7.       Urban Commons, LLC's relationship with Brian Egnatz

     8.       Urban Commons, LLC's relationship with Eagle Hospitality Trust.

     9.       Urban Commons, LLC's relationship with Eagle Hospitality Real Estate Investment Trust.

     10.     Urban Commons, LLC's relationship with Eagle Hospitality Business Trust.

     11.     The marketing and solicitation of investors to purchase a membership interest in Urban Commons 6th Ave Seattle, LLC.

     12.     The marketing and solicitation of investors to purchase a membership interest in Urban Commons Battery Park, LLC

     13.     The offering to purchase a membership interest in Urban Commons 6th Ave Seattle, LLC.

     14.     The offering to purchase a membership interest in Urban Commons Battery Park, LLC.

     15.     Completion of the offering to purchase a membership interest in Urban Commons 6th Ave Seattle, LLC.

     16.     Completion of the offering to purchase a membership interest in Urban Commons Battery Park, LLC.

     17.     The purchase and acquisition of the real property known as the Hilton Seattle, located at 1301 6th Avenue, Seattle, Washington was acquired by Urban Commons 6th Ave Seattle, LLC.

     18.     The purchase and acquisition of the real property formerly known as The Ritz-Carlton New York, Battery Park, NY by Urban Commons Battery Park, LLC.

     19.     The sale of the real property known as the Hilton Seattle, located at 1301 6th Avenue, Seattle, Washington to the EHT.

20.     The sale of the real property formerly known as The Ritz-Carlton New York, Battery Park, NY to the EHT.

21.     Urban Commons, LLC's financial information, including any bank accounts, investment accounts, and brokerage accounts formerly held and/or currently held by Urban Commons, LLC at any financial institution, foreign and domestic.

22.     Urban Commons, LLC's investments, loans, purchases, acquisitions, developments, finance, accounting, and asset management from January 1, 2020 to the present.

23.     Trading of EAGLEHT SP on the Singapore Exchange.

24.     Suspension of trading EAGLEHT SP securities on the Singapore Exchange.

25.     The Monetary Authority of Singapore's ("MAS") investigation of the EHT.

26.     The EHT's default of its $341 million facility loan with Bank of America.

27.     The EHT's default of its $35 million mortgage loan with Wells Fargo.

28.     The number of investors in Urban Commons 6th Ave Seattle, LLC.

29.     The number of investors in Urban Commons Battery Park, LLC.

30.     The use and/or transfer of any assets meant for or held by Urban Commons, LLC.

31.     Documents evidencing the past and current financial condition of Urban Commons, LLC.

32.     Documents evidencing the use and/or transfer of any assets meant for or held by Urban Commons, LLC.

33.     Any financial defaults of Urban Commons, LLC.

34.     The documents requested and identified in response to the attached requests for production of documents.

35.     The discovery propounded on Urban Commons, LLC and responses provided by Urban Commons, LLC.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

### REQUEST FOR PRODUCTION OF DOCUMENTS NO. 1:

All DOCUMENTS evidencing that the offering for Urban Commons Battery Park, LLC was completed on or before March 6, 2020.

### REQUEST FOR PRODUCTION OF DOCUMENTS NO. 2:

All DOCUMENTS evidencing the escrow account holding Plaintiff Ronald Christensen's investment funds in Urban Commons Battery Park, LLC.

### REQUEST FOR PRODUCTION OF DOCUMENTS NO. 3:

All DOCUMENTS evidencing the property formerly known as The Ritz-Carlton New York, Battery Park, NY was acquired pursuant to the February 2020 subscription agreement.

### REQUEST FOR PRODUCTION OF DOCUMENTS NO. 4:

The deed of trust and all closing DOCUMENTS evidencing The Ritz-Carlton New York, Battery Park, NY was acquired pursuant to the February 2020 subscription agreement.

### REQUEST FOR PRODUCTION OF DOCUMENTS NO. 5:

All DOCUMENTS evidencing all bank accounts where Ronald Christensen's and/or Clifford Rosen's investment funds are currently held.

### REQUEST FOR PRODUCTION OF DOCUMENTS NO. 6:

All DOCUMENTS evidencing how YOU used the funds YOU received from Ronald Christensen and/or Clifford Rosen in connection with the offerings for Urban

1  Commons 6th Ave Seattle, LLC AND/OR Urban Commons Battery Park, LLC in or about

2  February 2020.

3

4  **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 7:**

5      All DOCUMENTS evidencing all investors in Urban Commons Battery Park, LLC.

6

7  **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 8:**

8      All COMMUNICATIONS RELATED TO Ronald Christensen AND/OR Clifford

9  Rosen between December 1, 2019 and the present.

10

11  **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 9:**

12      All COMMUNICATIONS between YOU and any third party RELATED TO

13  Ronald Christensen AND/OR Clifford Rosen between December 1, 2019 and the present.

14

15  **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 10:**

16      All COMMUNICATIONS between YOU and Ronald Christensen AND/OR

17  Clifford Rosen between December 1, 2019 and the present.

18

19  **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 11:**

20      All offering materials YOU provided to Ronald Christensen AND/OR Clifford

21  Rosen RELATED TO Urban Commons 6th Ave Seattle, LLC AND/OR Urban Commons

22  Battery Park, LLC between December 1, 2019 and the present.

23

24  **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 12:**

25      All marketing materials YOU provided Ronald Christensen AND/OR Clifford

26  Rosen RELATED TO Urban Commons 6th Ave Seattle, LLC AND/OR Urban Commons

27  Battery Park, LLC between December 1, 2019 and the present.

28

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 13:**

All monthly bank statements for Urban Commons, LLC's Bank of America Account No. 4451390682 from January 1, 2020 to the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 14:**

All monthly bank statements any and all checking, savings, brokerage accounts held by Urban Commons, LLC at Bank of America, National Association from January 1, 2020 to the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 15:**

All monthly bank statements held by Urban Commons 6th Ave. Seattle, LLC at Bank of America, National Association from January 1, 2020 to the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 16:**

All documents evidencing the current balance for Urban Commons, LLC's Bank of America Account No. 4451390682.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 17:**

All monthly bank statements for Urban Commons Battery Park, LLC's Wells Fargo Account No. 1386490534 from January 1, 2020 to the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 18:**

All monthly bank statements for any and all checking, savings, brokerage accounts held by Urban Commons Battery Park, LLC at Wells Fargo Bank from January 1, 2020 to the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 19:**

All documents evidencing the current balance for Urban Commons Battery Park,

1  LLC's Wells Fargo Account No. 1386490534.

2

3  **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 20:**

4  All DOCUMENTS evidencing that the offering for Urban Commons 6th Ave

5  Seattle, LLC was completed on or before March 2020.

6

7  **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 21:**

8  All DOCUMENTS evidencing the escrow account holding Plaintiff Ronald

9  Christensen's investment funds in Urban Commons 6th Ave Seattle, LLC.

10

11  **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 22:**

12  All DOCUMENTS evidencing the escrow account holding Plaintiff Clifford

13  Rosen's investment funds in Urban Commons 6th Ave Seattle, LLC.

14

15  **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 23:**

16  All DOCUMENTS evidencing the real property known as the Hilton Seattle,

17  located at 1301 6th Avenue, Seattle, Washington was acquired by Urban Commons 6th Ave

18  Seattle, LLC.

19

20  **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 24:**

21  The deed of trust and all closing DOCUMENTS evidencing the real property

22  known as the Hilton Seattle, located at 1301 6th Avenue, Seattle, Washington was acquired

23  by Urban Commons 6th Ave Seattle, LLC.

24

25  **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 25:**

26  All DOCUMENTS evidencing all investors in Urban Commons 6th Ave Seattle,

27  LLC.

28

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 26:**

All COMMUNICATIONS between YOU and EGNATZ RELATED TO Plaintiffs Clifford Rosen AND/OR Ronald Christensen from January 1, 2020 to the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 27:**

All COMMUNICATIONS BETWEEN YOU and EGNATZ RELATED TO the offerings for Urban Commons 6th Ave Seattle, LLC AND/OR Urban Commons Battery Park, LLC from January 1, 2020 to the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 28:**

All COMMUNICATIONS between YOU and EHT RELATED TO Plaintiffs Clifford Rosen AND/OR Ronald Christensen from January 1, 2020 to the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 29:**

All COMMUNICATIONS BETWEEN YOU and EHT RELATED TO the offerings for Urban Commons 6th Ave Seattle, LLC AND/OR Urban Commons Battery Park, LLC from January 1, 2020 to the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 30:**

All COMMUNICATIONS BETWEEN YOU and EHT RELATED TO EHT purchasing and/or acquiring the real property known as the Hilton Seattle, located at 1301 6th Avenue, Seattle, Washington from Urban Commons 6th Ave Seattle, LLC from January 1, 2020 to the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 31:**

All COMMUNICATIONS BETWEEN YOU and EHT RELATED TO EHT purchasing and/or acquiring the property formerly known as The Ritz-Carlton New York, Battery Park, NY from Urban Commons Battery Park, LLC from January 1, 2020 to

the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 32:**

All DOCUMENTS evidencing the sale of the real property known as the Hilton Seattle, located at 1301 6th Avenue, Seattle, Washington to the EHT.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 33:**

All DOCUMENTS evidencing the sale of the property formerly known as The Ritz-Carlton New York, Battery Park, NY to the EHT.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 34:**

All DOCUMENTS evidencing the number of investors in Urban Commons Battery Park, LLC.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 35:**

All DOCUMENTS evidencing the number of investors in Urban Commons 6th Ave Seattle, LLC.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 36:**

All DOCUMENTS evidencing how YOU used the funds YOU received from Ronald Christensen and/or Clifford Rosen in connection with the offering for Urban Commons 6th Ave Seattle, LLC.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 37:**

All DOCUMENTS evidencing how YOU used the funds YOU received from Ronald Christensen in connection with the offering for Urban Commons Battery Park, LLC.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 38:**

All monthly bank statements for any checking, savings, or brokerage account formerly AND/OR currently held by Urban Commons , LLC at any financial banking institution, foreign or domestic, from January 1, 2020 to the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 39:**

All DOCUMENTS evidencing YOUR corporate structure.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 40:**

All DOCUMENTS evidencing the corporate structure between YOU and UC Seattle.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 41:**

All DOCUMENTS evidencing the corporate structure between YOU and UC Battery Park.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 42:**

All DOCUMENTS evidencing the corporate structure between YOU and EHT.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 43:**

All DOCUMENTS evidencing by name, title, address, telephone number the current officers of Urban Commons, LLC.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 44:**

All DOCUMENTS evidencing by name, title, address, telephone number the current directors of Urban Commons, LLC.

1

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 45:**

2

   All DOCUMENTS evidencing any and all assets YOU have disposed of through a

3

sale or otherwise between October 1, 2019 and the present.

4

5

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 46:**

6

   All DOCUMENTS evidencing any and all assets YOU have transferred to any third

7

party, including but not limited to any officers, directors, shareholders, AND/OR other

8

corporate entities between October 1, 2019 and the present.

9

10

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 47:**

11

   All DOCUMENTS evidencing YOUR relationship with AND/OR to the security

12

exchanged on the Singapore Stock Exchange and identified as EAGLEHT SP.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT R

GARCIA RAINEY BLANK & BOWERBANK LLP
 A LIMITED LIABILITY PARTNERSHIP
NORMA V. GARCIA, Cal. Bar No. 223512
ngarciaguillen@garciarainey.com
JEFFREY M. BLANK, Cal. Bar No. 217522
jblank@garciarainey.com
HUGO A. LOPEZ, Cal. Bar No. 315846
hlopez@garciarainey.com
695 Town Center Drive, Suite 700
Costa Mesa, CA 92626
Telephone:    (714) 382-7000
Facsimile:    (714) 784-0031

Attorneys for Plaintiffs
Clifford A. Rosen, MD and Ronald A. Christensen, MD.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLIFFORD A. ROSEN, an individual; RONALD A. CHRISTENSEN, an individual<br><br>Plaintiffs,<br>vs.<br>URBAN COMMONS, LLC, a Delaware Limited Liability Company; URBAN COMMONS 6TH AVE SEATTLE, LLC, a Delaware Limited Liability Company; URBAN COMMONS BATTERY PARK, LLC, a Delaware Limited Liability Company; CHICAGO ANALYTIC TRADING COMPANY, LLC, d/b/a LITTLERIVER CAPITAL, LLC, a Delaware Limited Liability Company; DIGITAL CAPITAL MARKETS, LLC, a Maryland Limited Liability Company; TAYLOR WOODS, an individual; HOWARD WU, an individual; C. BRIAN EGNATZ, an individual; and DOES 1 through 10, inclusive<br><br>Defendants | **Case No.:** 8:20-cv-01973-JLS-DFM<br><br>**PLAINTIFFS CLIFFORD A. ROSEN AND RONALD A. CHRISTENSEN'S NOTICE OF DEPOSITION OF PERSON MOST KNOWLEDGEABLE OF URBAN COMMONS 6TH AVE SEATTLE, LLC AND REQUEST FOR PRODUCTION OF DOCUMENTS**<br><br>Date:   Wednesday, May 5, 2021<br>Time:  9:00 a.m. PST<br>Place:  Virtual Deposition Coordinated By Veritext Legal Solutions 707 Wilshire Blvd., Suite 3500 Los Angeles, CA 90017<br><br><br>Complaint Filed: October 13, 2020 |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT,** pursuant to Rule 30 of the Federal Rules of Civil Procedure Plaintiffs Clifford A. Rosen and Ronald A. Christensen (collectively, "Plaintiffs") will take the virtual deposition of the Person(s) Most Knowledgeable of Defendant Urban Commons 6TH AVE SEATTLE, LLC ("UC Seattle"). The virtual deposition will be coordinated by Veritext Legal Solutions, whose physical address is 707 Wilshire Boulevard, Suite 3500,  Los Angeles, California 90017  and will take place Wednesday, May 5, 2021 commencing at 9:00 a.m. PST.

**PLEASE TAKE FURTHER NOTICE** we reserve the right to conduct this deposition utilizing the secure web-based deposition option afforded by Veritext or in the alternative video conferencing (VTC) services or telephonically to provide remote/virtual access for those parties wishing to participate in the deposition via the internet and/or telephone. Also take notice that we reserve the right to record the deposition either by stenographic means by a court reporter certified to record depositions through the instant visual display of the testimony through a software program such as LiveNote Stream or a digital reporter utilizing state-of-the-art digital recording equipment. Both the court reporter and digital reporter are authorized to administer the oath and serve as the deposition officer in the State of California. Take note that the deposition officer may also be remote and out of the presence of the deponent via one of the options above for purposes of providing the oath/affirmation to the deponent and capturing the proceeding. We further reserve the right to utilize the following: (1) Record the deposition utilizing audio or video technology; (2) Instant visual display such that the reporter's writing of the proceeding will be available to all who are a party to this proceeding to request and receive it in real-time; (3) Exhibit Capture (picture-in-picture) technology in which any exhibit reviewed by the deponent during the deposition can be captured visually; and (4) To conduct this deposition utilizing a paperless exhibit display process called Exhibit Share or a similar paperless virtual display platform. The parties are advised that in lieu of a paper set of exhibits they may be provided and displayed digitally to the deposition officer,

1  deponent, parties and counsel. The exhibits will be compiled by the deposition officer for

2  the purposes of exhibit stamping, and ultimate production of the final certified transcript.

3

4  DATED:  April 16, 2021

5                                          GARCIA RAINEY BLANK & BOWERBANK LLP

6

7

8                         By

9                                              NORMA V. GARCIA
                                              JEFFREY M. BLANK
10                                             HUGO A. LOPEZ
                                Attorneys for Plaintiffs Clifford A. Rosen, MD and
11                                           Ronald Christensen, MD

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **INSTRUCTIONS AND DEFINITIONS**

1.    As used herein, the term "YOU," "YOUR," and "Defendant" means Defendant Urban Commons 6th Ave Seattle, LLC and any of its parents or subsidiaries, and any of its employees, agents, independent contractors, representatives, attorneys, accountants, affiliates and any other PERSON(S) acting or purporting to act on its behalf or at its direction.

2.    As used herein, the term "URBAN COMMONS" means defendant Urban Commons, LLC and any of its parents or subsidiaries, and any of its employees, agents, independent contractors, representatives, attorneys, accountants, affiliates and any other PERSON(S) acting or purporting to act on its behalf or at its direction.

3.    As used herein, the term "WOODS" means Defendant Taylor Woods and his employees, agents, representatives, attorneys, accountants, affiliates, and any other PERSON(S) acting or purporting to act on his behalf or at his direct.

4.    As used herein, the term "WU" means Defendant Howard Wu and his employees, agents, representatives, attorneys, accountants, affiliates, and any other PERSON(S) acting or purporting to act on his behalf or at his direct.

5.    As used herein, the term "UC BATTERY PARK" means Defendant Urban Commons Battery Park, LLC and any of its parents or subsidiaries, and any of its employees, agents, independent contractors, representatives, attorneys, accountants, affiliates and any other PERSON(S) acting or purporting to act on its behalf or at its direction.

6.    As used herein "EGNATZ" means Defendant Brian Egnatz and his employees, agents, representatives, attorneys, accountants, affiliates, and any other PERSON(S) acting or purporting to act on his behalf or at his direct.

7.    As used herein "EHT" means Eagle Hospitality Trust, LLC and any of its parents or subsidiaries, and any of its employees, agents, independent contractors, representatives, attorneys, accountants, affiliates and any other PERSON(S) acting or purporting to act on its behalf or at its direction.

8.      As used herein, the term "RELATING TO" means embodying, discussing, constituting evidence of, having a relationship to (in whole or in part) pertaining, referring to, reflecting, describing, or setting forth the subject matter to which reference is made.

9.      As used herein, the term "COMMUNICATIONS" shall mean all inquiries, discussions, conversations, negotiations, agreements, understandings, meetings, conferences, telephone conversations, interviews, cards, letters, notes, correspondence, telegrams, telexes, cables, or other forms of interpersonal discourse, whether oral or written, however transmitted, including reports, notes, memoranda, lists, agenda, and other reports of communication.

10.     As used herein, the terms "AND" and "OR" shall be construed either conjunctively or disjunctively as necessary to bring within the scope of these requests matters which might otherwise be construed to be the outside of their scope.  A singular form of a word shall also be construed to include the plural form in any instances where such construction would expand the scope of these requests.

11.     As used herein, the terms "DOCUMENT" and/or "DOCUMENTS" mean any and all documents, tangible things and property, of any kind, as defined by Fed. R. Civ. P. 34(a)(1), California , and all writings as defined by California Evidence Code Section 250, including the originals and non-identical copies, whether different from the originals by reason of any notation made on such copies or otherwise, and including, without limitation, communication, memoranda, notes, diaries, statistics, letters, telegrams, telex, telefax, minutes, contracts, reports, studies, checks, statements, receipts, returns, summaries, pamphlets, books, inter office and intra office communications, notations of any sort of conversations, telephone calls, meetings, or other communications, bulletins, computer printouts, invoices, worksheets, all forms of drafts, notations, workings, alterations, modifications, changes and amendments of any of the foregoing, graphical or aural records or representations of any kind, including, without limitation, emails, texts, photographs, charts, microfiche, microfilm, videotape, records, motion pictures, and electronic, mechanical, or electrical records or representations of any kind, including,

without limitation, tapes, cassettes, discs, and recordings, computer discs, computer tapes, computer cards, computer programs, computer software, computer readable media, machine sensible media, electronically stored media, and any other form of stored information.

