1
GARCIA RAINEY BLANK & BOWERBANK LLP
    A LIMITED LIABILITY PARTNERSHIP
2
NORMA V. GARCIA, Cal. Bar No. 223512
ngarciaguillen@garciarainey.com
3
JEFFREY M. BLANK, Cal. Bar No. 217522
jblank@garciarainey.com
4
HUGO A. LOPEZ, Cal. Bar No. 315846
hlopez@garciarainey.com
5
695 Town Center Drive, Suite 700
Costa Mesa, CA 92626
6
Telephone:   (714) 382-7000
Facsimile:    (714) 784-0031
7

8
Attorneys for Plaintiffs
Clifford A. Rosen, MD and Ronald A. Christensen, MD.

9

10
UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

11

12

13
CLIFFORD A. ROSEN, an individual;
RONALD A. CHRISTENSEN, an
individual

14
                        Plaintiffs,

15
            vs.

16
URBAN COMMONS, LLC, a Delaware
Limited Liability Company; URBAN
COMMONS 6TH AVE SEATTLE, LLC, a
Delaware Limited Liability Company;

17

18
URBAN COMMONS BATTERY PARK,
LLC, a Delaware Limited Liability
Company; CHICAGO ANALYTIC

19
TRADING COMPANY, LLC, d/b/a
LITTLERIVER CAPITAL, LLC, a
Delaware Limited Liability Company;

20

21
DIGITAL CAPITAL MARKETS, LLC, a
Maryland Limited Liability Company;
TAYLOR WOODS, an individual;

22
HOWARD WU, an individual; C. BRIAN
EGNATZ, an individual; and DOES 1
through 10, inclusive

23

24
                        Defendants

25

26

27

28

**Case No.:** 8:20-cv-01973-JLS-DFM

**DECLARATION OF DR. RONALD A. CHRISTENSEN IN SUPPORT OF PLAINTIFFS' APPLICATION FOR RIGHT TO ATTACH ORDER, ORDER FOR ISSUANCE OF WRIT OF ATTACHMENT, AND REQUEST FOR AN ORDER PERMITTING EXPEDITED DISCOVERY**

Date:           May 14, 2021
Courtroom:  6B, 6th Floor
Judge:        Hon. Douglas F. McCormick

- 1 -

## DECLARATION OF DR. RONALD A. CHRISTENSEN

1.      I am an individual residing in Scottsdale, Arizona and named plaintiff in this action. I have personal knowledge of the facts set forth herein, which are known by me to be true and correct, and if called as a witness, I could and would competently testify thereto.

2.      This declaration is submitted in support of Plaintiffs' Application for Right to Attach Order, Order for Issuance of Writ of Attachment, And Request For An Ordering Permitting Expedited Discovery.

3.      Through this Application, I along with my co-plaintiff Clifford A. Rosen ("Dr. Rosen") seek to attach a sum equivalent to $750,000 against defendants Urban Commons, LLC ("Urban Commons"), Urban Commons 6th Ave Seattle, LLC ("UC Seattle"), Urban Commons Battery Park, LLC ("UC Battery Park"), Taylor Woods ("Woods"), and Howard Wu ("Wu"). This sum consists of my $250,000 investment in the purchase of a membership interest in UC Seattle, my $250,000 investment in in the purchase of a membership interest in UC Battery Park, and Dr. Rosen's $250,000 investment in the purchase of a membership interest in UC Seattle.

4.      Our rescission claim against Defendants arise out of Defendants' unlawful sale of unregistered, unqualified, and non-exempt securities (UC Seattle and UC Battery Park) in California. I am not seeking the attachment for any purpose other than to recover my $250,000 investment in UC Seattle and $250,000 investment in UC Battery Park related to my rescission claim. As Form CV-4D filed concurrently with the Application demonstrates, Plaintiffs, as to Urban Commons, UC Seattle, and UC Battery Park are only seeking to attach corporate property subject to attachment pursuant to subdivision (a) of the Code of Civil Procedure Section 487.010. As Form CV-4D and the accompanying attachment demonstrate, Plaintiffs, as to Woods and Wu, are only seeking to attach individual property subject to attachment pursuant to Section 487.010(c). (See Cal. Code Civ. Proc. § 487.010(c).)

5.      Additionally, the $500,000 investment amount owed to me is unsecured, by

- 2 -

1   real property or otherwise and to the best of my knowledge, the property I am seeking to

2   attach is not exempt from attachment.

3        6.     Also, as stated above, the amount to be secured by the attachment is greater

4   than zero as we are seeking to attach a sum equivalent to $750,000.00.