12.     With respect to any document(s) which YOU withhold under a claim of privilege or otherwise, please provide a statement setting forth as to each of the following documents:

(a) the name and address of the sender of the document;

(b) the name and address of the author of the document;

(c) the name and address of the person to whom the document was addressed;

(d) the name(s) and address(es) of the person(s) to whom a copy of the document was addressed;

(e) the name(s) and address(es) of all persons known to YOU who have seen the document or participated in communications about the document;

(f) the job title of each person listed in (a) through (e) above;

(g) the date of the document;

(h) the date upon which the document was received by those having possession of the document;

(i) a brief description of the nature and subject matter of the document; and, the statute, rule, division or other basis which has been claimed to give rise to the privilege.

13.     As used herein, the term "COMPUTER(S)" shall include, but is not limited to, microcomputers (also known as personal computers or desktops), laptop computers, portable computers, smartphones, personal digital assistants, Blackberrys, minicomputers, iPads, tablets, and mainframe computers.

14.     As used herein, the term "ELECTRONIC DATA" means all information stored in a digital format, including electronically stored information ("ESI"). ELECTRONIC DATA includes, but is not limited to, electronic mail messages and attachments, contacts, journal entries, calendar entries, word processing documents,

spreadsheets, databases including all records and fields and structural information, charts, graphs, and any and all miscellaneous files responsive to the following requests.  The responding party is expected to search for any and all information stored on hard disks, floppy disks, CDs, DVDs, USB devices, Personal Digital Assistants (including, but not limited to, electronic tablets, iPads, iPhones, Palm Pilots, Blackberrys and Treos), and in any other vehicle for digital data storage and/or transmittal.  The term ELECTRONIC DATA also includes the file, folder tabs and/or containers and labels appended to, or associated with, any physical storage device associated with the information described above.

15.     As used herein, the term "ESI" means any information, including electronically stored information, on any COMPUTERS AND/OR operational systems including accounting, financial, distribution, or manufacturing systems; e-mail; Instant Messages (IM); web pages; text messages; cell phone data; Excel spreadsheets and underlying formulae; metadata; computer databases (i.e., Access); erased, fragmented or damaged data; Blackberry data; and anything stored on COMPUTER or other electronic means located on or in, but not limited to cache memory; optical disks; magnetic tapes/back-up tapes; magnetic disks (hard drive, floppy disks, etc.); PDAs, Blackberries and Palm Pilots; cell phones; IM tools; or USB drives.

16.     "DELETED FILE(S)" means any ELECTRONIC DATA or ESI file that has been erased or deleted from the electronic media, COMPUTER, or DOCUMENT in which it resided.


**TOPICS OF EXAMINATION**

The matters on which the deponent(s) will be examined are as follows:

1.     The corporate structure of Urban Commons 6th Ave Seattle, LLC.

2.     Any agreements between Urban Commons 6th Ave Seattle, LLC and EHT, Urban Commons LLC, Taylor Woods, Brian Egnatz, Howard Wu, or any Urban Common related entities.

3.      Urban Commons 6th Ave Seattle, LLC's relationship to defendant Taylor Woods.

4.      Urban Commons 6th Ave Seattle, LLC's relationship to defendant Howard Wu.

5.      Urban Commons 6th Ave Seattle, LLC's relationship with Brian Egnatz

6.      Urban Commons 6th Ave Seattle, LLC's relationship with Eagle Hospitality Trust.

7.      Urban Commons 6th Ave Seattle, LLC's relationship with Eagle Hospitality Real Estate Investment Trust.

8.      Urban Commons 6th Ave Seattle, LLC's relationship with Eagle Hospitality Business Trust.

9.      The marketing and solicitation of investors to purchase a membership interest in Urban Commons 6th Ave Seattle, LLC.

10.     The offering to purchase a membership interest in Urban Commons 6th Ave Seattle, LLC.

11.     Completion of the offering to purchase a membership interest in Urban Commons 6th Ave Seattle, LLC.

12.     The purchase and acquisition of the real property known as the Hilton Seattle, located at 1301 6th Avenue, Seattle, Washington by Urban Commons 6th Ave Seattle, LLC.

13.     The sale of the real property known as the Hilton Seattle, located at 1301 6th Avenue, Seattle, Washington to the EHT.

14.     Urban Commons 6th Ave Seattle, LLC's financial information, including any bank accounts, investment accounts, and brokerage accounts formerly held and/or currently held by Urban Commons, LLC at any financial institution, foreign and domestic.

15.     Urban Commons 6th Ave Seattle, LLC's investments, loans, purchases, acquisitions, developments, finance, accounting, and asset management from January 1, 2020 to the present.

16.     The use and/or transfer of any assets meant for or held by Urban Commons 6th Ave Seattle, LLC.

17.     Documents evidencing the past and current financial condition of Urban Commons 6th Ave Seattle, LLC.

18.     Documents evidencing the use and/or transfer of any assets meant for or held by Urban Commons 6th Ave Seattle, LLC.

19.     Number of investors in Urban Commons 6th Ave Seattle, LLC.

20.     Any financial defaults of Urban Commons 6th Ave Seattle, LLC.

21.     The documents requested and identified in response to the attached requests for production of documents.

22.     The discovery propounded on Urban Commons 6th Ave Seattle, LLC and responses provided by Urban Commons 6th Ave Seattle, LLC.

## **REQUESTS FOR PRODUCTION OF DOCUMENTS**

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 1:**

All DOCUMENTS evidencing that the offering for Urban Commons 6th Ave Seattle, LLC was completed on or before March 6, 2020.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 2:**

All DOCUMENTS evidencing the escrow account holding Plaintiff Ronald Christensen's investment funds in Urban Commons 6th Ave Seattle, LLC.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 3:**

All DOCUMENTS evidencing all bank accounts where Ronald Christensen's and/or Clifford Rosen's investment funds in Urban Commons 6th Ave Seattle, LLC are currently held.

1 **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 4:**

2       All DOCUMENTS evidencing how YOU used the funds YOU received from

3 Ronald Christensen and/or Clifford Rosen in connection with the offering for Urban

4 Commons 6th Ave Seattle, LLC.

5

6 **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 5:**

7       All DOCUMENTS evidencing all investors in Urban Commons 6th Ave Seattle,

8 LLC.

9

10 **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 6:**

11       All COMMUNICATIONS RELATED TO Ronald Christensen AND/OR Clifford

12 Rosen between December 1, 2019 and the present.

13

14 **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 7:**

15       All COMMUNICATIONS between YOU and any third party RELATED TO

16 Ronald Christensen AND/OR Clifford Rosen between December 1, 2019 and the present.

17

18 **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 8:**

19       All COMMUNICATIONS between YOU and Ronald Christensen AND/OR

20 Clifford Rosen between December 1, 2019 and the present.

21

22 **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 9:**

23       All offering materials provided to Ronald Christensen AND/OR Clifford Rosen

24 RELATED TO Urban Commons 6th Ave Seattle, LLC between December 1, 2019 and the

25 present.

26

27 **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 10:**

28       All marketing materials provided Ronald Christensen AND/OR Clifford

1  Rosen RELATED TO Urban Commons 6th Ave Seattle, LLC between December 1, 2019

2  and the present.

3

4  **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 11:**

5        All monthly bank statements for any checking, savings, or brokerage account

6  formerly AND/OR currently held by Urban Commons 6th Ave. Seattle, LLC at Bank of

7  America from January 1, 2020 to the present.

8

9  **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 12:**

10        All DOCUMENTS evidencing the real property known as the Hilton Seattle,

11  located at 1301 6th Avenue, Seattle, Washington was acquired by Urban Commons 6th Ave

12  Seattle, LLC.

13

14  **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 13:**

15        The deed of trust and all closing DOCUMENTS evidencing the real property

16  known as the Hilton Seattle, located at 1301 6th Avenue, Seattle, Washington was acquired

17  by Urban Commons 6th Ave Seattle, LLC.

18

19  **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 14:**

20        All COMMUNICATIONS between YOU and EGNATZ RELATED TO Plaintiffs

21  Clifford Rosen AND/OR Ronald Christensen from January 1, 2020 to the present.

22

23  **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 15:**

24        All COMMUNICATIONS BETWEEN YOU and EGNATZ RELATED TO the

25  offering for Urban Commons 6th Ave Seattle, LLC from January 1, 2020 to the present.

26

27  **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 16:**

28        All COMMUNICATIONS between YOU and EHT RELATED TO Plaintiffs

1  Clifford Rosen AND/OR Ronald Christensen from January 1, 2020 to the present.

2

3  **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 17:**

4      All COMMUNICATIONS BETWEEN YOU and EHT RELATED TO the offering

5  for Urban Commons 6th Ave Seattle, LLC from January 1, 2020 to the present.

6

7  **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 18:**

8      All COMMUNICATIONS BETWEEN YOU and EHT RELATED TO EHT

9  purchasing and/or acquiring the real property known as the Hilton Seattle, located at 1301

10  6th Avenue, Seattle, Washington from Urban Commons 6th Ave Seattle, LLC from January

11  1, 2020 to the present.

12

13  **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 19:**

14      All DOCUMENTS evidencing the sale of the real property known as the Hilton

15  Seattle, located at 1301 6th Avenue, Seattle, Washington to the EHT.

16

17  **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 20:**

18      All DOCUMENTS evidencing the number of investors in Urban Commons 6th Ave

19  Seattle, LLC.

20

21  **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 21:**

22      All monthly bank statements for any checking, savings, or brokerage account

23  formerly AND/OR currently held by Urban Commons 6th Ave. Seattle, LLC at Wells

24  Fargo from January 1, 2020 to the present.

25

26  **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 22:**

27      All monthly bank statements for any checking, savings, or brokerage account

28  formerly AND/OR currently held by Urban Commons 6th Ave Seattle, LLC at any

financial banking institution, foreign or domestic, from January 1, 2020 to the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 23:**

All DOCUMENTS evidencing YOUR corporate structure.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 24:**

All DOCUMENTS evidencing the corporate structure between YOU and URBAN COMMONS.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 25:**

All DOCUMENTS evidencing the corporate structure between YOU and EHT.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 26:**

All DOCUMENTS evidencing by name, title, address, telephone number the current officers of Urban Commons 6th Ave Seattle, LLC.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 27:**

All DOCUMENTS evidencing by name, title, address, telephone number the current directors of Urban Commons 6th Ave Seattle, LLC.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 28:**

All DOCUMENTS evidencing any and all assets YOU have disposed of through a sale or otherwise between October 1, 2019 and the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 29:**

All DOCUMENTS evidencing any and all assets YOU have transferred to any third party, including but not limited to any officers, directors, shareholders, AND/OR other corporate entities between October 1, 2019 and the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 30:**

All DOCUMENTS evidencing YOUR relationship with AND/OR to the security exchanged on the Singapore Stock Exchange and identified as EAGLEHT SP.

EXHIBIT S

GARCIA RAINEY BLANK & BOWERBANK LLP
   A LIMITED LIABILITY PARTNERSHIP
NORMA V. GARCIA, Cal. Bar No. 223512
ngarciaguillen@garciarainey.com
JEFFREY M. BLANK, Cal. Bar No. 217522
jblank@garciarainey.com
HUGO A. LOPEZ, Cal. Bar No. 315846
hlopez@garciarainey.com
695 Town Center Drive, Suite 700
Costa Mesa, CA 92626
Telephone:   (714) 382-7000
Facsimile:    (714) 784-0031

Attorneys for Plaintiffs
Clifford A. Rosen, MD and Ronald A. Christensen, MD.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLIFFORD A. ROSEN, an individual; RONALD A. CHRISTENSEN, an individual | **Case No.:** 8:20-cv-01973-JLS-DFM |
| Plaintiffs, | **PLAINTIFFS CLIFFORD A. ROSEN AND RONALD A. CHRISTENSEN'S NOTICE OF DEPOSITION OF PERSON(S) MOST KNOWLEDGEABLE OF URBAN COMMONS BATTERY PARK, LLC AND REQUEST FOR PRODUCTION OF DOCUMENTS** |
| vs. | |
| URBAN COMMONS, LLC, a Delaware Limited Liability Company; URBAN COMMONS 6TH AVE SEATTLE, LLC, a Delaware Limited Liability Company; URBAN COMMONS BATTERY PARK, LLC, a Delaware Limited Liability Company; CHICAGO ANALYTIC TRADING COMPANY, LLC, d/b/a LITTLERIVER CAPITAL, LLC, a Delaware Limited Liability Company; DIGITAL CAPITAL MARKETS, LLC, a Maryland Limited Liability Company; TAYLOR WOODS, an individual; HOWARD WU, an individual; C. BRIAN EGNATZ, an individual; and DOES 1 through 10, inclusive | Date:  Thursday, May 6, 2021<br>Time:  9:00 a.m. PST<br>Place:  Virtual Deposition Coordinated By Veritext Legal Solutions 707 Wilshire Blvd., Suite 3500 Los Angeles, CA 90017 |
| Defendants | Complaint Filed: October 13, 2020 |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT,** pursuant to Rule 30 of the Federal Rules of Civil Procedure Plaintiffs Clifford A. Rosen and Ronald A. Christensen (collectively, "Plaintiffs") will take the virtual deposition of the Person(s) Most Knowledgeable of Defendant Urban Commons Battery Park, LLC ("UC Battery Park"). The virtual deposition will be coordinated by Veritext Legal Solutions, whose physical address is 707 Wilshire Boulevard, Suite 3500,  Los Angeles, California 90017  and will take place Thursday, May 6, 2021 commencing at 9:00 a.m. PST.

**PLEASE TAKE FURTHER NOTICE** we reserve the right to conduct this deposition utilizing the secure web-based deposition option afforded by Veritext or in the alternative video conferencing (VTC) services or telephonically to provide remote/virtual access for those parties wishing to participate in the deposition via the internet and/or telephone. Also take notice that we reserve the right to record the deposition either by stenographic means by a court reporter certified to record depositions through the instant visual display of the testimony through a software program such as LiveNote Stream or a digital reporter utilizing state-of-the-art digital recording equipment. Both the court reporter and digital reporter are authorized to administer the oath and serve as the deposition officer in the State of California. Take note that the deposition officer may also be remote and out of the presence of the deponent via one of the options above for purposes of providing the oath/affirmation to the deponent and capturing the proceeding. We further reserve the right to utilize the following: (1) Record the deposition utilizing audio or video technology; (2) Instant visual display such that the reporter's writing of the proceeding will be available to all who are a party to this proceeding to request and receive it in real-time; (3) Exhibit Capture (picture-in-picture) technology in which any exhibit reviewed by the deponent during the deposition can be captured visually; and (4) To conduct this deposition utilizing a paperless exhibit display process called Exhibit Share or a similar paperless virtual display platform. The parties are advised that in lieu of a paper set of exhibits they may be provided and displayed digitally to the deposition officer,

deponent, parties and counsel. The exhibits will be compiled by the deposition officer for the purposes of exhibit stamping, and ultimate production of the final certified transcript.

DATED:  April 16, 2021

GARCIA RAINEY BLANK & BOWERBANK LLP

By _____

NORMA V. GARCIA
JEFFREY M. BLANK
HUGO A. LOPEZ
Attorneys for Plaintiffs Clifford A. Rosen, MD and Ronald Christensen, MD

## **INSTRUCTIONS AND DEFINITIONS**

1.     As used herein, the term "YOU," "YOUR," and "Defendant" means Defendant Urban Commons Battery Park, LLC and any of its parents or subsidiaries, and any of its employees, agents, independent contractors, representatives, attorneys, accountants, affiliates and any other PERSON(S) acting or purporting to act on its behalf or at its direction.

2.     As used herein, the term "URBAN COMMONS" means defendant Urban Commons, LLC and any of its parents or subsidiaries, and any of its employees, agents, independent contractors, representatives, attorneys, accountants, affiliates and any other PERSON(S) acting or purporting to act on its behalf or at its direction.

3.     As used herein, the term "WOODS" means Defendant Taylor Woods and his employees, agents, representatives, attorneys, accountants, affiliates, and any other PERSON(S) acting or purporting to act on his behalf or at his direct.

4.     As used herein, the term "WU" means Defendant Howard Wu and his employees, agents, representatives, attorneys, accountants, affiliates, and any other PERSON(S) acting or purporting to act on his behalf or at his direct.

5.     As used herein, the term "UC SEATTLE" means Defendant Urban Commons 6th Ave Seattle, LLC and any of its parents or subsidiaries, and any of its employees, agents, independent contractors, representatives, attorneys, accountants, affiliates and any other PERSON(S) acting or purporting to act on its behalf or at its direction.

6.     As used herein "EGNATZ" means Defendant Brian Egnatz and his employees, agents, representatives, attorneys, accountants, affiliates, and any other PERSON(S) acting or purporting to act on his behalf or at his direct.

7.     As used herein "EHT" means Eagle Hospitality Trust, LLC and any of its parents or subsidiaries, and any of its employees, agents, independent contractors, representatives, attorneys, accountants, affiliates and any other PERSON(S) acting or purporting to act on its behalf or at its direction.

8.      As used herein, the term "RELATING TO" means embodying, discussing, constituting evidence of, having a relationship to (in whole or in part) pertaining, referring to, reflecting, describing, or setting forth the subject matter to which reference is made.

9.      As used herein, the term "COMMUNICATIONS" shall mean all inquiries, discussions, conversations, negotiations, agreements, understandings, meetings, conferences, telephone conversations, interviews, cards, letters, notes, correspondence, telegrams, telexes, cables, or other forms of interpersonal discourse, whether oral or written, however transmitted, including reports, notes, memoranda, lists, agenda, and other reports of communication.

10.      As used herein, the terms "AND" and "OR" shall be construed either conjunctively or disjunctively as necessary to bring within the scope of these requests matters which might otherwise be construed to be the outside of their scope.  A singular form of a word shall also be construed to include the plural form in any instances where such construction would expand the scope of these requests.

11.      As used herein, the terms "DOCUMENT" and/or "DOCUMENTS" mean any and all documents, tangible things and property, of any kind, as defined by Fed. R. Civ. P. 34(a)(1), California , and all writings as defined by California Evidence Code Section 250, including the originals and non-identical copies, whether different from the originals by reason of any notation made on such copies or otherwise, and including, without limitation, communication, memoranda, notes, diaries, statistics, letters, telegrams, telex, telefax, minutes, contracts, reports, studies, checks, statements, receipts, returns, summaries, pamphlets, books, inter office and intra office communications, notations of any sort of conversations, telephone calls, meetings, or other communications, bulletins, computer printouts, invoices, worksheets, all forms of drafts, notations, workings, alterations, modifications, changes and amendments of any of the foregoing, graphical or aural records or representations of any kind, including, without limitation, emails, texts, photographs, charts, microfiche, microfilm, videotape, records, motion pictures, and electronic, mechanical, or electrical records or representations of any kind, including,

without limitation, tapes, cassettes, discs, and recordings, computer discs, computer tapes, computer cards, computer programs, computer software, computer readable media, machine sensible media, electronically stored media, and any other form of stored information.