5

6   **INVESTMENT IN UC SEATTLE**

7        7.     In or about January 2020, defendants Urban Commons, Woods, and Wu

8   issued a private offering ("UC Seattle Offering") to investors, including myself and Dr.

9   Rosen seeking to raise Forty Million Dollars ($40,000,000) in membership interest in UC

10  Seattle, which is a single purpose limited liability company formed by Woods and Wu

11  that was to be used to purchase the Hilton Seattle Hotel, located at 1301 6th Avenue,

12  Seattle, Washington ("Hilton Seattle")

13       8.     As part of the UC Seattle Offering, on or about January 6, 2020, I received a

14  written correspondence from Woods on behalf of Urban Commons discussing Urban

15  Commons' "phenomenal track record" in its "value-add hospitality acquisitions and

16  dispositions." The correspondence also discussed Urban Commons' sponsorship of Eagle

17  Hospitality Trust ("EHT"), which is a U.S. hospitality-focused public REIT in Singapore.

18  The correspondence also discussed an "exciting investment opportunity" in the Hilton

19  Seattle and identified the following as key investment highlights: (i) up to $25MM of

20  equity available for investment, (ii) ownership will be based on $40MM of total equity in

21  the deal, (iii) expected duration of the investment 3-4 months, and (iv) cash on cash return

22  to investors targeted at 37%+ with targeted IRR at 100%+. Attached to the Appendix of

23  Exhibits as **Exhibit A** is a true and correct copy of the January 6, 2020 correspondence.

24       9.     As part of the UC Seattle Offering, I also received a document titled "Hilton

25  Seattle Hotel Investment Opportunity", which outlined in greater detail Urban Commons'

26  credentials and expertise in hospitality acquisitions as well as provided additional

27  information about the Hilton Seattle Hotel. Notably, the document stated that Urban

28  Commons had reached an agreement to purchase the Hilton Seattle for approximately

- 3 -

97.5MM and that upon sale of the Hilton Seattle, Urban Commons expected to achieve a 7.0% exit capitalization rate. Attached to the Appendix of Exhibits as **Exhibit B** is a true and correct copy of the document titled "Hilton Seattle Investment Opportunity."

10.    Prior to committing to investing in UC Seattle and in hopes of gaining a better understanding about Urban Commons, UC Seattle and the Hilton Seattle, I had several conversations with Woods and Engatz. In particular, on or about January 15, 2020, I along with Dr. Rosen had a telephone call with Woods and defendant Brian Egnatz ("Egnatz") about investing in UC Seattle. During the telephone call, Woods did most of the talking. Woods explained to us what Urban Commons was and did. Woods also explained to us the details of the purchase of the Hilton Seattle and discussed with us investing in UC Seattle.

11.    During the call, Woods explained that after the Hilton Seattle was purchased by UC Seattle, UC Seattle would hold the hotel property for about 3-4 months. Thereafter, UC Seattle **would sell the Hilton Seattle to EHT. During this call, Woods further stated that after fees and closing costs, there would be a 30% return on our investment**. Woods even represented that investing in UC Seattle was a "great deal" and that we would be "great additions" to the "family."

12.    Based on the representations contained in the offering materials for UC Seattle mentioned above as well as the numerous telephonic conversations with Woods and Egnatz and reliance on same, on or about January 17, 2020, I executed a Subscription Agreement ("UC Seattle Subscription Agreement") whereby I invested $250,000.00 in purchasing a membership interest in UC Seattle. I issued payment by wiring $250,000 to UC Seattle's Bank of America, NA bank account. My investment resulted in an ownership percentage of 0.625% in UC Seattle. That same day, via email correspondence, I provided Woods with a signed copy of the Subscription Agreement, the signature page of the Operating Agreement for Urban Commons and informed Woods that my $250,000 investment would be forthcoming today from Charles Schwab. Attached to the Appendix of Exhibits as **Exhibit I** is a true and correct copy of the UC Seattle Subscription

Agreement. Attached to the Appendix of Exhibits as **Exhibit J** is a true and correct copy of the Operating Agreement and attached to the Appendix of Exhibits as **Exhibit K** is a true and correct copy of my email correspondence to Woods on January 17, 2020.