12.     With respect to any document(s) which YOU withhold under a claim of privilege or otherwise, please provide a statement setting forth as to each of the following documents:

(a) the name and address of the sender of the document;

(b) the name and address of the author of the document;

(c) the name and address of the person to whom the document was addressed;

(d) the name(s) and address(es) of the person(s) to whom a copy of the document was addressed;

(e) the name(s) and address(es) of all persons known to YOU who have seen the document or participated in communications about the document;

(f) the job title of each person listed in (a) through (e) above;

(g) the date of the document;

(h) the date upon which the document was received by those having possession of the document;

(i) a brief description of the nature and subject matter of the document; and, the statute, rule, division or other basis which has been claimed to give rise to the privilege.

13.     As used herein, the term "COMPUTER(S)" shall include, but is not limited to, microcomputers (also known as personal computers or desktops), laptop computers, portable computers, smartphones, personal digital assistants, Blackberrys, minicomputers, iPads, tablets, and mainframe computers.

14.     As used herein, the term "ELECTRONIC DATA" means all information stored in a digital format, including electronically stored information ("ESI"). ELECTRONIC DATA includes, but is not limited to, electronic mail messages and attachments, contacts, journal entries, calendar entries, word processing documents,

spreadsheets, databases including all records and fields and structural information, charts, graphs, and any and all miscellaneous files responsive to the following requests.  The responding party is expected to search for any and all information stored on hard disks, floppy disks, CDs, DVDs, USB devices, Personal Digital Assistants (including, but not limited to, electronic tablets, iPads, iPhones, Palm Pilots, Blackberrys and Treos), and in any other vehicle for digital data storage and/or transmittal.  The term ELECTRONIC DATA also includes the file, folder tabs and/or containers and labels appended to, or associated with, any physical storage device associated with the information described above.

15.     As used herein, the term "ESI" means any information, including electronically stored information, on any COMPUTERS AND/OR operational systems including accounting, financial, distribution, or manufacturing systems; e-mail; Instant Messages (IM); web pages; text messages; cell phone data; Excel spreadsheets and underlying formulae; metadata; computer databases (i.e., Access); erased, fragmented or damaged data; Blackberry data; and anything stored on COMPUTER or other electronic means located on or in, but not limited to cache memory; optical disks; magnetic tapes/back-up tapes; magnetic disks (hard drive, floppy disks, etc.); PDAs, Blackberries and Palm Pilots; cell phones; IM tools; or USB drives.

16.     "DELETED FILE(S)" means any ELECTRONIC DATA or ESI file that has been erased or deleted from the electronic media, COMPUTER, or DOCUMENT in which it resided.

## TOPICS OF EXAMINATION

The matters on which the deponent(s) will be examined are as follows:

1.     The corporate structure of Urban Commons Battery Park, LLC.

2.     Any agreements between Urban Commons Battery Park, LLC and EHT, Urban Commons LLC, Taylor Woods, Brian Egnatz, Howard Wu, or any Urban Common related entities.

3.      Urban Commons Battery Park, LLC's relationship to defendant Taylor Woods.

4.      Urban Commons Battery Park, LLC's relationship to defendant Howard Wu.

5.      Urban Commons Battery Park, LLC's relationship with Brian Egnatz

6.      Urban Commons Battery Park, LLC's relationship with Eagle Hospitality Trust.

7.      Urban Commons Battery Park, LLC's relationship with Eagle Hospitality Real Estate Investment Trust.

8.      Urban Commons Battery Park, LLC's relationship with Eagle Hospitality Business Trust.

9.      The marketing and solicitation of investors to purchase a membership interest in Urban Commons Battery Park, LLC.

10.     The offering to purchase a membership interest in Urban Commons Battery Park, LLC.

11.     Completion of the offering to purchase a membership interest in Urban Commons Battery Park, LLC.

12.     The purchase and acquisition of the real property formerly known as The Ritz-Carlton New York, Battery Park, NY by Urban Commons Battery Park, LLC.

13.     The sale of the real property formerly known as The Ritz-Carlton New York, Battery Park, NY by Urban Commons Battery Park, LLC. to the EHT.

14.     Urban Commons Battery Park, LLC's financial information, including any bank accounts, investment accounts, and brokerage accounts formerly held and/or currently held by Urban Commons Battery Park, LLC at any financial institution, foreign and domestic.

15.     Urban Commons Battery Park, LLC's investments, loans, purchases, acquisitions, developments, finance, accounting, and asset management from January 1, 2020 to the present.

16.     The use and/or transfer of any assets meant for or held by Urban Commons

1   Battery Park, LLC.

2       17.    Documents evidencing the past and current financial condition of Urban

3   Commons Battery Park, LLC.

4       18.    Documents evidencing the use and/or transfer of any assets meant for or held

5   by Urban Commons Battery Park, LLC.

6       19.    Number of investors in Urban Commons Battery Park, LLC.

7       20.    Any financial defaults of Urban Commons Battery Park, LLC.

8       21.    The documents requested and identified in response to the attached requests

9   for production of documents.

10       22.    The discovery propounded on Urban Commons Battery Park, LLC and

11   responses provided by Urban Commons Battery Park, LLC.

12

13   <center>**REQUESTS FOR PRODUCTION OF DOCUMENTS**</center>

14

15   **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 1:**

16       All DOCUMENTS evidencing that the offering for Urban Commons Battery Park,

17   LLC was completed on or before March 6, 2020.

18

19   **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 2:**

20       All DOCUMENTS evidencing the escrow account holding Plaintiff Ronald

21   Christensen's investment funds in Urban Commons Battery Park, LLC.

22

23   **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 3:**

24       All DOCUMENTS evidencing all bank accounts where Ronald Christensen's

25   investment funds in Urban Commons Battery Park, LLC are currently held.

26

27   **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 4:**

28       All DOCUMENTS evidencing how YOU used the funds YOU received from

1  Plaintiff Ronald Christensen in connection with the offering for Urban Commons Battery

2  Park, LLC.

3

4  **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 5:**

5      All DOCUMENTS evidencing all investors in Urban Commons Battery Park, LLC.

6

7  **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 6:**

8      All COMMUNICATIONS RELATED TO Ronald Christensen AND/OR Clifford

9  Rosen between December 1, 2019 and the present.

10

11 **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 7:**

12     All COMMUNICATIONS between YOU and any third party RELATED TO

13 Ronald Christensen AND/OR Clifford Rosen between December 1, 2019 and the present.

14

15 **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 8:**

16     All COMMUNICATIONS between YOU and Ronald Christensen AND/OR

17  Clifford Rosen between December 1, 2019 and the present.

18

19 **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 9:**

20     All offering materials provided to Ronald Christensen AND/OR Clifford Rosen

21 RELATED TO Urban Commons Battery Park, LLC between December 1, 2019 and the

22 present.

23

24 **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 10:**

25     All marketing materials provided Ronald Christensen AND/OR Clifford Rosen

26 RELATED TO Urban Commons Battery Park, LLC between December 1, 2019 and the

27 present.

28

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 11:**

All DOCUMENTS evidencing the real property formerly known as The Ritz-Carlton New York, Battery Park, NY was acquired by Urban Commons Battery Park, LLC.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 12:**

The deed of trust and all closing DOCUMENTS evidencing the real property formerly known as The Ritz-Carlton New York, Battery Park, NY was acquired by Urban Commons Battery Park, LLC.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 13:**

All COMMUNICATIONS between YOU and EGNATZ RELATED TO Plaintiffs Clifford Rosen AND/OR Ronald Christensen from January 1, 2020 to the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 14:**

All COMMUNICATIONS BETWEEN YOU and EGNATZ RELATED TO the offering for Urban Commons Battery Park, LLC from January 1, 2020 to the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 15:**

All COMMUNICATIONS between YOU and EHT RELATED TO Plaintiffs Clifford Rosen AND/OR Ronald Christensen from January 1, 2020 to the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 16:**

All COMMUNICATIONS BETWEEN YOU and EHT RELATED TO the offering for Urban Commons Battery Park, LLC from January 1, 2020 to the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 17:**

All COMMUNICATIONS BETWEEN YOU and EHT RELATED TO EHT

purchasing and/or acquiring the real property known as the Hilton Seattle, located at 1301 6th Avenue, Seattle, Washington from Urban Commons 6th Ave Seattle, LLC from January 1, 2020 to the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 18:**

All DOCUMENTS evidencing the sale of the real property formerly known as The Ritz-Carlton New York, Battery Park, NY to the EHT.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 19:**

All DOCUMENTS evidencing the number of investors in Urban Commons Battery Park, LLC.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 20:**

All monthly bank statements for Urban Commons Battery Park, LLC's Wells Fargo Account No. 1386490534 from January 1, 2020 to the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 21:**

All monthly bank statements for any and all checking, savings, brokerage accounts held by Urban Commons Battery Park, LLC at Wells Fargo Bank from January 1, 2020 to the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 22:**

All documents evidencing the current balance for Urban Commons Battery Park, LLC's Wells Fargo Account No. 1386490534.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 23:**

All monthly bank statements for any checking, savings, or brokerage account formerly AND/OR currently held by Urban Commons Battery Park, LLC at any financial banking institution, foreign or domestic, from January 1, 2020 to the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 24:**

All DOCUMENTS evidencing YOUR corporate structure.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 25:**

All DOCUMENTS evidencing the corporate structure between YOU and URBAN COMMONS.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 26:**

All DOCUMENTS evidencing the corporate structure between YOU and EHT.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 27:**

All DOCUMENTS evidencing by name, title, address, telephone number the current officers of Urban Commons Battery Park, LLC.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 28:**

All DOCUMENTS evidencing by name, title, address, telephone number the current directors of Urban Commons Battery Park, LLC.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 29:**

All DOCUMENTS evidencing any and all assets YOU have disposed of through a sale or otherwise between October 1, 2019 and the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 30:**

All DOCUMENTS evidencing any and all assets YOU have transferred to any third party, including but not limited to any officers, directors, shareholders, AND/OR other corporate entities between October 1, 2019 and the present.

1  **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 31:**

2       All DOCUMENTS evidencing YOUR relationship with AND/OR to the security

3  exchanged on the Singapore Stock Exchange and identified as EAGLEHT SP.

EXHIBIT T

1  GARCIA RAINEY BLANK & BOWERBANK LLP
        A LIMITED LIABILITY PARTNERSHIP
2  NORMA V. GARCIA, Cal. Bar No. 223512
   ngarciaguillen@garciarainey.com
3  JEFFREY M. BLANK, Cal. Bar No. 217522
   jblank@garciarainey.com
4  HUGO A. LOPEZ, Cal. Bar No. 315846
   hlopez@garciarainey.com
5  695 Town Center Drive, Suite 700
6  Costa Mesa, CA 92626
   Telephone:   (714) 382-7000
7  Facsimile:   (714) 784-0031
8
9  Attorneys for Plaintiffs
   Clifford A. Rosen, MD and Ronald A. Christensen, MD.
10

11              UNITED STATES DISTRICT COURT

12             CENTRAL DISTRICT OF CALIFORNIA

13

| | |
|---|---|
| CLIFFORD A. ROSEN, an individual; RONALD A. CHRISTENSEN, an individual | **Case No.:** 8:20-cv-01973-JLS-DFM |
| Plaintiffs, | **PLAINTIFFS CLIFFORD A. ROSEN AND RONALD A. CHRISTENSEN'S NOTICE OF DEPOSITION OF DEFENDANT TAYLOR WOODS AND REQUEST FOR PRODUCTION OF DOCUMENTS** |
| vs. | |
| URBAN COMMONS, LLC, a Delaware Limited Liability Company; URBAN COMMONS 6TH AVE SEATTLE, LLC, a Delaware Limited Liability Company; URBAN COMMONS BATTERY PARK, LLC, a Delaware Limited Liability Company; CHICAGO ANALYTIC TRADING COMPANY, LLC, d/b/a LITTLERIVER CAPITAL, LLC, a Delaware Limited Liability Company; DIGITAL CAPITAL MARKETS, LLC, a Maryland Limited Liability Company; TAYLOR WOODS, an individual; HOWARD WU, an individual; C. BRIAN EGNATZ, an individual; and DOES 1 through 10, inclusive | Date:   Tuesday, May 4, 2021<br>Time:   9:00 a.m. PST<br>Place:  Virtual Deposition Coordinated<br>        By Veritext Legal Solutions<br>        707 Wilshire Blvd., Suite 3500<br>        Los Angeles, CA 90017 |
| Defendants | Complaint Filed: October 13, 2020 |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT,** pursuant to Rule 30 of the Federal Rules of Civil Procedure Plaintiffs Clifford A. Rosen and Ronald A. Christensen (collectively, "Plaintiffs") will take the virtual deposition of Defendant Taylor Woods ("Woods"). The virtual deposition will be coordinated by Veritext Legal Solutions, whose physical address is 707 Wilshire Boulevard, Suite 3500, Los Angeles, California 90017 and will take place on Tuesday, May 4, 2021 commencing at 9:00 a.m. PST.

**PLEASE TAKE FURTHER NOTICE** we reserve the right to conduct this deposition utilizing the secure web-based deposition option afforded by Veritext or in the alternative video conferencing (VTC) services or telephonically to provide remote/virtual access for those parties wishing to participate in the deposition via the internet and/or telephone. Also take notice that we reserve the right to record the deposition either by stenographic means by a court reporter certified to record depositions through the instant visual display of the testimony through a software program such as LiveNote Stream or a digital reporter utilizing state-of-the-art digital recording equipment. Both the court reporter and digital reporter are authorized to administer the oath and serve as the deposition officer in the State of California. Take note that the deposition officer may also be remote and out of the presence of the deponent via one of the options above for purposes of providing the oath/affirmation to the deponent and capturing the proceeding. We further reserve the right to utilize the following: (1) Record the deposition utilizing audio or video technology; (2) Instant visual display such that the reporter's writing of the proceeding will be available to all who are a party to this proceeding to request and receive it in real-time; (3) Exhibit Capture (picture-in-picture) technology in which any exhibit reviewed by the deponent during the deposition can be captured visually; and (4) To conduct this deposition utilizing a paperless exhibit display process called Exhibit Share or a similar paperless virtual display platform. The parties are advised that in lieu of a paper set of exhibits they may be provided and displayed digitally to the deposition officer,

deponent, parties and counsel. The exhibits will be compiled by the deposition officer for the purposes of exhibit stamping, and ultimate production of the final certified transcript.

DATED:  April 16, 2021

GARCIA RAINEY BLANK & BOWERBANK LLP

By _____

NORMA V. GARCIA
JEFFREY M. BLANK
HUGO A. LOPEZ
Attorneys for Plaintiffs Clifford A. Rosen, MD and Ronald Christensen, MD

## **INSTRUCTIONS AND DEFINITIONS**

1.     As used herein, the term "YOU," "YOUR," and "Defendant" means Defendant Taylor Woods and his employees, agents, representatives, attorneys, accountants, affiliates, and any other PERSON(S) acting or purporting to act on his behalf or at his direct.

2.     As used herein, the term "WU" means Defendant Howard Wu and his employees, agents, representatives, attorneys, accountants, affiliates, and any other PERSON(S) acting or purporting to act on his behalf or at his direct.

3.     As used herein, the term "UC BATTERY PARK" means Defendant Urban Commons Battery Park, LLC and any of its parents or subsidiaries, and any of its employees, agents, independent contractors, representatives, attorneys, accountants, affiliates and any other PERSON(S) acting or purporting to act on its behalf or at its direction.

4.     As used herein "URBAN COMMONS" means Defendant Urban Commons, LLC and any of its parents or subsidiaries, and any of its employees, agents, independent contractors, representatives, attorneys, accountants, affiliates and any other PERSON(S) acting or purporting to act on its behalf or at its direction.

5.     As used herein "UC SEATTLE" means Defendant Urban Commons 6th Ave Seattle, LLC and any of its parents or subsidiaries, and any of its employees, agents, independent contractors, representatives, attorneys, accountants, affiliates and any other PERSON(S) acting or purporting to act on its behalf or at its direction.

6.     As used herein "EGNATZ" means Defendant Brian Egnatz and his employees, agents, representatives, attorneys, accountants, affiliates, and any other PERSON(S) acting or purporting to act on his behalf or at his direct.

7.     As used herein "EHT" means Eagle Hospitality Trust, LLC and any of its parents or subsidiaries, and any of its employees, agents, independent contractors, representatives, attorneys, accountants, affiliates and any other PERSON(S) acting or purporting to act on its behalf or at its direction.

8.     As used herein, the term "TRUSTS" includes but is not limited to any and all individual trusts, family trusts, corporate trusts, and/or any other trust in which you hold an interest in.

9.     As used herein, the term "RELATING TO" means embodying, discussing, constituting evidence of, having a relationship to (in whole or in part) pertaining, referring to, reflecting, describing, or setting forth the subject matter to which reference is made.

10.     As used herein, the term "COMMUNICATIONS" shall mean all inquiries, discussions, conversations, negotiations, agreements, understandings, meetings, conferences, telephone conversations, interviews, cards, letters, notes, correspondence, telegrams, telexes, cables, or other forms of interpersonal discourse, whether oral or written, however transmitted, including reports, notes, memoranda, lists, agenda, and other reports of communication.

11.     As used herein, the terms "AND" and "OR" shall be construed either conjunctively or disjunctively as necessary to bring within the scope of these requests matters which might otherwise be construed to be the outside of their scope.  A singular form of a word shall also be construed to include the plural form in any instances where such construction would expand the scope of these requests.

12.     As used herein, the terms "DOCUMENT" and/or "DOCUMENTS" mean any and all documents, tangible things and property, of any kind, as defined by Fed. R. Civ. P. 34(a)(1), California , and all writings as defined by California Evidence Code Section 250, including the originals and non-identical copies, whether different from the originals by reason of any notation made on such copies or otherwise, and including, without limitation, communication, memoranda, notes, diaries, statistics, letters, telegrams, telex, telefax, minutes, contracts, reports, studies, checks, statements, receipts, returns, summaries, pamphlets, books, inter office and intra office communications, notations of any sort of conversations, telephone calls, meetings, or other communications, bulletins, computer printouts, invoices, worksheets, all forms of drafts, notations, workings, alterations, modifications, changes and amendments of any of the foregoing, graphical or aural records or representations of any kind, including, without limitation, emails, texts, photographs, charts, microfiche, microfilm, videotape, records, motion pictures, and electronic, mechanical, or electrical records or representations of any kind, including, without limitation, tapes, cassettes, discs, and recordings, computer discs, computer tapes, computer cards, computer programs, computer software, computer readable media, machine sensible media, electronically stored media, and any other form of stored information.

13.     With respect to any document(s) which YOU withhold under a claim of privilege or otherwise, please provide a statement setting forth as to each of the following documents:

(a) the name and address of the sender of the document;

(b) the name and address of the author of the document;

(c) the name and address of the person to whom the document was addressed;

(d) the name(s) and address(es) of the person(s) to whom a copy of the document was addressed;

(e) the name(s) and address(es) of all persons known to YOU who have seen the document or participated in communications about the document;

(f) the job title of each person listed in (a) through (e) above;

(g) the date of the document;

(h) the date upon which the document was received by those having possession of the document;

(i) a brief description of the nature and subject matter of the document; and, the statute, rule, division or other basis which has been claimed to give rise to the privilege.