13.     Notably, the UC Seattle Subscription Agreement executed between me and Urban Commons included the following representations:

- The Company ("UC Seattle") will not use or apply my $250,000 investment until UC Seattle has raised the necessary funds from the UC Seattle Offering;

- The funds raised from the UC Seattle Offering would be used to invest in an entity which would acquire, own, operate, and eventually sell the Hilton Seattle, located at 1301 6th Avenue, Seattle, Washington (the "Property");

- The purchase price would be deposited into an interest-bearing secure bank account;

- In the event the subscription was terminated, all funds raised by the Company would be returned to the to the applicable investors, together with any interest remaining on such funds following the payment of all costs and expenses; and

- The Company would obtain acquisition loans in an approximate aggregate amount of approximately Sixty Million Dollars ($60,000,000.00) in order to acquire and refurbish the Property.

14.     To date, Defendants have not provided any information or proof, despite repeated requests, that Defendants completed their offering for UC Seattle nor have Defendants provided any information or proof that they raised the $40,000,000 from the offering of membership interests in UC Seattle. Significantly, during the marketing and solicitation of investments in the membership interest of UC Seattle by Defendants, Woods represented to me that the UC Seattle Offering would be completed by March 2020 and that as of January 6, 2020, Defendants had already raised $25,000,000 from their offering of membership interests in UC Seattle and that Woods himself had personally invested $5,000,000 to $10,000,000. Based on all of this, it is my belief that Defendants never completed the UC Seattle Offering.

- 5 -

15.    To date, Defendants have not provided any information or proof, despite repeated requests, that Defendants obtained a financing commitment for the acquisition loans in an approximate aggregate amount of approximately $60,000,000.00 in order to acquire the Hilton Seattle nor have Defendants provided any information or proof that Defendants acquired and/or refurbished the Hilton Seattle. Based on all of this, it is my belief that Defendants never obtained the $60,000,000.00 financial commitment to acquire and/or refurbish the Hilton Seattle.

16.    To date, Defendants have not provided any information or proof, despite repeated requests, that my $250,000 investment is being held in a segregated interest-bearing escrow account in accordance with and as required by the UC Seattle Subscription Agreement. In fact, on multiple occasions I have requested from Defendants written proof that my $250,000 investment is in an interest-bearing escrow account, however, Defendants have failed and/or refused to provide any such proof. Thus, based on all of this, I do not believe that my $250,000 in UC Seattle is being held in an interest-bearing escrow account.

17.    **Importantly, Woods omitted the following critical and material facts from these conversations which would have impacted my decision to invest: (i) that the EHT had defaulted on its $340,000,000 facility loan with Bank of America only weeks before our call with Woods, (ii) that trading of the EAGLEHT units had been suspended on the Singapore Exchange, (iii) that there would be exposure to Singapore market fluctuations and risk and (iv) that the EHT was under investigation by the Monetary Authority of Singapore (MAS) and the Singapore Exchange for suspected breaches of disclosure requirements and breaches of regulations and listing rules. Significantly, had I been made aware of any of these material omissions by Woods or any of the Defendants at any point in the UC Seattle Offering, I would not have invested $250,000 in UC Seattle. After all, how could the EHT, which was financially insolvent, acquire the Seattle Hilton from UC Seattle 3-4 months after the hotel property was purchased if it lacked the financial means to do**

1    **so?**

2         18.    Likewise, but for the representations: (i) in Woods' January 6, 2020

3    correspondence, (ii) the "Hilton Seattle Investment Opportunity", (iii) made by Woods

4    and Egnatz during my conversations with them, and (iv) included in the UC Seattle

5    Subscription Agreement, I would not have invested in UC Seattle.

6

7                          **Investment In UC Battery Park**

8         19.    In or about February 2020, Defendants issued a private offering ("UC

9    Battery Park Offering") to investors, including myself, seeking to raise Seventy Million

10   Dollars ($70,000,000.) in membership interest in UC Battery Park. UC Battery Park is the

11   single purpose limited liability company Defendants formed and through which they were

12   supposedly going to purchase the Wagner Hotel (formerly known as the Ritz-Carlton

13   Battery Park).

14        20.    As part of the UC Battery Park Offering, on or about February 25, 2020, I

15   received a written correspondence from Woods which included an investment offering

16   memorandum for the acquisition of the Wagner Hotel. The correspondence touted the

17   investment opportunity as "significantly more compelling than most" and proclaimed that

18   "these kinds of NY opportunities are very rare." The written correspondence further stated

19   that Urban Commons had an opportunity to acquire the hotel for just $150MM, or $500k

20   per door, and "it needs only a moderate renovation. The correspondence also stated that

21   upon "stabilization our transaction implies an astounding 13%+ capitalization rate, and a

22   discount to market of as much as 50%" The correspondence closed by saying "an ultimate

23   sale of the property at capitalization rates typical for the type of asset and area would

24   bring a substantial windfall for investors." The accompanying Offering Memorandum

25   reiterated much of what was set out in the written correspondence and provided an

26   overview of The Wagner Hotel, its location and surrounding attractions and neighboring

27   competing hotels. Attached to the Appendix of Exhibits as **Exhibit L** is a true and correct

28   copy of the written correspondence and accompanying Offering Memorandum.