14.    As used herein, the term "COMPUTER(S)" shall include, but is not limited to, microcomputers (also known as personal computers or desktops), laptop computers, portable computers, smartphones, personal digital assistants, Blackberrys, minicomputers, iPads, tablets, and mainframe computers.

15.    As used herein, the term "ELECTRONIC DATA" means all information stored in a digital format, including electronically stored information ("ESI"). ELECTRONIC DATA includes, but is not limited to, electronic mail messages and attachments, contacts, journal entries, calendar entries, word processing documents, spreadsheets, databases including all records and fields and structural information, charts, graphs, and any and all miscellaneous files responsive to the following requests.  The responding party is expected to search for any and all information stored on hard disks, floppy disks, CDs, DVDs, USB devices, Personal Digital Assistants (including, but not limited to, electronic tablets, iPads, iPhones, Palm Pilots, Blackberrys and Treos), and in any other vehicle for digital data storage and/or transmittal.  The term ELECTRONIC DATA also includes the file, folder tabs and/or containers and labels appended to, or associated with, any physical storage device associated with the information described above.

16.    As used herein, the term "ESI" means any information, including electronically stored information, on any COMPUTERS AND/OR operational systems including accounting, financial, distribution, or manufacturing systems; e-mail; Instant Messages (IM); web pages; text messages; cell phone data; Excel spreadsheets and underlying formulae; metadata; computer databases (i.e., Access); erased, fragmented or

damaged data; Blackberry data; and anything stored on COMPUTER or other electronic means located on or in, but not limited to cache memory; optical disks; magnetic tapes/back-up tapes; magnetic disks (hard drive, floppy disks, etc.); PDAs, Blackberries and Palm Pilots; cell phones; IM tools; or USB drives.

17.    "DELETED FILE(S)" means any ELECTRONIC DATA or ESI file that has been erased or deleted from the electronic media, COMPUTER, or DOCUMENT in which it resided.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

### REQUEST FOR PRODUCTION OF DOCUMENTS NO. 1:

All DOCUMENTS evidencing that the offering for Urban Commons Battery Park, LLC was completed on or before March 6, 2020.

### REQUEST FOR PRODUCTION OF DOCUMENTS NO. 2:

All DOCUMENTS evidencing the escrow account holding Plaintiff Ronald Christensen's investment funds in Urban Commons Battery Park, LLC.

### REQUEST FOR PRODUCTION OF DOCUMENTS NO. 3:

All DOCUMENTS evidencing if and how Plaintiff Ronald Christensen's investment funds have been used by or on behalf of Urban Commons Battery Park, LLC.

### REQUEST FOR PRODUCTION OF DOCUMENTS NO. 4:

All DOCUMENTS evidencing the property formerly known as The Ritz-Carlton New York, Battery Park, NY was acquired pursuant to the February 2020 subscription agreement.

### REQUEST FOR PRODUCTION OF DOCUMENTS NO. 5:

The deed of trust and all closing DOCUMENTS evidencing The Ritz-Carlton New York, Battery Park, NY was acquired pursuant to the February 2020 subscription agreement.

### REQUEST FOR PRODUCTION OF DOCUMENTS NO. 6:

All DOCUMENTS evidencing all bank accounts where Ronald Christensen's AND/OR Clifford Rosen's investment funds are currently held.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 7:**

All DOCUMENTS evidencing how YOU used the funds YOU received from Ronald Christensen and/or Clifford Rosen in connection with the offerings for Urban Commons 6th Ave Seattle, LLC AND/OR Urban Commons Battery Park, LLC in or about February 2020.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 8:**

All DOCUMENTS evidencing all investors in Urban Commons Battery Park, LLC.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 9:**

All COMMUNICATIONS RELATED TO Ronald Christensen AND/OR Clifford Rosen between December 1, 2019 and the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 10:**

All COMMUNICATIONS between YOU and any third party RELATED TO Ronald Christensen AND/OR Clifford Rosen between December 1, 2019 and the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 11:**

All COMMUNICATIONS between YOU and Ronald Christensen AND/OR Clifford Rosen between December 1, 2019 and the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 12:**

All offering materials YOU provided to Ronald Christensen AND/OR Clifford Rosen RELATED TO Urban Commons 6th Ave Seattle, LLC AND/OR Urban Commons Battery Park, LLC between December 1, 2019 and the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 13:**

All marketing materials YOU provided Ronald Christensen AND/OR Clifford

-9-

Rosen RELATED TO Urban Commons 6th Ave Seattle, LLC AND/OR Urban Commons Battery Park, LLC between December 1, 2019 and the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 14:**

All monthly bank statements for Urban Commons, LLC's Bank of America Account No. 4451390682 from January 1, 2020 to the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 15:**

All monthly bank statements any and all checking, savings, brokerage accounts held by Urban Commons, LLC at Bank of America, National Association from January 1, 2020 to the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 16:**

All monthly bank statements held by Urban Commons 6th Ave. Seattle, LLC at Bank of America, National Association from January 1, 2020 to the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 17:**

All documents evidencing the current balance for Urban Commons, LLC's Bank of America Account No. 4451390682.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 18:**

All monthly bank statements for Urban Commons Battery Park, LLC's Wells Fargo Account No. 1386490534 from January 1, 2020 to the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 19:**

All monthly bank statements for any and all checking, savings, brokerage accounts held by Urban Commons Battery Park, LLC at Wells Fargo Bank from January 1, 2020 to the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 20:**

All documents evidencing the current balance for Urban Commons Battery Park, LLC's Wells Fargo Account No. 1386490534.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 21:**

All DOCUMENTS evidencing that the offering for Urban Commons 6th Ave Seattle, LLC was completed on or before March 2020.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 22:**

All DOCUMENTS evidencing the escrow account holding Plaintiff Ronald Christensen's investment funds in Urban Commons 6th Ave Seattle, LLC.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 23:**

All DOCUMENTS evidencing the escrow account holding Plaintiff Clifford Rosen's investment funds in Urban Commons 6th Ave Seattle, LLC.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 24:**

All DOCUMENTS evidencing the real property known as the Hilton Seattle, located at 1301 6th Avenue, Seattle, Washington was acquired by Urban Commons 6th Ave Seattle, LLC.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 25:**

The deed of trust and all closing DOCUMENTS evidencing the real property known as the Hilton Seattle, located at 1301 6th Avenue, Seattle, Washington was acquired by Urban Commons 6th Ave Seattle, LLC.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 26:**

All DOCUMENTS evidencing all investors in Urban Commons 6th Ave Seattle,

1 LLC.

2

3 **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 27:**

4 All COMMUNICATIONS between YOU and EGNATZ RELATED TO Plaintiffs

5 Clifford Rosen AND/OR Ronald Christensen from January 1, 2020 to the present.

6

7 **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 28:**

8 All COMMUNICATIONS BETWEEN YOU and EGNATZ RELATED TO the

9 offerings for Urban Commons 6th Ave Seattle, LLC AND/OR Urban Commons Battery

10 Park, LLC from January 1, 2020 to the present.

11

12 **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 29:**

13 All COMMUNICATIONS between YOU and EHT RELATED TO Plaintiffs

14 Clifford Rosen AND/OR Ronald Christensen from January 1, 2020 to the present.

15

16 **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 30:**

17 All COMMUNICATIONS BETWEEN YOU and EHT RELATED TO the

18 offerings for Urban Commons 6th Ave Seattle, LLC AND/OR Urban Commons Battery

19 Park, LLC from January 1, 2020 to the present.

20

21 **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 31:**

22 All COMMUNICATIONS BETWEEN YOU and EHT RELATED TO EHT

23 purchasing and/or acquiring the real property known as the Hilton Seattle, located at 1301

24 6th Avenue, Seattle, Washington from Urban Commons 6th Ave Seattle, LLC from January

25 1, 2020 to the present.

26

27 **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 32:**

28 All COMMUNICATIONS BETWEEN YOU and EHT RELATED TO EHT

purchasing and/or acquiring the property formerly known as The Ritz-Carlton New York, Battery Park, NY from Urban Commons Battery Park, LLC from January 1, 2020 to the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 33:**

All DOCUMENTS evidencing all bank accounts, investment accounts, AND/OR brokerage accounts held by YOU AND/OR on YOUR behalf from January 1, 2020 to the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 34:**

All DOCUMENTS evidencing all real property held by YOU AND/OR on YOUR behalf, in whole or in part, from January 1, 2020 to the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 35:**

All DOCUMENTS evidencing all real property in which YOU AND/OR YOUR spouse AND/OR YOUR personal AND/OR family trust has held an interest in from October 1, 2019 to the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 36:**

All DOCUMENTS evidencing any and all off-shore financial institution accounts YOU AND/OR YOUR spouse AND/OR YOUR personal AND/OR family trust has held an interest in from October 1, 2019 to the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 37:**

All DOCUMENTS evidencing any and all off-shore real property in which YOU AND/OR YOUR spouse AND/OR YOUR personal AND/OR family trust has held an interest in from October 1, 2019 to the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 38:**

All DOCUMENTS evidencing any and all TRUSTS in which YOU are a trustee.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 39:**

All DOCUMENTS evidencing any and all TRUSTS in which YOU are a beneficiary.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 40:**

All DOCUMENTS evidencing any and all TRUSTS in which YOU are a trustor.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 41:**

All DOCUMENTS evidencing any and all assets YOU have disposed of through a sale or otherwise between October 1, 2019 and the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 42:**

All DOCUMENTS evidencing any and all assets YOU have transferred to YOUR spouse between October 1, 2019 and the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 43:**

All DOCUMENTS evidencing any and all assets YOU have transferred to any third party, including but not limited to children, family members, trusts, or corporate entities, between October 1, 2019 and the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 44:**

All DOCUMENTS identified in response to Plaintiffs' Special Interrogatories, Set One.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 45:**

All DOCUMENTS evidencing the assets held in the Shiryuda Trust from October

1   1, 2019 to the present.

2

3   **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 46:**

4        All DOCUMENTS evidencing the trustors for the Shiryuda Trust.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT U

GARCIA RAINEY BLANK & BOWERBANK LLP
   A LIMITED LIABILITY PARTNERSHIP
NORMA V. GARCIA, Cal. Bar No. 223512
ngarciaguillen@garciarainey.com
JEFFREY M. BLANK, Cal. Bar No. 217522
jblank@garciarainey.com
HUGO A. LOPEZ, Cal. Bar No. 315846
hlopez@garciarainey.com
695 Town Center Drive, Suite 700
Costa Mesa, CA 92626
Telephone:    (714) 382-7000
Facsimile:    (714) 784-0031

Attorneys for Plaintiffs
Clifford A. Rosen, MD and Ronald A. Christensen, MD.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLIFFORD A. ROSEN, an individual; RONALD A. CHRISTENSEN, an individual<br><br>Plaintiffs,<br><br>vs.<br><br>URBAN COMMONS, LLC, a Delaware Limited Liability Company; URBAN COMMONS 6TH AVE SEATTLE, LLC, a Delaware Limited Liability Company; URBAN COMMONS BATTERY PARK, LLC, a Delaware Limited Liability Company; CHICAGO ANALYTIC TRADING COMPANY, LLC, d/b/a LITTLERIVER CAPITAL, LLC, a Delaware Limited Liability Company; DIGITAL CAPITAL MARKETS, LLC, a Maryland Limited Liability Company; TAYLOR WOODS, an individual; HOWARD WU, an individual; C. BRIAN EGNATZ, an individual; and DOES 1 through 10, inclusive<br><br>Defendants | **Case No.:** 8:20-cv-01973-JLS-DFM<br><br>**PLAINTIFFS CLIFFORD A. ROSEN AND RONALD A. CHRISTENSEN'S NOTICE OF DEPOSITION OF DEFENDANT TAYLOR WOODS AND REQUEST FOR PRODUCTION OF DOCUMENTS**<br><br>Date:    Monday, May 3, 2021<br>Time:    9:00 a.m. PST<br>Place:   Virtual Deposition Coordinated<br>          By Veritext Legal Solutions<br>          707 Wilshire Blvd., Suite 3500<br>          Los Angeles, CA 90017<br><br>Complaint Filed: October 13, 2020 |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT,** pursuant to Rule 30 of the Federal Rules of Civil Procedure Plaintiffs Clifford A. Rosen and Ronald A. Christensen (collectively, "Plaintiffs") will take the virtual deposition of Defendant Howard Wu ("Wu"). The virtual deposition will be coordinated by Veritext Legal Solutions, whose physical address is 707 Wilshire Boulevard, Suite 3500, Los Angeles, California 90017 and will take place on Monday, May 3, 2021 commencing at 9:00 a.m. PST.

**PLEASE TAKE FURTHER NOTICE** we reserve the right to conduct this deposition utilizing the secure web-based deposition option afforded by Veritext or in the alternative video conferencing (VTC) services or telephonically to provide remote/virtual access for those parties wishing to participate in the deposition via the internet and/or telephone. Also take notice that we reserve the right to record the deposition either by stenographic means by a court reporter certified to record depositions through the instant visual display of the testimony through a software program such as LiveNote Stream or a digital reporter utilizing state-of-the-art digital recording equipment. Both the court reporter and digital reporter are authorized to administer the oath and serve as the deposition officer in the State of California. Take note that the deposition officer may also be remote and out of the presence of the deponent via one of the options above for purposes of providing the oath/affirmation to the deponent and capturing the proceeding. We further reserve the right to utilize the following: (1) Record the deposition utilizing audio or video technology; (2) Instant visual display such that the reporter's writing of the proceeding will be available to all who are a party to this proceeding to request and receive it in real-time; (3) Exhibit Capture (picture-in-picture) technology in which any exhibit reviewed by the deponent during the deposition can be captured visually; and (4) To conduct this deposition utilizing a paperless exhibit display process called Exhibit Share or a similar paperless virtual display platform. The parties are advised that in lieu of a paper set of exhibits they may be provided and displayed digitally to the deposition officer,

-1-
NOTICE OF DEPOSITION OF DEFENDANT HOWARD WU

1    deponent, parties and counsel. The exhibits will be compiled by the deposition officer for

2    the purposes of exhibit stamping, and ultimate production of the final certified transcript.

3

4    DATED:  April 16, 2021

5                                    GARCIA RAINEY BLANK & BOWERBANK LLP

6

7

8                    By    _____
                                      NORMA V. GARCIA
9                                      JEFFREY M. BLANK
                                        HUGO A. LOPEZ
10              Attorneys for Plaintiffs Clifford A. Rosen, MD and
                              Ronald Christensen, MD
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **INSTRUCTIONS AND DEFINITIONS**

1.       As used herein, the term "YOU," "YOUR," and "Defendant" means Defendant Howard Wu and his employees, agents, representatives, attorneys, accountants, affiliates, and any other PERSON(S) acting or purporting to act on his behalf or at his direct.

2.       As used herein, the term "WOODS" means Defendant Taylor Woods and his employees, agents, representatives, attorneys, accountants, affiliates, and any other PERSON(S) acting or purporting to act on his behalf or at his direct.

3.       As used herein, the term "UC BATTERY PARK" means Defendant Urban Commons Battery Park, LLC and any of its parents or subsidiaries, and any of its employees, agents, independent contractors, representatives, attorneys, accountants, affiliates and any other PERSON(S) acting or purporting to act on its behalf or at its direction.

4.       As used herein "URBAN COMMONS" means Defendant Urban Commons, LLC and any of its parents or subsidiaries, and any of its employees, agents, independent contractors, representatives, attorneys, accountants, affiliates and any other PERSON(S) acting or purporting to act on its behalf or at its direction.

5.       As used herein "UC SEATTLE" means Defendant Urban Commons 6th Ave Seattle, LLC and any of its parents or subsidiaries, and any of its employees, agents, independent contractors, representatives, attorneys, accountants, affiliates and any other PERSON(S) acting or purporting to act on its behalf or at its direction.

6.       As used herein "EGNATZ" means Defendant Brian Egnatz and his employees, agents, representatives, attorneys, accountants, affiliates, and any other PERSON(S) acting or purporting to act on his behalf or at his direct.

7.       As used herein "EHT" means Eagle Hospitality Trust, LLC and any of its parents or subsidiaries, and any of its employees, agents, independent contractors, representatives, attorneys, accountants, affiliates and any other PERSON(S) acting or purporting to act on its behalf or at its direction.

8.      As used herein, the term "TRUSTS" includes but is not limited to any and all individual trusts, family trusts, corporate trusts, and/or any other trust in which you hold an interest in.

9.      As used herein, the term "RELATING TO" means embodying, discussing, constituting evidence of, having a relationship to (in whole or in part) pertaining, referring to, reflecting, describing, or setting forth the subject matter to which reference is made.

10.     As used herein, the term "COMMUNICATIONS" shall mean all inquiries, discussions, conversations, negotiations, agreements, understandings, meetings, conferences, telephone conversations, interviews, cards, letters, notes, correspondence, telegrams, telexes, cables, or other forms of interpersonal discourse, whether oral or written, however transmitted, including reports, notes, memoranda, lists, agenda, and other reports of communication.

11.     As used herein, the terms "AND" and "OR" shall be construed either conjunctively or disjunctively as necessary to bring within the scope of these requests matters which might otherwise be construed to be the outside of their scope.  A singular form of a word shall also be construed to include the plural form in any instances where such construction would expand the scope of these requests.

12.     As used herein, the terms "DOCUMENT" and/or "DOCUMENTS" mean any and all documents, tangible things and property, of any kind, as defined by Fed. R. Civ. P. 34(a)(1), California , and all writings as defined by California Evidence Code Section 250, including the originals and non-identical copies, whether different from the originals by reason of any notation made on such copies or otherwise, and including, without limitation, communication, memoranda, notes, diaries, statistics, letters, telegrams, telex, telefax, minutes, contracts, reports, studies, checks, statements, receipts, returns, summaries, pamphlets, books, inter office and intra office communications, notations of any sort of conversations, telephone calls, meetings, or other communications, bulletins, computer printouts, invoices, worksheets, all forms of drafts, notations, workings, alterations, modifications, changes and amendments of any of the foregoing, graphical or aural records or representations of any kind, including, without limitation, emails, texts, photographs, charts, microfiche, microfilm, videotape, records, motion pictures, and electronic, mechanical, or electrical records or representations of any kind, including, without limitation, tapes, cassettes, discs, and recordings, computer discs, computer tapes, computer cards, computer programs, computer software, computer readable media, machine sensible media, electronically stored media, and any other form of stored information.

13.     With respect to any document(s) which YOU withhold under a claim of privilege or otherwise, please provide a statement setting forth as to each of the following documents:

(a) the name and address of the sender of the document;

(b) the name and address of the author of the document;

(c) the name and address of the person to whom the document was addressed;

(d) the name(s) and address(es) of the person(s) to whom a copy of the document was addressed;

(e) the name(s) and address(es) of all persons known to YOU who have seen the document or participated in communications about the document;

(f) the job title of each person listed in (a) through (e) above;

(g) the date of the document;

(h) the date upon which the document was received by those having possession of the document;

(i) a brief description of the nature and subject matter of the document; and, the statute, rule, division or other basis which has been claimed to give rise to the privilege.