- 7 -

21.     On or about February 26, 2020 and prior to committing to investing in UC Battery Park, I had a call with Tina Ellis, who had put me in contact with Defendants regarding investing in UC Seattle and UC Battery Park and Egnatz regarding The Wagner. During the call, Egnatz stated that the investment period for The Wagner would be longer because there was more work and restructuring that needed to be done prior to acquisition. Egnatz also stated that the sale of The Wagner to UC Battery Park would take place in the fourth quarter of 2020. Just as it was supposed to be with my investment in UC Seattle, my investment in UC Battery Park, according to Egnatz, would also yield a 30% return on my investment and would also be sold to the EHT.

22.     During the marketing and solicitation of investments in UC Battery Park, Egnatz also explained to me his relationship with Urban Commons, Urban Commons' inner workings, and Urban Commons' relationship Eagle Hospitality Trust. Via written correspondence, Egnatz explained that for the purchase and/or acquisition of properties, Urban Commons creates a single purpose LLC that owns the liquor license, labor contracts, facilities. Egnatz further explained that the purchased property is simultaneously underwritten for Urban Commons and Eagle Hospitality Trust's ownership thereby reducing the holding period between Urban Commons' ownership and the sale to Eagle Hospitality Trust. Egnatz also explained that the net returns were significant to the investor and repeatable as properties were added and grew. Lastly, Egnatz explained that in the end, the single purpose LLC is sold to EHT and becomes part of the EAGLEHT portfolio. Attached to the Appendix of Exhibits as **Exhibit M** is a true and correct copy of the Egnatz correspondence.

23.     Based on the representations contained in the offering materials for UC Battery Park mentioned above as well my telephonic conversation with Egnatz and reliance on same, on or about February 27, 2020, I executed a Subscription Agreement ("UC Battery Park Subscription Agreement") whereby I invested $250,000.00 in purchasing a membership interest in UC Battery Park. I issued payment by wiring $250,000 to UC Battery Park's  Wells Fargo, NA bank account. My investment resulted

in an ownership percentage of 0.357% in UC Battery Park. Attached to the Appendix of Exhibits as **Exhibit N** is a true and correct copy of the UC Battery Park Subscription Agreement. Attached to the Appendix of Exhibits as **Exhibit O** is a true and correct copy of the Operating Agreement.

24.    Notably, the UC Battery Park Subscription Agreement executed between Urban Commons and I included many of the same misrepresentations as the UC Seattle Subscription, including the following representations:

25.    The Company ("UC Battery Park") will not use or apply my $250,000 investment until UC Battery Park has raised the necessary funds from the UC Battery Park Offering;

26.    The funds raised from the UC Battery Park Offering would be used to invest in an entity which would acquire, own, operate, and eventually sell the property formerly known as The Ritz-Carlton New York, Battery Park, NY (the "Property");

27.    The purchase price would be deposited into an interest-bearing secure bank account;

28.    In the event the subscription was terminated, all funds raised by the Company would be returned to the to the applicable investors, together with any interest remaining on such funds following the payment of all costs and expenses; and

29.    The Company would obtain acquisition loans in an approximate aggregate amount of approximately One Hundred Million Dollars ($100,000,000.00) in order to acquire the Property.

30.    Remarkably, despite being told by Defendants that my $250,000 investment would be added to the rest of the funds raised by UC Battery Park to purchase the Wagner Hotel, through discovery in this action, I recently learned that at the time I made my $250,000 investment, Defendants had already purchased the Wagner Hotel. Importantly, at no point in time during the marketing and solicitation of investments in UC Battery Park did Defendants disclose that the acquisition of the Wagner Hotel was completed.

31.    To date, Defendants have not provided any information or proof, despite

- 9 -

repeated requests of where my $250,000 investment is being held. In fact, on multiple occasions, I have requested from Defendants written proof evidencing where my $250,000 investment is being held, however, Defendants have failed and/or refused to provide any such proof.