14.     As used herein, the term "COMPUTER(S)" shall include, but is not limited to, microcomputers (also known as personal computers or desktops), laptop computers, portable computers, smartphones, personal digital assistants, Blackberrys, minicomputers, iPads, tablets, and mainframe computers.

15.     As used herein, the term "ELECTRONIC DATA" means all information stored in a digital format, including electronically stored information ("ESI"). ELECTRONIC DATA includes, but is not limited to, electronic mail messages and attachments, contacts, journal entries, calendar entries, word processing documents, spreadsheets, databases including all records and fields and structural information, charts, graphs, and any and all miscellaneous files responsive to the following requests.  The responding party is expected to search for any and all information stored on hard disks, floppy disks, CDs, DVDs, USB devices, Personal Digital Assistants (including, but not limited to, electronic tablets, iPads, iPhones, Palm Pilots, Blackberrys and Treos), and in any other vehicle for digital data storage and/or transmittal.  The term ELECTRONIC DATA also includes the file, folder tabs and/or containers and labels appended to, or associated with, any physical storage device associated with the information described above.

16.     As used herein, the term "ESI" means any information, including electronically stored information, on any COMPUTERS AND/OR operational systems including accounting, financial, distribution, or manufacturing systems; e-mail; Instant Messages (IM); web pages; text messages; cell phone data; Excel spreadsheets and underlying formulae; metadata; computer databases (i.e., Access); erased, fragmented or

damaged data; Blackberry data; and anything stored on COMPUTER or other electronic means located on or in, but not limited to cache memory; optical disks; magnetic tapes/back-up tapes; magnetic disks (hard drive, floppy disks, etc.); PDAs, Blackberries and Palm Pilots; cell phones; IM tools; or USB drives.

17. "DELETED FILE(S)" means any ELECTRONIC DATA or ESI file that has been erased or deleted from the electronic media, COMPUTER, or DOCUMENT in which it resided.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 1:**

All DOCUMENTS evidencing that the offering for Urban Commons Battery Park, LLC was completed on or before March 6, 2020.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 2:**

All DOCUMENTS evidencing the escrow account holding Plaintiff Ronald Christensen's investment funds in Urban Commons Battery Park, LLC.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 3:**

All DOCUMENTS evidencing if and how Plaintiff Ronald Christensen's investment funds have been used by or on behalf of Urban Commons Battery Park, LLC.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 4:**

All DOCUMENTS evidencing the property formerly known as The Ritz-Carlton New York, Battery Park, NY was acquired pursuant to the February 2020 subscription agreement.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 5:**

The deed of trust and all closing DOCUMENTS evidencing The Ritz-Carlton New York, Battery Park, NY was acquired pursuant to the February 2020 subscription agreement.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 6:**

All DOCUMENTS evidencing all bank accounts where Ronald Christensen's and/or Clifford Rosen's investment funds are currently held.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 7:**

All DOCUMENTS evidencing how YOU used the funds YOU received from Ronald Christensen and/or Clifford Rosen in connection with the offerings for Urban Commons 6th Ave Seattle, LLC AND/OR Urban Commons Battery Park, LLC in or about February 2020.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 8:**

All DOCUMENTS evidencing all investors in Urban Commons Battery Park, LLC.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 9:**

All COMMUNICATIONS RELATED TO Ronald Christensen AND/OR Clifford Rosen between December 1, 2019 and the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 10:**

All COMMUNICATIONS between YOU and any third party RELATED TO Ronald Christensen AND/OR Clifford Rosen between December 1, 2019 and the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 11:**

All COMMUNICATIONS between YOU and Ronald Christensen AND/OR Clifford Rosen between December 1, 2019 and the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 12:**

All offering materials YOU provided to Ronald Christensen AND/OR Clifford Rosen RELATED TO Urban Commons 6th Ave Seattle, LLC AND/OR Urban Commons Battery Park, LLC between December 1, 2019 and the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 13:**

All marketing materials YOU provided Ronald Christensen AND/OR Clifford

Rosen RELATED TO Urban Commons 6th Ave Seattle, LLC AND/OR Urban Commons Battery Park, LLC between December 1, 2019 and the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 14:**

All monthly bank statements for Urban Commons, LLC's Bank of America Account No. 4451390682 from December 1, 2019 to the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 15:**

All monthly bank statements any and all checking, savings, brokerage accounts held by Urban Commons, LLC at Bank of America, National Association from December 1, 2019 to the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 16:**

All monthly bank statements held by Urban Commons 6th Ave. Seattle, LLC at Bank of America, National Association from December 1, 2019 to the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 17:**

All documents evidencing the current balance for Urban Commons, LLC's Bank of America Account No. 4451390682.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 18:**

All monthly bank statements for Urban Commons Battery Park, LLC's Wells Fargo Account No. 1386490534 from January 1, 2020 to the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 19:**

All monthly bank statements for any and all checking, savings, brokerage accounts held by Urban Commons Battery Park, LLC at Wells Fargo Bank from January 1, 2020 to the present.

NOTICE OF DEPOSITION OF DEFENDANT HOWARD WU

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 20:**

All documents evidencing the current balance for Urban Commons Battery Park, LLC's Wells Fargo Account No. 1386490534.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 21:**

All DOCUMENTS evidencing that the offering for Urban Commons 6th Ave Seattle, LLC was completed on or before March 2020.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 22:**

All DOCUMENTS evidencing the escrow account holding Plaintiff Ronald Christensen's investment funds in Urban Commons 6th Ave Seattle, LLC.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 23:**

All DOCUMENTS evidencing the escrow account holding Plaintiff Clifford Rosen's investment funds in Urban Commons 6th Ave Seattle, LLC.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 24:**

All DOCUMENTS evidencing the real property known as the Hilton Seattle, located at 1301 6th Avenue, Seattle, Washington was acquired by Urban Commons 6th Ave Seattle, LLC.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 25:**

The deed of trust and all closing DOCUMENTS evidencing the real property known as the Hilton Seattle, located at 1301 6th Avenue, Seattle, Washington was acquired by Urban Commons 6th Ave Seattle, LLC.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 26:**

All DOCUMENTS evidencing all investors in Urban Commons 6th Ave Seattle,

1  LLC.

2

3  **<u>REQUEST FOR PRODUCTION OF DOCUMENTS NO. 27:</u>**

4      All COMMUNICATIONS between YOU and EGNATZ RELATED TO Plaintiffs

5  Clifford Rosen AND/OR Ronald Christensen from January 1, 2020 to the present.

6

7  **<u>REQUEST FOR PRODUCTION OF DOCUMENTS NO. 28:</u>**

8      All COMMUNICATIONS BETWEEN YOU and EGNATZ RELATED TO the

9  offerings for Urban Commons 6th Ave Seattle, LLC AND/OR Urban Commons Battery

10 Park, LLC from January 1, 2020 to the present.

11

12 **<u>REQUEST FOR PRODUCTION OF DOCUMENTS NO. 29:</u>**

13     All COMMUNICATIONS between YOU and EHT RELATED TO Plaintiffs

14 Clifford Rosen AND/OR Ronald Christensen from January 1, 2020 to the present.

15

16 **<u>REQUEST FOR PRODUCTION OF DOCUMENTS NO. 30:</u>**

17     All COMMUNICATIONS BETWEEN YOU and EHT RELATED TO the

18 offerings for Urban Commons 6th Ave Seattle, LLC AND/OR Urban Commons Battery

19 Park, LLC from January 1, 2020 to the present.

20

21 **<u>REQUEST FOR PRODUCTION OF DOCUMENTS NO. 31:</u>**

22     All COMMUNICATIONS BETWEEN YOU and EHT RELATED TO EHT

23 purchasing and/or acquiring the real property known as the Hilton Seattle, located at 1301

24 6th Avenue, Seattle, Washington from Urban Commons 6th Ave Seattle, LLC from January

25 1, 2020 to the present.

26

27 **<u>REQUEST FOR PRODUCTION OF DOCUMENTS NO. 32:</u>**

28     All COMMUNICATIONS BETWEEN YOU and EHT RELATED TO EHT

purchasing and/or acquiring the property formerly known as The Ritz-Carlton New York, Battery Park, NY from Urban Commons Battery Park, LLC from January 1, 2019 to the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 33:**

All DOCUMENTS evidencing all bank accounts, investment accounts, AND/OR brokerage accounts held by YOU AND/OR on YOUR behalf from January 1, 2020 to the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 34:**

All DOCUMENTS evidencing all real property held by YOU AND/OR on YOUR behalf, in whole or in part, from January 1, 2020 to the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 35:**

All DOCUMENTS evidencing all real property in which YOU AND/OR YOUR spouse AND/OR YOUR personal AND/OR family trust has held an interest in from October 1, 2019 to the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 36:**

All DOCUMENTS evidencing any and all off-shore financial institution accounts YOU AND/OR YOUR spouse AND/OR YOUR personal AND/OR family trust has held an interest in from October 1, 2019 to the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 37:**

All DOCUMENTS evidencing any and all off-shore real property in which YOU AND/OR YOUR spouse AND/OR YOUR personal AND/OR family trust has held an interest in from October 1, 2019 to the present.

NOTICE OF DEPOSITION OF DEFENDANT HOWARD WU

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 38:**

All DOCUMENTS evidencing any and all TRUSTS in which YOU are a trustee.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 39:**

All DOCUMENTS evidencing any and all TRUSTS in which YOU are a beneficiary.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 40:**

All DOCUMENTS evidencing any and all TRUSTS in which YOU are a trustor.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 41:**

All DOCUMENTS evidencing any and all assets YOU have disposed of through a sale or otherwise between October 1, 2019 and the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 42:**

All DOCUMENTS evidencing any and all assets YOU have transferred to YOUR spouse between October 1, 2019 and the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 43:**

All DOCUMENTS evidencing any and all assets YOU have transferred to any third party, including but not limited to children, family members, trusts, or corporate entities, between October 1, 2019 and the present.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 44:**

All DOCUMENTS identified in response to Plaintiffs' Special Interrogatories, Set One.

# EXHIBIT V

GARCIA RAINEY BLANK & BOWERBANK LLP
    A LIMITED LIABILITY PARTNERSHIP
NORMA V. GARCIA, Cal. Bar No. 223512
ngarciaguillen@garciarainey.com
JEFFREY M. BLANK, Cal. Bar No. 217522
jblank@garciarainey.com
HUGO A. LOPEZ, Cal. Bar No. 315846
hlopez@garciarainey.com
695 Town Center Drive, Suite 700
Costa Mesa, CA 92626
Telephone:    (714) 382-7000
Facsimile:    (714) 784-0031
Attorneys for Plaintiffs
Clifford A. Rosen, MD and Ronald A. Christensen, MD.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLIFFORD A. ROSEN, an individual; RONALD A. CHRISTENSEN, an individual<br><br>Plaintiffs,<br><br>vs.<br><br>URBAN COMMONS, LLC, a Delaware Limited Liability Company; URBAN COMMONS 6TH AVE SEATTLE, LLC,  a Delaware Limited Liability Company; URBAN COMMONS BATTERY PARK, LLC, a Delaware Limited Liability Company; CHICAGO ANALYTIC TRADING COMPANY, LLC, d/b/a LITTLERIVER CAPITAL,LLC, a Delaware Limited Liability Company; DIGITAL CAPITAL MARKETS, LLC, a Maryland Limited Liability Company; TAYLOR WOODS, an individual; HOWARD WU, an individual; C. BRIAN EGNATZ, an individual; and DOES 1 through 10, inclusive<br><br>Defendants | **Case No. 8:20-cv-01973 JLS (DFMx)**<br><br>**PLAINTIFFS CLIFFORD A. ROSEN AND RONALD A. CHRISTENSEN'S SPECIAL INTERROGATORIES, SET ONE TO DEFENDANT URBAN COMMONS, LLC** |

PROPOUNDING PARTY:      PLAINTIFFS CLIFFORD A. ROSEN AND

                        RONALD A. CHRISTENSEN

RESPONDING PARTY:       DEFENDANT URBAN COMMONS, LLC

SET NO.:                ONE

- 1 -

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Plaintiffs Clifford A. Rosen and Ronald A. Christensen hereby request that Defendant Urban Commons, LLC respond to the following interrogatories within 30 days of service of this request in accordance with the requirements and procedures set forth in the Federal Rules of Civil Procedure.

## **INSTRUCTIONS AND DEFINITIONS**

1.      As used herein, the term "YOU," "YOUR," and "Defendant" means Defendant URBAN COMMONS, LLC and any of its parents or subsidiaries, and any of its employees, agents, independent contractors, representatives, attorneys, accountants, affiliates and any other PERSON(S) acting or purporting to act on its behalf or at its direction.

2.      As used herein, the term "WOODS" means Defendant Taylor Woods and his employees, agents, representatives, attorneys, accountants, affiliates, and any other PERSON(S) acting or purporting to act on his behalf or at his direct.

3.      As used herein, the term "WU" means Defendant Howard Wu and his employees, agents, representatives, attorneys, accountants, affiliates, and any other PERSON(S) acting or purporting to act on his behalf or at his direct.

4.      As used herein, the term "UC BATTERY PARK" means Defendant Urban Commons Battery Park, LLC and any of its parents or subsidiaries, and any of its employees, agents, independent contractors, representatives, attorneys, accountants, affiliates and any other PERSON(S) acting or purporting to act on its behalf or at its direction.

5.      As used herein "UC SEATTLE" means Defendant Urban Commons 6th Ave Seattle, LLC and any of its parents or subsidiaries, and any of its employees, agents, independent contractors, representatives, attorneys, accountants, affiliates and any other PERSON(S) acting or purporting to act on its behalf or at its direction.

6.     As used herein "EGNATZ" means Defendant Brian Egnatz and his employees, agents, representatives, attorneys, accountants, affiliates, and any other PERSON(S) acting or purporting to act on his behalf or at his direct.

7.     As used herein "EHT" means Eagle Hospitality Trust, LLC and any of its parents or subsidiaries, and any of its employees, agents, independent contractors, representatives, attorneys, accountants, affiliates and any other PERSON(S) acting or purporting to act on its behalf or at its direction.

8.     As used herein, the term "RELATING TO" means embodying, discussing, constituting evidence of, having a relationship to (in whole or in part) pertaining, referring to, reflecting, describing, or setting forth the subject matter to which reference is made.

9.     As used herein, the term "COMMUNICATIONS" shall mean all inquiries, discussions, conversations, negotiations, agreements, understandings, meetings, conferences, telephone conversations, interviews, cards, letters, notes, correspondence, telegrams, telexes, cables, or other forms of interpersonal discourse, whether oral or written, however transmitted, including reports, notes, memoranda, lists, agenda, and other reports of communication.

10.     As used herein, the terms "AND" and "OR" shall be construed either conjunctively or disjunctively as necessary to bring within the scope of these requests matters which might otherwise be construed to be the outside of their scope.  A singular form of a word shall also be construed to include the plural form in any instances where such construction would expand the scope of these requests.

11.     "IDENTIFY" when used with respect to a natural PERSON, means to state the PERSON'S full name, present or last known business affiliation and position, past and present home address and past position and business affiliation, if any, with any of the parties herein.

12.     "IDENTIFY" when used with respect to a company or other business entity, means to state the company's legal name, the names under which it does business, its form (e.g., partnership, corporation, etc.), the address of its principal place of business,

- 3 -

and to IDENTIFY its principal proprietors, officers and/or directors.

13.    "IDENTIFY" when used with respect to a DOCUMENT, means to state the DATE(S) prepared, drafted or generated, the author(s), intended and actual recipient(s), type of DOCUMENT (e.g., "letter," "Terms of Service" or "email"), and to IDENTIFY its last known custodian or location.

14.    "IDENTIFY" when used in reference to an event, transaction, or occurrence, means to DESCRIBE the act in complete and reasonable detail; state the time, DATE, location; IDENTIFY all PERSONS participating or present; and IDENTIFY all DOCUMENTS RELATING thereto.

15.    "IDENTIFY" when used with respect to a COMMUNICATION, means to state type of COMMUNICATION (i.e., telephone discussion, email, face-to-face, etc.), the name and present address of each PERSON present during the COMMUNICATION, or who otherwise observed or heard the COMMUNICATION and to state the subject matter of the COMMUNICATION and the DATE upon which it occurred. If the COMMUNICATION was in writing, IDENTIFY all DOCUMENTS that RELATE or are RELATING TO the COMMUNICATION in the manner provided above.

16.    "INCLUDING" means "including, but not limited to;" "INCLUDES" means "includes, but not limited to."

17.    As used herein, the terms "DOCUMENT" and/or "DOCUMENTS" mean any and all documents, tangible things and property, of any kind, as defined by Fed. R. Civ. P. 34(a)(1), California , and all writings as defined by California Evidence Code Section 250, including the originals and non-identical copies, whether different from the originals by reason of any notation made on such copies or otherwise, and including, without limitation, communication, memoranda, notes, diaries, statistics, letters, telegrams, telex, telefax, minutes, contracts, reports, studies, checks, statements, receipts, returns, summaries, pamphlets, books, inter office and intra office communications, notations of any sort of conversations, telephone calls, meetings, or other

PLAINTIFFS' SPECIAL INTERROGATORIES TO DEFENDANT URBAN COMMONS, LLC

communications, bulletins, computer printouts, invoices, worksheets, all forms of drafts, notations, workings, alterations, modifications, changes and amendments of any of the foregoing, graphical or aural records or representations of any kind, including, without limitation, emails, texts, photographs, charts, microfiche, microfilm, videotape, records, motion pictures, and electronic, mechanical, or electrical records or representations of any kind, including, without limitation, tapes, cassettes, discs, and recordings, computer discs, computer tapes, computer cards, computer programs, computer software, computer readable media, machine sensible media, electronically stored media, and any other form of stored information.

18.    With respect to any document(s) which YOU withhold under a claim of privilege or otherwise, please provide a statement setting forth as to each of the following documents:

(a) the name and address of the sender of the document;

(b) the name and address of the author of the document;

(c) the name and address of the person to whom the document was addressed;

(d) the name(s) and address(es) of the person(s) to whom a copy of the document was addressed;

(e) the name(s) and address(es) of all persons known to YOU who have seen the document or participated in communications about the document;

(f) the job title of each person listed in (a) through (e) above;

(g) the date of the document;

(h) the date upon which the document was received by those having possession of the document;

(i) a brief description of the nature and subject matter of the document; and, the statute, rule, division or other basis which has been claimed to give rise to the privilege.

## SPECIAL INTERROGATORIES, SET ONE

**SPECIAL INTERROGATORY NO. 1:**

IDENTIFY all bank accounts held by YOU from January 1, 2020 to the present.

**SPECIAL INTERROGATORY NO. 2:**

IDENTIFY all brokerage accounts held by YOU from January 1, 2020 to the present.

**SPECIAL INTERROGATORY NO. 3:**

IDENTIFY all investment accounts held by YOU from January 1, 2020 to the present.

**SPECIAL INTERROGATORY NO. 4:**

IDENTIFY the date upon which the offering of membership interest in Urban Commons 6th Ave Seattle, LLC was completed.

**SPECIAL INTERROGATORY NO. 5:**

IDENTIFY the date upon which Urban Commons 6th Ave Seattle, LLC acquired the real property known as the Hilton Seattle, located at 1301 6th Avenue, Seattle, Washington.