32.   **Importantly, Woods and Egnatz omitted the following critical facts from these conversations which would have impacted my decision to invest: (i) that the EHT had defaulted on its $340,000,000 facility loan with Bank of America only weeks before our call with Woods, (ii) that trading of the EAGLEHT units had been suspended on the Singapore Exchange, (iii) that there would be exposure to Singapore market fluctuations and risk and (iv) that the EHT was under investigation by the Monetary Authority of Singapore (MAS) and the Singapore Exchange for suspected breaches of disclosure requirements and breaches of regulations and listing rules. Significantly, had I been made aware of any of these material omissions by Woods, Egnatz, or any of the Defendants at any point in the UC Battery Park Offering, I would not have invested $250,000 in UC Battery Park. After all, how could the EHT, which was financially insolvent, acquire the Wagner Hotel from UC Battery Park 3-4 months after the hotel property was purchased if it lacked the financial means to do so? Significantly, had I been made aware of any of these material omissions by Woods, Egnatz, or any of the Defendants at any point in the UC Seattle Offering and/or the UC Battery Park Offering , I would not have invested $250,000 in UC Seattle and another $250,000 in UC Battery Park.**

**Inquiries Into The Status Of My Investments And Defendants' Evasiveness And Lack Of Cooperation Regarding Same**

33.   On or about April 2020, not having heard anything from Defendants regarding UC Seattle and UC Battery Park, I reached out to Tina Ellis, who had put me in contact with Defendants regarding investing in UC Seattle and UC Battery Park. During my conversation with Ms. Ellis, I had a lot of questions regarding both of my investments.

In particular, I had questions about: (i) whether the UC Seattle Offering had been completed, (ii) whether UC Seattle had purchased the Hilton Seattle, and (iii) the EHT and its ability to buy the Seattle Hilton from UC Seattle. The questions I had for Ms. Ellis are memorialized in a written correspondence dated April 28, 2020 that Ms. Ellis sent directly to Woods. Attached to the Appendix of Exhibits as **Exhibit P** is a true and correct copy of Ms. Ellis's written correspondence.

34.     By May 2020, with neither UC Seattle nor UC Battery Park having completed their offerings nor having obtained their respective $60,000,000 and $100,000,000 financing commitments, I sought to rescind the purchase of my membership interest in both UC Seattle and UC Battery Park and demanded remittance of my $500,000 investment in same. More specifically, on or about May 17, 2020, my then attorney Mark R. Riley, provided Defendants written notice of my rescission of membership interest in UC Seattle and UC Battery Park and demanded that Defendants remit $750,000 which represented my $500,000 investment in UC Seattle and UC Battery Park and Dr. Rosen's $250,000 investment in UC Seattle. The notice gave Defendants until Friday, May 22, 2020 to reimburse the entire sum. Notably, the notice also outlined the myriad of misrepresentations and omissions of material facts concerning Defendants, including, but not limited to EHT's default on a $341 million facility loan.

35.     Unfortunately, May 22, 2020 came and went and Defendants failed to reimburse our investment sum. Accordingly, on or about June 6, 2020, Mr. Riley on my behalf and on behalf of Dr. Rosen sent then counsel for Defendants Mark S. Adams a Demand for Inspection of Books and Records for UC Seattle.

36.     On or about June 19, 2020, Defendants produced 282 bates stamped documents made up of 11,966 pages. Shockingly, the documents produced by Defendants were not responsive to our demands. Thus, on June 21, 2020, Mr. Riley sent written correspondence to Mark S. Adams, who was Defendants' counsel at the time, outlining the lack of compliance and deficiencies in Defendants' document production. Importantly, the written correspondence outlined how not a single page was produced evidencing that:

(i) neither I nor Dr. Rosen were members in UC Seattle, (ii) the 2020 offering of membership interests occurred, (iii) my investment funds were deposited into an interest-bearing secure bank account; (iv) my initial membership interest was not reflected in the Operating Agreement, (v) UC Seattle completed its offering and raised the necessary $40 million from its offering of membership interests, (vi) UC Seattle obtained the $60 million financing commitment, and (vii) UC Battery Park completed its offering and raised the necessary funds of $70 million from its offering of membership interests.

37.     Subsequently, on or about June 30, 2020, Mr. Riley also sent written notice to defendant Egnatz once again rescinding my membership interest in UC Seattle and UC Battery Park and demanding remittance of $750,000, which consisted of my $250,000 each in UC Seattle and UC Battery Park and Dr. Rosen's $250,000 investment in UC Seattle. The Notice gave Egnatz until Friday, July 20, 2020 to remit payment of the total sum owed. However, Egnatz did not remit payment on July 20, 2020 or any time thereafter.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.


Executed on April __15__, 2021 at Scottsdale, Arizona.


_Ronald A. Christensen_
Ronald A. Christensen

DECLARATION OF DR. RONALD A. CHRISTENSEN IN SUPPORT OF PLAINTIFFS' APPLICATION FOR WRIT OF ATTACHMENT