**SPECIAL INTERROGATORY NO. 6:**

State the price at which Urban Commons 6th Ave Seattle, LLC acquired the real property known as the Hilton Seattle, located at 1301 6th Avenue, Seattle, Washington.

PLAINTIFFS' SPECIAL INTERROGATORIES TO DEFENDANT URBAN COMMONS, LLC

**SPECIAL INTERROGATORY NO. 7:**

IDENTIFY the number of investors (by first and last name, last known address and telephone number, and last known email address) in Urban Commons 6th Ave Seattle, LLC.

**SPECIAL INTERROGATORY NO. 8:**

IDENTIFY the date upon which the real property known as the Hilton Seattle, located at 1301 6th Avenue, Seattle, Washington was sold to Eagle Hospitality Trust.

**SPECIAL INTERROGATORY NO. 9:**

IDENTIFY the escrow account holding Plaintiff Ronald Christensen's investment funds in Urban Commons 6th Ave Seattle, LLC.

**SPECIAL INTERROGATORY NO. 10:**

IDENTIFY the the escrow account holding Plaintiff Clifford Rosen's investment funds in Urban Commons 6th Ave Seattle, LLC.

**SPECIAL INTERROGATORY NO. 11:**

IDENTIFY all bank accounts where Plaintiff Ronald Christensen's investment funds are currently held.

**SPECIAL INTERROGATORY NO. 12:**

IDENTIFY all bank accounts where Plaintiff Clifford Rosen's investment funds are currently held.

**SPECIAL INTERROGATORY NO. 13:**

IDENTIFY all bank accounts held by Urban Commons 6th Ave Seattle, LLC from January 1, 2020 to the present.

**SPECIAL INTERROGATORY NO. 14:**

IDENTIFY all bank accounts held by Urban Commons Battery Park, LLC from January 1, 2020 to the present.

**SPECIAL INTERROGATORY NO. 15:**

IDENTIFY all brokerage accounts held by Urban Commons 6th Ave Seattle, LLC from January 1, 2020 to the present.

**SPECIAL INTERROGATORY NO. 16:**

IDENTIFY all investment accounts held by Urban Commons 6th Ave Seattle, LLC from January 1, 2020 to the present.

**SPECIAL INTERROGATORY NO. 17:**

IDENTIFY all brokerage accounts held by Urban Commons Battery Park, LLC from January 1, 2020 to the present.

**SPECIAL INTERROGATORY NO. 18:**

IDENTIFY all investment accounts held by Urban Commons Battery Park, LLC from January 1, 2020 to the present.

**SPECIAL INTERROGATORY NO. 19:**

IDENTIFY the date upon which the offering of membership interest in Urban Commons Battery Park, LLC was completed.

**SPECIAL INTERROGATORY NO. 20:**

IDENTIFY the date upon which Urban Commons Battery Park, LLC acquired the real property formerly known as The Ritz-Carlton New York, Battery Park, NY.

- 8 -

**SPECIAL INTERROGATORY NO. 21:**

State the price at which Urban Commons Battery Park, LLC acquired the real formerly known as The Ritz-Carlton New York, Battery Park, NY.

**SPECIAL INTERROGATORY NO. 22:**

IDENTIFY the number of investors (by first and last name, last known address and telephone number, and last known email address) in Urban Commons Battery Park, LLC.

**SPECIAL INTERROGATORY NO. 23:**

IDENTIFY the date upon which the real property formerly known as The Ritz-Carlton New York, Battery Park, NY was sold to the Eagle Hospitality Trust.

**SPECIAL INTERROGATORY NO. 24:**

IDENTIFY the escrow account holding Plaintiff Ronald Christensen's investment funds in Urban Commons Battery Park, LLC.

**SPECIAL INTERROGATORY NO. 25:**

Describe with specificity the corporate structure between Urban Commons, LLC and EHT.

**SPECIAL INTERROGATORY NO. 26:**

IDENTIFY by name, title, address, telephone number the current officers of Urban Commons LLC.

**SPECIAL INTERROGATORY NO. 27:**

IDENTIFY by name, title, address, telephone number the current directors of Urban Commons, LLC.

**SPECIAL INTERROGATORY NO. 28:**

IDENTIFY any and all assets YOU have disposed of through a sale or otherwise between October 1, 2019 and the present.

**SPECIAL INTERROGATORY NO. 29:**

IDENTIFY any and all assets YOU have transferred to YOUR spouse between October 1, 2019 and the present.

**SPECIAL INTERROGATORY NO. 30:**

IDENTIFY any and all assets YOU have transferred to any third party, including but not limited to children, family members, trusts, or corporate entities, between October 1, 2019 and the present.

**SPECIAL INTERROGATORY NO. 31:**

Describe with specificity YOUR relationship with AND/OR to EHT.

**SPECIAL INTERROGATORY NO. 32:**

Describe with specificity YOUR relationship with AND/OR to the security exchanged on the Singapore Stock Exchange and identified as EAGLEHT SP.

//
//
//
//
//
//
//
//
//

- 10 -

DATED:  April 16, 2021

GARCIA RAINEY BLANK & BOWERBANK LLP

By _____
          NORMA V. GARCIA
          JEFFREY M. BLANK
          HUGO A. LOPEZ
          Attorneys for Plaintiffs
Clifford A. Rosen, MD and Ronald Christensen, MD

EXHIBIT W

1    GARCIA RAINEY BLANK & BOWERBANK LLP
     A LIMITED LIABILITY PARTNERSHIP
2    NORMA V. GARCIA, Cal. Bar No. 223512
     ngarciaguillen@garciarainey.com
3    JEFFREY M. BLANK, Cal. Bar No. 217522
     jblank@garciarainey.com
4    HUGO A. LOPEZ, Cal. Bar No. 315846
     hlopez@garciarainey.com
5    695 Town Center Drive, Suite 700
     Costa Mesa, CA 92626
6    Telephone:   (714) 382-7000
     Facsimile:   (714) 784-0031
7    Attorneys for Plaintiffs
     Clifford A. Rosen, MD and Ronald A. Christensen, MD.
8
                     UNITED STATES DISTRICT COURT
9
                    CENTRAL DISTRICT OF CALIFORNIA
10
11   CLIFFORD A. ROSEN, an individual;      **Case No. 8:20-cv-01973 JLS (DFMx)**
     RONALD A. CHRISTENSEN, an
12   individual                            **PLAINTIFFS CLIFFORD A. ROSEN
                                           AND RONALD A. CHRISTENSEN'S
13              Plaintiffs,                 SPECIAL INTERROGATORIES, SET
                                           ONE TO DEFENDANT URBAN
14        vs.                              COMMONS 6th AVENUE SEATTLE,
     URBAN COMMONS, LLC, a Delaware        LLC**
15   Limited Liability Company; URBAN
     COMMONS 6TH AVE SEATTLE, LLC,  a
16   Delaware Limited Liability Company;
     URBAN COMMONS BATTERY PARK,
17   LLC, a Delaware Limited Liability
     Company; CHICAGO ANALYTIC
18   TRADING COMPANY, LLC, d/b/a
     LITTLERIVER CAPITAL,LLC, a
19   Delaware Limited Liability Company;
     DIGITAL CAPITAL MARKETS, LLC, a
20   Maryland Limited Liability Company;
     TAYLOR WOODS, an individual;
21   HOWARD WU, an individual; C. BRIAN
     EGNATZ, an individual; and DOES 1
22   through 10, inclusive

23              Defendants

24   PROPOUNDING PARTY:      PLAINTIFFS CLIFFORD A. ROSEN AND

25                           RONALD A. CHRISTENSEN

26   RESPONDING PARTY:       DEFENDANT URBAN COMMONS 6TH AVENUE,

27   LLC

28   SET NO.:                ONE

                                    - 1 -

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Plaintiffs Clifford A. Rosen and Ronald A. Christensen hereby request that Defendant Urban Commons 6th Ave Seattle, LLC respond to the following interrogatories within 30 days of service of this request in accordance with the requirements and procedures set forth in the Federal Rules of Civil Procedure.

**INSTRUCTIONS AND DEFINITIONS**

1.      As used herein, the term "YOU," "YOUR," and "Defendant" means Defendant Urban Commons 6th Ave Seattle, LLC and any of its parents or subsidiaries, and any of its employees, agents, independent contractors, representatives, attorneys, accountants, affiliates and any other PERSON(S) acting or purporting to act on its behalf or at its direction.

2.      As used herein, the term "URBAN COMMONS" means defendant Urban Commons, LLC and any of its parents or subsidiaries, and any of its employees, agents, independent contractors, representatives, attorneys, accountants, affiliates and any other PERSON(S) acting or purporting to act on its behalf or at its direction.

3.      As used herein, the term "WOODS" means Defendant Taylor Woods and his employees, agents, representatives, attorneys, accountants, affiliates, and any other PERSON(S) acting or purporting to act on his behalf or at his direct.

4.      As used herein, the term "WU" means Defendant Howard Wu and his employees, agents, representatives, attorneys, accountants, affiliates, and any other PERSON(S) acting or purporting to act on his behalf or at his direct.

5.      As used herein, the term "UC BATTERY PARK" means Defendant Urban Commons Battery Park, LLC and any of its parents or subsidiaries, and any of its employees, agents, independent contractors, representatives, attorneys, accountants, affiliates and any other PERSON(S) acting or purporting to act on its behalf or at its direction.

6.     As used herein "EGNATZ" means Defendant Brian Egnatz and his employees, agents, representatives, attorneys, accountants, affiliates, and any other PERSON(S) acting or purporting to act on his behalf or at his direct.

7.     As used herein "EHT" means Eagle Hospitality Trust, LLC and any of its parents or subsidiaries, and any of its employees, agents, independent contractors, representatives, attorneys, accountants, affiliates and any other PERSON(S) acting or purporting to act on its behalf or at its direction.

8.     As used herein, the term "RELATING TO" means embodying, discussing, constituting evidence of, having a relationship to (in whole or in part) pertaining, referring to, reflecting, describing, or setting forth the subject matter to which reference is made.

9.     As used herein, the term "COMMUNICATIONS" shall mean all inquiries, discussions, conversations, negotiations, agreements, understandings, meetings, conferences, telephone conversations, interviews, cards, letters, notes, correspondence, telegrams, telexes, cables, or other forms of interpersonal discourse, whether oral or written, however transmitted, including reports, notes, memoranda, lists, agenda, and other reports of communication.

10.     As used herein, the terms "AND" and "OR" shall be construed either conjunctively or disjunctively as necessary to bring within the scope of these requests matters which might otherwise be construed to be the outside of their scope.  A singular form of a word shall also be construed to include the plural form in any instances where such construction would expand the scope of these requests.

11.     "IDENTIFY" when used with respect to a natural PERSON, means to state the PERSON'S full name, present or last known business affiliation and position, past and present home address and past position and business affiliation, if any, with any of the parties herein.

12.     "IDENTIFY" when used with respect to a company or other business entity, means to state the company's legal name, the names under which it does business, its form (e.g., partnership, corporation, etc.), the address of its principal place of business,

and to IDENTIFY its principal proprietors, officers and/or directors.

13.    "IDENTIFY" when used with respect to a DOCUMENT, means to state the DATE(S) prepared, drafted or generated, the author(s), intended and actual recipient(s), type of DOCUMENT (e.g., "letter," "Terms of Service" or "email"), and to IDENTIFY its last known custodian or location.

14.    "IDENTIFY" when used in reference to an event, transaction, or occurrence, means to DESCRIBE the act in complete and reasonable detail; state the time, DATE, location; IDENTIFY all PERSONS participating or present; and IDENTIFY all DOCUMENTS RELATING thereto.

15.    "IDENTIFY" when used with respect to a COMMUNICATION, means to state type of COMMUNICATION (i.e., telephone discussion, email, face-to-face, etc.), the name and present address of each PERSON present during the COMMUNICATION, or who otherwise observed or heard the COMMUNICATION and to state the subject matter of the COMMUNICATION and the DATE upon which it occurred. If the COMMUNICATION was in writing, IDENTIFY all DOCUMENTS that RELATE or are RELATING TO the COMMUNICATION in the manner provided above.

16.    "INCLUDING" means "including, but not limited to;" "INCLUDES" means "includes, but not limited to."

17.    As used herein, the terms "DOCUMENT" and/or "DOCUMENTS" mean any and all documents, tangible things and property, of any kind, as defined by Fed. R. Civ. P. 34(a)(1), California , and all writings as defined by California Evidence Code Section 250, including the originals and non-identical copies, whether different from the originals by reason of any notation made on such copies or otherwise, and including, without limitation, communication, memoranda, notes, diaries, statistics, letters, telegrams, telex, telefax, minutes, contracts, reports, studies, checks, statements, receipts, returns, summaries, pamphlets, books, inter office and intra office communications, notations of any sort of conversations, telephone calls, meetings, or other

- 4 -

communications, bulletins, computer printouts, invoices, worksheets, all forms of drafts, notations, workings, alterations, modifications, changes and amendments of any of the foregoing, graphical or aural records or representations of any kind, including, without limitation, emails, texts, photographs, charts, microfiche, microfilm, videotape, records, motion pictures, and electronic, mechanical, or electrical records or representations of any kind, including, without limitation, tapes, cassettes, discs, and recordings, computer discs, computer tapes, computer cards, computer programs, computer software, computer readable media, machine sensible media, electronically stored media, and any other form of stored information.

18.    With respect to any document(s) which YOU withhold under a claim of privilege or otherwise, please provide a statement setting forth as to each of the following documents:

(a) the name and address of the sender of the document;

(b) the name and address of the author of the document;

(c) the name and address of the person to whom the document was addressed;

(d) the name(s) and address(es) of the person(s) to whom a copy of the document was addressed;

(e) the name(s) and address(es) of all persons known to YOU who have seen the document or participated in communications about the document;

(f) the job title of each person listed in (a) through (e) above;

(g) the date of the document;

(h) the date upon which the document was received by those having possession of the document;

(i) a brief description of the nature and subject matter of the document; and, the statute, rule, division or other basis which has been claimed to give rise to the privilege.

## SPECIAL INTERROGATORIES, SET ONE

### SPECIAL INTERROGATORY NO. 1:

IDENTIFY all bank accounts held by YOU from January 1, 2020 to the present.

### SPECIAL INTERROGATORY NO. 2:

IDENTIFY all brokerage accounts held by YOU from January 1, 2020 to the present.

### SPECIAL INTERROGATORY NO. 3:

IDENTIFY all investment accounts held by YOU from January 1, 2020 to the present.

### SPECIAL INTERROGATORY NO. 4:

IDENTIFY the date upon which the offering of membership interest in Urban Commons 6th Ave Seattle, LLC was completed.

### SPECIAL INTERROGATORY NO. 5:

IDENTIFY the date upon which Urban Commons 6th Ave Seattle, LLC acquired the real property known as the Hilton Seattle, located at 1301 6th Avenue, Seattle, Washington.

### SPECIAL INTERROGATORY NO. 6:

State the price at which Urban Commons 6th Ave Seattle, LLC acquired the real property known as the Hilton Seattle, located at 1301 6th Avenue, Seattle, Washington.

**SPECIAL INTERROGATORY NO. 7:**

IDENTIFY the number of investors (by first and last name, last known address and telephone number, and last known email address) in Urban Commons 6th Ave Seattle, LLC.

**SPECIAL INTERROGATORY NO. 8:**

IDENTIFY the date upon which the real property known as the Hilton Seattle, located at 1301 6th Avenue, Seattle, Washington was sold to Eagle Hospitality Trust.

**SPECIAL INTERROGATORY NO. 9:**

IDENTIFY the escrow account holding Plaintiff Ronald Christensen's investment funds in Urban Commons 6th Ave Seattle, LLC.

**SPECIAL INTERROGATORY NO. 10:**

IDENTIFY the the escrow account holding Plaintiff Clifford Rosen's investment funds in Urban Commons 6th Ave Seattle, LLC.

**SPECIAL INTERROGATORY NO. 11:**

IDENTIFY all bank accounts where Plaintiff Ronald Christensen's investment funds are currently held.

**SPECIAL INTERROGATORY NO. 12:**

IDENTIFY all bank accounts where Plaintiff Clifford Rosen's investment funds are currently held.

**SPECIAL INTERROGATORY NO. 13:**

Describe with specificity the corporate structure between Urban Commons 6th Ave Seattle, LLC and Urban Commons, LLC.

**SPECIAL INTERROGATORY NO. 14:**

Describe with specificity the corporate structure between Urban Commons 6th Ave Seattle, LLC and EHT.

**SPECIAL INTERROGATORY NO. 15:**

IDENTIFY by name, title, address, telephone number the current officers of Urban Commons 6th Ave Seattle, LLC.

**SPECIAL INTERROGATORY NO. 15:**

IDENTIFY by name, title, address, telephone number the current directors of Urban Commons 6th Ave Seattle, LLC.

**SPECIAL INTERROGATORY NO. 16:**

IDENTIFY any and all assets YOU have disposed of through a sale or otherwise between October 1, 2019 and the present.

**SPECIAL INTERROGATORY NO. 17:**

IDENTIFY any and all assets YOU have transferred to any third party, including but not limited to any officers, directors, shareholders, AND/OR other corporate entities between October 1, 2019 and the present.

**SPECIAL INTERROGATORY NO. 18:**

Describe with specificity YOUR relationship with AND/OR to EHT.

**SPECIAL INTERROGATORY NO. 19:**

Describe with specificity YOUR relationship with AND/OR to the security exchanged on the Singapore Stock Exchange and identified as EAGLEHT SP.

//

//

- 8 -

1  DATED:  April 16, 2021

2

3                              GARCIA RAINEY BLANK & BOWERBANK LLP

4

5

6                              By _____

7                                      NORMA V. GARCIA

8                                      JEFFREY M. BLANK
                                       HUGO A. LOPEZ

9                                      Attorneys for Plaintiffs
                           Clifford A. Rosen, MD and Ronald Christensen, MD

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' SPECIAL INTERROGATORIES TO DEFENDANT URBAN COMMONS 6TH AVENUE SEATTLE, LLC

# EXHIBIT X

1    GARCIA RAINEY BLANK & BOWERBANK LLP
        A LIMITED LIABILITY PARTNERSHIP
2    NORMA V. GARCIA, Cal. Bar No. 223512
     ngarciaguillen@garciarainey.com
3    JEFFREY M. BLANK, Cal. Bar No. 217522
     jblank@garciarainey.com
4    HUGO A. LOPEZ, Cal. Bar No. 315846
     hlopez@garciarainey.com
5    695 Town Center Drive, Suite 700
     Costa Mesa, CA 92626
6    Telephone:    (714) 382-7000
     Facsimile:    (714) 784-0031
7    Attorneys for Plaintiffs
     Clifford A. Rosen, MD and Ronald A. Christensen, MD.
8
                    UNITED STATES DISTRICT COURT
9
                   CENTRAL DISTRICT OF CALIFORNIA
10

| | |
|---|---|
| 11   CLIFFORD A. ROSEN, an individual; RONALD A. CHRISTENSEN, an individual | **Case No. 8:20-cv-01973 JLS (DFMx)** |
| 12 | **PLAINTIFFS CLIFFORD A. ROSEN AND RONALD A. CHRISTENSEN'S SPECIAL INTERROGATORIES, SET ONE TO DEFENDANT URBAN COMMONS BATTERY PARK, LLC** |
| 13                 Plaintiffs, | |
| 14        vs. | |
|      URBAN COMMONS, LLC, a Delaware | |
| 15   Limited Liability Company; URBAN COMMONS 6TH AVE SEATTLE, LLC,  a | |
|      Delaware Limited Liability Company; | |
| 16   URBAN COMMONS BATTERY PARK, LLC, a Delaware Limited Liability | |
| 17   Company; CHICAGO ANALYTIC TRADING COMPANY, LLC, d/b/a | |
| 18   LITTLERIVER CAPITAL,LLC, a Delaware Limited Liability Company; | |
| 19   DIGITAL CAPITAL MARKETS, LLC, a Maryland Limited Liability Company; | |
| 20   TAYLOR WOODS, an individual; HOWARD WU, an individual; C. BRIAN | |
| 21   EGNATZ, an individual; and DOES 1 through 10, inclusive | |
| 22                Defendants | |

23   PROPOUNDING PARTY:      PLAINTIFFS CLIFFORD A. ROSEN AND

24                           RONALD A. CHRISTENSEN

25   RESPONDING PARTY:       DEFENDANT URBAN COMMONS BATTERY

26                           PARK, LLC

27   SET NO.:                ONE

28

- 1 -

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Plaintiffs Clifford A. Rosen and Ronald A. Christensen hereby request that Defendant Urban Commons Battery Park, LLC respond to the following interrogatories within 30 days of service of this request in accordance with the requirements and procedures set forth in the Federal Rules of Civil Procedure.

## INSTRUCTIONS AND DEFINITIONS

1. As used herein, the term "YOU," "YOUR," and "Defendant" means Defendant Urban Commons Battery Park, LLC and any of its parents or subsidiaries, and any of its employees, agents, independent contractors, representatives, attorneys, accountants, affiliates and any other PERSON(S) acting or purporting to act on its behalf or at its direction.

2. As used herein, the term "URBAN COMMONS" means defendant Urban Commons, LLC and any of its parents or subsidiaries, and any of its employees, agents, independent contractors, representatives, attorneys, accountants, affiliates and any other PERSON(S) acting or purporting to act on its behalf or at its direction.

3. As used herein, the term "WOODS" means Defendant Taylor Woods and his employees, agents, representatives, attorneys, accountants, affiliates, and any other PERSON(S) acting or purporting to act on his behalf or at his direct.

4. As used herein, the term "WU" means Defendant Howard Wu and his employees, agents, representatives, attorneys, accountants, affiliates, and any other PERSON(S) acting or purporting to act on his behalf or at his direct.

5. As used herein, the term "UC SEATTLE" means Defendant Urban Commons 6th Ave Seattle, LLC and any of its parents or subsidiaries, and any of its employees, agents, independent contractors, representatives, attorneys, accountants, affiliates and any other PERSON(S) acting or purporting to act on its behalf or at its direction.

PLAINTIFFS' SPECIAL INTERROGATORIES TO DEFENDANT URBAN COMMONS BATTERY PARK, LLC

6.     As used herein "EGNATZ" means Defendant Brian Egnatz and his employees, agents, representatives, attorneys, accountants, affiliates, and any other PERSON(S) acting or purporting to act on his behalf or at his direct.

7.     As used herein "EHT" means Eagle Hospitality Trust, LLC and any of its parents or subsidiaries, and any of its employees, agents, independent contractors, representatives, attorneys, accountants, affiliates and any other PERSON(S) acting or purporting to act on its behalf or at its direction.

8.     As used herein, the term "RELATING TO" means embodying, discussing, constituting evidence of, having a relationship to (in whole or in part) pertaining, referring to, reflecting, describing, or setting forth the subject matter to which reference is made.

9.     As used herein, the term "COMMUNICATIONS" shall mean all inquiries, discussions, conversations, negotiations, agreements, understandings, meetings, conferences, telephone conversations, interviews, cards, letters, notes, correspondence, telegrams, telexes, cables, or other forms of interpersonal discourse, whether oral or written, however transmitted, including reports, notes, memoranda, lists, agenda, and other reports of communication.

10.     As used herein, the terms "AND" and "OR" shall be construed either conjunctively or disjunctively as necessary to bring within the scope of these requests matters which might otherwise be construed to be the outside of their scope.  A singular form of a word shall also be construed to include the plural form in any instances where such construction would expand the scope of these requests.

11.     "IDENTIFY" when used with respect to a natural PERSON, means to state the PERSON'S full name, present or last known business affiliation and position, past and present home address and past position and business affiliation, if any, with any of the parties herein.

12.     "IDENTIFY" when used with respect to a company or other business entity, means to state the company's legal name, the names under which it does business, its form (e.g., partnership, corporation, etc.), the address of its principal place of business,

and to IDENTIFY its principal proprietors, officers and/or directors.

13.   "IDENTIFY" when used with respect to a DOCUMENT, means to state the DATE(S) prepared, drafted or generated, the author(s), intended and actual recipient(s), type of DOCUMENT (e.g., "letter," "Terms of Service" or "email"), and to IDENTIFY its last known custodian or location.

14.   "IDENTIFY" when used in reference to an event, transaction, or occurrence, means to DESCRIBE the act in complete and reasonable detail; state the time, DATE, location; IDENTIFY all PERSONS participating or present; and IDENTIFY all DOCUMENTS RELATING thereto.

15.   "IDENTIFY" when used with respect to a COMMUNICATION, means to state type of COMMUNICATION (i.e., telephone discussion, email, face-to-face, etc.), the name and present address of each PERSON present during the COMMUNICATION, or who otherwise observed or heard the COMMUNICATION and to state the subject matter of the COMMUNICATION and the DATE upon which it occurred. If the COMMUNICATION was in writing, IDENTIFY all DOCUMENTS that RELATE or are RELATING TO the COMMUNICATION in the manner provided above.

16.   "INCLUDING" means "including, but not limited to;" "INCLUDES" means "includes, but not limited to."

17.   As used herein, the terms "DOCUMENT" and/or "DOCUMENTS" mean any and all documents, tangible things and property, of any kind, as defined by Fed. R. Civ. P. 34(a)(1), California , and all writings as defined by California Evidence Code Section 250, including the originals and non-identical copies, whether different from the originals by reason of any notation made on such copies or otherwise, and including, without limitation, communication, memoranda, notes, diaries, statistics, letters, telegrams, telex, telefax, minutes, contracts, reports, studies, checks, statements, receipts, returns, summaries, pamphlets, books, inter office and intra office communications, notations of any sort of conversations, telephone calls, meetings, or other

- 4 -

communications, bulletins, computer printouts, invoices, worksheets, all forms of drafts, notations, workings, alterations, modifications, changes and amendments of any of the foregoing, graphical or aural records or representations of any kind, including, without limitation, emails, texts, photographs, charts, microfiche, microfilm, videotape, records, motion pictures, and electronic, mechanical, or electrical records or representations of any kind, including, without limitation, tapes, cassettes, discs, and recordings, computer discs, computer tapes, computer cards, computer programs, computer software, computer readable media, machine sensible media, electronically stored media, and any other form of stored information.

18.    With respect to any document(s) which YOU withhold under a claim of privilege or otherwise, please provide a statement setting forth as to each of the following documents:

(a) the name and address of the sender of the document;

(b) the name and address of the author of the document;

(c) the name and address of the person to whom the document was addressed;

(d) the name(s) and address(es) of the person(s) to whom a copy of the document was addressed;

(e) the name(s) and address(es) of all persons known to YOU who have seen the document or participated in communications about the document;

(f) the job title of each person listed in (a) through (e) above;

(g) the date of the document;

(h) the date upon which the document was received by those having possession of the document;

(i) a brief description of the nature and subject matter of the document; and, the statute, rule, division or other basis which has been claimed to give rise to the privilege.

## SPECIAL INTERROGATORIES, SET ONE

### SPECIAL INTERROGATORY NO. 1:

IDENTIFY all bank accounts held by YOU from January 1, 2020 to the present.

### SPECIAL INTERROGATORY NO. 2:

IDENTIFY all brokerage accounts held by YOU from January 1, 2020 to the present.

### SPECIAL INTERROGATORY NO. 3:

IDENTIFY all investment accounts held by YOU from January 1, 2020 to the present.

### SPECIAL INTERROGATORY NO. 4:

IDENTIFY the date upon which the offering of membership interest in Urban Commons Battery Park, LLC was completed.

### SPECIAL INTERROGATORY NO. 5:

IDENTIFY the date upon which Urban Commons Battery Park, LLC acquired the real property formerly known as The Ritz-Carlton New York, Battery Park, NY.

### SPECIAL INTERROGATORY NO. 6:

State the price at which Urban Commons Battery Park, LLC acquired the real formerly known as The Ritz-Carlton New York, Battery Park, NY.

### SPECIAL INTERROGATORY NO. 7:

IDENTIFY the number of investors (by first and last name, last known address

- 6 -

and telephone number, and last known email address) in Urban Commons Battery Park, LLC.

**SPECIAL INTERROGATORY NO. 8:**

IDENTIFY the date upon which the real property formerly known as The Ritz-Carlton New York, Battery Park, NY was sold to the Eagle Hospitality Trust.

**SPECIAL INTERROGATORY NO. 9:**

IDENTIFY the escrow account holding Plaintiff Ronald Christensen's investment funds in Urban Commons Battery Park, LLC.

**SPECIAL INTERROGATORY NO. 10:**

IDENTIFY the escrow account holding Plaintiff Ronald Christensen's investment funds in Urban Commons Battery Park, LLC.

**SPECIAL INTERROGATORY NO. 11:**

IDENTIFY all accounts holding Plaintiff Ronald Christensen's investment funds in Urban Commons Battery Park, LLC.

**SPECIAL INTERROGATORY NO. 12:**

Describe with specificity the corporate structure between Urban Commons Battery Park, LLC and Urban Commons, LLC.

**SPECIAL INTERROGATORY NO. 13:**

Describe with specificity the corporate structure between Urban Commons Battery Park, LLC and EHT.

**SPECIAL INTERROGATORY NO. 14:**

IDENTIFY by name, title, address, telephone number the current officers of Urban Commons Battery Park, LLC.

**SPECIAL INTERROGATORY NO. 15:**

IDENTIFY by name, title, address, telephone number the current directors of Urban Commons Battery Park, LLC.

**SPECIAL INTERROGATORY NO. 16:**

IDENTIFY any and all assets YOU have disposed of through a sale or otherwise between October 1, 2019 and the present.

**SPECIAL INTERROGATORY NO. 17:**

IDENTIFY any and all assets YOU have transferred to any third party, including but not limited to any officers, directors, shareholders, AND/OR other corporate entities between October 1, 2019 and the present.

**SPECIAL INTERROGATORY NO. 18:**

Describe with specificity YOUR relationship with AND/OR to EHT.

**SPECIAL INTERROGATORY NO. 19:**

Describe with specificity YOUR relationship with AND/OR to the security exchanged on the Singapore Stock Exchange and identified as EAGLEHT SP.

//
//
//
//
//

1    DATED:  April 16, 2021

2

3                  GARCIA RAINEY BLANK & BOWERBANK LLP

4

5

6           By  _____

7                        NORMA V. GARCIA

8                        JEFFREY M. BLANK

                          HUGO A. LOPEZ

9                        Attorneys for Plaintiffs

10         Clifford A. Rosen, MD and Ronald Christensen, MD

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<center>- 9 -</center>

EXHIBIT Y

GARCIA RAINEY BLANK & BOWERBANK LLP
  A LIMITED LIABILITY PARTNERSHIP
NORMA V. GARCIA, Cal. Bar No. 223512
ngarciaguillen@garciarainey.com
JEFFREY M. BLANK, Cal. Bar No. 217522
jblank@garciarainey.com
HUGO A. LOPEZ, Cal. Bar No. 315846
hlopez@garciarainey.com
695 Town Center Drive, Suite 700
Costa Mesa, CA 92626
Telephone:    (714) 382-7000
Facsimile:    (714) 784-0031
Attorneys for Plaintiffs
Clifford A. Rosen, MD and Ronald A. Christensen, MD.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLIFFORD A. ROSEN, an individual; RONALD A. CHRISTENSEN, an individual<br><br>Plaintiffs,<br><br>vs.<br><br>URBAN COMMONS, LLC, a Delaware Limited Liability Company; URBAN COMMONS 6TH AVE SEATTLE, LLC,  a Delaware Limited Liability Company; URBAN COMMONS BATTERY PARK, LLC, a Delaware Limited Liability Company; CHICAGO ANALYTIC TRADING COMPANY, LLC, d/b/a LITTLERIVER CAPITAL,LLC, a Delaware Limited Liability Company; DIGITAL CAPITAL MARKETS, LLC, a Maryland Limited Liability Company; TAYLOR WOODS, an individual; HOWARD WU, an individual; C. BRIAN EGNATZ, an individual; and DOES 1 through 10, inclusive<br><br>Defendants | **Case No. 8:20-cv-01973 JLS (DFMx)**<br><br>**PLAINTIFFS CLIFFORD A. ROSEN AND RONALD A. CHRISTENSEN'S SPECIAL INTERROGATORIES, SET ONE TO DEFENDANT TAYLOR WOODS** |

PROPOUNDING PARTY:      PLAINTIFFS CLIFFORD A. ROSEN AND

RONALD A. CHRISTENSEN

RESPONDING PARTY:       DEFENDANT TAYLOR WOODS

SET NO.:                ONE

- 1 -

PLAINTIFFS' FIRST SET OF SPECIAL INTERROGATORIES TO DEFENDANT TAYLOR WOODS

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Plaintiffs Clifford A. Rosen and Ronald A. Christensen hereby request that Defendant Taylor Woods respond to the following interrogatories within 30 days of service of this request in accordance with the requirements and procedures set forth in the Federal Rules of Civil Procedure.

**INSTRUCTIONS AND DEFINITIONS**

1.      As used herein, the term "YOU," "YOUR," and "Defendant" means Defendant Taylor Woods and his employees, agents, representatives, attorneys, accountants, affiliates, and any other PERSON(S) acting or purporting to act on his behalf or at his direct.

2.      As used herein, the term "WU" means Defendant Howard Wu and his employees, agents, representatives, attorneys, accountants, affiliates, and any other PERSON(S) acting or purporting to act on his behalf or at his direct.

3.      As used herein, the term "UC BATTERY PARK" means Defendant Urban Commons Battery Park, LLC and any of its parents or subsidiaries, and any of its employees, agents, independent contractors, representatives, attorneys, accountants, affiliates and any other PERSON(S) acting or purporting to act on its behalf or at its direction.

4.      As used herein "URBAN COMMONS" means Defendant Urban Commons, LLC and any of its parents or subsidiaries, and any of its employees, agents, independent contractors, representatives, attorneys, accountants, affiliates and any other PERSON(S) acting or purporting to act on its behalf or at its direction.

5.      As used herein "UC SEATTLE" means Defendant Urban Commons 6th Ave Seattle, LLC and any of its parents or subsidiaries, and any of its employees, agents, independent contractors, representatives, attorneys, accountants, affiliates and any other PERSON(S) acting or purporting to act on its behalf or at its direction.

6.      As used herein "EGNATZ" means Defendant Brian Egnatz and his employees, agents, representatives, attorneys, accountants, affiliates, and any other PERSON(S) acting or purporting to act on his behalf or at his direct.

- 2 -

7.     As used herein "EHT" means Eagle Hospitality Trust, LLC and any of its parents or subsidiaries, and any of its employees, agents, independent contractors, representatives, attorneys, accountants, affiliates and any other PERSON(S) acting or purporting to act on its behalf or at its direction.

8.     As used herein, the term "TRUSTS" includes but is not limited to any and all individual trusts, family trusts, corporate trusts, and/or any other trust in which you hold an interest in.

9.     As used herein, the term "RELATING TO" means embodying, discussing, constituting evidence of, having a relationship to (in whole or in part) pertaining, referring to, reflecting, describing, or setting forth the subject matter to which reference is made.

10.     As used herein, the term "COMMUNICATIONS" shall mean all inquiries, discussions, conversations, negotiations, agreements, understandings, meetings, conferences, telephone conversations, interviews, cards, letters, notes, correspondence, telegrams, telexes, cables, or other forms of interpersonal discourse, whether oral or written, however transmitted, including reports, notes, memoranda, lists, agenda, and other reports of communication.

11.     As used herein, the terms "AND" and "OR" shall be construed either conjunctively or disjunctively as necessary to bring within the scope of these requests matters which might otherwise be construed to be the outside of their scope.  A singular form of a word shall also be construed to include the plural form in any instances where such construction would expand the scope of these requests.

12.     "IDENTIFY" when used with respect to a natural PERSON, means to state the PERSON'S full name, present or last known business affiliation and position, past and present home address and past position and business affiliation, if any, with any of the parties herein.

13.     "IDENTIFY" when used with respect to a company or other business entity, means to state the company's legal name, the names under which it does business, its form (e.g., partnership, corporation, etc.), the address of its principal place of business,

and to IDENTIFY its principal proprietors, officers and/or directors.

14.     "IDENTIFY" when used with respect to a DOCUMENT, means to state the DATE(S) prepared, drafted or generated, the author(s), intended and actual recipient(s), type of DOCUMENT (e.g., "letter," "Terms of Service" or "email"), and to IDENTIFY its last known custodian or location.

15.     "IDENTIFY" when used in reference to an event, transaction, or occurrence, means to DESCRIBE the act in complete and reasonable detail; state the time, DATE, location; IDENTIFY all PERSONS participating or present; and IDENTIFY all DOCUMENTS RELATING thereto.

16.     "IDENTIFY" when used with respect to a COMMUNICATION, means to state type of COMMUNICATION (i.e., telephone discussion, email, face-to-face, etc.), the name and present address of each PERSON present during the COMMUNICATION, or who otherwise observed or heard the COMMUNICATION and to state the subject matter of the COMMUNICATION and the DATE upon which it occurred. If the COMMUNICATION was in writing, IDENTIFY all DOCUMENTS that RELATE or are RELATING TO the COMMUNICATION in the manner provided above.

17.     "INCLUDING" means "including, but not limited to;" "INCLUDES" means "includes, but not limited to."

18.     As used herein, the terms "DOCUMENT" and/or "DOCUMENTS" mean any and all documents, tangible things and property, of any kind, as defined by Fed. R. Civ. P. 34(a)(1), California , and all writings as defined by California Evidence Code Section 250, including the originals and non-identical copies, whether different from the originals by reason of any notation made on such copies or otherwise, and including, without limitation, communication, memoranda, notes, diaries, statistics, letters, telegrams, telex, telefax, minutes, contracts, reports, studies, checks, statements, receipts, returns, summaries, pamphlets, books, inter office and intra office communications, notations of any sort of conversations, telephone calls, meetings, or other

- 4 -

communications, bulletins, computer printouts, invoices, worksheets, all forms of drafts, notations, workings, alterations, modifications, changes and amendments of any of the foregoing, graphical or aural records or representations of any kind, including, without limitation, emails, texts, photographs, charts, microfiche, microfilm, videotape, records, motion pictures, and electronic, mechanical, or electrical records or representations of any kind, including, without limitation, tapes, cassettes, discs, and recordings, computer discs, computer tapes, computer cards, computer programs, computer software, computer readable media, machine sensible media, electronically stored media, and any other form of stored information.

19.    With respect to any document(s) which YOU withhold under a claim of privilege or otherwise, please provide a statement setting forth as to each of the following documents:

(a) the name and address of the sender of the document;

(b) the name and address of the author of the document;

(c) the name and address of the person to whom the document was addressed;

(d) the name(s) and address(es) of the person(s) to whom a copy of the document was addressed;

(e) the name(s) and address(es) of all persons known to YOU who have seen the document or participated in communications about the document;

(f) the job title of each person listed in (a) through (e) above;

(g) the date of the document;

(h) the date upon which the document was received by those having possession of the document;

(i) a brief description of the nature and subject matter of the document; and, the statute, rule, division or other basis which has been claimed to give rise to the privilege.

- 5 -

## SPECIAL INTERROGATORIES, SET ONE

**SPECIAL INTERROGATORY NO. 1:**

IDENTIFY all bank accounts held by YOU between October 1, 2019 and the present.

**SPECIAL INTERROGATORY NO. 2:**

IDENTIFY all brokerage accounts held by YOU between October 1, 2019 and the present.

**SPECIAL INTERROGATORY NO. 3:**

IDENTIFY all investment accounts held by YOU between October 1, 2019 and the present.

**SPECIAL INTERROGATORY NO. 4:**

IDENTIFY the date upon which the offering of membership interest in Urban Commons Battery Park, LLC was completed.

**SPECIAL INTERROGATORY NO. 5:**

IDENTIFY the date upon which Urban Commons Battery Park, LLC acquired the real property formerly known as The Ritz-Carlton New York, Battery Park, NY.

**SPECIAL INTERROGATORY NO. 6:**

State the price at which Urban Commons Battery Park, LLC acquired the real formerly known as The Ritz-Carlton New York, Battery Park, NY.

**SPECIAL INTERROGATORY NO. 7:**

IDENTIFY the number of investors (by first and last name, last known address

- 6 -

and telephone number, and last known email address) in Urban Commons Battery Park, LLC.

**SPECIAL INTERROGATORY NO. 8:**

IDENTIFY the date upon which the real property formerly known as The Ritz-Carlton New York, Battery Park, NY was sold to the Eagle Hospitality Trust.

**SPECIAL INTERROGATORY NO. 9:**

IDENTIFY the escrow account holding Plaintiff Ronald Christensen's investment funds in Urban Commons Battery Park, LLC.

**SPECIAL INTERROGATORY NO. 10:**

IDENTIFY the escrow account holding Plaintiff Ronald Christensen's investment funds in Urban Commons Battery Park, LLC.

**SPECIAL INTERROGATORY NO. 11:**

IDENTIFY all accounts holding Plaintiff Ronald Christensen's investment funds in Urban Commons Battery Park, LLC.

**SPECIAL INTERROGATORY NO. 12:**

IDENTIFY all positions held within Urban Commons, LLC.

**SPECIAL INTERROGATORY NO. 13:**

IDENTIFY all positions held within Urban Commons 6th Ave Seattle, LLC.

**SPECIAL INTERROGATORY NO. 14:**

IDENTIFY all positions held within Urban Commons Battery Park, LLC.

- 7 -

**SPECIAL INTERROGATORY NO. 15:**

IDENTIFY all positions held at Eagle Hospitality Trust.

**SPECIAL INTERROGATORY NO. 16:**

IDENTIFY all positions held at Eagle Hospitality Real Investment.

**SPECIAL INTERROGATORY NO. 17:**

IDENTIFY all positions held at Eagle Hospitality Business Trust.

**SPECIAL INTERROGATORY NO. 18:**

IDENTIFY all real property in which YOU AND/OR YOUR spouse AND/OR YOUR personal or family trust has held an interest in from October 1, 2019 to the present.

**SPECIAL INTERROGATORY NO. 19:**

IDENTIFY any and all off-shore financial institution accounts YOU AND/OR YOUR spouse or YOUR personal AND/OR family trust has held an interest in from October 1, 2019 to the present.

**SPECIAL INTERROGATORY NO. 20:**

IDENTIFY any and all off-shore real property in which YOU AND/OR YOUR spouse AND/OR YOUR personal or family trust has held an interest in from October 1, 2019 to the present.

**SPECIAL INTERROGATORY NO. 21:**

IDENTIFY any and all TRUSTS in which YOU are a trustee.

**SPECIAL INTERROGATORY NO. 22:**

IDENTIFY any and all TRUSTS in which YOU are a beneficiary.

**SPECIAL INTERROGATORY NO. 23:**

IDENTIFY any and all TRUSTS in which YOU are a trustor.

**SPECIAL INTERROGATORY NO. 24:**

IDENTIFY any and all assets YOU have disposed of through a sale or otherwise between October 1, 2019 and the present.

**SPECIAL INTERROGATORY NO. 25:**

IDENTIFY any and all assets YOU have transferred to YOUR spouse between October 1, 2019 and the present.

**SPECIAL INTERROGATORY NO. 26:**

IDENTIFY any and all assets YOU have transferred to any third party, including but not limited to children, family members, trusts, or corporate entities, between October 1, 2019 and the present.

**SPECIAL INTERROGATORY NO. 27:**

IDENTIFY the assets held in the Shiryuda Trust from October 1, 2019 to the present.

**SPECIAL INTERROGATORY NO. 28:**

IDENTIFY the trustors for the Shiryuda Trust.

//
//
//
//
//
//

- 9 -

1   DATED:  April 16, 2021

2

3                     GARCIA RAINEY BLANK & BOWERBANK LLP

4

5

6               By

7                            NORMA V. GARCIA

8                            JEFFREY M. BLANK

                              HUGO A. LOPEZ

9                           Attorneys for Plaintiffs

10            Clifford A. Rosen, MD and Ronald Christensen, MD

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' SPECIAL INTERROGATORIES TO DEFENDANT TAYLOR WOODS

EXHIBIT Z

GARCIA RAINEY BLANK & BOWERBANK LLP
A LIMITED LIABILITY PARTNERSHIP
NORMA V. GARCIA, Cal. Bar No. 223512
ngarciaguillen@garciarainey.com
JEFFREY M. BLANK, Cal. Bar No. 217522
jblank@garciarainey.com
HUGO A. LOPEZ, Cal. Bar No. 315846
hlopez@garciarainey.com
695 Town Center Drive, Suite 700
Costa Mesa, CA 92626
Telephone:    (714) 382-7000
Facsimile:    (714) 784-0031
Attorneys for Plaintiffs
Clifford A. Rosen, MD and Ronald A. Christensen, MD.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLIFFORD A. ROSEN, an individual; RONALD A. CHRISTENSEN, an individual<br><br>                        Plaintiffs,<br>            vs.<br>URBAN COMMONS, LLC, a Delaware Limited Liability Company; URBAN COMMONS 6TH AVE SEATTLE, LLC,  a Delaware Limited Liability Company; URBAN COMMONS BATTERY PARK, LLC, a Delaware Limited Liability Company; CHICAGO ANALYTIC TRADING COMPANY, LLC, d/b/a LITTLERIVER CAPITAL,LLC, a Delaware Limited Liability Company; DIGITAL CAPITAL MARKETS, LLC, a Maryland Limited Liability Company; TAYLOR WOODS, an individual; HOWARD WU, an individual; C. BRIAN EGNATZ, an individual; and DOES 1 through 10, inclusive<br><br>                        Defendants | **Case No. 8:20-cv-01973 JLS (DFMx)**<br><br>**PLAINTIFFS CLIFFORD A. ROSEN AND RONALD A. CHRISTENSEN'S SPECIAL INTERROGATORIES, SET ONE TO DEFENDANT HOWARD WU** |

PROPOUNDING PARTY:        PLAINTIFFS CLIFFORD A. ROSEN AND

                          RONALD A. CHRISTENSEN

RESPONDING PARTY:         DEFENDANT HOWARD WU

SET NO.:                  ONE

PLAINTIFFS' FIRST SET OF SPECIAL INTERROGATORIES TO DEFENDANT HOWARD WU

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Plaintiffs Clifford A. Rosen and Ronald A. Christensen hereby request that Defendant Howard Wu respond to the following interrogatories within 30 days of service of this request in accordance with the requirements and procedures set forth in the Federal Rules of Civil Procedure.

**INSTRUCTIONS AND DEFINITIONS**

1.     As used herein, the term "YOU," "YOUR," and "Defendant" means Defendant Howard Wu and his employees, agents, representatives, attorneys, accountants, affiliates, and any other PERSON(S) acting or purporting to act on his behalf or at his direct.

2.     As used herein, the term "WOODS" means Defendant Taylor Woods and his employees, agents, representatives, attorneys, accountants, affiliates, and any other PERSON(S) acting or purporting to act on his behalf or at his direct.

3.     As used herein, the term "UC BATTERY PARK" means Defendant Urban Commons Battery Park, LLC and any of its parents or subsidiaries, and any of its employees, agents, independent contractors, representatives, attorneys, accountants, affiliates and any other PERSON(S) acting or purporting to act on its behalf or at its direction.

4.     As used herein "URBAN COMMONS" means Defendant Urban Commons, LLC and any of its parents or subsidiaries, and any of its employees, agents, independent contractors, representatives, attorneys, accountants, affiliates and any other PERSON(S) acting or purporting to act on its behalf or at its direction.

5.     As used herein "UC SEATTLE" means Defendant Urban Commons 6th Ave Seattle, LLC and any of its parents or subsidiaries, and any of its employees, agents, independent contractors, representatives, attorneys, accountants, affiliates and any other PERSON(S) acting or purporting to act on its behalf or at its direction.

6.     As used herein "EGNATZ" means Defendant Brian Egnatz and his employees, agents, representatives, attorneys, accountants, affiliates, and any other

PERSON(S) acting or purporting to act on his behalf or at his direct.

7.      As used herein "EHT" means Eagle Hospitality Trust, LLC and any of its parents or subsidiaries, and any of its employees, agents, independent contractors, representatives, attorneys, accountants, affiliates and any other PERSON(S) acting or purporting to act on its behalf or at its direction.

8.      As used herein, the term "TRUSTS" includes but is not limited to any and all individual trusts, family trusts, corporate trusts, and/or any other trust in which you hold an interest in.

9.      As used herein, the term "RELATING TO" means embodying, discussing, constituting evidence of, having a relationship to (in whole or in part) pertaining, referring to, reflecting, describing, or setting forth the subject matter to which reference is made.

10.     As used herein, the term "COMMUNICATIONS" shall mean all inquiries, discussions, conversations, negotiations, agreements, understandings, meetings, conferences, telephone conversations, interviews, cards, letters, notes, correspondence, telegrams, telexes, cables, or other forms of interpersonal discourse, whether oral or written, however transmitted, including reports, notes, memoranda, lists, agenda, and other reports of communication.

11.     As used herein, the terms "AND" and "OR" shall be construed either conjunctively or disjunctively as necessary to bring within the scope of these requests matters which might otherwise be construed to be the outside of their scope.  A singular form of a word shall also be construed to include the plural form in any instances where such construction would expand the scope of these requests.

12.     "IDENTIFY" when used with respect to a natural PERSON, means to state the PERSON'S full name, present or last known business affiliation and position, past and present home address and past position and business affiliation, if any, with any of the parties herein.

13.     "IDENTIFY" when used with respect to a company or other business entity, means to state the company's legal name, the names under which it does business,

its form (e.g., partnership, corporation, etc.), the address of its principal place of business, and to IDENTIFY its principal proprietors, officers and/or directors.

14.     "IDENTIFY" when used with respect to a DOCUMENT, means to state the DATE(S) prepared, drafted or generated, the author(s), intended and actual recipient(s), type of DOCUMENT (e.g., "letter," "Terms of Service" or "email"), and to IDENTIFY its last known custodian or location.

15.     "IDENTIFY" when used in reference to an event, transaction, or occurrence, means to DESCRIBE the act in complete and reasonable detail; state the time, DATE, location; IDENTIFY all PERSONS participating or present; and IDENTIFY all DOCUMENTS RELATING thereto.

16.     "IDENTIFY" when used with respect to a COMMUNICATION, means to state type of COMMUNICATION (i.e., telephone discussion, email, face-to-face, etc.), the name and present address of each PERSON present during the COMMUNICATION, or who otherwise observed or heard the COMMUNICATION and to state the subject matter of the COMMUNICATION and the DATE upon which it occurred. If the COMMUNICATION was in writing, IDENTIFY all DOCUMENTS that RELATE or are RELATING TO the COMMUNICATION in the manner provided above.

17.     "INCLUDING" means "including, but not limited to;" "INCLUDES" means "includes, but not limited to."

18.     As used herein, the terms "DOCUMENT" and/or "DOCUMENTS" mean any and all documents, tangible things and property, of any kind, as defined by Fed. R. Civ. P. 34(a)(1), California , and all writings as defined by California Evidence Code Section 250, including the originals and non-identical copies, whether different from the originals by reason of any notation made on such copies or otherwise, and including, without limitation, communication, memoranda, notes, diaries, statistics, letters, telegrams, telex, telefax, minutes, contracts, reports, studies, checks, statements, receipts, returns, summaries, pamphlets, books, inter office and intra office communications,

- 4 -

notations of any sort of conversations, telephone calls, meetings, or other communications, bulletins, computer printouts, invoices, worksheets, all forms of drafts, notations, workings, alterations, modifications, changes and amendments of any of the foregoing, graphical or aural records or representations of any kind, including, without limitation, emails, texts, photographs, charts, microfiche, microfilm, videotape, records, motion pictures, and electronic, mechanical, or electrical records or representations of any kind, including, without limitation, tapes, cassettes, discs, and recordings, computer discs, computer tapes, computer cards, computer programs, computer software, computer readable media, machine sensible media, electronically stored media, and any other form of stored information.

19.     With respect to any document(s) which YOU withhold under a claim of privilege or otherwise, please provide a statement setting forth as to each of the following documents:

(a) the name and address of the sender of the document;

(b) the name and address of the author of the document;

(c) the name and address of the person to whom the document was addressed;

(d) the name(s) and address(es) of the person(s) to whom a copy of the document was addressed;

(e) the name(s) and address(es) of all persons known to YOU who have seen the document or participated in communications about the document;

(f) the job title of each person listed in (a) through (e) above;

(g) the date of the document;

(h) the date upon which the document was received by those having possession of the document;

(i) a brief description of the nature and subject matter of the document; and, the statute, rule, division or other basis which has been claimed to give rise to the privilege.

## SPECIAL INTERROGATORIES, SET ONE

**SPECIAL INTERROGATORY NO. 1:**

IDENTIFY all bank accounts held by YOU from January 1, 2020 to the present.

**SPECIAL INTERROGATORY NO. 2:**

IDENTIFY all brokerage accounts held by YOU from January 1, 2020 to the present.

**SPECIAL INTERROGATORY NO. 3:**

IDENTIFY all investment accounts held by YOU from January 1, 2020 to the present.

**SPECIAL INTERROGATORY NO. 4:**

IDENTIFY the date upon which the offering of membership interest in Urban Commons Battery Park, LLC was completed.

**SPECIAL INTERROGATORY NO. 5:**

IDENTIFY the date upon which Urban Commons Battery Park, LLC acquired the real property formerly known as The Ritz-Carlton New York, Battery Park, NY.

**SPECIAL INTERROGATORY NO. 6:**

State the price at which Urban Commons Battery Park, LLC acquired the real formerly known as The Ritz-Carlton New York, Battery Park, NY.

**SPECIAL INTERROGATORY NO. 7:**

IDENTIFY the number of investors (by first and last name, last known address

and telephone number, and last known email address) in Urban Commons Battery Park, LLC.

**SPECIAL INTERROGATORY NO. 8:**

IDENTIFY the date upon which the real property formerly known as The Ritz-Carlton New York, Battery Park, NY was sold to the Eagle Hospitality Trust.

**SPECIAL INTERROGATORY NO. 9:**

IDENTIFY the escrow account holding Plaintiff Ronald Christensen's investment funds in Urban Commons Battery Park, LLC.

**SPECIAL INTERROGATORY NO. 10:**

IDENTIFY the escrow account holding Plaintiff Ronald Christensen's investment funds in Urban Commons Battery Park, LLC.

**SPECIAL INTERROGATORY NO. 11:**

IDENTIFY all accounts holding Plaintiff Ronald Christensen's investment funds in Urban Commons Battery Park, LLC.

**SPECIAL INTERROGATORY NO. 12:**

IDENTIFY all positions held within Urban Commons, LLC.

**SPECIAL INTERROGATORY NO. 13:**

IDENTIFY all positions held within Urban Commons 6th Ave Seattle, LLC.

**SPECIAL INTERROGATORY NO. 14:**

IDENTIFY all positions held within Urban Commons Battery Park, LLC.

**SPECIAL INTERROGATORY NO. 15:**

IDENTIFY all positions held at Eagle Hospitality Trust.

**SPECIAL INTERROGATORY NO. 16:**

IDENTIFY all positions held at Eagle Hospitality Real Investment.

**SPECIAL INTERROGATORY NO. 17:**

IDENTIFY all positions held at Eagle Hospitality Business Trust.

**SPECIAL INTERROGATORY NO. 18:**

IDENTIFY all real property in which YOU AND/OR YOUR spouse AND/OR YOUR personal AND/OR family trust has held an interest in from October 1, 2019 to the present.

**SPECIAL INTERROGATORY NO. 19:**

IDENTIFY any and all off-shore financial institution accounts YOU AND/OR YOUR spouse AND/OR YOUR personal or family trust has held an interest in from October 1, 2019 to the present.

**SPECIAL INTERROGATORY NO. 20:**

IDENTIFY any and all off-shore real property in which YOU AND/OR YOUR spouse AND/OR YOUR personal or family trust has held an interest in from October 1, 2019 to the present.

**SPECIAL INTERROGATORY NO. 21:**

IDENTIFY any and all TRUSTS in which YOU are a trustee.

**SPECIAL INTERROGATORY NO. 22:**

IDENTIFY any and all TRUSTS in which YOU are a beneficiary.

**SPECIAL INTERROGATORY NO. 23:**

IDENTIFY any and all TRUSTS in which YOU are a trustor.

**SPECIAL INTERROGATORY NO. 24:**

IDENTIFY any and all assets YOU have disposed through a sale or otherwise between October 1, 2019 and the present.

**SPECIAL INTERROGATORY NO. 25:**

IDENTIFY any and all assets YOU have transferred to YOUR spouse between October 1, 2019 and the present.

**SPECIAL INTERROGATORY NO. 26:**

IDENTIFY any and all assets YOU have transferred to any third party, including but not limited to children, family members, trusts, or corporate entities, between October 1, 2019 and the present.

DATED:  April 16, 2021

GARCIA RAINEY BLANK & BOWERBANK LLP

By _____

NORMA V. GARCIA
JEFFREY M. BLANK
HUGO A. LOPEZ
Attorneys for Plaintiffs
Clifford A. Rosen, MD and Ronald Christensen, MD

PLAINTIFFS' SPECIAL INTERROGATORIES TO DEFENDANT HOWARD WU